UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

MICHAEL D. COHEN                                    :

               Plaintiff,                   :

     -v.-                                           :

UNITED STATES OF AMERICA,                 :

             Defendant.                :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

**THE GOVERNMENT'S OPPOSITION TO MICHAEL COHEN'S MOTION FOR A
TEMPORARY RESTRAINING ORDER**

 

ROBERT S. KHUZAMI
Attorney for the United States,
Acting Under Authority Conferred
by 28 U.S.C. § 515
Southern District of New York
One St. Andrew's Plaza
New York, New York 10007

Thomas McKay
Rachel Maimin
Nicolas Roos
Assistant United States Attorneys
     -Of Counsel-

## PRELIMINARY STATEMENT

On April 9, 2018, agents from the New York field office of the Federal Bureau of Investigation ("FBI") executed search warrants for Michael Cohen's residence, hotel room, office, safety deposit box, and electronic devices.  The searches were authorized by a federal magistrate judge, who had found probable cause to believe that the premises and devices searched contained evidence, fruits, and instrumentalities of conduct for which Cohen is under criminal investigation, namely ███████████████████████████████████████ ██████████████████.

Cohen now seeks the extraordinary remedy of preventing the United States Attorney's Office for the Southern District of New York ("USAO-SDNY") from reviewing lawfully-obtained evidence of Cohen's alleged criminal conduct, and asks that, instead, *defense counsel* be permitted to review the materials in the first instance and produce to the USAO-SDNY what defense counsel deems to be "responsive, non-privileged items."  This request is unprecedented and is not supported by case law in this Circuit, which has repeatedly found that the government's use of a filter team appropriately protects applicable privileges.  Cohen's alternative request for the appointment of a special master should likewise be denied.  It is premised on a wholly distinguishable case involving a search of the law offices of a practicing criminal defense attorney, who shared an office with other criminal defense attorneys, in the district in which the attorney was being prosecuted.  Here, Cohen is not a criminal defense attorney, has no cases with the USAO-SDNY, and is being investigated for criminal conduct that largely centers on his personal business dealings.  Based on information gathered in the investigation to date, the USAO-SDNY and FBI have reason to believe that Cohen has exceedingly few clients and a low volume of potentially privileged communications.

1

Moreover, although Cohen's claims are founded on his expressed concern that attorney-client privilege will be undermined, he nevertheless asks for far broader relief:  He asks to also be the first to make the determination of whether a document is *responsive* to the search warrant. That request for relief, which bears no relation to the claimed justification, belies the true intent of his motion:  To delay the case and deprive the USAO-SDNY of evidence to which it is entitled.

To be sure, searches of premises belonging to an attorney raise special concerns, which impose a need for heightened care, due to the fact that such premises may contain privileged material.  But there can be no dispute that attorneys, like anyone else, may be criminally investigated for their conduct, and that law enforcement officials may search an attorney's law office – or other premises – "pursuant to a valid warrant that is supported by probable cause that an attorney has been engaging in criminal activity and that the law offices in question contain evidence of this suspected wrongdoing."  *United States v. Stewart*, No. 02 Cr. 396 (JGK), 2002 WL 1300059, at *3 (S.D.N.Y. June 11, 2002).  That is what happened here:  A federal magistrate judge found that there was probable cause to believe that Cohen's premises and devices contained evidence, fruits and instrumentalities that specified federal crimes were committed. Despite Cohen's conclusory claims to the contrary, there is nothing inappropriate about the execution of these warrants.

The USAO-SDNY and FBI take seriously the obligation to respect attorney-client privilege.  That is why the search warrants in question expressly provide that review of the seized material "shall be conducted pursuant to established procedures designed to collect evidence in a manner reasonably designed to protect any attorney-client or other applicable privilege."  As set forth below, the USAO-SDNY and FBI have established rigorous protocols –

consistent with common practice in this District – to ensure that the attorney-client privilege is respected.  Furthermore, the USAO-SDNY and FBI have invited Cohen to offer suggestions as to the USAO's review process and to provide a list of Cohen's clients and his own attorneys, to facilitate the initial segregation of potentially-privileged materials for review (which invitation has thus far been ignored).  These protocols are more than sufficient to protect any privileged materials that may have been seized.  Cohen's motion should be denied.

## I.    FACTUAL BACKGROUND

As noted, on April 9, 2018, the FBI executed search warrants for Cohen's residence, hotel room, office, safety deposit box, and two cell phones.  Each warrant was supported by a detailed affidavit, and authorized by a federal magistrate judge, who found probable cause to believe that the subject premises and devices contained evidence of ██████████████

████████████████████████████████████████████████

██████████████████████████

These searches were carried out as part of an ongoing grand jury investigation being conducted by the USAO-SDNY and the FBI.[1]  Unlike in this case, challenges to search warrants typically occur after charges have been filed; consequently, facts that are normally set forth in a charging document are not available to the Court in this case.  For that same reason, the USAO-SDNY is constrained from disclosing certain facts that would provide the Court with a more

---

[1] Although Cohen accurately states that the Special Counsel's Office ("SCO") referred this investigation to the USAO-SDNY, the investigation has proceeded independent from the SCO's investigation.  Cohen's speculation, *see* Br. at 10, that the SCO drafted the search warrants is unfounded.  The date in the bottom corner of the attachments is the date that the USAO-SDNY's standard form search warrant rider was most recently updated for use by the office.

complete factual background.[2]  But the riders to the search warrants – copies of which have been

provided to Cohen – identify the federal criminal statutes under which Cohen is being

investigated.

Although Cohen is an attorney, he also has several other business interests and sources of

income.  The searches are the result of a months-long investigation into Cohen, and seek

evidence of crimes, many of which have nothing to do with his work as an attorney, but rather

relate to Cohen's own business dealings.  As set forth below, unlike a search of a traditional law

office, the information gathered thus far in the investigation suggests that the overwhelming

majority of evidence seized during the searches will not be privileged material, but rather will

relate to Cohen's business dealings.

Nevertheless, because Cohen holds himself out as a practicing attorney, each of the

search warrants contains the following provision:

> Additionally, review of the items described in this Attachment shall be conducted pursuant
> to established procedures designed to collect evidence in a manner reasonably designed to
> protect any attorney-client or other applicable privilege. When appropriate, the procedures
> shall include use of a designated "filter team," separate and apart from the investigative
> team, in order to address potential privileges.

The FBI agents who seized materials pursuant to the search warrants were filter agents

who are not part of the investigative team and have been walled off from those AUSAs or FBI

personnel assigned to the investigation (the "Investigative Team").

Moreover, before seeking and obtaining the search warrants, the USAO-SDNY consulted

with the Department of Justice's Office of Enforcement Operations, consistent with the guidance

provided by the United States Attorney's Manual.  As a part of that consultation, the USAO-

---

[2] To the extent the Court has specific factual questions, the Government is prepared to
provide additional information to the Court on an *ex parte* basis, including the affidavit that
formed the basis for the search warrants.

SDNY developed a set of instructions for a team of walled-off AUSAs (the "Filter Team"), which has been tasked with reviewing the materials seized pursuant to the search warrants in the first instance to identify documents that are subject to the attorney-client privilege (and any other applicable privilege).

The Filter Team is composed of AUSAs who have had, and will have, no involvement in the investigation. The Filter Team is prohibited from disclosing, directly or indirectly, the substance of any material under its review to the Investigative Team, unless and until the Filter Team has determined that the material is not privileged.

As an initial matter, the Filter Team will review and release communications to the Investigative Team between Cohen and persons with whom Cohen undisputedly does not have an attorney-client relationship.[3] Based on the information presently known to the USAO, the Investigative Team has compiled a list of individuals and entities relevant to the investigation with whom Cohen undisputedly does *not* have an attorney-client relationship. (The USAO-SDNY has asked Cohen's counsel to provide a list of Cohen's clients and attorneys, but that invitation has thus far been ignored.) To the extent there are any remaining potentially privileged documents—*i.e.*, any communications between Cohen and clients known or believed to have been represented by Cohen, any communications between Cohen and an identified

---

[3] The attorney-client privilege protects from disclosure "confidential communications that pass in the course of professional employment from client to lawyer." *United States v. Schwimmer*, 892 F.2d 237, 243 (2d Cir. 1989). The privilege does not attach to communications between two or more persons that do not enjoy an attorney-client relationship. *Id.* Additionally, it is settled that even where an attorney-client relationship does exist, disclosure of a privileged communication to a third party waives privilege as to that communication. *See Schaeffler v. United States*, 806 F.3d 34, 40 (2d Cir. 2015) (privilege "is generally waived by voluntary disclosure of the [privileged] communication to another party"); *In re Horowitz*, 482 F.2d at 81 ("subsequent disclosure to a third party by the party of a communication with his attorney eliminates whatever privilege the communication may have originally possessed").

attorney or law firm known or believed to have represented Cohen—the Filter Team will review them to determine whether the material is: (1) not privileged, (2) potentially privileged, (3) requires redaction, and/or (4) potentially meets an applicable exception (for example, the crime-fraud exception).

To be clear, under no circumstances will a potentially privileged document or a document potentially subject to the crime-fraud exception be provided to or described to the Investigative Team without the consent of the privilege holder or his/her counsel, or the court's approval. If the Filter Team is unable to clarify a document's category, or if there is an exception to the privilege that applies to particular material, such as the crime-fraud exception, or any waiver of the privilege – the Filter Team will (1) confer with counsel for the privilege holder at the appropriate time and before any such material is shared with the Investigative Team and, if no agreement can be reached, submit the material under seal to an appropriate court for a determination as to whether the material is privileged; (2) bring the document to a court for resolution, including by seeking an *ex parte* determination if appropriate; *or* (3) if the document is of obviously minimal probative value, place the document into the "Privileged" category as a means of efficiently completing the review.

## II.    JURISDICTION & STANDARD OF REVIEW

Cohen contends that his pre-indictment claim is akin to a motion to return property seized by the government, which, in the pre-indictment context, should be treated as a "civil equitable proceeding." (Br. 12). But courts in this District have recognized that this is an "anamolous" form of jurisdiction, which "is to be exercised with great restraint and caution, since it rests upon the Court's supervisory powers over the actions of federal law enforcement officials." *United States v. Padilla*, 151 F.R.D. 232, 234 (W.D.N.Y. 1992); *see also Fifth Ave. Peace Parade*

*Committee v. Hoover*, 327 F. Sup. 238, 242 (S.D.N.Y. 1971) ("such jurisdiction is to be exercised with great restraint and caution since it rests upon the court's supervisory power over the actions of federal law enforcement officials").  Under this standard, courts have declined to exercise such jurisdiction where "it is far from clear that Plaintiffs' Fourth Amendment rights were infringed," *id.*, and have declined to grant relief where the government took care in the execution of the search, *see National City Trading Corp. v. United States*, 635 F.2d 1020, 1026 (2d Cir. 1980).

To the extent the typical standard for a temporary restraining order applies in this unique context, "[i]t is well established that in this Circuit the standard for an entry of a TRO is the same as for a preliminary injunction."  *Andino v. Fischer*, 555 F. Supp. 2d 418, 419 (S.D.N.Y. 2008). "Generally, to obtain a preliminary injunction, a party must demonstrate (1) irreparable harm in the absence of the injunction and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair grounds for litigation and a balance of hardships tipping decidedly in the movant's favor."  *Id.* (quotation omitted).

## III.   THE PROPOSED USE OF A FILTER TEAM IS APPROPRIATE

### 1.  <u>The Use of a Filter Team is Common Procedure in This District</u>

The use of a designated filter team, like the one in place here, is a "common procedure" in this District.  *United States v. Ceglia*, 2015 WL 1499194, at *1 (S.D.N.Y. Mar. 30, 2015); *see also United States v. Patel*, No. 16 Cr. 798 (KBF), 2017 WL 3394607, at *7 (S.D.N.Y. Aug. 8, 2017) (noting government use of wall review team as evidence of good faith); *United States v. Lumiere*, No. 16 Cr. 483, 2016 WL 7188149, at *7 (S.D.N.Y. Nov. 29, 2016) (noting proposed use of wall review team); *SEC v. Lek Secs. Corp.*, 17 Civ. 1879 (DLC), 2018 WL 417596, at *4 (S.D.N.Y. Jan. 16, 2018) (SEC's use of filter team "reflects respect for the privilege").  Indeed,

the USAO-SDNY currently has numerous pending cases in which it is employing the use of a

filter team to screen for potentially privileged material.  This common procedure is sufficient for

this case.

Moreover, courts in this District have approved the use of Filter Teams over the objection

of defendants, including in cases in which the defendants have sought the appointment of a

special master.  For example, in *United States v. Winters*, No. 06 Cr. 54 (SWK), 2006 WL

2789864 (S.D.N.Y. Sept. 27, 2006), the court specifically found that the USAO-SDNY's

proposed use of a "'wall Assistant' adequately protects the defendant's asserted privilege."  *Id.* at

*2.  While recognizing the importance of the attorney-client privilege, the court found that it

must be "balanced against competing public policies, including the public's interest in the

enforcement of criminal law."  *Id.* at *2.  The court explained that the defendant's proposal for in

camera review did not "adequately account for society's interest in the enforcement of its

criminal law," because:

> [t]he documents in question were gathered during the execution of a search warrant whose
> lawfulness and manner of execution have not, to this point, been challenged. The
> Government, having lawfully conducted the initial seizure of evidence, possesses a strong
> interest in prosecuting crimes revealed by the same. In order to fully advance this interest,
> members of a Government privilege team should be permitted to review all allegedly
> privileged documents. Only in this manner can the privilege team acquire information
> necessary to challenge assertions of privilege.

*Id.* at *2.  The same reasoning applies fully in this case.  The searches were conducted pursuant

to judicially authorized warrants.  The lawfulness and manner of execution have not been

seriously challenged.[4]  And the USAO-SDNY and FBI should be permitted to review documents they lawfully obtained so long as the Filter Team has screened out privileged documents.

This last point bears particular relevance in this case, in which Cohen proposes (as his primary argument) not that a neutral third party conduct the initial review of the seized materials, but that *Cohen's own counsel* conduct the initial review, including for responsiveness.  Such a procedure would stymie the USAO-SDNY's investigation and block lawful evidence gathering in accordance with the Government's judicially-approved Rule 41 search authority.  Moreover, under such a procedure, Cohen's claims of privilege would likely be "generous."  Already in his brief to this Court, Cohen's makes overbroad privilege claims.  For example, as described below, Cohen makes claims about his purported privileged communications involving a law firm (with which he had a "strategic relationship"), which are inconsistent with the facts we know about his actual relationship with that firm.  In addition, the USAO-SDNY has already received correspondence from counsel for the Trump Organization (Cohen's former employer), which referenced the searches conducted of Cohen's premises and claimed:

> We consider *each and every communication by, between or amongst* Mr. Cohen and the Trump Organization and each of its officers, directors and employees, to be subject to and protected by the attorney- client privilege and/or the work-product privilege.

(emphasis added)).

In the face of inaccurate and/or overbroad claims of privilege, the USAO-SDNY would be seriously prejudiced if it were not able, through a Filter Team, to evaluate the validity of such claims.  As Judge Barbara Jones explained in permitting review by a filter

---

[4] Cohen himself told a CNN journalist that the FBI agents who conducted the searches "were all extremely professional, courteous and respectful."  Don Lemon, *Michael Cohen to CNN: FBI Was 'Professional, Courteous, Respectful' In Raids, Counter to Trump's Depiction*, CNN (Apr. 10, 2018), https://www.cnn.com/2018/04/10/politics/michael-cohen-fbi-raid/index.html.

team, "[w]ithout the benefit of such a review, the privilege team would likely be unable to argue, for example, that no attorney-client privilege attached to the communication because of the crime-fraud exception, or that a document should be available for use at trial, regardless of work-product contents, because of necessity and unavailability by other means." *United States v. Grant*, No. 04 Cr. 207 (BSJ), 2004 WL 1171258, at *2 (S.D.N.Y. May 25, 2004); *see also Winters*, 2006 WL 2789864, at *2.

This Court should follow the common procedure in this District and permit the use of a Filter Team.

### 2. **Cohen's Attempts to Distinguish This Case Are Inaccurate**

Cohen makes several attempts to argue that the facts of this case somehow warrant a variance from this common approach, but none is persuasive.

Cohen claims that the materials seized include "thousands of privileged documents and communications related to numerous clients of Mr. Cohen, as well as Mr. Cohen's privileged communications with his own attorneys." (Br. 2). Although the USAO-SDNY and FBI have not yet reviewed the seized materials, there is considerable reason to doubt that assertion. As an initial matter, as set forth above, the USAO-SDNY's investigation relates in significant part to Cohen's personal business dealings and finances. Moreover, it is neither apparent (i) that Cohen, in his capacity as an attorney, has many, or any, attorney-client relationships *other than* with President Donald Trump (indeed, he does not specifically identify any in his motion and thus far has refused to identify any to the USAO-SDNY), nor (ii) that the seized communications will

include a significant volume of communications with that one identified client.  This is so for several reasons.

*First*, Cohen's claim that he has confidential communications with multiple clients appears to be exaggerated.  For example, Cohen has told at least one witness that he has only client – President Trump.[5]

*Second*, Cohen's claim to have privileged communicatons through a law firm that he describes as "Law Firm-1" omits facts about his relationship with Law Firm-1 that render it unlikely that a significant volume of attorney-client privileged material – if any – was seized in connection with Cohen's relationship with that law firm.  Specifically, on or about March 1, 2017, Cohen—through his wholly-owned entity, Michael D. Cohen & Associates P.C.—entered into a "Strategic Alliance Agreement" with the law firm (the "Agreement").[6]  Among other things, the Agreement provided that Cohen would receive a $500,000 annual "strategic alliance fee" from the law firm.  Under certain circumstances, Cohen would also receive a percentage of the fees charged by the law firm for clients introduced to the law firm by Cohen. The Agreement also spelled out other aspects of the relationship between Cohen and the law firm, including: (1) Cohen would be given an office at the law firm; (2) Cohen would maintain his own computer server system *not connected to the law firm's computer server system*; and (3) *the law firm would*

---

[5] And there is reason to doubt that even communications with his only publicly identified client regarding payments to Stephanie Clifford, who is also known as Stormy Daniels, would be protected by attorney-client privilege.  Among other things, President Trump has publicly denied knowing that Cohen paid Clifford, and suggested to reporters that they had to "ask Michael" about the payment.  *See* Kevin Liptak, *Trump Says He Didn't Know About Stormy Daniels Payment,* CNN.com (Apr. 6, 2018), https://www.cnn.com/2018/04/05/politics/donald-trump-stormy-daniels/index.html.

[6] Written notice of termination by the law firm was made to Cohen on or about March 2, 2018, although oral discussion of termination preceded that date.

*not have a key to Cohen's office.*  In addition, based upon conversations with a representative of the law firm, the USAO-SDNY understands as follows, in substance and in part: (1) Cohen did not have an email address associated with the firm; (2) Cohen did not have access to the firm's shared drives or document systems—and vice versa; (3) Cohen's documents were to be kept in a locked filing cabinet; and (4) Cohen did not have access to any of the firm's client files.

A representative of the firm also advised, in substance and in part, that for the duration of the Agreement, Cohen introduced a sum total of five clients to the firm (the "Five Clients"). Cohen did not maintain timesheets at the law firm and Cohen did not bill any clients through the law firm. Thus, the law firm is not aware one way or another whether Cohen billed any of the Five Clients for services of any kind.

Cohen was not an employee or partner of the law firm and, according to the law firm's representative, maintained complete independence from the firm.  To be sure, it is possible that Cohen was copied on certain attorney-client privileged communications relating to clients of the firm.  But to the extent such documents exist, it is likely – given the relatively short duration of the Agreement, the limited number of clients involved, and the utterly segregated nature of Cohen's relationship with the firm, both electronically and otherwise – that the number of such communications is small.

*Third,* ██████████████████████████████████ ██████████████████████████████████████████ ██████████████████, further belying the notion that Cohen is currently engaged in any significant practice of law.

*Fourth*, the USAO-SDNY has specific reason to doubt that the seized materials will include the volume and nature of attorney-client communications that Cohen claims.  This is

because the USAO-SDNY has already obtained search warrants – covert until this point – on multiple different email accounts maintained by Cohen, and has conducted a privilege review of the materials obtained pursuant to those warrants.  The results of that review, as resported by the USAO's Filter Team, indicate that Cohen is in fact performing little to no legal work, and that *zero* emails were exchanged with President Trump.

Cohen next relies on the United States Attorney's Manual ("USAM") for the argument that search warrants should not have been executed here, and that a Special Master should be appointed.  That reliance is misplaced, and the conclusions Cohen draws from the USAM are wrong.  As a preliminary matter, it is well settled that the USAM "is not intended to, does not, and may not be relied upon to create any rights, substantive or procedural, that are enforceable at law by any party in any matter, civil or criminal."  USAM § 1-1.100; *see also United States v. Piervinanzi*, 23 F.3d 670, 682 (2d Cir. 1994) (USAM "guidelines . . . provide no substantive rights to criminal defendants"); *United States v. Ohle*, 678 F. Supp. 2d 215, 233 (S.D.N.Y. 2010) ("the Second Circuit has held that the provisions of the USAM reflect executive branch policy judgments and do not confer substantive rights on any party") (quotations and citations omitted).

Moreover, not only is Cohen's reliance on the USAM misplaced, but he invokes the wrong section.  Cohen cites to section 9-19.220 of the USAM, which, as Cohen points out, applies to "attorneys who are not suspects" of a criminal investigations.  *See* Br. at 22; USAM § 9-19.220 (noting the procedure to be followed when privileged materials are sought from a "disinterested third party").  Cohen, however, is not the disinterested third party contemplated by the USAM.  The applicable provision is that which applies when the attorney is a "suspect, subject or target" of the investigation.  As a result, as the USAM observes, "[t]here are occasions when effective law enforcement may require the issuance of a search warrant for the premises of

an attorney *who is a subject of an investigation*, and who also is or may be engaged in the practice of law on behalf of clients."  USAM § 9-13.420 (emphasis added).  This was such an occasion, and the USAO-SDNY followed the applicable guidelines in the USAM for the search of premises of a subject attorney by, among other things, consulting with the Department of Justice's Office of Enforcement Operations, implementing safeguard procedures in the warrant and during the execution of searches, and considering and rejecting "less intrusive means."  *Id.*

The USAO-SDNY had good cause to execute search warrants at Cohen's premises and seize certain electronic devices, in lieu of "less intrusive means."  *Id.* ███████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████ Accordingly, the nature of the USAO-SDNY's investigation and the nature of the offenses—which sound in fraud and evidence a lack of truthfulness—weighed heavily in favor of the USAO-SDNY's decision to execute search warrants.  Furthermore, in the course of its investigation, the USAO-SDNY has learned that

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████ As a result, absent a search warrant, these records could have been deleted without record, and without recourse for the law enforcement.[7]

---

[7] The service of a subpoena also necessarily implicates the Fifth Amendment's act-of-production privilege.  "[A]lthough the Fifth Amendment may protect an individual from complying with a subpoena for the production of his personal records in his possession because

That Cohen cites to his purported cooperation with Congressional investigations does not alter that conclusion.  It appears that Cohen was not a target of those investigations. Additionally, while Cohen claims in his motion to have been cooperative, he offers no support for this assertion.  Publicly, Cohen suggested the opposite, telling *Time Magazine* that he declined a voluntary request from Congress because it was "too broad."  *See* Alana Abramson, *House Intelligence Committee Issues Subpoenas for Michael Cohen and Michael Flynn*, Time (May 31, 2017), https://www.cnn.com/2018/04/10/politics/michael-cohen-fbi-raid/index.html.

Cohen also states that the SCO "had requested that the Trump Organization produce all of Mr. Cohen's communications that were within the Trump Organization's custody, possession, or control," and that Cohen objected "on the grounds that [the request] called for production of privileged communications, among other things." (Br. 8-9).  Although in the ordinary course, the USAO-SDNY would not comment on investigative requests or demands made to third parties, particularly those from a separate office undertaking its own, independent investigation, in light of the representations made by Cohen's counsel, USAO-SDNY contacted the SCO about these representations and understands they are not accurate.  In particular, the SCO did not request that the Trump Organization produce "all communications" by Cohen in the Trump Organization's

---

the very act of production may constitute a compulsory authentication of incriminating information, a seizure of the same materials by law enforcement officers differs in a crucial respect [that] the individual against whom the search is directed is not required to aid in the discovery, production, or authentication of incriminating evidence."  *Andresen v. Maryland*, 427 U.S. 463, 473-74 (1976).  Had the USAO-SDNY served Cohen with a subpoena, he may have been entitled to asset a Fifth Amendment objection to compliance.  Indeed, in civil litigation involving Cohen, he has invoked the Fifth Amendment to obtain a stay.  *See* David Voreacos, *Trump Lawyer Cohen Says He Intends to Seek Halt to Stormy Daniels Case*, Bloomberg (Apr. 12, 2018), https://www.bloomberg.com/news/articles/2018-04-12/trump-lawyer-cohen-intends-to-seek-halt-to-stormy-daniels-case.  Cohen has given no indication of how he would have responded to a grand jury subpoena, but to the extent his response would have been consistent with his recent filing in the civil litigation, it is an additional reason why service of a subpoena would have been futile.

possession or control irrespective of subject matter or privilege.  Indeed, the request made by the

SCO was considerably narrower, and specifically omitted, among other things, any documents

that were protected by privilege or of a purely personal nature.  Cohen nonetheless objected to

that request for documents and, after discussions between Cohen's counsel and the SCO, the

SCO decided not to seek production at that time.  That Cohen sought to preclude the Trump

Organization from producing these third party communications belies both (i) his general

assertion of cooperation, and (ii) his stated principal interest in protecting attorney-client

communications.  Indeed, a careful review of Cohen's motion papers reveals that he does not

purport to have personally produced any documents to the SCO.

*Lastly*, Cohen argues that the USAM suggests that a special master should be appointed

here.  As discussed below, the appointment of a special master is neither required nor appropriate

in these circumstances.  The USAM does not alter that analysis.  It merely lists a special master,

along with, notably, "a privilege team," as one possible reviewer of potentially privileged

material.  *See* USAM § 9-13.420(F).  There is nothing in the USAM that expresses a preference

for review of potentially privileged material by a special master, or that indicates that use of a

special master is necessary here.

### 3. Cohen Offers No Support for His Request to View the Seized Materials First

Cohen advances the novel proposition, without any precedent or legal basis, that Cohen's

own counsel should undertake the initial review of the returns of lawfully executed search

warrants.  The USAO is aware of no precedent for such an unconventional practice.  This Court

should not accept Cohen's invitation to make new law and convert a duly authorized search warrant into a subpoena.

The two cases Cohen cites do not support his proposed approach.  One, a case from the District of Kansas, involved a motion *for the return of property* seized during a search warrant. The court granted that motion, after finding that "the seizure in question grossly exceeded the scope of the search warrant."  *Matter of 636 S. 66th Terrace, Kansas City, Kan.*, 835 F. Supp. 1304 (D. Kan. 1993).  The second case relied on by Cohen involved a search that the court described as a "government rampage" that "potentially or actually invaded the privacy of every client of the . . . firm."  *See Klitzman, Klitzman and Gallagher v. Krut*, 744 F.2d 955, 961 (3d Cir. 1984).  Critically, in that case, the court found that "the government took not one step to minimize the extent of the search or to prevent the invasion of the clients' privacy guaranteed by the attorney-client privilege."  *Id.*  Here, by contrast, the USAO-SDNY and FBI did not seek broad authority to seize all files of a law firm, but rather specific categories of documents for which probable cause existed.  Moreover, as discussed herein, the USAO-SDNY and FBI have established a rigorous protocol to honor the attorney-client privilege.  In no way do either of these cases stand for the novel proposition for which they are cited.

In attempting to align this case with these precedents, Cohen briefly suggests that the seizure of materials from his premises was overbroad.  But unlike in *Matter of 636 S. 66th Terrance* and *Klitzman*, the search warrants here were narrowly tailored.  Cohen claims that the seized materials contain privileged documents relating to communications with President Trump and other clients.  That suggestion, though, as noted above, is undermined by the fact that Cohen apparently rarely emailed with President Trump, and has identified no other clients with whom he has an attorney-client relationship.  In fact, when questioned about this very issues, Cohen's

counsel declined to identify Cohen's other clients, and instead chose to file this motion. Similarly, as noted above, Cohen exaggerates the extent to which he had an attorney-client relationship with the law firm described above.

Cohen also suggests that the USAO-SDNY seized personal communications with Cohen's family and medical records. Notably, this assertion does not appear in the sworn affidavit of Cohen's counsel, Todd Harrison, and to the extent the unsworn claim is true, it is likely because such records exist on Cohen's electronic devices, which were expressly covered by the search warrants. Thus, Cohen's claims of over-seizure are overblown. And to the extent records covered by the attorney-client privilege were seized during the searches, they will be reviewed, as described herein, pursuant to a rigorous filter protocol.

Cohen's novel proposal would set a dangerous precedent. It would permit subjects or targets of an investigation, who have not yet been indicted, to delay government investigations into their criminal conduct by giving them, and not the government, the authority to make a unilateral determination not only of what is privileged, but also of what is "responsive" to the warrant. *See* Br. at 1 (asking the court to "have all seized items be made available to Mr. Cohen's counsel to conduct a review of the documents in the first instance and produce to the government all responsive, non-privileged items"). Cohen provides no suggestions how as to how the USAO-SDNY would ever be able to challenge defense counsel's representation of a document as non-responsive. Given that the crimes being investigated involve acts of concealment by Cohen, the USAO-SDNY sought and obtained a search warrant – rather than using a subpoena – so that it would not have have to rely on Cohen to accurately make such a production. *See United States v. Roberts*, 852 F.2d 671, 676 (2d Cir. 1988) ("[W]e can deplore but not ignore the possibility that the recipient of a subpoena may falsely claim to have lost or

destroyed the documents called for, or may even deliberately conceal or destroy them after service of the subpoena.").

Moreover, even were Cohen to narrow his request to focus only on privilege determinations, his already demonstrably overbroad claims of privilege evidence that this would result in extensive delay and will prevent law enforcement from seeing evidence to which it is entitled.  This Court should not permit Cohen to stall the investigation of his conduct in this manner.  *See United States v. Bilzerian*, 926 F.2d 1285, 12923 (2d Cir. 1991) ("[T]he attorney-client privilege cannot at once be used as a shield and a sword. A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes." (internal citations omitted)).

### 4. **The Court Should Not Appoint a Special Master**

As an alternative, Cohen argues that the Court should appoint a special master to conduct the privilege review.  The Court should deny this alternative request.

Cohen principally relies on *United States v. Stewart*.  But as the foregoing establishes, this case is fundamentally different from *Stewart*.  Stewart was a criminal defense attorney who represented numerous defendants being prosecuted by the USAO-SDNY.  She shared an office with other criminal defense attorneys who similarly represented numerous defendants being prosecuted by the USAO-SDNY.  When agents executed a search warrant on her office, they seized files not just from her own office, but also hard drives and networking hardware from common areas of the office that had been used by other attorneys.  2002 WL 1300059, at *3. This fact raised significant Sixth Amendment concerns for numerous defendants in pending criminal cases, as multiple courts have recognized in distinguishing *Stewart*.  *See, e.g.*, *United States v. Grant*, No. 04 Cr. 207 (BSJ), 2004 WL 1171258, at *3 (S.D.N.Y. May 25, 2004)

("[U]nlike the situation in *Stewart*, there are no Sixth Amendment concerns in this case.  The seized documents were not in the files of a criminal defense lawyer, and relate to civil, not criminal, litigation that predates the indictment in this case."); *United States v. Kaplan*, No. 02 Cr. 883 (DAB), 2003 WL 22880914, at *11 (S.D.N.Y. Dec. 5, 2003) ("*Stewart* is of little aid to the Defendant here, since in this case Defendant is a civil litigation attorney, the seized files are materials pertaining to civil cases, and the Sixth Amendment concerns implicated in *Stewart* are clearly not present here.").

Here, unlike in *Stewart*, Cohen appears to practice only *civil* law, such that no Sixth Amendment concerns are raised by the seizure of any of his client files.  In addition, for the reasons set forth above, there is reason to believe that Cohen has few actual representations, and that the amount of potentially privileged material as to those representation will be low.  Moreover, to the extent that any privileged documents were seized in this case, they were seized from *Cohen* – the person whose conduct gave rise to the federal magistrate judge's finding that there was probable cause to believe the premises contained evidence of federal crimes.  This is significant:  In *National City Trading Corp. v. United States*, 635 F.2d 1020 (2d Cir. 1980), the Second Circuit denied a motion for return of property where materials were seized from a business that included an attorney's office.  In describing the reasonableness of the search, the Second Circuit pointed out that the facts were distinguishable from cases where a warrant is issued to search a lawyer's office to obtain evidence of a *client's* criminal activity.  In *National City*, "the lawyer actually permitted the allegedly criminal business operation to take place at his office."  *Id.* at 1025.  Here, the warrant

authorized seizure of materials from Cohen, because the judge found probable cause to believe that such materials would include evidence of Cohen's own crimes.

Moreover, *Stewart* was exceptional because the search swept-up files for multiple criminal defendants with cases pending before the USAO-SDNY, which was the office investigating Stewart herself.  There was thus no way for the USAO to effectively establish a filter team, because the filter AUSAs may well have had cases involving the clients (whose names were unknown to the USAO-SDNY) of the other attorneys in the defendant's law suite. Thus, the filter attorneys might have inadvertently been exposed to the privileged files of the very defendants they were prosecuting.  2002 WL 1300059, at *7.  No such concern exists here, where Cohen is not a criminal lawyer at all, let alone in any pending criminal case in this Court.

Appointment of a special master would also run the risk of creating significant delay in an ongoing criminal investigation, as even the author of *Stewart* recognized.  In the related case of *United States v. Sattar*, the defendants asked Judge Koeltl to appoint another special master for a different privilege review.  Judge Koeltl denied the request, noting that the appointment of a special master would cause "undue delay," and lamenting that the special master in *Stewart* was appointed in June 2002 but had yet, as of September 15, 2003 – 15 months later – to prepare a report.  2003

WL 22137012, at *22 (S.D.N.Y. Sept. 15, 2003). Such a delay in this case would unacceptably prolong and impede an ongoing criminal investigation in a case of national interest.

This case is thus a far cry from *Stewart*, and is more in line with the cases in this District that have approved the use of a Filter Team, such as *Grant* and *Winters*, described above. This Court should not deviate from this common, well-accepted practice.

## CONCLUSION

For the reasons set forth above, the Government respectfully requests that the Court deny Cohen's motion.[8]

Dated:   April 13, 2018
         New York, New York

                                   Respectfully submitted,

                                   ROBERT S. KHUZAMI
                                   Attorney for the United States,
                                   Acting Under Authority Conferred
                                   by 28 U.S.C. § 515

              By:   _____
                                   Thomas A. McKay
                                   Rachel Maimin
                                   Nicolas Roos
                                   Assistant United States Attorneys

---

[8] In light of the Court's order, dated April 12, 2018, addressing Cohen's sealing request, the USAO does not respond herein to Cohen's request for sealing.