**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| *In the Matter of Search Warrants Executed on April 9, 2018* | |
| Michael D. Cohen, | **FILED UNDER SEAL** |
| Plaintiff, | |
| - against - | |
| United States of America, | |
| Defendant. | |

**Memorandum of Law in Support of Michael D. Cohen's Order to Show Cause and a Temporary Restraining Order Concerning Warrants Executed on April 9, 2018**

MCDERMOTT WILL & EMERY LLP
Todd Harrison
Stephen Ryan (*pro hac vice application*
forthcoming)
Joseph B. Evans
340 Madison Avenue
New York, New York 10173-1922
(212) 547-5400

*Attorneys for Michael D. Cohen*

### *Preliminary Statement*

On April 9, 2018, the government raided the ███████████████████████

███████ attorney Michael D. Cohen and seized a large number of documents, as well as

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████ Mr. Cohen's counsel immediately requested in writing that

the government provide the seized materials to Mr. Cohen's counsel for initial review and

production of any responsive, non-privileged items.  The government has now denied that

request.  In a letter received by Mr. Cohen's counsel on April 11, 2018, at 5:10 PM, the

government stated it would begin reviewing the seized materials on Friday, April 13, 2018, at

noon, and decide for itself which documents are privileged and which documents are responsive.

Accordingly, we bring this emergency application to:

(1)      have all seized items be made available to Mr. Cohen's counsel to conduct a

review of the documents in the first instance and produce to the government all responsive, non-

privileged items.   The Court could also appoint a Special Master to oversee that review by Mr.

Cohen's counsel;

(2)      keep all documents and information relating to the investigation of Michael D.

Cohen under seal, ███████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████, all of which were executed on April 9, 2018; and

(3)     temporarily restrain the government from reviewing any of the seized materials until the Court rules on Mr. Cohen's applications, or from publishing the search warrants, search warrant inventory, or this application.

Mr. Cohen is a longtime member of the New York State bar.  Declaration of Todd Harrison, dated April 12, 2018 ("Harrison Decl."), ¶ 5.  He has been an attorney in good standing since 1992, with a spotless disciplinary record.  *Id.*  He has fully and extensively cooperated with numerous ongoing government investigations, including cooperation with the Special Counsel (Robert Mueller) as well as the production of documents and appearances in front of two Congressional committees, both of which included sworn testimony.  *Id.* ¶¶ 12-27.  In these circumstances, the United States Attorney's Manual ("USAM") dictates that search warrants should never have been requested, or executed on an attorney or an attorney's law office.  Mr. Cohen's counsel is unaware of whether the full extent of Mr. Cohen's prior extensive voluntary and ongoing cooperation (detailed below) was made known to the magistrate judge who issued the search warrants at issue here.

████████████████████████████████████████████████████

██████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████ The search warrants were requested and executed in violation of the guidelines set forth in the USAM, and were wholly unnecessary, given Mr. Cohen's extensive and ongoing cooperation with the government's various investigating agencies.

The government's unnecessary seizure carries a substantial risk of infringing upon the attorney-client privilege and attorney-work product doctrine. There are two general categories of privileged information the government has seized: (1) documents relating to privileged communications between Mr. Cohen and his clients; and (2) documents relating to privileged communications between Mr. Cohen and his own lawyers.

This matter is particularly sensitive and unique because, as the government is well aware, the President of the United States is one of Mr. Cohen's clients. ████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████ There is therefore no doubt that the government is in possession of a significant amount of information that is protected by the attorney-client privilege and attorney

work product doctrines, most of which does not relate to their current investigation of Mr. Cohen.

On the same day as the seizures (April 9, 2018), the undersigned counsel requested in writing that the U.S. Attorney's Office for the SDNY return all of the seized property and allow Mr. Cohen and his attorneys the opportunity to screen the materials for privilege, produce any relevant, non-privileged documents to the government, and provide a log of any documents withheld on privilege grounds. *Id*., ¶ 32, Ex. A. On Wednesday, April 11, 2018, the government responded by letter, rejecting defense counsel's proposal and informing defense counsel that the government would begin to review the materials at noon on Friday, April 13, 2018. *Id.* ¶ 33, Ex. B. Accordingly, Mr. Cohen hereby moves for immediate injunctive and equitable relief seeking the opportunity to have his counsel review the seized documents in the first instance, before any review by any law enforcement personnel, for privilege and responsiveness, and, if the Court believes it necessary, for the appointment of a Special Master to supervise that review process. Alternatively, Mr. Cohen moves for the appointment of an independent Special Master to review the items seized in the first instance for privilege and for responsiveness to the search warrants.

Additionally, we request that the warrants and inventory be filed under seal to protect the privacy interests and rights of Mr. Cohen and third parties referenced in the seized materials. Many third parties that are referenced in the inventory have nothing to do with this investigation. Given the high profile nature of this matter and the related investigations, and the fact that no criminal action has ever been initiated against Mr. Cohen, revealing those names publicly would unnecessarily subject Mr. Cohen and those persons and entities referenced in the search warrants

to undue harassment from the media and the public and potential reputational damage due to the public revelation of their documents, information and affiliations.

Finally, we request that should the Court postpone a ruling in this matter, that a temporary restraining order be issued to restrain the government from reviewing privileged materials until such a decision is made, and to seal this application, the search warrants and search warrant inventory.

For the reasons that follow, the motion should be granted.

## Statement of Facts

### Mr. Cohen's Legal Background

Michael D. Cohen is an attorney barred in the State of New York. Declaration of Todd Harrison, dated April 12, 2018 ("Harrison Decl."), ¶ 5. Mr. Cohen was admitted to practice in New York in 1992 and his license is currently in good standing. *Id.* ¶ 5. Mr. Cohen has engaged in the private practice of law for more than two decades. *Id.* ¶ 6. In the course of his legal practice, Mr. Cohen has used various means to engage in privileged communications with his clients, including letters, e-mail correspondence, telephone calls, and text messages. *Id.* ¶ 6. Mr. Cohen has also used both paper and electronic files to document and facilitate his legal work on behalf of his clients. *Id.* ¶ 6.

In or around 2006, Mr. Cohen joined the Trump Organization as an Executive Vice President and Special Counsel to Donald J. Trump. *Id.* ¶ 7. During his tenure at the Trump Organization, Mr. Cohen provided legal counsel to the Trump Organization and also served as

Mr. Trump's personal attorney. *Id.* ¶ 8. In this latter capacity, Mr. Cohen provided legal advice directly to Mr. Trump, including legal advice unrelated to the Trump Organization. *Id.* ¶ 8.

On November 8, 2016, Mr. Trump was elected President of the United States. *Id.* ¶ 9. Mr. Cohen resigned from the Trump Organization on January 20, 2017. *Id.* ¶ 10. Following Mr. Cohen's resignation from the Trump Organization, President Trump allowed Mr. Cohen to continue using the title, "Personal Attorney to President Donald J. Trump," in his email signature block. *Id.* ¶ 10. Mr. Cohen has served as Mr. Trump's personal legal counsel from at least 2006 to the present. *Id.* ¶ 11.

This arduous journey began for Mr. Cohen over 16 months ago with the publication of his name in the so-called Steele dossier. The references to Mr. Cohen in the Steele dossier are false and have been completely debunked. Nevertheless, because of those false allegations, Mr. Cohen has had to spend the last 16 months defending himself in front of numerous government investigatory agencies.

### *Mr. Cohen's Cooperation with the United States House of Representatives Investigation*

On March 1, 2017, the Permanent Select Committee on Intelligence of the United States House of Representatives ("House Intelligence Committee") announced its investigation into possible Russian active measures targeting the 2016 U.S. presidential election. *Id.* ¶ 12. On or around May 31, 2017, the House Intelligence Committee served a subpoena on Mr. Cohen. *Id.* ¶ 13. The subpoena commanded Mr. Cohen to produce certain documents and records and to appear before the House Intelligence Committee for deposition testimony. *Id.* ¶ 15. Undersigned counsel began representing Mr. Cohen shortly thereafter.

Mr. Cohen made his first production of documents and records to the House Intelligence Committee in July 2017 and made his final production of documents and records to the Committee in August 2017. *Id.* ¶ 15. Mr. Cohen's legal counsel advised the staff of the House Intelligence Committee that Mr. Cohen had withheld from production any document or record protected by the attorney-client privilege or the attorney work product protection. *Id.* ¶ 16.

Mr. Cohen appeared before the House Intelligence Committee for sworn testimony on October 24, 2017. *Id.* ¶ 17. During his testimony, Mr. Cohen made clear that he could not reveal any confidential communications with his clients pursuant to the attorney-client privilege protection. *Id*.

### *Mr. Cohen's Cooperation with the United States Senate Investigation*

On or around May 12, 2017, Mr. Cohen received a letter from the Select Committee on Intelligence of the United States Senate ("Senate Intelligence Committee"). *Id.* ¶ 18. The letter requested that Mr. Cohen voluntarily produce certain documents and records, and appear for a voluntary interview. *Id*.

Mr. Cohen made his first voluntary production of documents and records to the Senate Intelligence Committee in July 2017 and made his final voluntary production to the Committee in August 2017. *Id.* ¶ 19. Mr. Cohen's legal counsel advised the staff of the Senate Intelligence Committee that Mr. Cohen had withheld from production any document or record protected by the attorney-client privilege or the attorney work product protection. *Id.* ¶ 20. Mr. Cohen voluntarily appeared before the staff of the Senate Intelligence Committee for a sworn and transcribed interview on October 25, 2017. *Id.* ¶ 21. During the interview, Mr. Cohen advised

the staff that he could not reveal any confidential communications with his client, the President of the United States, under the attorney-client privilege protection. *Id.*

### Mr. Cohen's Cooperation with Special Counsel Robert Mueller's Investigation

On May 17, 2017, the Department of Justice (DOJ) appointed Robert Mueller as Special Counsel to oversee a federal investigation into potential Russian interference in the 2016 U.S. presidential election. *Id.* ¶ 22. On information and belief, the Office of Special Counsel submitted requests for the voluntary production of documents to the Trump Organization and also issued subpoenas requiring the Trump Organization to produce documents and records. *Id.* ¶ 23. Pursuant to those requests and with the acquiescence of Mr. Cohen, the Trump Organization produced responsive documents and records that included materials that Mr. Cohen had previously produced to the House Intelligence Committee. *Id.*

On September 1, 2017, Mr. Cohen's legal counsel participated in a conference call with the Special Counsel working on Mr. Mueller's investigation team. *Id.* ¶ 24. The Special Counsel indicated that it wished to obtain a copy of Mr. Cohen's document production to the House Intelligence Committee. *Id.* The Special Counsel also requested that Mr. Cohen produce certain correspondence with the Senate Intelligence Committee and the House Intelligence Committee. *Id.* Mr. Cohen's counsel gave permission to the Special Counsel to review both committee transcripts containing approximately 14 hours of Mr. Cohen's testimony under oath. *Id.* ¶ 25.

In or around October 2017, Mr. Cohen's legal counsel became aware that the Special Counsel had requested that the Trump Organization produce *all* of Mr. Cohen's communications

that were within the Trump Organization's custody, possession, or control. *Id.* ¶ 26. These communications included personal and private correspondence to family, privileged documents unrelated to the Russia investigation, and many other non-responsive confidential and privileged documents unrelated to any government investigation. *Id.* ¶ 27.

On November 2, 2017, Mr. Cohen's legal counsel challenged the Special Counsel's request on the grounds that it called for production of privileged communications, among other things. *Id.* In response, the Special Counsel agreed not to seek that production at that time. *Id.*

***Execution of Search and Seizure Warrants***

 The materials seized pursuant to the search and seizure warrants include documents, records, and communications protected by the attorney-client privilege and/or the attorney work product doctrine. *Id.* ¶ 29. For example, the materials seized include documents protected by the attorney-client privilege and work-product doctrine relating to President Trump. *Id.* The seized materials also include privileged communications between Mr. Cohen and his other clients. *Id.* The seized materials also include privileged communications between Mr. Cohen and his own personal counsel ▮▮▮▮▮▮▮▮▮▮▮▮▮ *Id.* In addition, the seized materials include privileged communications between Mr. Cohen and his personal counsel ▮▮▮▮▮▮▮▮▮ . In addition to privileged materials, documents and communications were seized that are highly

personal and private in nature. For example, communications between Mr. Cohen and his friends and family and Mr. Cohen and his family's medical records are some of the materials that have been seized which are particularly sensitive and private.

***Communications with the United States Attorney's Office for the Southern District of New York***

On April 9, 2018, Mr. Cohen's legal counsel was advised in a telephone call by an Assistant United States Attorney from the Southern District of New York, that the Office of Special Counsel (Robert Mueller) had "referred a portion of" the subject matter of the warrants to the U.S. Attorney's Office for the Southern District of New York. *Id.* ¶ 31. Each page of the attachments to the search warrants contains a footer with the date "2017.08.02" (August 2, 2017)—that happens to be the same date that the Office of Special Counsel's jurisdiction was amended by the Deputy Attorney General. One obvious and credible explanation is that the attachments listing the subject matter of the warrant used by the U.S. Attorney's Office were drafted by the Office of Special Counsel as earlier as that date. ████████████████

████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████

That same day, Mr. Cohen's legal counsel sent a letter to the U.S. Attorney's Office for the Southern District of New York stating that the DOJ's review of the materials seized from Mr. Cohen would infringe upon the attorney-client privilege and attorney work product protection, including the privilege attaching to materials concerning President Trump. *Id.* ¶ 32, Ex. A. The

letter also explained that the DOJ's practice of using a "taint team" to review the seized materials would also be inappropriate under these circumstances. *Id.*

On April 11, 2018, at 5:10 PM, counsel for Mr. Cohen received a letter from the U.S. Attorney's Office via email refusing to allow Mr. Cohen's attorneys to review the seized materials for privilege and responsiveness and indicating that the government will begin to review materials on Friday, April 13, 2018, at noon. *Id.* ¶ 33, Ex. B. Accordingly, we bring this application.

### *Argument*

It is well-settled that "law office searches raise special concerns, which impose a need for heightened care, due to the fact that law offices often contain privileged attorney-client materials and work product." *United States v. Stewart*, No. 02-cr-395, 2002 U.S. Dist. LEXIS 10530 (S.D.N.Y. June 11, 2002) (collecting cases). In recognition of such concerns, the United States Attorney's Manual sets forth procedures for conducting such a search. USAM § 9-12.220; USAM § 9-13.420. One such procedure is the appointment of a Special Master to review documents seized from a law office. *See* USAM § 9-13.420, at § F; *Stewart*, 2002 U.S. Dist. LEXIS 10530, at *11-12 ("the [USAM] lists review by a special master as one method of reviewing documents seized from a law office."). In this case, given the sensitive nature of the seized materials, the fact that many of the seized records are privileged, protected by the attorney work product doctrine, and/or concern confidential matters or clients that are unrelated to the government's investigation; and the incumbent risk of violating the attorney-client privilege, the attorney work product doctrine, and other privileges concerning the President of the United

States, this motion should be granted, and either Mr. Cohen's counsel or a Special Master (or both) should conduct the initial review of documents.

## A.      Applicable Legal Standard

Motions concerning search warrants "where no criminal proceeding against the movant is pending or has transpired" are "treated as a civil equitable proceeding." *See Carpenter v. Koskinen*, 2015 U.S. Dist. LEXIS 72074 (D. Conn. June 4, 2015) (citing *De Almeida v. United States*, 459 F.3d 377, 379-80 (2d Cir. 2006)); *Purcell v. United States*, 908 F.2d 434, 437-38 (9th Cir. 1990) ("Until criminal proceedings have been initiated against the movant by the filing of an indictment or information, motions to return property seized by the government are 'civil equitable proceedings.'") (internal citations omitted).

Preliminary injunctions should be granted where a plaintiff can demonstrate: "(a) that it will suffer irreparable harm in the absence of an injunction and (b) either (i) a likelihood of success on the merits or (ii) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor." *Dodge v. County of Orange*, 209 F.R.D. 65, 72 (S.D.N.Y. 2002) (citing *Tom Doherty Assocs. v. Saban Entm't Inc.*, 60 F.3d 27, 33 (2d Cir. 1995)). Temporary restraining orders may be granted immediately if "specific facts in an affidavit or verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and "the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required." FED. R. CIV. P. 65(b)(1).

## B.      Decisional Authority Supports the Appointment of a Special Master Because of the

**Sensitive Nature of the Seized Materials and the Preservation of the Attorney-Client Privilege**

There is ample case law supporting the appointment of a Special Master to supervise or conduct the review of materials seized from lawyers and law firms to preserve attorney-client privilege. In *United States v. Stewart*, the FBI and the New York City Police Department executed a warrant on a defendant's law offices. *United States v. Stewart*, No. 02-cr-395, 2002 U.S. Dist. LEXIS 10530 (S.D.N.Y. June 11, 2002). The search was conducted by a special team of officers who had been walled off from the prosecution team in order to prevent the prosecution from viewing any privileged materials or learning any privileged information that was uncovered on-site during the search. *Id.* at *7-8. The search was limited to areas used by the defendant, and materials from offices of other attorneys were not seized. *Id.* at *8-9. Among the items seized were "copies of the hard drives of the computer in the common area, the computer in the paralegal's office and the networking hardware from the common area, all of which had also been used to perform legal work for clients of other attorneys in the suite or for clients of the defendant who were not identified in the warrant and who likely have no relation to this case." *Id.* at *8. In *Stewart*, the question decided by the Court was whether "a Special Master [should] perform an initial review of the seized materials, as defendant proposes, or [whether] a government privilege team [should] do it, as the government proposes." *Id.* at *13. The Court rejected the government's proposal, appointed a Special Master to review the documents seized in the search of the law office, and granted the Special Master authority to determine responsiveness, privilege issues, and whether any valid exceptions to the privilege

exist.  *Id.* at *30.

In so doing, the Court noted three decisions where "courts that have allowed for review by a government privilege team have opined, in retrospect, that the use of other methods of review would have been better."  *Id.* at *19 (citing *United States v. Skeddle*, 989 F. Supp. 890, 896-97 (N.D. Ohio 1997) ("by hindsight, a safer course would have been to have given notice to the defendants . . . and the lawyers whose offices were searched to show cause within a specific period why the materials should not be released to the government"); *United States v. Hunter*, 13 F. Supp. 2d 574, 583 n. 2 (D. Vt. 1998) ("It may have been preferable for the screening of potentially privileged records to be left not to a prosecutor behind a 'Chinese Wall,' but to a special master or the magistrate judge"); *United States v. Neill*, 952 F. Supp. 834, 841 n. 14 (D.D.C. 1997) (indicating that "the more traditional alternative[]" is to "submit[] disputed documents under seal for *in camera* review by a neutral and detached magistrate or by court-appointed special masters") (collecting cases in which procedure with *in camera* review was used).

In its April 11, 2018 letter, the government makes a glancing effort to distinguish *Stewart*, arguing that it is an "exceptional" case because other attorneys' files were also seized by the government.  Harrison Aff. ¶ 33, Ex. B.  It is hard to imagine a more "exceptional" case than this one, ███████████████████████████████████████

████████████████████████████████████████

██████████████  Additionally, as in *Stewart*, privileged files related to Mr. Cohen's other clients and other matters far removed from the scope of the investigation have been seized by the

government.  Add to this the unprecedented level of media scrutiny and partisan political attacks related to the government's investigations, and it is hard to imagine a more "exceptional" case than the instant matter.

The government asserts in its April 11, 2018 letter that it will take its "filter team" obligations seriously.  Harrison Aff. ¶ 33, Ex. B.  These assurances do little to assuage the legitimate concerns of lawyer defendants and their clients about whether the attorney-client privilege and work product doctrine will remain sacred.  This practice inherently invades these privileges because using a "Taint Team" does not prevent the government from reviewing attorney-client privileged documents; it merely "changes the identity of the government attorneys and agents who first review that information."  *See* Loren Weiss & Gregory S. Osborne, *Taint Teams and the Attorney-Client Privilege*, American Bar Association (Dec. 2015) (internal citations omitted).  Indeed, such practices have been called into question, because government agents and investigators cannot be expected to simply ignore material because it was not responsive to a search warrant or contained privileged material:

> government attorneys and investigators serving on the Taint Team cannot reasonably be expected to ignore evidence of other crimes they may find in reviewing a criminal defendant's privileged documents. The conscious knowledge of other crimes could lead investigators to unconsciously alter the course of investigation and prosecution for other criminal matters.

*Id.* at 5.

Particularly with raids of law firms and lawyers, courts have found it necessary to protect privileged materials in a manner to "not only be fair but also appear to be fair[,]" noting that "the

appearance of fairness helps to protect the public's confidence in the administration of justice and the willingness of clients to consult with their attorneys." *Stewart*, 2002 U.S. Dist. LEXIS 10530, at *23. If the government is permitted to raid law firms and then decide for itself which documents are privileged, it would significantly diminish the "public's confidence in the administration of justice and the willingness of clients to consult with their attorneys." *Id.*; *Neill*, 952 F. Supp. at 834 n. 14 ("There is no doubt that, at the very least, the 'taint team' procedures create an appearance of unfairness.'"). Such concerns are certainly heightened in the instant case, where the government's investigation involves, in part, the appointment of a Special Counsel to investigate the Executive Branch, and media coverage has been ubiquitous. In relation to the government's various investigations in the instant matter, it is hard to imagine another case in which the government's motives and degree of impartiality have been the subject of such repeated attack and speculation by the media, politicians, and just about everyone else in America. Frankly, it would be in the government's interest to agree to a Special Master in this matter in order to maintain at least an appearance of fairness. Therefore, under the analysis set forth in *Stewart* (which was cited by the government in its April 11, 2018 letter), it is hard to imagine a matter in which it would be more appropriate to allow counsel to review the seized materials for documents or to appoint a Special Master.

The government writes that it is "aware of no court to have ordered the procedure you

propose." Harrison Aff. ¶ 33, Ex. B.[1]  To the contrary, however, there is ample authority for

such procedures.  In fact, certain courts have even ordered the complete return of documents

seized from law offices and lawyers.  For instance, the District Court of Kansas ordered the

government to return documents seized from an attorney under Rule 41 of the Federal Rules of

Criminal Procedure to protect the attorney-client privilege:

> This court also concludes that an invasion of the attorney-client privilege through
> a search and seizure generates an injury to the possessor of the privilege – in this
> case the movants . . . The seizure of materials protected by the attorney-client
> privilege in this case gives rise to irreparable injury to the movants.  The basis of
> the attorney-client privilege is to protect confidential communications between
> client and attorney.  If the privilege communications materials are permitted to
> remain in the hands of the government it is apparent to the court that any
> confidentiality of the communication involved may well be lost, and the movants
> will be effectively denied the protection of the privilege.  Once lost,
> confidentiality cannot be restored.

*In re Search of 636 S. 66th Terrace*, 835 F. Supp. 1304, 1306 (D. Kan. 1993).

Similarly, the Third Circuit affirmed a decision to return files seized from an attorney's

law office pursuant to a search warrant, holding that the government "completely disregarded

any concept of the attorney-client privilege" because the files it "searched for and seized

pursuant to the warrants constituted the existing records of an entire law practice."  *Klitzman,*

*Klitzman & Gallagher v. Krut*, 744 F.2d 955, 961 (3d Cir. 1984).

---

[1] The government mischaracterizes Mr. Cohen's request as asking to return all of the materials
"to defense counsel for unilateral review and designation of privilege in the first instance."
Harrison Aff. ¶ 33, Ex. B.  While such a solution would be acceptable, that is not the only
resolution Mr. Cohen is seeking.  Mr. Cohen would also be amenable to a situation where Mr.
Cohen's counsel could perform the initial review of such materials whilst the materials are still
within the government's possession.  Alternatively, we have requested the appointment of a
Special Master.  Thus, we have provided numerous reasonable alternatives to the "filter team"
approach which we would diligently and expeditiously undertake.

The same is true in the instant matter.  As in *Stewart*, files and communications relating to a number of clients – many of which are not responsive or in any way relevant to the categories of evidence identified in the warrant – have been seized by the government.  *See Stewart*, 2002 U.S. Dist. LEXIS 10530, at *22 ("the computer materials seized are likely to contain a broad range of files and information that are not in any way responsive to the warrant").  ██████████████████████████████

██████████████████████████████████████████

████████████████████████████████████

  ▪  █████████████████████████████
     ██████████████

  ▪  ██████████████████████████████
     ████████████

  ▪  █████████████████████████████
     ████████████████████████████████
     ███████

  ▪  █████████████████████████████
     ████████████████████████████████
     ██████████████████

  ▪  ████████████████████████

  ▪  ██████████████████████

██████████████████

The government also seized highly personal communications between Mr. Cohen and his family.  Additionally, the government seized Mr. Cohen and his family's medical records, which contain even further privacy and privilege issues.  ████████████████████████

Much of this information is privileged,

and most, if not all, is likely completely outside the scope of this investigation.

Lastly, the documents seized by the government are uniquely sensitive because they contain documents relating to privileged communications between the President of the United States and his personal lawyer. *Id.* ¶ 29. The retention of such privileged information from the President presents not only routine attorney-client privilege and attorney work product issues, but also creates constitutional concerns regarding officers of the Executive Branch rummaging through the private and privileged papers of the President.

In its April 11, 2018 letter, the government points to two district court cases denying the appointment of a special master. Harrison Aff. ¶ 26, Ex. C. (citing *United States v. Winters*, No. 06-cr-54, 2006 U.S. Dist. LEXIS 70488 (S.D.N.Y. Sept. 27, 2006) (defendant was a principal of a company accused of fraud and no lawyer or law firm was raided); *United States v. Grant*, No. 04-cr-207, 2004 U.S. Dist. LEXIS 9462 (S.D.N.Y. May 25, 2004) (defendants were nightclub owners charged with narcotics crimes and no lawyer or law firm was raided). The common thread with those two cases is that unlike this case, none of them are raids of lawyers or law firms, and are therefore almost completely inapposite. Other cases cited as support by the government in its April 11, 2018 letter do not involve raids of lawyers or law firms either.[2] Raids of lawyers and law firms raise special concerns because of the inherent risk of impeding on the attorney-client privilege and work product privilege of the lawyer's clients. In fact, the

---

[2] *See United States v. Patel*, No. 16cr-798, 2017 U.S. Dist. LEXIS 125072 (S.D.N.Y. Aug. 8, 2017) (no lawyer or law firm was raided); *United States v. Lumiere*, No. 16-cr-483, 2016 U.S. Dist. LEXIS 17702 (S.D.N.Y. 2016) (same); *SEC v. LEK Secs. Corp.*, No. 17-cv-1879, 2018 U.S. Dist. LEXIS 6704 (S.D.N.Y. Jan. 16, 2018) (same).

government argued exactly that in its motion opposing an application for a Special Master in the

*Winters* case:

> Other than the special context of the search of a law office, Winters
> can cite to no case where a special master was appointed or an in
> camera review was undertaken.  As noted, there are obviously
> special concerns when searching a law office, which is in the
> business of providing legal advice, and which generally represents
> multiple clients, many of whom may be uninvolved in criminal
> activity.

*United States v. Winters*, No. 06-cr-54, ECF No. 18, at 8 n.1 (S.D.N.Y. July 31, 2006)

(Government's opposition brief).  As the government previously argued, raiding lawyers and law

firms raises "special concerns" and therefore the remedies we seek are reasonable requests.

Given the sensitivity of these documents and the high-profile nature of this investigation,

we submit that it would be most prudent to either allow for Mr. Cohen's undersigned lawyers to

handle the review and production of documents or to appoint a Special Master or to allow Mr.

Cohen's attorneys to conduct the review under the supervision of a Special Master.  Such an

appointment would ensure fairness, respect the attorney-client privilege, and would also "protect

the public's confidence in the administration of justice and the willingness of clients to consult

with their attorneys."  *See Stewart*, 2002 U.S. Dist. LEXIS 10530, at *23.

**C.**    **The United States Attorney's Office Manual Also Supports Appointing a Special
Master**

The United States Attorney's Office Manual lists special considerations for searches

executed on lawyers and law firms.  The policies set forth in the USAM support the conclusion

that the search warrants were completely unnecessary in this case.  Furthermore, the USAM

supports the appointment of a Special Master.

With respect to attorneys who are not suspects, "a search warrant should normally not be used to obtain such confidential materials." USAM 9-19.220. "A warrant should be used only if the use of a subpoena, or other less intrusive means of obtaining the materials, such as a request, (1) would substantially jeopardize the availability or usefulness of the materials sought; (2) access to the materials is of substantial importance to the investigation or prosecution for which they are sought; and (3) the application of the warrant has been approved by the appropriate Deputy Assistant Attorney General (DAAG) upon the recommendation of the United States Attorney or supervising Department of Justice attorney (in a case in which a division of the Department is directly handling the investigation or prosecution)." USAM 9-19.220. As discussed *supra*, Mr. Cohen has cooperated with the United States House of Representatives investigation, United States Senate investigation, and Special Counsel Robert Mueller's investigation. Harrison Decl. at ¶¶ 12-27. Indeed, Mr. Cohen has produced numerous documents, his attorneys have been actively corresponding with the government, and Mr. Cohen even testified under oath before the House Intelligence Committee and the Senate Intelligence Committee. *Id.* There is no indication whatsoever that the normal means of collecting evidence would somehow "jeopardize the availability or usefulness of the materials sought." USAM 9-19.220. Therefore, search warrants should not have been utilized.

The USAM states that "because of the potential effects of this type of search on legitimate attorney-client relationships and because of the possibility that, during a search, the government may encounter material protected by a legitimate claim of privilege, it is important that close control be exercised over this type of search." USAM 9-13.420. The decision to

proceed by executing a warrant violates the USAM's guidance to "take the least intrusive approach" when seeking evidence from a practicing attorney "in order to avoid impinging on valid attorney-client relationships." USAM 9-13.420. "Consideration should be given to obtaining information from other sources or through the use of a subpoena." USAM 9-13.420. Mr. Cohen's track record of compliance with the various investigations shows that ████ ████████████████████████████████████████████—was not the "least intrusive approach."

Additionally, the USAM suggests that in a situation such as this one, a "judicial officer" or a "special master" should conduct the document review. USAM 9-13.400. Because of the "potential effects of this type of search on legitimate attorney-client relationships," the USAM supports Mr. Cohen's request for the appointment of a Special Master in this case. We suggest that Mr. Cohen's lawyers are in the best position to review documents for responsiveness and privilege. However, in the alternative, an independent Special Master – and not the government – is also a viable alternative to review the seized materials.

Therefore, in these exceptional circumstances, the facts, sensitive nature of the documents, and sheer amount of privileged material seized by the government all point to the conclusion that a preliminary injunction should be granted.

## D.     This Motion and the Warrant Returns Should Be Sealed

The issues contained in this application and the references to names and entities in the search warrants and inventory should not be revealed to the general public at this time. While the public does have some right of access to certain documents, there have been no criminal

charges filed against Mr. Cohen and many of the names and information listed may not even be relevant to the investigation. We respectfully submit that the warrants and inventory returns in this case should be filed – and should remain – under seal.[3] The inventory reveals information about innocent third parties, exposes the existence of documents concerning third parties, and unnecessarily fuels the media circus surrounding the very public search of a prominent attorney's home, hotel room, and law office. To preserve privacy interests of Mr. Cohen and of third parties, the inventory returns and this application should be filed under seal.

It is true that the public has a "general right to inspect and copy public records and documents." *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). But the public's "right of access to criminal proceedings and to documents submitted in them, however, is not all-encompassing." *United States v. Wolfson*, 55 F.3d 58, 61 (2d Cir. 1995). "Courts must balance the right [of access] against other important values" such as "privacy interests." *United States v. Rajaratnam*, 708 F. Supp. 2d 371, 374-75 (S.D.N.Y. 2010).

The Second Circuit "previously held that 'the privacy interests of innocent third parties . . . should weigh heavily in a court's balancing equation." *See United States v. Amodeo*, 71 F. 3d 1044, 1050-51 (2d Cir. 1995) (citing *Gardner v. Newsday, Inc.*, 895 F.2d 74, 79-80 (2d Cir. 1990)). "Courts have long declined to allow public access simply to cater 'to a morbid craving for that which is sensational and impure.'" *Id.* at 1051 (internal citations omitted). "As the Supreme Court noted in *Nixon v. Warner Communications, Inc.*, 435 U.S. 589 (1978), courts

---

[3] The Magistrate Judge did not initial the section requiring that the "warrant and inventory should be filed under seal by the Clerk of the Court" in relation to the warrants issued in connection with this matter.

have the power to insure that their records are not 'used to gratify private spite or promote public scandal,' and have 'refused to permit their files to serve as reservoirs of libelous statements for press consumption.'" *Id.*

The inventory returns list names of third-party individuals and entities, many (perhaps all) of which have nothing to do with the current investigation. There is no reason why such individuals and entities need to suffer the media interest and concomitant disruption caused by having their names revealed by a publicly filed inventory list. Similarly, there are references to checks, with amounts, and references to business entities and individuals. At present time, when formal charges have not even been brought against Mr. Cohen, there is no need to reveal those names or that information to the public.

Moreover, a warrant inventory is designed to ensure the return of seized items to a defendant after a criminal proceeding is complete and to notify the Court of the seized items. It is wholly unnecessary to reveal such a document publicly – particularly when no charges have issued against Mr. Cohen or any of the referenced third parties. The Second Circuit has upheld the sealing of wiretap applications because "there is no First Amendment right of access to the underlying *ex parte* proceedings in which wiretap applications are presented to a district judge." *In re New York Times Co.*, 577 F. 3d 401, 410 (2d Cir. 2009). Here, the warrant process is an "ex parte proceeding" where the issuance and the return should be a process that involves the United States Attorney's Office and a Magistrate Judge and should remain sealed. *See* FED. R. CRIM. P. 41(e); *New York Times*, 577 F.3d at 410.

This matter has received overwhelming media attention—as the government intended.

However, courts have kept certain documents sealed in even the most high-profile cases.  For example, in a very high-profile insider trading case, the Court kept wiretap applications sealed in part because of its concern that "untested wiretap material may turn out to be inadmissible."  *See Rajaratnam*, 708 F. Supp. 2d 375.  The Court differentiated between material "that has been judicially tested and not suppressed" and other material "whose lawfulness has yet to be judicially determined."  *Id.*  Ultimately, in *Rajaratnam*, the Court held that "shielding such material from the public eye is often critical to protect defendants' fair trial and privacy interests, especially when the material has yet to be tested in court."  *Id.* at 377.  Comparatively, this matter is in its infancy.  There are not even any criminal charges, much less evidentiary rulings.  Many of the issues discussed in this application, the search warrants, and inventory returns may not even be relevant.  Additionally, much of it is privileged and the majority of it would be inadmissible.  Therefore, to protect privacy interests, this material that has not been "tested in court" should be sealed.

For the aforementioned reasons, the motion to seal should be granted because revealing this application, the search warrants, and inventory returns would merely serve to promote public scandal and to negatively impact privacy interests of third parties.

### *Conclusion*

For the foregoing reasons, Mr. Cohen's application should be granted.

Dated:      April 12, 2018
              New York, New York

MCDERMOTT WILL & EMERY LLP
Todd Harrison
Stephen M. Ryan (*pro hac vice
application* forthcoming)
Joseph B. Evans
340 Madison Avenue
New York, New York 10173-1922
(212) 547-5400

*Attorneys for Michael D. Cohen*