I4dWcohC

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     In the Matter of Search Warrants
 3   Executed on April 9, 2018
     ------------------------------x
 4   MICHAEL D. COHEN,

 5                Plaintiff,

 6        v.                                  18 Mag. 3161

 7   UNITED STATES OF AMERICA,

 8                                            Conference

                 Defendant.
 9
     ------------------------------x
10                                           New York, N.Y.
                                             April 13, 2018
11                                           10:30 a.m.

12   Before:

13                      HON. KIMBA M. WOOD,

14                                           District Judge

15
                            APPEARANCES
16
     MCDERMOTT WILL & EMERY LLP
17        Attorneys for Plaintiff
     BY:  TODD HARRISON
18        JOSEPH B. EVANS
          MICHAEL R. HUTTENLOCHER
19
     ROBERT S. KHUZAMI
20        Acting United States Attorney for
          the Southern District of New York
21   THOMAS A. McKAY
     RACHEL A. MAIMIN
22   NICOLAS ROOS
          Assistant United States Attorneys
23

24

25
```

I4dWcohC

```
 1   Also Present:

 2
     SPEARS & IMES LLP
 3        Attorneys for Intended Intervenor
          Donald J. Trump, President
 4   BY:  JOANNA C. HENDON

 5
     DAVIS WRIGHT TREMAINE LLP
 6        Attorneys for ABC
     BY:  RACHEL F. STROM
 7

 8   MICHAEL AVANATTI
          Attorney for Interested Party
 9        Stephanie Clifford a/k/a "Stormy Daniels"

10
     John Riley, Newsday
11   Benjamin Weiser, The New York Times

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

I4dWcohC

1          (Case called)

2          THE COURT:  Good morning.  Please have a seat.

3          MR. McKAY:  Good morning, your Honor.  Tom McKay,

4  Rachel Maimin and Nicolas Roos, for the government.

5          THE COURT:  Good morning.

6          MR. HARRISON:  Good morning, your Honor.  Todd

7  Harrison and Joe Evans, from McDermott Will & Emery.

8          THE COURT:  Good morning.

9          I have a letter from the legal department of *The New*

10 *York Times*, asking that the press be heard if the Court takes

11 any argument at sidebar or under seal.  The law is clear-cut

12 here.  I'm not sure that we need a lawyer from *The New York*

13 *Times*, other than the person who authored the letter to me, but

14 let me state at the outset that Mr. Cohen's lawyers applied

15 yesterday evening for an opportunity to take the first cut at

16 identifying documents that are relevant or not relevant to the

17 investigation, and to identify any documents subject to

18 attorney-client privilege or the work product doctrine.

19          The arguments that bear on this issue are largely ones

20 having to do with an ongoing criminal investigation and the

21 government's position that flows from that investigation.

22          Let me also say that although both parties recognize

23 that the search conducted here was a search of attorney's

24 offices and an attorney's devices, and that a search of

25 attorney's information is subject to special consideration

I4dWcohC

1    given the possibility of breach of attorney-client privilege or

2    the work product doctrine, there is no dispute about that.  The

3    dispute before the Court is who should make the determination

4    in the first instance of what is subject to attorney-client

5    privilege or the work product doctrine.

6            The government's view is that a taint team should make

7    that determination, and the view of Mr. Cohen's lawyers is that

8    the determination should be made either by Mr. Cohen's lawyers,

9    or their fallback position is a special master.

10           A special master was used in the *Lynne Stewart* case.

11   I note that in that case there was a heightened need for a

12   special master because the search swept in documents relating

13   to clients other than the subject of the investigation and to

14   work product and otherwise privileged materials of other

15   lawyers who were in the same law office as Lynne Stewart and

16   had shared computers with her.

17           I believe that the balance of what needs to be argued

18   has to be at sidebar and under seal, and I take that decision

19   not lightly at all, but having reviewed the papers, it's clear

20   to me that the arguments will reveal the ongoing investigation.

21   I note, parenthetically, that *The New York Times* seeks access

22   to the search warrant and related documents.  Those, too, are

23   subject to sealing to protect the ongoing investigation,

24   notwithstanding the views of the Second Circuit on this point.

25           At this point, I would like to hear --

I4dWcohC

1          MS. STROM:  Your Honor, I'm an attorney for ABC.  My

2     name is Rachel Strom, and I am not here for *The New York Times*,

3     but that letter was written by Dave McCraw --

4          THE COURT:  Do you want to come to the podium?

5          MS. STROM:  That would be great.  Thank you so much.

6     Where would you like me, your Honor?

7          THE COURT:  Oh, just by the podium so that the mike

8     will pick up what you're saying.

9          MS. STROM:  I'll note there's no press here for me and

10    that I was given about a 15 minute warning that I'd be here.

11          Your Honor, I'm sure that letter came from Dave

12    McCraw, who is an expert in this area.  I don't have much to

13    add.  I'm sure he laid out all the *Press Enterprise* factors

14    that must be considered before a Court will seal the courtroom

15    or deny access to court records that are necessary for a

16    determination at a proceeding.

17          The only thing I would say is that the *Press*

18    *Enterprise* factors require the Court to make specific,

19    on-the-record findings, as I think you have, but the findings

20    must include that the closure, or the nondisclosure, must be

21    essential to preserve a compelling interest.  And I think what

22    you articulated here is the compelling interest is protecting

23    the attorney-client material.

24          THE COURT:  I'm sorry.  The compelling interest here

25    is protecting the ongoing criminal investigation as well as

I4dWcohC

1    attorney-client privilege.

2              MS. STROM:  But I'm just confused.  The fact that

3    there's an ongoing criminal investigation is already public.

4              THE COURT:  Yes.

5              MS. STROM:  We're here today because we knew that

6    there was going to be a hearing today.

7              THE COURT:  Of course.

8              MS. STROM:  The factors kind of turn in on each other,

9    and one of the factors is that the closure has to be effective,

10   that the nondisclosure order has to be effective, and we know

11   that there's an ongoing proceeding.  Many of us do; it's about

12   as full of a courtroom as I've ever been in.  So I don't know

13   what specific things that will be protected by ordering the

14   press out of this courtroom or not sealing something, and I do

15   think we deserve an answer of what specific things will be

16   protected.  And just, because I see I'm going to get an

17   argument, the other thing --

18             MR. McKAY:  Your Honor --

19             THE COURT:  Could you wait just a moment.

20             MR. McKAY:  I think I may be able to short circuit

21   this.

22             THE COURT:  OK.

23             MR. McKAY:  I think it won't be so much an argument as

24   agreement in part, which is that we filed our responsive brief

25   this morning with the Court largely publicly.  There were few

1   portions that we redacted for the specific purpose of not

2   disclosing ongoing law enforcement investigations that weren't

3   otherwise disclosed, but we were very careful in our brief to

4   try to talk as much as we could at a high level so that the

5   right of access would be respected and at the same time we'd be

6   able to make the points to the Court that we think are

7   necessary for the Court to resolve the instant motion.

8          We're comfortable today having oral argument in open

9   court and describing those things which are publicly filed in

10  our brief, which is really the vast majority of our brief.

11         To the extent that the Court has specific questions

12  about particular things, including the things that were

13  redacted or other aspects of the investigation that aren't

14  already public, we would be happy to go to sidebar on that.

15  But I think that the inquiry for the present motion need not go

16  into that great detail about the ongoing investigation, because

17  we think the issues at stake are clear and can be decided based

18  on things that are already public.

19         THE COURT:  All right.  Ms. Strom, have you had access

20  to what Mr. McKay has described?

21         MS. STROM:  If that was public -- was that publicly

22  filed on Pacer.

23         MR. RILEY:  We don't have a case number yet to look up

24  yet on Pacer, Judge.

25         THE COURT:  OK.  Thank you.

I4dWcohC

1              Ms. Strom.

2              MS. STROM:  I have not had access to that.

3              MR. McKAY:  Your Honor, I think that's just a matter

4      of docketing.  We sent it to the Court.  I think it will be

5      publicly filed whenever the Clerk of the Court is able to get a

6      docket assigned and the briefs up on Pacer.

7              THE COURT:  All right.  I don't have a redacted copy.

8      My copy simply says "filed under seal."

9              Yes.

10             MR. HARRISON:  Thank you, Judge.

11             THE COURT:  Mr. Harrison.

12             MR. HARRISON:  Judge, as your Honor noted, we

13     previously requested that this proceeding be under seal.  We

14     would prefer to do it as your Honor just suggested, at sidebar

15     and in chambers.  We are going to be asking, since the

16     government apparently is going to be arguing in their favor,

17     about facts of their underlying investigation, we think we

18     deserve to know some more of the facts about the underlying

19     investigation in order to rebut their arguments.  That's only

20     fair.

21             There's another related issue, Judge, which is there

22     is another attorney in the courtroom today for an individual

23     privilege holder, who would like to be heard and be part of

24     these proceedings, and she and we, Mr. Cohen's attorneys, are

25     going to request that we have some sort of adjournment and some

I4dWcohC

| | |
|---|---|
| 1 | time for her to get up to speed and, frankly, for us to get all |
| 2 | the way up to speed.  I haven't had a chance to read the |
| 3 | government's submission from this morning, so perhaps if we |
| 4 | could have some sort of adjournment to do that and to deal with |
| 5 | all the media issues, perhaps that would be the most prudent |
| 6 | thing to do. |
| 7 | MR. McKAY:  Your Honor, a few things on that. |
| 8 | First of all, the privilege holder has had notice of |
| 9 | these searches on Monday, when they became widely publicly. |
| 10 | The privilege holder in question publicly commented on these |
| 11 | searches.  That privilege holder is representing the exact same |
| 12 | interests as Mr. Cohen is here, so he adds absolutely nothing |
| 13 | to the discussion. |
| 14 | THE COURT:  She. |
| 15 | MR. McKAY:  She adds nothing to the discussion.  And |
| 16 | so the only point of intervention and delay for this privilege |
| 17 | holder to get up to speed, as Mr. Cohen's counsel said, would |
| 18 | be to further delay the review of materials seized pursuant to |
| 19 | lawfully authorized search warrants.  We think there's no basis |
| 20 | for this privilege holder to delay these proceedings any |
| 21 | further, and to the extent that Mr. Harrison is saying he |
| 22 | hasn't had time to review the brief, with respect, they filed |
| 23 | their brief shortly after 5:00 last night.  We got our response |
| 24 | out in less than -- very quickly, by 9 a.m. this morning.  He's |
| 25 | had an hour and a half to read before these proceedings.  I |

I4dWcohC

1     think that falls on deaf ears.

2             THE COURT:  I do think that it's important for anyone

3     asserting an interest in this matter to be able to review the

4     government letter, and if you haven't had that opportunity, I

5     think we should adjourn.  I would assume that a short

6     adjournment suffices.  In other words, we could resume this

7     afternoon once you have had a chance to review the letter and

8     think through the law.

9             MR. McKAY:  Your Honor, I think a very short

10    adjournment would be the most that's appropriate -- about an

11    hour -- to read the papers, which are only about 22 pages.

12            Again, this privilege holder has had notice of this

13    since Monday, has likely been in contact with Mr. Cohen's

14    counsel.  The privilege holder's counsel notified us last

15    night.  They've had plenty of time to get involved in this

16    proceeding.  It's just another attempt at delay.

17            MS. HENDON:  Your Honor, may I?

18            THE COURT:  Yes, you may, but we haven't finished with

19    Ms. Strom, who is still at the podium.

20            Ms. Strom.

21            MS. STROM:  What I would say is that it does sound

22    like there may be times where there is information that might

23    meet this compelling-interest need and that there might be a

24    need for sidebars.  Like Dave McCraw, I'd like to be able to

25    have some opportunity to argue at those junctures, but to kick

I4dWcohC

```
 1   the press out completely from a decision-making process --

 2            THE COURT:  I'm not kicking them out.

 3            MS. STROM:  OK.  I thought you were saying you wanted

 4   to make this decision in private and have it under seal.

 5            THE COURT:  No.  Based on the copy I have of the

 6   government's letter, which is what you have not seen, I thought

 7   that most of what the government argued was going to need to be

 8   under seal.  The government has corrected my misapprehension

 9   there.

10            MR. McKAY:  Your Honor, if I can?

11            THE COURT:  Yes.

12            MR. McKAY:  I think the copy that you have has certain

13   sentences that are highlighted in gray.

14            THE COURT:  Yes.

15            MR. McKAY:  Those are the ones which are going to be

16   redacted in the publicly filed copy.

17            THE COURT:  I see.

18            MR. McKAY:  If you skim through, you'll see it's about

19   four or five sentences in a 22-page brief.  Like I said, we're

20   comfortable having this proceeding in open court and answering

21   as many of the Court's questions as we think we can.  I think

22   that the issues here are straightforward and don't require a

23   deep dive into an underlying criminal investigation.

24            THE COURT:  Good.

25            Ms. Strom, the adjourned proceeding that I
```

I4dWcohC

1    contemplate, in an hour or a few hours, would be public to the

2    extent it can be, and to the extent I find it cannot, I will

3    make the requisite findings.

4            MS. STROM:  Absolutely.

5            THE COURT:  And I will allow you to argue at that

6    point.

7            MS. STROM:  Thank you so much, your Honor.  We

8    appreciate it.

9            THE COURT:  All right.

10           Now, I believe an attorney wishes to be heard.

11           MS. HENDON:  Yes.  Thank you, your Honor.

12           My name is Joanna Hendon.  It's been a long time since

13   I was before you.  I'm here with my partner Chris Dysard and my

14   colleague Reed Keefe.  It's very nice to see you.

15           We represent Donald Trump in this matter.  As a

16   privilege holder, he has an acute interest in these proceedings

17   and in the manner in which these materials are reviewed, etc.

18   Your Honor, I therefore request permission to be heard with

19   respect to the issues that have been, at least I understand,

20   briefed by Mr. Cohen's counsel.

21           Now, I should say my firm was engaged Wednesday

22   evening, April 11.  That's a day and a half ago.  Last night, I

23   contacted the U.S. Attorney's Office on behalf of the privilege

24   holder, whose interests are different and not entirely the same

25   as the lawyer, because the privilege belongs to the privilege

I4dWcohC

1    holder, not the lawyer.  A client can waive the privilege.  The

2    lawyer cannot waive the privilege.

3            I contacted the government and I conveyed my concern

4    about the use of a taint team.  I conveyed my concern about the

5    mechanism by which even after a review of the documents has

6    been done -- whether by a taint team or by a special master --

7    the mechanism by which parties may then make objections to and

8    seek judicial review of those decisions, because the most

9    critical moment here, your Honor, for a privilege holder, is

10   when a special master or a taint team, or whomever has

11   conducted a review, made a judgment about what is not

12   privileged and then turns to hand that material over to the

13   prosecution team, who will then make charging decisions and

14   otherwise.

15           THE COURT:  Wait just a moment.

16           MS. HENDON:  I plan to raise --

17           THE COURT:  May I interrupt you.

18           MS. HENDON:  Yes, of course, your Honor.

19           THE COURT:  There hasn't been a determination as to

20   whether the prosecution team would have access to those

21   documents before the privilege holder or the attorney can be

22   heard.

23           MS. HENDON:  Oh, I understand, your Honor.  I'm just

24   letting you know that in a day and a half we identified these

25   issues for our client, conveyed them in writing to the office

I4dWcohC

last night and said, Look, can we sit down with you and see if

we can reach agreement on both of these questions, who does the

review and what's the mechanism for judicial review?  I said,

Look, Can you agree not to touch these documents and begin a

review until we've met and conferred and, if necessary, engaged

in any litigation and come to the Court.

What I am asking today, your Honor -- and I know the

government objects to this, because I met and conferred with

them to get their views; I think Mr. Cohen's counsel is

amenable -- I am not prepared, even with two hours' notice, to

vindicate this very important right on behalf of my client in

this matter.  These parties apparently have filed papers.  I've

not seen what Mr. Cohen filed.  I've not seen what the

government filed, and given the interest at stake here and the

exceptional nature of my client, giving me two hours to get up

to speed so that I can come make oral argument before your

Honor makes very important decisions is simply inadequate.

What I would ask, what I thought would be best was

that we have a -- I'm not trying to delay anything, nor do I

see a particular rush here.  The searches have been executed.

The concerns typically announced in a search warrant affidavit

about the need for expediency because evidence will be

destroyed, those searches have been executed.  The evidence is

locked down.  I'm not trying to delay.  I'm trying to make

sure -- I think everyone, the Court, the government, my client,

I4dWcohC

the public, all have an interest in how this review of

privileged material takes place.  The interest is that it be

done scrupulously, so that it's not subject to taint complaints

later, so that it withstands scrutiny for all time, frankly.

I don't see that we need to rush these proceedings.  I

think my client should be allowed to join in a briefing

schedule.  We should get this litigation that your Honor was

prepared to address today on the track for next week or the

week after and let the owner of the privilege participate

alongside the government and the individual whose materials

were seized, and do this in an orderly way, because what's at

stake, the viability of this prosecution, it has to be done

right.

My client's interests as a privilege holder -- this is

the oldest privilege, I think, one of them, that our law

recognizes; he is the President of the United States.  These

interests are so weighty that I think we need more than,

respectfully, an afternoon's adjournment so that I on his

behalf can weigh in thoroughly and be heard on these issues,

because ultimately, in my view, this is of most concern to him.

I think the public is a close second and anyone who has ever

been represented, everyone who's ever hired a lawyer a close

third.  And I just want to say that I don't want anyone in this

room to take from my remarks any lack of confidence in the way

the United States Attorney's Office in this district is

I4dWcohC

1    prepared to conduct itself, but there's an

2    appearance-of-fairness problem here.

3              In addition, there has been so much media coverage of

4    the matters under investigation, of my client, that the idea

5    that anyone could neutrally and fairly pick up communications

6    between him and Mr. Cohen and make privilege calls, that's

7    going to be a very, very heavy lift for anyone.  And I think

8    the prosecutors, who are properly trained to investigate and

9    rule out evidence of crimes, they would not be my first choice,

10   even though they're the best prosecutors in the country, for

11   that work and for that role.

12             I thank your Honor.

13             THE COURT:  Thank you very much.

14             Mr. McKay rose to speak.

15             MR. McKAY:  Counsel just referenced the appearance of

16   fairness and the exceptional nature of her client, and with

17   respect, his attorney-client privilege is no stronger than any

18   other person who seeks legal advice.  He has been on notice of

19   this search since Monday.  There's no excuse for the late

20   intervention, and his interest is undifferentiated from

21   Mr. Cohen's here.  It's just a question of who is asserting it.

22             There is no question in Mr. Cohen's papers that he is

23   asserting the privilege on behalf of his client, and he's doing

24   so with very experienced, very qualified counsel.  There's no

25   danger that the privilege holder's interest is going to be not

I4dWcohC

1    represented here.  If Mr. Cohen were prepared to waive

2    privilege on behalf of some clients and weren't objecting to

3    our search in the manner he is, there would be a different

4    analysis.  But here, where Mr. Cohen is asserting the

5    privilege, which Mr. Trump also intends to assert, there's no

6    reason that -- well, there's no differentiation between the

7    arguments that he would make.

8         If Ms. Hendon wants an hour to read the papers so that

9    she can see if there are any unique arguments that she ought to

10   make, we don't object to that, but we absolutely do object to

11   this last, second intervention, which would further delay our

12   lawful review of materials that were seized pursuant to a

13   federal search warrant.

14        THE COURT:  Please.

15        MR. HARRISON:  Just very briefly, Judge.

16        I join in Ms. Hendon's application, and the other

17   problem with just adjourning for a couple hours, while it might

18   give me time to read the government's 20-plus-page filing, it

19   won't give me time to do research on it and things like that,

20   which I can't do from the courthouse here, unfortunately.  I

21   don't feel like we'd be able to fully prepare --

22        MR. McKAY:  Your Honor, Mr. Cohen --

23        THE COURT:  One second.

24        MR. HARRISON:  -- that I would be able to fully

25   prepare within that short period of time, and I really don't

I4dWcohC

1    see the problem -- we do have these weighty issues, which

2    Ms. Hendon so eloquently laid out for the Court -- why there's

3    a problem with adjourning to, say, even just Monday, a couple

4    of days.

5            THE COURT:  I was about to propose an adjournment

6    until Monday.  I'm happy to hear Ms. Hendon whenever she wishes

7    to be heard.  It appears to me that the interests are

8    completely parallel with those of Mr. Cohen, but if you'd like

9    to be heard, I'd be glad to hear you so long as there's no

10   undue delay.  I propose that we resume on Monday after

11   everyone's had a chance to review the government's letter and

12   consider, I must say, the very sparse law that applies.  I

13   think probably everyone in this courtroom is familiar with the

14   right of the press and the public to judicial documents.

15           Go ahead, Ms. Hendon.

16           MS. HENDON:  Can I just have a moment with my

17   colleague?

18           THE COURT:  Yes.

19           MS. HENDON:  That's fine, your Honor.  Thank you very

20   much.

21           THE COURT:  All right.

22           Mr. McKay, you jumped up.  Did you want to be heard

23   again?

24           MR. McKAY:  No, your Honor.  I'd just note our

25   objection to the adjournment.

I4dWcohC

1    I will note for the record that in light of the

2    Court's adjournment, we will not begin our review of the

3    materials until whenever we reappear on Monday.

4          THE COURT:  All right.  I propose 2:00 on Monday.

5          MR. HARRISON:  That works for us, your Honor.

6          MR. McKAY:  Fine for the government, your Honor.

7          THE COURT:  Good.

8          MR. McKAY:  Your Honor, if I may?

9          Given that Mr. Cohen filed his papers around 5 p.m.

10   last night and we responded by 9 a.m. this morning, we put a

11   deadline on Mr. Trump's time to weigh in, which is not the last

12   minute, so that if there are any differentiated arguments we'll

13   have an opportunity to file our responsive brief before Monday.

14         THE COURT:  All right.

15         Ms. Hendon, if you have any arguments that are

16   different from those made by Mr. Cohen, could you give me a

17   filing describing that by 11 a.m. on Monday.

18         MS. HENDON:  Yes, your Honor.

19         THE COURT:  Thank you.

20         MR. McKAY:  Your Honor, if I may?

21         If it's 11 a.m. on Monday, we won't have an

22   opportunity to file a responsive brief by 2 p.m.  Can we make

23   it sometime on Sunday so that we can get our filing in by

24   Monday morning?

25         THE COURT:  All right.  Ms. Hendon, could you have it

I4dWcohC

1  by 3:00 on Sunday?

2          MS. HENDON:  No, we can't, your Honor.  I've conferred

3  with my team.  We can have papers filed by 10:00 Monday

4  morning, and if we need to slide the hearing, I would

5  respectfully ask that we do that.  We're already talking about

6  48 hours to put a brief together on this issue.  I think the

7  most that we reasonably can be asked to do.

8          THE COURT:  I said, and I'm sure of this, that the law

9  is very sparse on the issues here and that no one is likely to

10  uncover any case law that hasn't already been uncovered in the

11  filings.

12          MS. HENDON:  Your Honor, we could file by Sunday

13  night, 9:00.  I can't do it by Sunday at 3 p.m.

14          These are important matters, and for me, Judge, even

15  when there's sparse case law, it takes me a long time to

16  satisfy myself that there is sparse case law.  We pride

17  ourselves on careful, thorough, meticulous work product, and I

18  really feel that I'm being rushed here.

19          THE COURT:  You're proposing Sunday at?

20          MS. HENDON:  Sunday at 9 p.m.

21          THE COURT:  Mr. McKay.

22          MR. McKAY:  Your Honor, that's fine.  We'll respond by

23  then.

24          I just want to note again that this is a TRO brought

25  by Mr. Cohen, not by the government, so these claims of undue

I4dWcohC

1    rush are a little strange coming from the person who brought

2    the motion for a TRO and the privilege holder for whom he's

3    making the motion.  We will respond whenever the papers come

4    in, your Honor, but I just want to note that.

5              THE COURT:  All right.

6              MR. HARRISON:  I'm happy to respond if you want me to.

7              THE COURT:  I think I understand what the response

8    would be, which is that the rush has to do with whether the

9    government will have immediate access to any potentially

10   privileged or work product documents.

11             I have a few questions that I think might short

12   circuit some of this, and I'm loath to state them in public

13   until I understand whether they should be privileged, so I'll

14   ask counsel to come to sidebar with the court reporter.  These

15   will be very brief and narrow.

16             MS. STROM:  Your Honor, I'm sorry.  Before you do a

17   sidebar, could you just give the on-the-record findings about

18   why the nondisclosure of these questions will serve a

19   compelling need and how the nondisclosure for the sidebar will

20   be effective and narrowly tailored.

21             THE COURT:  Yes.

22             MS. STROM:  Thank you, your Honor.

23             THE COURT:  My question will be very narrowly tailored

24   and the higher interest that I identify is the protection of

25   any innocent parties whose information may be divulged.

I4dWcohC

| | |
|---|---|
| 1 | MS. STROM:  By your questions. |
| 2 | THE COURT:  By the answers to my question, both my |
| 3 | questions and the answers to them. |
| 4 | MS. STROM:  OK.  And the one question, you'll be |
| 5 | having a sidebar for just the question and the answer that will |
| 6 | go to the types of information you're hoping to see in the |
| 7 | briefs?  Is that what this is about? |
| 8 | THE COURT:  They have to do with whether there's a |
| 9 | factual basis for certain arguments being made. |
| 10 | MS. STROM:  Thank you, your Honor.  I just wanted to |
| 11 | notify the Court that I will not be here on Monday.  I have |
| 12 | another matter that will take me away, but we will find someone |
| 13 | on Monday to appear for the sidebar. |
| 14 | THE COURT:  Thank you. |
| 15 | (At sidebar) |
| 16 | THE COURT:  In order for me to understand -- |
| 17 | (In open court) |
| 18 | MS. STROM:  Your Honor, can I just ask one question? |
| 19 | If the secrecy is so essential here, why are |
| 20 | Mr. Trump's lawyers able to be at the sidebar and we are not? |
| 21 | THE COURT:  Actually, I don't need Mr. Trump's lawyers |
| 22 | here for this question. |
| 23 | I'm sorry, Ms. Hendon. |
| 24 | MS. HENDON:  That's all right. |
| 25 | THE COURT:  Thank you for pointing that out. |

I4dWcohC

1          (At sidebar)

2          THE COURT:  In order for me to gain an understanding

3  of what delay would necessarily ensue if a special master were

4  the inspecting person rather than the government taint team, I

5  need to know how many clients Mr. Cohen has whose documents

6  have been seized.

7          MR. HARRISON:  That's a good question, Judge.  I don't

8  have an exact number for you.

9          THE COURT:  I expected that you wouldn't have an

10 answer, and I want you to contact your client and get me the

11 answer.

12         MR. HARRISON:  Sure.  Will do.

13         Part of it's a little complicated, Judge, because as

14 we put in our papers, he did have an affiliation with another

15 law firm and he was on a lot of communications and things with

16 a number of those clients, as I understand it, from that law

17 firm.

18         THE COURT:  I'll need to have you identify all of that

19 given the government's contention that Mr. Cohen did not have

20 access to the bulk of it, not all of the law firm's privileged

21 communications.

22         MR. HARRISON:  OK.

23         (In open court)

24         THE COURT:  Could the spectators please step outside

25 if you wish to speak.

I4dWcohC

1          (At sidebar)

2          MR. HARRISON:  We'll do that, your Honor.  I haven't

3     read their papers yet, but I assume that's what they say in

4     their papers, so we'll read that and figure it out.

5          THE COURT:  I see.

6          I'll be asking the government when we have the

7     adjourned proceeding to identify precisely how appointment of a

8     special master would cause more delay than a government taint

9     team.  Without having heard from the government, I anticipate

10    that the argument may be that the taint team is already up to

11    speed with respect to the investigation, and hence, there won't

12    be any delay for them in getting up to speed, but how long the

13    delay would be in getting up to speed is something I need to

14    know.  If, for example, the special master can be briefed on

15    the relevant issues and the likely scope of any crime fraud

16    exception, it doesn't seem that there would be much delay.

17         MR. McKAY:  Your Honor, I can answer that in part now.

18    I'm happy to elaborate further, but it's not just the delay in

19    getting up to speed and getting a special master selected.

20    It's that this is a fast-moving investigation.

21         We are devoting a large amount of resources to the

22    whole case but, in particular, to our filter team to get this

23    review done very quickly.  We reference in our brief that we've

24    already searched email accounts.  We did our privilege review

25    of those remarkably quickly because of the size of our filter

I4dWcohC

1    team and the hard work that they're doing.

2            With all respect, I'm sure you could find a special

3    master who's willing to work very hard, but the example that

4    you have in this district is the *Stewart* case.

5            THE COURT:  I know, 15 months.

6            MR. McKAY:  And that was 15 months for them to even

7    do, and before that wasn't even done, I don't know how long it

8    ultimately took to respond, to produce the report.  Judge

9    Koeltl in that very opinion -- in *Sattar* -- I think it is,

10   laments the appointment of the special master and the delay

11   that arose.  So it's not just that.  As well, if the special

12   master is making the identifications in the first instance --

13   first of all, I want to note that their proposal to have the

14   special master do responsiveness, not just privilege, is

15   completely divorced from their alleged harm.

16           THE COURT:  I agree.

17           MR. McKAY:  With respect to the privilege, part of the

18   delay is that if the special master is making the first

19   determination of privileged materials, the government, the

20   filter team, will be unable to understand the context of what

21   is going on with these privileged materials without seeing the

22   documents.

23           By contrast, Mr. Cohen understands, because he's going

24   to be the author of these documents; he likely has access to

25   them anyway, so we're severely handicapped in our ability to

I4dWcohC

1    understand the privilege determinations, and that's going to

2    result in protracted and costly litigation.  It's going to

3    delay our investigation.  It's going to be burdensome on the

4    special master and the Court's resources, and so experience

5    suggests, we think, that a special master is a very

6    time-consuming process.  And even more importantly, I think,

7    even if the Court were inclined to appoint a special master,

8    the request to have a special master review everything for

9    privilege is likely overbroad.

10          As we set forth in our brief, we think the universe of

11   privileged materials is likely to be a fraction of what was

12   actually seized, and the large majority of emails or

13   communications or documents which may have been seized quickly

14   could be identified as not privileged by the use of simple

15   search terms, for instance, knowing individuals with whom

16   Mr. Cohen undoubtedly does not have an attorney-client

17   communication.  A backup proposal could be, and this would help

18   the delay of a special master to some degree, to agree on a

19   unique set of calls or determinations that a special master's

20   required to make.

21          For example, if the Court were compelled by some

22   unique argument on behalf of Mr. Trump, you could have sorting

23   of only those potentially privileged communications involving

24   Mr. Trump and have a special master make the first

25   determination as to those only, but as to the broader universe

I4dWcohC

1      of documents, it would be much more efficient to have the

2      filter team making the judgment in the first instance.

3              THE COURT:  Now, there is a process point that I don't

4      understand.  In the *Stewart* case, Lynne Stewart's lawyers were

5      given a copy of all of the documents, etc., that were seized.

6      They then decided what information they would argue was subject

7      to the privilege.  I believe they then conferred with the

8      government, and where there was not agreement, it went to the

9      Court.  The problem in the *Stewart* case is that the preparation

10     of the privilege log took months instead of the days or weeks

11     that had been conveyed would be enough, and I'll be looking to

12     Mr. Cohen's lawyers to tell me how quickly they could prepare a

13     privilege log.

14              MR. McKAY:  Your Honor, I would say that, as we make

15     clear in our papers, we think we have a more efficient proposal

16     than that, which is that when the filter team makes the first

17     review, there is a certain subset of documents with which we

18     would be perfectly willing to consult with the privilege holder

19     or the Court, depending on the nature of the call.  For

20     instance, if Mr. Cohen would give us a client list, which he's

21     refused to do to date, we could run emails or communications

22     between Cohen and any clients, and any of those that we marked

23     nonprivileged or potentially privileged as opposed to us making

24     a call, You know what, this is privileged, we're not going to

25     look at, we could present those to Mr. Cohen, he could raise

I4dWcohC

1  objections and any disputes could be brought to the Court or to

2  a special master.

3      We think that would be a far more efficient procedure

4  than having defense counsel who, with respect, has every

5  incentive to delay.  They can commit all they want to making a

6  privilege log.  They have every incentive to delay this matter,

7  because there is an ongoing criminal investigation of their

8  client, and delay is very, very good for them.

9      THE COURT:  I don't yet quite understand the point at

10  which defense counsel would have the opportunity to claim

11  privilege.

12      MR. McKAY:  Under our current filter protocol

13  proposal, we would run clients' names and attorney names and a

14  series of search terms that hit on or were keyed to identifying

15  potentially privileged materials.  We would then have the

16  filter team make the initial review.  Anything that fell within

17  the category of attorney-client, whether between Cohen and

18  client or Cohen and attorney, and we marked them either not

19  privileged or subject to an exception, such as crime fraud or

20  waiver, those things we'd be willing to present to defense

21  counsel.

22      And like I say, as we say in the brief, we think this

23  is going to be a very narrow universe of documents, and that's

24  the reason why we think this is going to be the most efficient

25  protocol.  If you start with the shoe on the other foot, with

I4dWcohC

1    respect, defense counsel has every incentive to be overbroad in

2    their privilege calls, and we're going to have much more

3    protracted litigation over privilege issues than if the

4    government can in the first instance narrow the universe to the

5    things about which we might reasonably.

6        MS. ZORNBERG:  Lisa Zornberg with the criminal

7    division.

8        We're getting reports that the audio of your sidebar

9    is on in the overflow room.

10       THE COURT:  It's got to be off.

11       I believe that counsel should return at some point

12   this afternoon to answer the question how many other clients

13   Mr. Cohen had with respect to whose documents would have been

14   seized in the search and how large Mr. Cohen believes the set

15   of privileged or work product-protected documents would be

16   compared to the overall amount of information.  Is he claiming

17   80 to 90 percent, which is what I would have guessed from his

18   past privilege claims, which seem indeed overbroad, or are we

19   looking at maybe 5 percent?

20       The volume matters in terms of delay.

21       MR. HARRISON:  Sure.

22       MR. McKAY:  Your Honor, if I may, we've asked defense

23   counsel for a client list.

24       THE COURT:  I know.

25       MR. McKAY:  We'd ask that if they're giving a number

I4dWcohC

 1   today they give names.

 2          THE COURT:  OK.

 3          MR. McKAY:  And we do that for two reasons.  One is

 4   that if we are going to be doing the first review, it's

 5   important to us that we know the names of the clients so at

 6   least we can make our search as accurate as possible.  But the

 7   second is we already have considerable amounts of information

 8   about Mr. Cohen's activities, and so to the extent that they're

 9   making overbroad claims today about their client list, we'd

10   like the ability to challenge those, because we want to make

11   sure that the Court is given an accurate estimate of the number

12   of clients.

13          THE COURT:  All right.  I believe a client list should

14   be provided.

15          Yes.

16          MR. HARRISON:  If I can just respond to some of the

17   things that Mr. McKay has said?

18          THE COURT:  I think we'll need to speak more slowly

19   than we've been speaking.

20          MR. HARRISON:  The issue really does come down in this

21   conversation to who reviews the materials first.  It's our

22   position there's already been a Fourth Amendment violation,

23   because I think we all would agree that the government has

24   seized materials that are beyond the scope of the warrant.

25          MR. McKAY:  We would not agree with that.

I4dWcohC

1          THE COURT:  I believe that this part of the argument

2     doesn't need to be made now.

3          MR. HARRISON:  Then I'll just respond -- I'm just

4     trying to respond to what Mr. McKay has already said.

5          THE COURT:  Yes.

6          MR. HARRISON:  I'll say that.

7          I'll also say I do not think that it would take long

8     to appoint a special master.  I do not think it would take long

9     to get a special master up to speed.  We already have someone

10     in mind, and we're happy to work with the U.S. Attorney's

11     Office on rules and guidelines for that special master, which

12     we're happy to do very quickly, so I don't think that process

13     would take very long.

14          THE COURT:  These, I note, are the same arguments that

15     were made to Judge Koeltl in the *Stewart* case, and as Mr. McKay

16     pointed out, Judge Koeltl later rued the day that he allowed

17     defense the time they said they needed, because it was so much

18     more time than defendant had argued would be needed.

19          MR. McKAY:  Your Honor, we agree, and also, defense

20     counsel says they have someone in mind for the special master.

21     We respectfully request, if the Court's considering that, that

22     it be someone the Court pick, not who defense counsel picks.

23          THE COURT:  There is no harm in attorneys suggesting

24     names, but I, of course, would be the appointing person if the

25     special master is appointed.

I4dWcohC

1          MR. McKAY:  Thank you, your Honor.

2          MR. HARRISON:  Of course, your Honor.  I didn't mean

3    to suggest anything different.

4          THE COURT:  I understand.

5          MR. HARRISON:  In relation to the client list, Judge,

6    they keep saying we refuse to turn it over as if we at this

7    point have some obligation -- I know your Honor just directed

8    us to, but prior to now, that we have some obligation to turn

9    over our client list.

10          The reason we haven't turned over a client list is we

11    don't think it's appropriate at this point.  The Court hasn't

12    decided the issue of who is going to be reviewing this stuff

13    first, and that really goes to the heart of the arguments as to

14    who should be reviewing it first.  If there are clients that

15    are totally unrelated to their investigation, they shouldn't

16    get that client list and interview those people and try and get

17    dirt on my client.

18          THE COURT:  This is, I think, a specious argument.  To

19    say that you have refused to give it does not suggest that you

20    have an obligation to give it.  It just suggests that the

21    government asked for something and you refused to give it at

22    that point.

23          The reason I think it's important to have it now is,

24    first, I believe that what I've seen so far of Mr. Cohen's

25    lawyers' arguments about privilege suggests to me that your

I4dWcohC

1    view of the privilege is much broader than the law permits, and

2    hence, I think that needs to be checked.

3           Secondly, my determination needs to be based in part

4    on how long it will take anyone -- a special master, a taint

5    team, the Court -- to deal with the universe of potentially

6    privileged or work product-protected documents.

7           All right.  Now, before I learned that the feed was

8    on, it was on my mind to ask at the end of this sidebar, could

9    each side please review everything said at sidebar and let me

10   know what needs to be sealed and what does not need to be

11   sealed and try to reach agreement on that.

12           MR. HARRISON:  Sure.

13           THE COURT:  In terms of the client list and universe

14   of privileged documents or potentially privileged documents, I

15   assume you could learn that in an hour or two.  Is that right?

16           MR. HARRISON:  I'll do my best.

17           THE COURT:  Is that fair?

18           MR. HARRISON:  Probably, Judge.  I'll do my best.

19           THE COURT:  Why don't we resume at 2 p.m. here.

20           MR. HARRISON:  I would request, Judge, that that

21   information be filed under seal.

22           THE COURT:  I agree.

23           MR. HARRISON:  I think potentially innocent third

24   parties, who are totally unrelated to my client, should be kept

25   under seal.

I4dWcohC

1                THE COURT:  That's why I'm hearing you at sidebar.

2                MR. HARRISON:  Thank you, Judge.

3                MR. McKAY:  Your Honor, just to note, we don't object

4      to the client list being under seal.  We don't think anything

5      said at this sidebar needs to be sealed.  We didn't go into any

6      detail about the investigation beyond what we said in our

7      papers, so we have no objection to this being in open court.

8                THE COURT:  All right.  If you have an objection, you

9      need to let me know by 2.  Otherwise I'll be releasing it.  I

10     think Mr. McKay is right.

11               MR. HARRISON:  OK.  And we're coming back here at 2,

12     Judge?

13               THE COURT:  Yes.

14               MR. HARRISON:  Just to respond briefly to what Mr.

15     McKay said, we're not trying to delay anything, Judge.  We've

16     been moving quickly.  We're not asking for long delays.  We

17     don't have an interest in delay.

18               THE COURT:  I understand.

19               MR. HARRISON:  The only other thing I'll say -- I'll

20     save the rest of my arguments for later, Judge.

21               THE COURT:  Thank you very much.  See you at 2.

22               (In open court)

23               THE COURT:  I'd like to note for those still in the

24     courtroom that I believe it is likely that a transcript of what

25     transpired at sidebar can be made public, but I need to hear

I4dWcohC

1    argument from the attorneys when they've had a chance to think

2    through the issues before I do that.

3            I will be convening here with the attorneys for

4    Mr. Cohen and the government to flesh out some facts that I

5    believe will be relevant to whether a special master needs to

6    be appointed or whether a government filter team or taint team

7    should be the filtering body.

8            MR. RILEY:  I'm confused, Judge.  John Riley from

9    Newsday.  You're saying that you're going to be convening in

10   private or in public session to discuss that?  If it's private,

11   I would object.

12           THE COURT:  I understand.  I'm not surprised to hear

13   that you object.  I've enjoyed your objections in the past, and

14   not to demean them, they're always well-taken but not

15   necessarily adopted by the Court.

16           I believe that what I will be hearing at sidebar

17   relates to potentially innocent individuals being identified

18   and their privacy interests being invaded if what I'm going to

19   hear is public.  That's my rationale at this point, and I

20   believe that that's a higher interest than the need of the

21   press and the public to learn this information.

22           MR. RILEY:  Just so I can explain to our lawyers at

23   *Newsday* and the *Times*, is this something you're talking about

24   occurring on Monday when this hearing reconvenes or something

25   that is going to occur prior to the reconvening of this

I4dWcohC

1    hearing?

2            THE COURT:  What I intend to learn at 2 p.m. consists

3    of facts that might invade the privacy interests of any

4    innocent person.

5            MR. RILEY:  You're talking about 2 p.m. today.

6            THE COURT:  2 p.m. today.

7            MR. RILEY:  And you intend to close the courtroom for

8    that hearing and exclude us?

9            THE COURT:  I intend to hear the parties as to whether

10   it should be closed, and I may close it.  Let me say I'll be

11   glad to hear from the press as to whether a transcript of that

12   should be made public, but in the first instance, I need to

13   hear the attorneys in a sealed proceeding, and I know you

14   object.

15           MR. RILEY:  So you intend to -- you have decided it

16   will be closed at 2:00 but will consider unsealing the

17   transcript afterwards, or will we be allowed to be heard at

18   2:00 with lawyers for the media arguing that it should not be

19   sealed in the first place?

20           THE COURT:  I'll be glad to hear you if you like, but

21   I'm very familiar with the public interest in transparency, and

22   it would be only if I'm quite certain that innocent

23   individuals' privacy interests would be invaded if the public

24   had this information.

25           MS. STROM:  Your Honor, I would love to be heard at

I4dWcohC

1    that hearing, because it seems to me that we should at least

2    consider less restrictive means.  For example, if there are

3    certain individuals that we're worried about, we could give

4    them pseudonyms.  Or at least when we're arguing about why the

5    proceedings writ large must be public, there must be ways that

6    we can have pseudonyms or just not state the person's name

7    while we're discussing the larger interest of who should be

8    reviewing these materials and what types of information would

9    be in the materials.  It seems to me there are less restrictive

10   means than just not allowing us at all.

11        THE COURT:  I think you're making a good point, and

12   I'll ask counsel to consider whether pseudonyms would solve the

13   privacy interests.

14        MR. McKAY:  Your Honor, from our perspective, as long

15   as we understand what the pseudonyms are, we don't object.  I

16   think we could propose a hybrid procedure where the specific

17   question that you propose to defense counsel that calls for

18   some names, those names might be given at sidebar, but the

19   discussion that follows, as long as specific names are not

20   used, could be in open court.

21        MS. STROM:  To me, that seems like a great

22   alternative.  I understand that there are extraordinarily

23   compelling interests for keeping innocent people's names out of

24   these, but there are extraordinarily compelling interests on

25   the other side that I don't think we've articulated.  The press

I4dWcohC

         1    and the public are so interested in this governmental

         2    investigation and also on the idea of when it's appropriate to

         3    breach attorney-client privilege; when the government can look

         4    at attorney-client privileged documents, who should be the

         5    person that is able to search these documents in the first

         6    interest.  This is something the President has been tweeting

         7    about.  This is something that's on the front page of every

         8    newspaper in the country, and to exclude us completely from

         9    these proceedings, I think, is something we need to keep in

        10    consideration.  If there's a way to have a hybrid procedure

        11    where we keep the names out, it seems to me, would be a good

        12    alternative.

        13         THE COURT:  I think you've made a very good point.

        14    The government accepts it.

        15         Do Mr. Cohen's lawyers wish to weigh in on this?

        16         MR. HARRISON:  Judge, could we approach very briefly

        17    for one second?  Something else that I just thought of related

        18    to the Court's request.

        19         THE COURT:  All right.  I'll hear you briefly at

        20    sidebar.

        21         (At sidebar)

        22         MR. HARRISON:  Judge, I just want to front an issue

        23    for you.  I'll make sure to go try and find out the answers to

        24    the close questions for sure.  It occurred to me, I don't know

        25    this for sure, but there may be clients of Mr. Cohen's that

I4dWcohC

1   have a privacy interest in not having the government know that

2   they've been talking to him, so I don't know if we're going to

3   have to go get permission from the clients to reveal their

4   names to the Court and to the government.

5           I haven't thought about that issue yet.  Maybe it's

6   not an issue.  I don't know.

7           MR. McKAY:  Your Honor, I think that a list of client

8   names is not covered by the privilege.  The mere fact of the

9   representation is not privileged.

10          THE COURT:  That's correct.

11          MR. HARRISON:  I'll try and look at the law really

12   quickly, but I think it might be in some instances.  I don't

13   know if that's the case here.  Maybe it's not.

14          Come on, Tom.  You're not deciding it right now.  Come

15   on.

16          THE COURT:  No, we're not deciding it right now.

17          MR. HARRISON:  OK.

18          THE COURT:  If you have any authority that a client

19   list is privileged, I want to have you bring copies of the

20   decisions with you.

21          MR. HARRISON:  Sure.  Thank you, Judge.

22          THE COURT:  OK.  Thank you.  A copy for the government

23   and for the Court.

24          (In open court)

25          THE COURT:  Let's talk about what happens next.

I4dWcohC

1          At 2:00, I'll be glad to hear the press, anyone from

2     the press, if you wish to be heard, and at that point, I will

3     hear counsel at sidebar to learn whether the information in

4     question should be under seal or not.  I don't yet know what

5     their arguments are, but I can't make the decision without

6     hearing you and without hearing them.

7          MS. STROM:  Thank you, your Honor.  I appreciate the

8     opportunity.

9          THE COURT:  Yes.

10          MR. AVANATTI:  Your Honor, could I be heard briefly?

11          THE COURT:  Yes.

12          MR. AVANATTI:  Michael Avanatti.  I represent

13     Stephanie Clifford, otherwise known as "Stormy Daniels."

14          I would like an opportunity at 2:00 to weigh in on

15     this issue relating to the privacy, or lack thereof, concerning

16     the documents.  We have every reason to believe that some of

17     the documents that were seized relate to my client and, in

18     fact, may impact this privacy issue that the Court is speaking

19     about, so I would like the opportunity to address the Court

20     briefly at 2:00.

21          THE COURT:  I'll give you that opportunity.

22          MR. AVANATTI:  Thank you, your Honor.

23          THE COURT:  Would anyone else like to be heard at this

24     point?

25          MR. RILEY:  Judge, I just don't know the case number

I4dWcohC

```
 1   yet, and we have no capacity to follow what is and isn't sealed

 2   and what has or hasn't been filed without a case number to look

 3   up on Pacer.  That would be very helpful.

 4           THE COURT:  Can the government help with identifying

 5   how the press would learn what's public?

 6           MR. McKAY:  Yes, your Honor.  We'll ask the clerk's

 7   office to see if they can assign a case number speedily, if it

 8   hasn't already been assigned, and then we can provide that

 9   number, I suppose.  I suppose the Clerk of Court's press office

10   will be provided with that number and can communicate it.

11           THE COURT:  All right.  Is there a member of the press

12   you would designate to be your point person who can then

13   communicate with the rest of the press?

14           MR. RILEY:  We all will.

15           MR. WEISER:  I think we all can.

16           THE COURT:  Very good.

17           We're adjourned.  Thank you.

18           (Recess)

19

20

21

22

23

24

25
```

I4dWcohC

```
                          AFTERNOON SESSION

                             2:00 p.m.
```

1          AFTERNOON SESSION

2             2:00 p.m.

3          MR. HARRISON:  Judge, could I have 30 seconds?

4          THE COURT:  Yes.

5          While he takes that 30 seconds, I'd like to ask anyone

6     else who is with Mr. Harrison to review the transcript of what

7     occurred at sidebar to make sure that it can be released

8     publicly.  The government has said it can.  I believe it can.

9     I just need to have you review it.

10          Mr. Harrison, are you ready?

11          MR. HARRISON:  Yes, Judge.  Could we approach the

12     sidebar, please?

13          THE COURT:  Why?

14          MR. McKAY:  Your Honor, we don't think there's any

15     basis for the application they're about to make to be made at

16     sidebar.

17          THE COURT:  All right.  Can you proceed from there,

18     please.

19          MR. HARRISON:  As to the issue that we discussed at

20     sidebar in the previous appearance today, your Honor, I was

21     able to have one of my colleagues do some research over the

22     short break, and I do think that there's some case law that

23     demonstrates that it would potentially be an ethical breach for

24     us and/or us on behalf of our client to turn over the specific

25     information that we discussed potentially turning over.

I4dWcohC

|  |  |
|---|---|
| 1 | THE COURT:  I told you at sidebar that you'd need to |
| 2 | hand me up copies of any decisions you rely upon and have a |
| 3 | copy for the government. |
| 4 | MR. HARRISON:  We've got copies of the decisions, |
| 5 | Judge.  I'll hand them up in one second. |
| 6 | THE COURT:  And I hope you've indicated in the |
| 7 | decision what portion we should read. |
| 8 | MR. HARRISON:  I'm sorry.  I didn't hear your Honor. |
| 9 | THE COURT:  I see you've got a fairly thick set there. |
| 10 | Can you just indicate what you want us to read, the important |
| 11 | part. |
| 12 | MR. HARRISON:  I could, Judge.  That's going to take a |
| 13 | minute. |
| 14 | THE COURT:  Just as a housekeeping matter, my law |
| 15 | clerk told me that Ms. Stormy Daniels's attorney, Mr. Avanatti, |
| 16 | is not admitted here but wishes to be heard. |
| 17 | I'll be glad to hear you. |
| 18 | MR. AVANATTI:  Your Honor, we appreciate the |
| 19 | accommodation very much. |
| 20 | THE COURT:  Not at all. |
| 21 | MR. AVANATTI:  Thank you, your Honor. |
| 22 | MR. HARRISON:  Judge, I don't know if I can perhaps |
| 23 | short circuit this a little bit.  My colleague actually did |
| 24 | prepare a letter to submit to the Court.  He just walked down |
| 25 | to court with it, since we had a short break.  I just read it |

I4dWcohC

1    for the first time here.  I've got to make a couple of changes

2    to it, but it is a letter that explains everything that we

3    could conceivably submit to the Court within a very short

4    period of time, but what I was going to ask is because of what

5    I'm concerned about with certain ethical obligations that we've

6    explained in this letter, I just don't think there's any way

7    that we can give the Court an answer today.  I was going to ask

8    that we adjourn this issue to Monday, since we're already

9    adjourned to Monday.

10        THE COURT:  There's more than one question so there's

11   more than one answer.  THE question how many clients is one I'm

12   sure you can answer.

13        MR. HARRISON:  I can't give you an exact number, your

14   Honor.

15        THE COURT:  Why not?

16        MR. HARRISON:  I don't know how far the documents go

17   back.  Prior to working for the Trump organization, between

18   2006 and 2017, for instance, my client had other clients.  I

19   don't know if there are -- and I don't have an exact number.

20   It's a long time ago.  That's over 12 years ago.  We've got to

21   go back and be able to look and try and compile a list of

22   clients from that time period.

23        THE COURT:  That doesn't strike me as something that

24   takes more than a couple of hours if your client focuses on it.

25        MR. HARRISON:  I can try and sit down with him and

I4dWcohC

1    have him do that, Judge, but it's hard for me to do that from

2    Pret a Manger up the street and try and comply with the Court's

3    other orders at the same time and try and do research on this

4    ethical issue so I make sure I'm not violating any ethical

5    obligations.

6            THE COURT:  I appreciate what you're saying, but you

7    have a team and I'm expecting the team to be working full time,

8    given that you're the ones who want emergency relief.

9            MR. HARRISON:  We are, Judge.  We're working round the

10   clock.  Mr. Huttenlocher was not even on this case until an

11   hour and a half ago, and he jumped on that research and he

12   wrote a three-page letter for the Court.

13           THE COURT:  Could you please just read out loud the

14   key portions of the letter.

15           MR. HARRISON:  Sure.  I'll skip to the reference to

16   the pertinent case law, your Honor.

17               First, the New York Court of Appeals has stated that

18   "in discussing whether the attorney-client privilege insulates

19   a client's identity from disclosure, we have stated on a

20   previous occasion that notwithstanding opinion to the contrary,

21   the rule in New York is not so broad as to state categorically

22   that the privilege never attaches to a client's identity."

23           THE COURT:  You're speaking of New York State law.

24           MR. HARRISON:  That is a New York State case, Judge.

25           THE COURT:  I don't think we should pay too much mind

I4dWcohC

1    to that.

2              MR. HARRISON:  OK.  That particular opinion references

3    a Southern District of New York opinion, so let me just read

4    that sentence.  The Court of Appeals continued, the New York

5    Court of Appeals, your Honor, and stated that:  "Absent other

6    circumstances, an attorney cannot be compelled to reveal the

7    client's identity where the latter is not a party to the

8    pending litigation.  This rule has been applied by courts in

9    this district"; that is, the Southern District of New York,

10   your Honor.

11             THE COURT:  What case is that and what did it hold,

12   the Southern District one?

13             MR. HARRISON:  Sure.  The reference I've got here is

14   *Elliott Associates L.P. v. Republic of Peru*, and the cite which

15   I have here is 176 F.R.D. 93, 99 (S.D.N.Y. 1997).  The quote

16   from that is, "The grounds for exempting a client's identity or

17   location" -- sorry, Judge.  I'm just making sure I've got the

18   right one.  The quote is, "The grounds for exempting a client's

19   identity or location from the scope of the attorney-client

20   privilege rarely apply where, as here, the client is a

21   nonparty."

22             There's also a reference to another Southern District

23   of New York case from 1994, *Allen v. W. Posh Pepperell Inc.*,

24   848 F.Supp. 423, 431-32.  The quote is, "Defendants here have

25   not made a showing of a need for disclosure of the names of

I4dWcohC

1  Mr. Crone's other clients sufficient to overcome the legitimate

2  fear of retaliation harbored by those clients."  And that goes

3  on to state, I believe, your Honor, if I'm reading this

4  correctly, if covered by the attorney-client privilege that

5  identity "cannot be revealed by the attorney without the

6  client's consent."

7          There's also ethical obligations on the part of

8  attorneys as they've been interpreted by the New York State Bar

9  Association, your Honor.  In pertinent part, quoting from New

10 York State Bar Association, Committee on Professional Ethics,

11 ethics opinion 1088.

12         THE COURT:  Again, this is New York State law?

13         MR. HARRISON:  That is New York State law, Judge, yes,

14 which covers ethics.

15         THE COURT:  Anything else that's federal law?

16         MR. HARRISON:  Federal law.  I've got some quotes from

17 that ethics opinion, but I'll skip that.

18         I don't have any other federal cases cited in this

19 particular letter, your Honor.

20         Can I just have one second to confer with

21 Mr. Huttenlocher?

22         THE COURT:  Yes.

23         MR. HARRISON:  Judge, that's all that we were able to

24 find in the short period of time that we've had so far.

25         THE COURT:  OK.  Now, you've referenced how long your

I4dWcohC

1     client has been representing the Trump organization.

2                 MR. HARRISON:  I believe that's correct, Judge, yes.

3                 THE COURT:  And that began when?

4                 MR. HARRISON:  I believe it's 2006 that he started

5     working for the Trump organization, your Honor.

6                 THE COURT:  At that time did he have any other clients

7     who continued with him during his representation of the Trump

8     organization?

9                 MR. HARRISON:  I don't know the answer to that

10    question, Judge.  I think that he did have other individual

11    clients.  I don't know if they continued with him from his

12    prior employment, but my understanding is he did have other

13    individual clients during that period.

14                THE COURT:  All right.  Your inability to answer these

15    questions suggests to me that Mr. Cohen should be with you in

16    court next time so that the Court will have an answer to these

17    factual questions; that is, the ones that are not privileged.

18                Thank you.

19                MR. McKAY:  Your Honor, could I be heard briefly on

20    this?

21                THE COURT:  Yes.

22                MR. McKAY:  We'll obviously consider Mr. Cohen's

23    counsels' letter.  We haven't seen a copy yet nor the authority

24    therein, but it sounds like their cases were referring to

25    compelling an attorney to disclose client's names.

I4dWcohC

1          Here, we're in quite a different situation.  Mr. Cohen

2     is seeking a TRO to assert privilege on behalf of his clients.

3     The law, federal law in the Second Circuit, is very clear.

4     This is a quote from a Second Circuit case:  "In the absence of

5     special circumstances, client identity and fee arrangements do

6     not fall within the attorney-client privilege, because they are

7     not the kinds of disclosures that would have been made absent

8     the privilege, and their disclosures do not incapacitate the

9     attorney from rendering legal advice," *Vingelli v. DEA*, 992

10    F.2d 449.

11         My colleague has copies for the Court and defense

12    counsel.  We're happy to hand it up.

13         THE COURT:  What year was that?

14         MR. McKAY:  That was Second Circuit 1993.

15         THE COURT:  OK.

16         MR. McKAY:  I think it's important to remember that

17    what's going on here is Mr. Cohen filed a temporary restraining

18    order.  They made a representation to the Court about the vast

19    amount of attorney-client privileged material that was

20    allegedly seized.  Now they're being asked by the Court to back

21    up those assertions with just the names of those clients where

22    there's not privilege.  The law is very clear on this.  The

23    attorney-client privilege can't at the same time be used as

24    both a sword and a shield.  The quote for that is the Second

25    Circuit case of *Bilzerian*, 926 F.2d 1285.

I4dWcohC

1          What they are trying to do right now is use

2     attorney-client privilege as a sword to challenge the

3     government's ability to review evidence seized pursuant to

4     lawful search warrants, and then when we contest the factual

5     allegations that they use as a basis for that motion, they try

6     to use attorney-client privilege as a shield and refuse to

7     provide the Court with the information the Court has asked.

8          By their own account, in their brief, the case is a

9     cause of action in equity.  In equitable proceedings, you can't

10    be trying to use the privilege as both the sword and the

11    shield.  They've deprived the Court of the facts that you've

12    asked in order to base your decision, and so for that reason,

13    we think that the Court could deny the application on this

14    basis alone if they're not willing to turn over the client

15    list, if you don't have any basis to know that the

16    representations that are made about the scope of the seizure

17    have any basis in fact.

18          THE COURT:  I must say I find it intriguing that

19    Mr. Harrison's application to the Court and attendant

20    memorandum tells me that there are thousands of documents that

21    the government seized that are subject to attorney-client

22    privilege.  How could you know there are thousands if you can't

23    answer my question?  Please tell me.

24          MR. HARRISON:  Sure, Judge.

25          So, I don't have a copy and we haven't been able to

I4dWcohC

1    review what the government has seized, so I can't give you an

2    exact number.  I know basically from what was seized that there

3    are a lot of documents.

4             THE COURT:  I'm not asking whether there are a lot.

5    I'm asking the basis for your contention that there are

6    thousands and thousands.

7             MR. HARRISON:  That is our best understanding without

8    being able to look at the documents and give the Court an exact

9    number.

10            THE COURT:  How did you get that understanding?

11            MR. HARRISON:  Discussions among the defense team,

12   Judge, about the case.

13            THE COURT:  Really?

14            MR. HARRISON:  Yes, Judge.

15            THE COURT:  Who on the defense team represented that

16   there are thousands and thousands of privileged documents?

17            MR. HARRISON:  Judge, I'm not prepared to get into

18   internal defense discussions today.  I don't think I can

19   ethically reveal this.

20            THE COURT:  What I need to know is whether you have a

21   basis, as an officer of the court, to tell me that there are

22   thousands and thousands of privileged documents.

23            MR. HARRISON:  I want to be very careful, because I

24   want to be as up-front with the Court as possible.  The

25   "thousands" is an estimate.  I can't tell the Court that it's

I4dWcohC

exactly a thousand or it's in the thousands.  That is my best

understanding without having the documents to look at.  That's

an approximation, an estimate of how many documents are

relevant.  I don't know the exact number, your Honor.

THE COURT:  All right.

MR. HARRISON:  It might be less than a thousand.  I

don't know for sure.  I haven't had a chance --

THE COURT:  Did anyone have a basis for telling me

thousands and thousands?

MR. HARRISON:  Yes, I think we do have a basis.

That's our sort of best guess or best estimate based on what we

know at this time without looking at the actual production.

THE COURT:  I'm going to want to know your basis for

that.

I don't know of any better way to handle this thing

than to adjourn it briefly to allow Mr. Harrison to talk to his

client to find out the approximate number of other clients'

privileged documents that were likely in his possession;

documents or device information, how many, the number, and I

want you to have the names with you.  I'm not telling you you

have to give them to me, but I'll be reading the case law and

deciding whether you have to give them to me, so I want you to

have them right there in case I decide you must give them to

me.

Yes.

I4dWcohC

1          MR. AVANATTI:  Your Honor, could I be heard briefly?

2          Your Honor, I dealt with this issue in another case,

3    just for the Court's benefit, and I think actually the question

4    is not how many other clients are there.  The question is how

5    many other clients that have not been previously disclosed are

6    there?  Because if Mr. Cohen represented a client and that

7    client was disclosed to an opponent or another attorney or

8    there was a lawsuit that was filed, that's no longer privileged

9    even if it was privileged at some point in time, so we're

10   talking about a very small subset of clients, and what we're

11   talking about is clients that consulted Mr. Cohen on a

12   confidential basis and who were never disclosed to anyone.  And

13   as a practicing attorney, and your Honor knows from your

14   experience, that's a very small number in the grand scheme of

15   things, and so I think that's the inquiry, and it should be

16   able to be answered in short order.

17          I appreciate you giving me the time and opportunity to

18   address the Court.

19          THE COURT:  Thank you very much for that.

20          All right.  I suggest that we reconvene at 4 p.m., at

21   which point I expect Mr. Harrison to be able to answer my

22   questions so long as I have a basis in law to learn the answer.

23          MR. HARRISON:  Judge, I'm going to need more time.  I

24   need to consult internally at our firm with our ethics people

25   and talk to them about these ethics opinions.  I need more time

I4dWcohC

```
1    to do that.  I need more time.  I'm not going to be able to do
2    it at 4:00.
3              THE COURT:  I believe you can so I want you to try.
4              If anyone else wishes to be heard, I'll be glad to
5    hear you.
6              MS. STROM:  Your Honor, I'd like to just say one
7    thing.
8              THE COURT:  Please come to the podium.
9              MS. STROM:  Thank you.
10             Just to the extent that the names of clients will be
11   used as a justification for sealing, since we have time to
12   think about it, I thought I'd put one more case in front of
13   your Honor, which is the Bernstein v. Bernstein Litowitz case.
14   I know the docket was just put out, so I don't know if that was
15   in the government's briefing or not, but there, they talked
16   specifically that a lawyer's ethical obligation to protect
17   client confidences is more extensive than the very narrow
18   attorney-client privilege, and generally, the fact that you
19   represent a client, as was discussed before, is generally,
20   absent special circumstances, not privileged.  So to narrow
21   even this inquiry, it's not only people that we didn't know
22   that Mr. Cohen represented before, it's people that have a
23   special circumstance, that there's some reason that the fact
24   Mr. Cohen was representing them was privileged, and I can give
25   you those case cites if you hold on.
```

I4dWcohC

1        All right.  The *Bernstein v. Bernstein Litowitz* case

2   is 814 F.3d 132 (2d Cir. 2016).  That's the one that talked

3   about the ethical duty is broader than the attorney-client

4   privilege.  And then the fact -- sorry.  I had associates

5   working hard over the time that we were out.

6        The fact that generally, the fact that a lawyer

7   represents a client is not privileged, the name of which case

8   my email isn't picking up right now, is *Vingelli v. U.S. Drug*

9   *Enforcement Agency*.  That's also Second Circuit 1993, case cite

10  992 F.2d 449.

11        To the extent that this is the reason that they want

12  sealing, we would argue that there needs to be a special

13  circumstance that the fact they were clients of Mr. Cohen

14  should be deemed privileged.

15        THE COURT:  All right.

16        Now, we discussed this morning your suggestion that

17  pseudonyms could replace the actual names.  I think everyone is

18  operating on the premise that pseudonyms can be used.

19        MS. STROM:  Absolutely.  If there is a reason to use a

20  pseudonym, that seems Luke a reasonable alternative.

21        THE COURT:  All right.  Anything else?

22        MS. STROM:  That's it, your Honor.  Thank you.

23        THE COURT:  OK.  Thank you.  See you at 4.

24        (Recess)

25        THE COURT:  Good afternoon.  Please have a seat.

I4dWcohC

1          I'd like to begin by asking Mr. Harrison his view of

2     whether the colloquy at sidebar can be unsealed.

3          MR. HARRISON:  I don't think we have an objection,

4     Judge.

5          THE COURT:  All right.  It will be unsealed

6     immediately.

7          I'll turn now to Mr. Harrison to give me the

8     information that I sought.

9          MR. HARRISON:  Judge, I believe you asked us to answer

10    two questions.  The first one was our basis for the assertion

11    in our papers that we believe, or we estimate that there are

12    thousands of privileged documents that have been seized.

13         THE COURT:  Thousands and thousands.

14         MR. HARRISON:  I'm sorry.  What, Judge?

15         THE COURT:  I think you said thousands and thousands.

16         MR. HARRISON:  I think we just said thousands, but I

17    don't object, Judge.

18         THE COURT:  OK.  Go ahead.

19         MR. HARRISON:  We make pretty clear in our papers,

20    Judge, that there are, at least as we understand it, two

21    general categories of what we believe to be privileged

22    documents.  One is between Mr. Cohen and his clients, and the

23    other category of privileged communications is between

24    Mr. Cohen and his attorneys.

25         Mr. Cohen's involved in a number of different ongoing

I4dWcohC

legal issues right now, and he has attorneys another more than

one firm and he has attorney-client privilege for those

communications.  Based on that, I think we're pretty confident

that there are thousands of privileged communications.  Again,

we haven't seen what the government seized.  I haven't reviewed

it.  I don't have an exact count for you, but there is that.

         In addition to that, Judge, we don't know exactly how

far back in terms of the time period the seized materials go,

but just so the Court understands, prior to working for the

Trump organization, my understanding is that Mr. Cohen was an

attorney for over 20 years before that, with clients, so we

believe, we assume that a lot of those communications, that

there were privileged communications with clients during that

period, and those may well be encompassed in the materials that

the government seized, because they seized a lot of stuff.

         THE COURT:  I think your premise is that some of these

date back at least 30 years, and that the attorney would have

kept that in his office?

         MR. HARRISON:  Well, I think, and I didn't have a

chance to check this, the beginning of the time period of the

Trump organization, I think he started there in 2006, so that

would be 12 years going back as far as we go back.  We don't

know what time period is in the seized materials.

         Based on that and based on what we've also clearly

included in our memo, a reference to privileged communications

I4dWcohC

1    between Mr. Cohen and his own lawyers, that's where we get the

2    basis from, Judge, to say that there were thousands and

3    thousands.

4                THE COURT:  Thank you.

5                MR. HARRISON:  As to an approximate number of clients,

6    I don't have an approximate number of clients, but I'm

7    confident in telling the Court as an officer of the court right

8    now, I need more time.  We need more time to really analyze

9    that question.  As the government has pointed out, whether or

10   not someone is a client is not necessarily a black-and-white

11   issue.  Mr. Cohen did have a relationship.

12               THE COURT:  Just a moment.  The question has to do

13   with attorney-client privilege.  It doesn't have to do with his

14   business clients.

15               MR. HARRISON:  I understand that, Judge, but that's

16   sort of why it's a more complicated issue than it would be, I

17   think, for instance, for, say, me or other attorneys who work

18   only at law firms.  Mr. Cohen had his own individual clients.

19   He also had an affiliation with another major law firm.

20               THE COURT:  Of brief duration.

21               MR. HARRISON:  Relatively brief, Judge, but still not

22   really brief, not like a week or two.

23               We're still trying to work through whether those are

24   considered as clients or not, and that obviously has an impact

25   on Mr. Cohen and an impact on what representations we're going

I4dWcohC

1    to make about that law firm and whether they were shared

2    clients or the law firm's clients or Mr. Cohen's clients.  It's

3    not an easy issue to figure out.

4            I know the Court is attuned to this issue.  I know the

5    Court wants us to respond with as much specificity as possible,

6    but we need time to work through those issues.  All I'm asking

7    is that you give us until Monday to give you an answer that I

8    feel more confident in giving to the Court as an officer of the

9    court.

10           THE COURT:  All right.  Can you get me the answer by

11   10 a.m. Monday and get the government the answer.  Then people

12   will have a chance to consider what to agree with and what not

13   to.

14           MR. HARRISON:  I think so, your Honor.  I will do my

15   best, and we will try and meet that 10 a.m. deadline.  I don't

16   know of a reason right now why we couldn't, and we will try and

17   meet that deadline.

18           THE COURT:  Will you have access to your client, or

19   are you telling me you don't know whether you will?

20           MR. HARRISON:  I believe I'll have access to him over

21   the weekend, yes, Judge.

22           THE COURT:  All right.  I'm directing that he be here

23   present with you at counsel table at 2 p.m. so that we don't

24   need to have many more adjournments.

25           Mr. McKay, does the government wish to be heard?

I4dWcohC

1              MR. McKAY:  Yes, your Honor.

2              We seized evidence pursuant to judicially authorized

3     search warrant on Monday.  Since Monday, we have had the legal

4     authority to review that evidence for the crimes that were set

5     forth in the detailed affidavit.

6              After Mr. Cohen's counsel contacted us asking us to

7     stop our review, and then after he filed the temporary

8     restraining order, we ceased our review of this important

9     evidence, first as a courtesy and then in light of the pending

10    motion, but every day that goes by is a day that we are

11    lawfully allowed to review this evidence and further our

12    investigation, and we're not able to.

13             Mr. Cohen's counsel says he needs more time, but this

14    is their motion.  They made a motion for extraordinary

15    temporary relief asking us not to review lawfully seized

16    materials.  As the reason for the immediacy, which is the

17    subject heading in Mr. Harrison's affidavit at page 36, he

18    says, "the seized materials contain thousands, if not millions,

19    of pages of documents that are protected by the attorney-client

20    privilege and/or the attorney work product doctrine."

21             Now, today he can't tell you how many clients

22    Mr. Cohen has or how many documents are out there.  He's

23    walking back those representations, which were the premise of

24    their motion.  We're now here for the third today.  The defense

25    still cannot provide the Court with the information that the

I4dWcohC

1   Court needs to make the decision.  They've talked about their

2   ethical obligations under Rule 1.6 of the ethical rules that

3   say that you can disclose a client name when permitted or

4   required under these rules or to comply with the law or a court

5   order.

6            Now the Court has directed them to provide a client

7   list, and there's no ethical obligation there.  As we've

8   discussed, the case law is clear that the fact of the client

9   list is privileged.

10           But Mr. Cohen's counsel --

11           THE COURT:  But the fact of the client list is not

12   privileged.

13           MR. McKAY:  Not privileged, correct.

14           They put themselves in this place by filing a TRO and

15   asking for this extraordinary relief, and now they are delaying

16   the government's investigation because they can't come up with

17   the facts that are necessary to predicate their motion.  It's

18   their burden to show likelihood of success on the merits.  This

19   is a quote from a Second Circuit case, "A TRO is an

20   extraordinary and drastic remedy, one that should not be

21   granted unless the movant, by a clear showing, carries the

22   burden of persuasion."  The cite for that is *JBR, Inc.*, 618

23   F.App'x 31, a 2015 Second Circuit case.

24           Your Honor, we respectfully submit that the Court

25   should conclude right now that the defense has failed to meet

I4dWcohC

1    that burden, because their failure to provide the basic facts

2    that support their motion is, I think, fatal in a couple

3    different respects, and I'd like to briefly describe those.

4              The first is the very premise of their argument is

5    that an attorney's office has special protections, that in

6    extreme cases, like the *Lynne Stewart* case, it requires the

7    appointment of a special master to protect the privilege.  But

8    if Mr. Cohen and his counsel can't substantiate his assertions

9    about the thousands, if not millions, of documents of

10   privileged material, this case is not like the *Lynne Stewart*

11   case.  It's not like the *Lynne Stewart* case for a couple of

12   other reasons, which I've talked about and we've briefed, but

13   it brings us quite squarely into the run-of-the-mill case in

14   which an individual, who may at times seek advice from

15   attorneys, has his evidence or his documents or his hard drives

16   seized and in that evidence there is some attorney-client

17   communication.  The common practice for such cases in this

18   district is a filter team like we propose.  The failure to

19   substantiate the amount of documents and the number of clients

20   takes us out of the law firm realm and squarely into the realm

21   of cases like *Grant* and *Winters* that we cite in our brief.

22             The second point is that whether it's defense

23   counsel's primary proposal, where they get to make the first

24   review, or it's the special master context, where defense

25   counsel will get to make privilege claims to the special master

I4dWcohC

1   and the government filter team will be able to see the

2   documents, both situations require defense counsel to have an

3   honest and complete and clear picture of who his clients are

4   and what sorts of attorney-client relationships exist.

5         In light of what has transpired, in their motion and

6   their declaration, I'm not sure the Court can have faith that

7   defense counsel is going to fairly participate in that process

8   in the way that would be required to make it work.

9         What the Court should do instead is exactly what is

10   proposed, a filter team made up of walled-off AUSAs, which will

11   make an honest and accurate sorting of privilege from

12   nonprivileged, and even despite what I've said, we still intend

13   to follow the procedure that we set forth in our brief, which

14   is that in a certain class of documents or communications, we

15   provide the defense with the ability to make objections to our

16   designation of something as not privileged, and in such

17   circumstances, if there was disagreement, it could be taken up

18   with the Court.

19         This is exactly the issue that Judge Jones flagged in

20   the *Grant* case, because if you've got defense counsel, and even

21   in the special master context, making wildly overbroad claims

22   of privilege and the government has got a hand tied behind its

23   back because it can't see the documents, you're not going to

24   have an efficient process.

25         Your Honor, for all those reasons, we think you can

1    and should deny Mr. Cohen's motion right now.  I think the

2    delay, and this has clearly been a delay tactic from the

3    outset, their failure to be able to back up their facts is

4    clearly fatal to their argument.  For that reason, we think you

5    should deny the motion now.

6            I'll note that I say this with respect to Mr. Cohen's

7    motion.  I think he's failed to meet his burden.  Obviously, at

8    this time, the Court has allowed President Trump to intervene

9    to assert his own interest as the privilege holder.  We don't

10   object, given the Court has already set a briefing schedule for

11   President Trump's counsel and a hearing Tuesday at which we can

12   address his privilege claims, but we think Mr. Cohen has

13   utterly failed in his motion at this time and that you can and

14   should deny it so that, on Monday, all we should be considering

15   is a narrower set of documents, which are any documents that

16   might have a plausible claim of privilege by President Trump

17   asserting his own interest as a privilege holder, but not all

18   of Mr. Cohen's documents where he's trying to make these

19   overbroad privilege claims.

20           THE COURT:  All right.

21           Yes.

22           MR. HARRISON:  Quick response, Judge.

23           I think that turns things on its head to say we put

24   ourselves in this place.  This has happened because the

25   government seized the documents, and they told us that they

I4dWcohC

1    were going to start reviewing.

2            THE COURT:  I mentioned that today.

3            MR. HARRISON:  Yes, and they told us they were going

4    to start reviewing by today at noon, so we had to file

5    something.

6            We're not delaying.  All I'm asking for, basically for

7    the reasons I've already put in front of the Court, is to give

8    us until 10 a.m. on Monday to answer the Court.  That's all we

9    ask.

10           THE COURT:  I'm going to give you that time, but I

11   expect that in return, there will be a good faith effort on the

12   part of counsel to be able to answer the Court's factual

13   questions, and if you don't have the answers by 2 p.m. on

14   Monday, I'm likely to discount the argument that there are

15   thousands, if not millions, of privileged documents.

16           Now, I want to be sure I understand the government's

17   proposal with respect to when defense counsel can review

18   documents as to which the government finds no privilege.  I had

19   understood one thing from the government's submission, but what

20   I understand now is that as soon as the government taint team,

21   if that's who is the first reviewer, identifies a set of

22   documents or any documents that it views as not privileged, it

23   will then show them to defense counsel.  Is that right?

24           MR. McKAY:  No, your Honor.  It's a narrower subset.

25           Just to give a concrete example, let's say that we

I4dWcohC

know for a fact that someone named John Smith is not an

attorney for Mr. Cohen, he's not a client of Mr. Cohen.  In the

initial review, what we would do is we'd get the client list

from Mr. Cohen, if one can be made, and we'll get an attorney

list for Mr. Cohen.  We will run keyword searches.  All the

evidence will be in an electronic database.  We'll run searches

designed to segregate any emails that are to or from or

documents that involve clients or attorneys.

Out of that subset, the filter or taint review team

will review the documents for privilege.  If Mr. Cohen has

exchanged an email with an attorney who represents him in a

matter -- let's say it's Mr. Harrison -- and it's clearly

privileged, the filter team will designate it as such and there

will be no need to present it to the Court or to defense.  But

let's say the email did something that very obviously waived

the privilege, like copied a third party on the email -- so

Mr. Cohen emails Mr. Harrison and the Court is cc'd -- we'd

likely take the position that that waives any privilege in that

email, and we'd designate that as nonprivileged.

The other example might be, let's say, there's an

email between Mr. Cohen and his client and the filter team or

taint team believes that they've got a showing as to the crime

fraud exception.  In those instances where there's a document

that is sort of presumptively privileged because it's to or

from an attorney or a client, and the government filter team

I4dWcohC

nevertheless thinks it's not privileged, that's the situation

in which we present our finding to defense counsel and say, Do

you object to this?

    But in the broader scope of things, if Mr. Cohen has

an email with his plumber saying, Hey, can you come fix my

sink, and we know that this is a plumber, and the filter team

sees that, they're just going to mark that not privileged

because it's very obvious, and we don't need to burden defense

counsel or the Court with arguing about privilege over what is

likely to be the vast majority of documents that are very

obviously not privileged.

    What we're focused on is consulting with the defense

in instances where there's some plausible reason to believe

that the document might be privileged.

    I should say we've asked the defense in our initial

letter to give us its client list, attorney list and any sort

of input on the review.  The devil may be in the details on

this.  If there are particular adjustments that the Court

thinks are appropriate to the procedure or that defense counsel

thinks are appropriate to the procedure, we're willing to

discuss those, of course.

    What we have proposed is as I just described, but we

think that's the most efficient process.  That's the process

that we're using, by the way, in many of our cases that have

these filter teams.  We think that's a fair and efficient way

I4dWcohC

to tee up with defense counsel the narrowest universe of

documents where there might be a dispute, because we think that

the vast majority of things are going to be obviously

nonprivileged, no reason to argue about it, and there are going

to be certain things that are very obviously privileged, we're

going to mark them as such, and the filter team is never going

to release them.

            THE COURT:  Thank you.

            I'd like to note something that may not have been

obvious this morning.

            When I was asking the plaintiff's counsel about the

names of clients, I had in mind not the immediate use of the

names for which pseudonyms could be substituted.  What I had in

mind was that the government would need those names if it were

to do the type of search that is suggested, and so we do need

to decide whether those names must be divulged.

            I looked at all of the cases that counsel cited, and

it's quite clear, under Second Circuit law, that the identity

of a client is not privileged unless the mere identification of

the client gives away what advice was given or what advice was

sought, and that that would be incriminating.

            We are left with the need for you to at least have in

hand, Mr. Harrison, the identity of the other clients, not

business clients but clients who sought legal advice from

Mr. Cohen as an attorney.

I4dWcohC

1          Yes.

2          MR. McKAY:  May I make one request, your Honor?

3          THE COURT:  Yes.

4          MR. McKAY:  Obviously you've given defense counsel

5   until Monday to come up with the names of the clients.  I think

6   the case law is also clear that the burden of establishing

7   attorney-client privilege rests on the person asserting it.  In

8   light of the fact that the Court has given the defense numerous

9   opportunities to come up with a list and it can't, we're

10  concerned that whatever list is going to come on Monday morning

11  is going to be something that's difficult to substantiate.

12          The case law is also clear that the Court is permitted

13  to require, because there is this *prima facie* burden, some

14  substantiation of the attorney-client relationship.  The case

15  I'm thinking of is actually the case they cited earlier this

16  morning, *Elliott Associates*, 176 F.R.D. 93 at 97, which says,

17  "courts permit questions necessary to test the factual

18  grounding of an asserted attorney-client privilege."

19          I think in light of what has transpired today, it

20  would be appropriate for defense counsel to give us not just

21  names but some substantiation, whether that's a retainer

22  agreement or some indicia of attorney-client relationship, and

23  if whatever that indicia is is something that they believe is

24  privileged, we don't have an objection to them presenting it to

25  the Court on an *ex parte* base, because we don't want to see

I4dWcohC

1    that privileged information.  But I do think just a bare list

2    of names may result in a situation where we say, your Honor, we

3    have reason to think that some of these names aren't actually

4    names with which he had an attorney-client relationship, that

5    they were business relationships.

6            Given the extra time that you've given defense

7    counsel, we think it's also reasonable to ask for

8    substantiation, so that on Monday morning we don't find

9    ourselves with yet another adjournment while they find the

10   substantiation for those claims.

11           THE COURT:  That's right.  I thought maybe you were

12   going to raise the question of whether they had the burden of

13   contacting the clients and seeing if the clients waive the

14   privilege or insist upon it.

15           MR. McKAY:  As we've discussed, the release of the

16   identity of the client isn't privileged, so for just giving the

17   names, I don't think there's any privilege waiver required.

18           If you're asking for underlying substantiation --

19           THE COURT:  Yes.

20           MR. McKAY:  -- I suppose there might be, although I

21   don't know that presenting something in camera to the Court

22   would waive the privilege.

23           THE COURT:  I don't think it would.

24           MR. McKAY:  If there are concerns about disclosing

25   privileged information to substantiate the claim, we don't

I4dWcohC

1    object to an *ex parte* showing, whether it's retainer agreement

2    or whatever, but we do think that there needs to be some actual

3    substantiation for whatever claim we get on Monday morning so

4    we don't find ourselves with another adjournment.

5              THE COURT:  All right.

6              Mr. Harrison, I think Mr. McKay's point is well-taken.

7    Do you disagree?

8              MR. HARRISON:  I'm not sure, Judge.  I'll take a look

9    at the case and think about how we can do that.  It depends on

10   what "substantiation" has to mean.  I'll take a look at it,

11   Judge, and we'll do our best to be prepared on Monday to show

12   something or to make a representation to the Court.

13             THE COURT:  I would like to have that in your 10 a.m.

14   letter.

15             MR. HARRISON:  Understood, Judge.

16             THE COURT:  In other words, if you do need to be

17   prepared to substantiate that the relationship was a

18   lawyer-client relationship, I need to know that by 10 a.m.

19             MR. HARRISON:  I understand, your Honor.

20             THE COURT:  Would anyone else like to be heard?

21             Yes, Mr. Riley.

22             MR. RILEY:  Judge, we have a docket number for the

23   case.

24             THE COURT:  Yes.

25             MR. RILEY:  And it includes the government's filing.

72

I4dWcohC

1    There is nothing else.  The petition that originally initiated

2    this isn't filed.  There's no notation that it even exists, and

3    we would request that it be filed and unsealed.

4         There's also no indication of any minute entries as to

5    any action you've taken.  I'm not trying to interview you, but

6    I don't actually know whether you've issued a TRO or not.

7         THE COURT:  I have not.

8         MR. RILEY:  So any action leading up to today we would

9    hope would be in the docket.

10        THE COURT:  All right.  There should be in the docket

11   the application made by Mr. Cohen's lawyers with only three

12   paragraphs redacted.

13        I think it's three.  Yes, it is three.

14        MR. HARRISON:  I think that's right, Judge.  I'll

15   check.

16        THE COURT:  The government response, I believe, has

17   been docketed.

18        MR. McKAY:  It has, your Honor.

19        THE COURT:  I think you will find those in the docket.

20        MR. RILEY:  Thank you.

21        THE COURT:  The memorandum of law, my recollection as

22   to where I last left it with my law clerk, was that Mr. Cohen's

23   counsel was going to review the memorandum of law and give me

24   proposed redactions.  The government agrees with him.  If that

25   hasn't already been filed, it will be filed.

I4dWcohC

1          MR. RILEY:  Thank you, Judge.

2          THE COURT:  Anything else?

3          MS. STROM:  Will the submission from President Trump

4     on Sunday and Mr. Cohen on Monday morning be publicly filed as

5     well?

6          THE COURT:  I don't know whether any privilege will be

7     claimed, but I would think they'd be public.

8          MS. STROM:  Because the presumption of access to this

9     proceeding was it would attach to any documents that would be

10    filed in this proceeding, so if anything was going to be asked

11    for sealing, it would have to meet the four-part standard that

12    we discussed this morning.

13         THE COURT:  Yes, and apply to the Court and get a

14    ruling.

15         MS. STROM:  Yes.  Thank you, your Honor.

16         THE COURT:  All right.  Thank you.

17         We're adjourned.

18         (Adjourned)

19

20

21

22

23

24

25