UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------X
*In the Matter of Search Warrants Executed on*
*April 9, 2018*
-------------------------------------------------------------------X
MICHAEL D. COHEN

|  |  |  |
|---|---|---|
| | Plaintiff, | 18-MJ-3161 (KMW) |
| -against- | | **MEMORANDUM OF LAW IN SUPPORT TO THE MOTION FOR A PROTECTIVE ORDER** |
| UNITED STATES OF AMERICA | | |
| | Defendant. | |

-------------------------------------------------------------------X

Peter J. Gleason, P.C
935 South Lake Blvd., Suite 17
Mahopac, New York 10541-3222

**Table of Contents**

**PAGE NO.**

TABLE OF AUTHORITIES……………………………………………………….ii, iii

INTRODUCTION……………………………………………………………..….1

PRELIMINARY STATEMENT…………………………………………………4

FACTS……………………………………………………………………………6

ARGUMENT……………………………………………………………………..7

      I.     MICHAEL AVENATTI…………………………………………………7

      II.    NEW YORK POLITICAL CORRUPTION………………………………...8

      III.   ADDITIONAL EXAMPLES OF NEW YORK CORRUPTION…………….....9

CONCLUSION…………………………………………………………………..10

<u>**Table of Authorities**</u>

<u>**PAGE NO.**</u>

**Cases**

*Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's, London*,
    176 Misc.2d 605, 611-12 (Sup.Ct. N.Y. County 1998),
    aff'd, 263 A.D.2d 367 (1st Dep't 1999)……………………………………………3

*Ambac Assurance Corp. v. Countrywide Home loans, Inc*.,
    124 A.D.3d 129, 135-36 (1st Dep't 2014),
    NY Slip Op 04439 Decided on June 9, 2016 Court of Appeals………………....3,4

*Chahoon v. Commonwealth*,
    62 Va. (21 Gratt.) 822, 841-42 (1871)…………………………………….....1,3

*Hudson Val. Mar., Inc. v. Town of Cortlandt*,
    30 A.D.3d 377, 378 (2d Dep't 2006)………………………………………….3

*Hunt v. Blackburn*,
    128 U.S. 470 (1888)…………………………………………………………...1

*Hyatt v. State of Cal. Franchise Tax Bd.*,
    105 A.D.3d 186, 205 (2d Dep't 2013)…………………………….………...3

Matter of Jacqueline F.,
    47 NY2d 215, 219 [1979]…………………………………………….……...5

Matter of Priest v Hennessy,
    51 NY2d 62, 67 [1980]……………………………………………….……...5

*People v. Osario*,
    75 N.Y.2d 80 (1989)………………………………………………….……...3

Rossi v Blue Cross & Blue Shield,
    73 NY2d 588, 593-594 [1989]…………………………………………….5

*Schmitt v. Emery*,
    2 N.W.2d 413 (Minn. 1942)…………………………………………………1

Spectrum Sys. Intl. Corp. v Chemical Bank,
    78 NY2d 371, 377 [1991]……………………………………………………5

*Stenovich v. Wachtell, Lipton, Rosen & Katz,*
    195 Misc. 2d 99, 108 (Sup. Ct. NY County 2003)…………………………………..3

*United States v. Kovel,*
    296 F.2d 918 (2d Cir. 1961)……………………………………………………1,3

*Upjohn Co. v. United States,*
    449 U.S. 383, 390 (1981)………………………………………………………1

*Yemini v. Goldberg,*
    12 Misc. 3d 1114 (Sup. Ct. Nassau County 2006)…………………………………..3

**Statutes**

CPLR 3101[a][1]…………………………………………………………………5

CPLR 4503[a][1]…………………………………………………………………5

NY Civil Rights Law Section 50-b………………………………………………………7

NY Criminal Procedure Law Section 240.50……………………………………………6

**Treatises**

*Restatement (Third) of the Law Governing Lawyers*…………………………………………..2

## INTRODUCTION

The origins of the attorney-client privilege date back to English common law, where it was considered an essential tool to facilitate open and honest dialogue between lawyers and their clients.  Like most common law concepts, the attorney-client privilege eventually migrated to the United States and first emerged in American jurisprudence in the Nineteenth Century.  In 1888, the United States Supreme Court formally recognized the attorney-client privilege in *Hunt v. Blackburn*, 128 U.S. 470 (1888), and later reaffirmed the privilege and its purposes of encouraging the free flow of information between client and attorney and enhancing the quality of legal advice in *Upjohn Co. v. United States,* 449 U.S. 383, 390 (1981).

Since *Hunt v. Blackburn*, exceptions to the general "waiver" rule have emerged. One such exception, the joint defense privilege was first conceptualized prior to *Hunt* in *Chahoon v. Commonweath*, 62 Va. (21 Gratt.) 822, 841-42 (1871).  Here, the Virginia Supreme Court held that a criminal defendant did not waive the attorney-client privilege by sharing confidential information with his co-defendants' attorneys since fostering open communication enhanced to quality of legal counsel.

Many years later Courts began to recognize the joint defense privilege in civil matters as well.  In 1942, in *Schmitt v. Emery*, 2 N.W.2d 413 (Minn. 1942), the Minnesota Supreme Court applied the same principles employed by the Virginia Supreme Court nearly seven decades earlier in *Chahoon* and held that co-defendants in a personal injury case did not waive the attorney-client privilege by openly discussing the details of the case in the presence of each other's lawyers.

More recently, In *United States v. Kovel*, 296 F.2d 918 (2d Cir. 1961), the United States

1.

Second Circuit held that the work product of an accountant was protected by the attorney-client privilege where the accountant had specifically been retained by the attorney in response to criminal tax charges brought against the client. The Second Circuit compared the role of the accountant to an interpreter facilitating communications between a lawyer and a non-English speaking client, and stated that the accountant's work was essential for "effective consultation" and analysis of the client's legal position. Therefore, communications by and between agents of an attorney or client related to the underlying legal representation where the agent has been retained to assist the attorney in providing legal advice are generally afforded privileged status.  From the joint defense privilege evolved yet another exception to the traditional rule that the presence of a third party waives the attorney client privilege, the common interest doctrine.

The common interest doctrine was intended to apply to confidential disclosures made to third parties, which are represented by separate counsel and share any common legal interest. The common interest privilege is broadly defined in the *Restatement (Third) of the Law Governing Lawyers:*

> If two or more clients with a common interest in a litigated or non-litigated
> matter are represented by separate lawyers and they agree to exchange
> information concerning the matter, a communication of any such client that
> otherwise qualifies as privilege . . . . that relates to the matter is privileged as
> against third persons.

New York Courts were delayed in embracing the common interest doctrine and initially refused to adopt the Restatement's definition.  The New York Court of Appeals refused to extend

2.

the common interest privilege protection to communications between an attorney and two separately represented co-defendants where one co-defendant was acting as the other's language interpreter, *People v. Osario,* 75 N.Y.2d 80 (1989).  This significant departure from the principles established by the courts in *Chahoon and Kovel*, was distinguished by the Court of Appeals in *Osario*, by virtue that the interpreter's exposure to the confidential dialogue between his co-defendant and the co-defendant's attorney was unrelated to his own defense.  As a result, the Court ruled that there was no common interest, and the communication was not privileged.

The progeny of *Osario* resulted in New York courts cautiously applying privilege as a narrow exception to the traditional rule of waiver of the attorney-client privilege. Statewide, courts limited the scope of the common interest privilege requiring that any shared interest between clients be "identical" (or nearly identical) as opposed to merely similar.  *Hyatt v. State of Cal. Franchise Tax Bd.,* 105 A.D.3d 186, 205 (2d Dep't 2013).  Further restricting the concept of, common interest, many New York courts imposed a "litigation requirement" to the doctrine, requiring that parties must face pending or reasonably anticipated litigation for the privilege to apply to communications made in furtherance of a common legal interest.  *Hyatt*, 105 A.D.3d at 205; *Hudson Val. Mar., Inc. v. Town of Cortlandt*, 30 A.D.3d 377, 378 (2d Dep't 2006); *Stenovich v. Wachtell, Lipton, Rosen & Katz*, 195 Misc. 2d 99, 108 (Sup. Ct. NY County 2003); *Yemini v. Goldberg*, 12 Misc. 3d 1114 (Sup. Ct. Nassau County 2006); *Aetna Cas. & Sur. Co. v. Certain Underwriters at Lloyd's, London*, 176 Misc.2d 605, 611-12 (Sup.Ct. N.Y. County 1998), aff'd, 263 A.D.2d 367 (1st Dep't 1999).

In 2014, the First Department, in a unanimous decision, eliminated the litigation requirement, *Ambac Assurance Corp. v. Countrywide Home loans, Inc*., 124 A.D.3d 129, 135-36

3.

(1st Dep't 2014)

More recently in 2016, the Court of Appeals modified the lower Court's ruling in *Ambac*, rejecting the more expansive application of the common interest privilege.  It was reasoned that it should be limited to "situations where the benefit and the necessity of shared communications are at their highest, and the potential for misuse is minimal."  For example, when litigation is pending or imminent, "the threat of mandatory disclosure may chill the parties' exchange of privileged information and therefore thwart any desire to coordinate legal strategy."

The New York Court of Appeals in *Ambac* made clear that the common interest doctrine applies under New York law only if the following three elements are met: (1) the parties share a common interest; (2) the communications are made in furtherance of the common legal interest; and (3) the communications relate to a pending or reasonably anticipated litigation.

## PRELIMINARY STATEMENT

Confidentiality is the cornerstone to the practice of law.  Licensed professionals such as those working in the field of law acknowledge that confidentiality is sacrosanct.  However professionals do and should seek the advice and or insight from other professionals in their field. In the same way a physician might seek advice from another physician on a patient's unusual medical condition so too should attorneys reach out to their colleagues at the bar if an unusual legal matter arises.  In order for the integrity of the legal profession to survive these attorney-to-attorney communications must be privileged.

This very issue was recently resolved by the New York State Court of Appeals which allows for privileged communications to be exchanged between parties represented by separate counsel without losing the privilege, so long as the parties share a "common interest" *Ambac*

4.

*Assurance Corp. v. Countrywide Home loans, Inc. 2016* NY Slip Op 04439 Decided on June 9, 2016 Court of Appeals.

The attorney-client privilege shields from disclosure any confidential communications between an attorney and his or her client made for the purpose of obtaining or facilitating legal advice in the course of a professional relationship (see CPLR 4503[a][1]). The oldest among the common law evidentiary privileges, the attorney-client privilege "fosters the open dialogue between lawyer and client that is deemed essential to effective representation" (Spectrum Sys. Intl. Corp. v Chemical Bank, 78 NY2d 371, 377 [1991]). "It exists to ensure that one seeking legal advice will be able to confide fully and freely in his attorney, secure in the knowledge that his confidences will not later be exposed to public view to his embarrassment or legal detriment" (Matter of Priest v Hennessy, 51 NY2d 62, 67 [1980]).

Despite the social utility of the privilege, it is in "[o]bvious tension" with the policy of this State favoring liberal discovery (Spectrum, 78 NY2d at 376-377; see also CPLR 3101[a][1] [directing that there be "full disclosure of all matter material and necessary in the prosecution or defense of an action"]). Because the privilege shields from disclosure pertinent information and therefore "constitutes an 'obstacle' to the truth-finding process," it must be narrowly construed (Matter of Jacqueline F., 47 NY2d 215, 219 [1979]; see Spectrum, 78 NY2d at 377). The party asserting the privilege bears the burden of establishing its entitlement to protection by showing that the communication at issue was between an attorney and a client "for the purpose of facilitating the rendition of legal advice or services, in the course of a professional relationship," that the communication is predominantly of a legal character, that the communication was confidential and that the privilege was not waived (Rossi v Blue Cross & Blue Shield, 73 NY2d

5.

588, 593-594 [1989]).

The motion for a protective order should be granted. The undersigned attorney, Peter Gleason, (Counsel) has given legal consultations to numerous victims of political corruption. Counsel is aware and follows the ethical obligations regarding both attorney client privilege and discussing pending matters with the media, NY CPLR 4503(a)(1) which codifies the attorney-client privilege, and NY Rules of Professional Conduct.  Counsel's discussions, regarding Eric Schneiderman, with the above named Plaintiff, himself an attorney, which Plaintiff may have memorialized, should be privileged communications and not subject to disclosure to any third party.  Any conversations between Counsel and Plaintiff were in furtherance of Counsel's role as an attorney investigating a potential claim and or representing clients.

## FACTS

The Federal Bureau of Investigation (FBI) on or about April 9, 2018 pursuant to a search warrant raided and confiscated legal files from the Law Offices of Plaintiff.   Counsel's application by dint of a letter motion dated May 11, 2018 seeks a protective order pursuant to NY Criminal Procedure Law Section 240.50.  (CPL 240.50)

Counsel's letter motion acknowledges he had communications with Plaintiff.  Those communications took place well before the recent resignation of NYS Attorney General Eric Schneiderman.  Counsel is unaware whether or not Plaintiff memorialized said communications. The possibility Plaintiff may have created any document, memorandum or digital notes of said communications, is the basis for the instant application.

CPL 240.50 provides in part:

> The Court in which the criminal action is pending may upon motion
> of either party, or of any affected person, or upon determination of a

6.

motion of either party for an order of discovery, or upon its own
initiative, issue a protective order denying, limiting, conditioning,
delaying or regulating discovery pursuant to this article for good
cause, including constitutional limitations, danger to the integrity
of physical evidence or a substantial risk of physical harm, intimidation,
economic reprisal, bribery or unjustified annoyance or embarrassment
to any person or an adverse effect upon the legitimate needs of law
enforcement, including the protection of the confidentiality of
informants, or any other factor or set of factors which outweighs
the usefulness of the discovery.

## MICHAEL AVENATTI

Counsel's concern for what might be part of Plaintiff's seized files is related to what

counsel perceives as the reckless and wanton behavior of Michael Avenatti the attorney for Ms.

Clifford who is seeking to intervene in this matter.  A few examples of Avenatti's questionable

tactics, culled from the May 9, 2018 letter filed by the Plaintiff in this matter are:

- Avenatti attributed certain, "fraudulent" wire transfers to the incorrect Michael Cohen.

- Avenatti claims to have possession of Bank records belonging to Michael Cohen.

These two examples necessitated the instant motion.  To wit, if Ms. Clifford is given

intervenor status, that would potentially give rise to Mr. Avenatti having access to potential

records relating to the instant motion.  Avenatti's fast and loose style is exactly why a protective

order should be granted.  Furthermore, NY Civil Rights Law Section 50-b provides in part:

The identity of any victim of a sex offense, as defined in article one hundred thirty
or section 255.25 ,255.26 or 255.27 of the penal law , or of an offense involving
the alleged transmission of the human immunodeficiency virus, shall be
confidential.   No report, paper, picture, photograph, court file or other
documents, in the custody or possession of any public officer or employee, which
identifies such a victim shall be made available for public inspection.   No such
public officer or employee shall disclose any portion of any police report, court
file, or other document, which tends to identify such a victim except as provided
in subdivision two of this section.

7.

## NEW YORK POLITICAL CORRUPTION

But for the systemic political corruption in New York the underlying matter could have been addressed and reported to the New York County District Attorney (DANY) and then dealt with accordingly.  Unfortunately, Counsel's history with DANY is one of frustration in reporting prima facie evidence of governmental corruption only to be ignored.  The following are a few examples of what Counsel previously reported to DANY that were totally ignored:

- William Rapfogel, declined by DANY, prosecuted by NY State Attorney General.

- Sheldon Silver, declined by DANY, prosecuted by US Attorney.

- Stolen FDNY medical records, declined by DANY, resulted in civil action that settled, including legal fees, in excess of $300,000.

- Human trafficking complaint against the Village Voice and Backpage.com, declined by DANY, presently being prosecuted by US Attorney in Phoenix Arizona.

- (2) George Arzt Political Corruption complaints, both declined by DANY.

The most recent "George Arzt," complaint is heretofore attached and marked **Exhibit A**. This Arzt Complaint, as the time stamp indicates, was filed on July 17, 2013 with the NYC Board of Elections with an identical copy mailed to DANY.  Shortly after the copy was mailed to DANY, I was in 100 Centre Street (Manhattan Criminal Court) on business when an unknown individual, who presented the appearance of an DANY employee, politely stopped me in the hallway, addressed me by my surname and said something to the following, "Watch your back, they are trying to figure out a way to arrest you, most of us here like what you do, but not the boss."

The exhibited Arzt complaint not only gives a clear snapshot of the open and notorious

8.

political corruption within New York Politics but it should also be mentioned that Arzt was at relevant times a consultant for both DANY as well as the neighboring Kings County District Attorney.

Furthermore, Arzt, a former journalist is used here as a glaring example of how incestuously deep the political waters connecting the media and politics run in New York.

The Arzt complaint was also submitted to the Moreland Commission, prior to its being prematurely disbanded, that fell upon deaf ears. Media consultants, such as Arzt, pervert, exploit and operate within the body politic creating such a toxic atmosphere with impunity while making it impossible to report with any appropriate satisfaction the misdeeds of the politically powerful.

**OTHER EXAMPLES OF NEW YORK CORRUPTION**

The following examples as to why a victim of a sexual assault, at the hands of someone politically connected, should be forewarned before seeking redress within the channels of the New York criminal justice system.

• Louisa Esposito.  Ms. Esposito's horrific experience can be seen in this YouTube clip https://www.youtube.com/watch?v=TnPbcoZuVGY&feature=youtu.be , At 6:27 of this video clip, it indicates the spokesperson for the alleged predator's law firm is Bob Liff, who is the Senior Vice President at George Arzt Communications.  The Arzt connection may explain why the predator was never pursued by DANY.  However, Ms. Esposito also lodged complaints, to no avail with:

    o   Attorney General Elliot Spitzer

    o   Attorney General Andrew Cuomo

    o   Attorney General Eric Schneiderman

9.

Additionally please see the following: http://www.tmz.com/videos/0_y7m5491m/

The attorney representing the victim on that matter, Joseph Murray, has found it impossible for any one to investigate Elliott Spitzer's apparent death threats against his former lover and her family.

And then there is Harvey Weinstein, who, from all accounts, was given a pass by DANY.

**CONCLUSION**

In light of the foregoing it is fair to say the State of New York is a safe haven for the politically connected to do as they please.  Those who represent the victims of political corruption, as does counsel, do so under severe scrutiny and should not be dissuaded by the disturbing winds of harassment.  For example, the NY Post, in a recent editorial accused Counsel of a missed opportunity regarding the instant matter.  The reality is the NY Post should have opined, some time ago, regarding their missed opportunity with respect to their colleague Roger Ailes.

The ethical and appropriate step in discussing a legal issue with a sympathetic colleague at the bar, who has a common interest, was not only logical but appropriate under the circumstances.

WHEREFORE, Counsel respectfully asks this Court to grant the motion for a protective order, and that the Court grant any other relief that it deems just, equitable, and proper.

DATE: May 17, 2018
       Putnam, New York

                            Respectfully,
                              //PJG//
                            Peter J. Gleason, P.C
                            935 South Lake Blvd Suite 17
                            Mahopac, New York 10541-3222
                            Tel: (646) 872-3546

TO:  All Parties Via ECF

10.