SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
*(AVISO AL DEMANDADO):*
MICHAEL J. AVENATTI, an Individual

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAY 16 2018

Sherri R. Carter, Executive Officer/Clerk
By Nancy Alvarez, Deputy

**YOU ARE BEING SUED BY PLAINTIFF:**
*(LO ESTÁ DEMANDANDO EL DEMANDANTE):*
JASON FRANK LAW, PLC, a Professional Law Corporation

**NOTICE!** You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

*¡AVISO! Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):*
LOS ANGELES SUPERIOR COURT
Central District of Los Angeles
111 North Hill Street
Los Angeles, CA 90012

CASE NUMBER:
*(Número del Caso)*
BC706555

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*
BROWNE GEORGE ROSS LLP; Eric M. George (SBN 166403); Benjamin D. Scheibe (SBN 101327)
2121 Avenue of the Stars, Suite 2800          Tel. (310) 274-7100; Fax (310) 275-5697
Los Angeles, CA 90067                          egeorge@bgrfirm.com; bscheibe@bgrfirm.com

DATE: MAY 16 2018          SHERRI R. CARTER   Clerk, by   NANCY ALVAREZ   , Deputy
*(Fecha)*                                      *(Secretario)*                 *(Adjunto)*

(For proof of service of this summons, use Proof of Service of Summons (form POS-010).)
*(Para prueba de entrega de esta citación use el formulario Proof of Service of Summons, (POS-010)).*

[SEAL]

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*

3. ☐ on behalf of *(specify):*
   under: ☐ CCP 416.10 (corporation)          ☐ CCP 416.60 (minor)
          ☐ CCP 416.20 (defunct corporation)  ☐ CCP 416.70 (conservatee)
          ☐ CCP 416.40 (association or partnership)  ☐ CCP 416.90 (authorized person)
          ☐ other *(specify):*
4. ☐ by personal delivery on *(date):*

Page 1 of 1

1055063.1

Form Adopted for Mandatory Use
Judicial Council of California
SUM-100 [Rev. July 1, 2009]

**SUMMONS**

American LegalNet, Inc.
www.FormsWorkflow.com

Code of Civil Procedure §§ 412.20, 465
www.courtinfo.ca.gov

1  Eric M. George, SBN 166403
    egeorge@bgrfirm.com
2  Benjamin D. Scheibe, SBN 101327
    bscheibe@bgrfirm.com
3  BROWNE GEORGE ROSS LLP
    2121 Avenue of the Stars
4  Suite 2800
    Los Angeles, California 90067
5  Telephone:   (310) 274-7100
    Facsimile:    (310) 275-5697
6

7  Attorneys for Jason Frank Law, PLC

8

CONFORMED COPY
ORIGINAL FILED
Superior Court of California
County of Los Angeles

MAY 1 6 2018

Sherri R. Carter, Executive Officer/Clerk
By Nancy Alvarez, Deputy

9        SUPERIOR COURT OF THE STATE OF CALIFORNIA

10        COUNTY OF LOS ANGELES, CENTRAL DISTRICT

11

| 12 | JASON FRANK LAW, PLC, a professional law corporation, | Case Number: BC 7 0 6 5 5 5 |
|---|---|---|
| 13 | | |
| 14 | Plaintiff, | **VERIFIED COMPLAINT FOR BREACH OF GUARANTY AGREEMENT** |
| 15 | vs. | |
| 16 | MICHAEL J. AVENATTI, an Individual, | |
| 17 | Defendant. | |

18      Plaintiff Jason Frank Law, PLC ("Plaintiff" or "JFL") hereby brings this action against

19  Defendant Michael J. Avenatti ("Defendant" or "Avenatti") for breach of contract based on Avenatti's

20  failure to pay TWO MILLION DOLLARS ($2,000,000.00) currently due and payable under a Guaranty

21  Agreement between the parties.  A true and correct copy of the Guaranty Agreement is attached as

22  Exhibit 1.  The following verified allegations are based on Plaintiff's personal knowledge.

23                  **VERIFIED ALLEGATIONS**

24      1.    Avenatti is the managing partner and majority owner of the law firm, Eagan Avenatti

25  LLP ("EA").  Avenatti owns his interest in Eagan Avenatti, LLP through his personal corporation

26  Avenatti & Associates, APC.

27      2.    Jason Frank, through his personal corporation JFL, worked as an attorney at EA pursuant

28  to an independent contractor agreement.  Under the terms of the agreement, JFL was owed various forms

1    of compensation, including, among other things, 25% of the firm's annual profits and 20% of all fees

2    paid by JFL's clients.  EA was also contractually required to provide JFL with copies of its federal

3    income tax returns (including the Schedule K-1's) and the firm's revenues and expenses.

4         3.    EA breached the independent contractor agreement by (a) failing to pay millions of

5    dollars owed under the agreement, (b) failing to provide copies of the tax returns and other financial

6    information required under the agreement, and (c) misstating the firm's profits.  Accordingly, in

7    February 2016, JFL filed a Demand for Arbitration against EA before JAMS pursuant to the contract's

8    mandatory arbitration provision.  JFL and Jason Frank, thereafter, resigned from the firm in May 2016

9    after EA failed to cure its breaches of the agreement.

10        4.    The arbitration was assigned to a three-judge panel, consisting of retired California

11   Appellate Court Justice Steven J. Stone, and retired California Superior Court Judges Terry B. Friedman

12   and Judith M. Ryan (the "Panel").  The trial in the arbitration was scheduled to go forward on March

13   13, 2017.

14        5.    Approximately one month before the trial, on February 10, 2017, the three-judge Panel

15   *unanimously* found that EA had "acted with malice, fraud and oppression by hiding its revenue numbers"

16   and "tax returns" from JFL in violation of the independent contractor agreement.  [Feb. 10, 2017 Order

17   pp. 3-4.] The Panel permitted JFL to amend its Demand to add a claim for punitive damages.  [*Id.*] The

18   Panel also issued various evidentiary and issue sanctions against EA for its repeated failure to comply

19   with the Panel's discovery orders, which the Panel concluded were reasonable and appropriate due to

20   the "magnitude of EA's non-compliance with Panel Orders."  [*Id.* at pp. 2-6.]  A true and correct copy

21   of the Panel's February 10, 2017 Order is attached as Exhibit 2.

22        6.    On February 22, 2017, the Panel ordered Avenatti and his bookkeeper, Judy Regnier, to

23   sit for a deposition by March 3, 2017.  A true and correct copy of the Panel's February 22, 2017 Order

24   is attached as Exhibit 3.

25        7.    On March 1, 2017, a purported creditor of EA named "Gerald Tobin" filed a petition to

26   place EA into involuntary Chapter 11 bankruptcy.  Tobin alleged he was owed $28,700 and filed his

27   petition to place EA into involuntary bankruptcy in the Middle District of Florida, even though EA is a

28   law firm based in Newport Beach, California.  The address on Tobin's petition was for a UPS mailbox

1   that was opened with cash on February 28, 2017, one day before the filing of the petition.

2        8.    On March 2, 2017, EA filed a notice in the arbitration claiming that Avenatti's deposition

3   and the trial could not go forward due to the automatic bankruptcy stay. Avenatti subsequently denied

4   playing any role in orchestrating Tobin's involuntary bankruptcy petition.

5        9.    On March 5, 2017, JFL filed an Emergency Motion for Limited Relief from the

6   Automatic Stay requesting the Bankruptcy Judge, the Honorable Karen S. Jennemann, lift the stay and

7   allow the arbitration trial to go forward as scheduled on March 13, 2017.

8        10.   On March 8, 2017, Judge Jennemann conditionally granted JFL relief from the automatic

9   stay so the arbitration could forward, with the caveat that the stay would remain in effect if EA consented

10   to placing itself in Chapter 11 bankruptcy by Friday, March 10, 2017. In explaining her ruling, Judge

11   Jennemann noted that Tobin's "involuntary case [] has a stench of impropriety" and "I don't have any

12   real confidence that [EA is] going to stay in this bankruptcy or any other bankruptcy, and that whether

13   [Tobin] has some relationship with the firm that would have induced a collusive filing or if [EA] just

14   got plain lucky that somebody filed on the eve of the arbitration, I just don't know, but because of that

15   issue [EA] will have until this Friday to decide whether they want to stay in bankruptcy or not." [March

16   8, 2017 Tr. at 22:12-13; 23:9-17.] A true and correct copy of the March 8, 2017 hearing transcript is

17   attached as Exhibit 4.

18        11.   On March 10, 2017, Avenatti, on behalf of EA, consented to place his firm into Chapter

19   11 bankruptcy, thereby preventing the trial in the arbitration from going forward as scheduled.

20        12.   On April 21, 2017, EA's bankruptcy case was transferred to the Central District of

21   California before the Honorable Catherine E. Bauer (the "Bankruptcy Court").

22        13.   On or about December 12, 2017, EA, Avenatti and Avenatti & Associates APC, on the

23   one hand, and JFL and Jason Frank, on the other hand, entered into a Settlement Agreement, along with

24   other parties (the "Settlement" or "Settlement Agreement"). A true and correct copy of the Settlement

25   Agreement is attached as Exhibit 5.

26        14.   The effectiveness of the Settlement was contingent upon the Bankruptcy Court approving

27   the terms of the Settlement and dismissing EA's bankruptcy case. [Settlement, § 1.1.]

28

1    15.    On March 15, 2018, the Bankruptcy Court approved the Settlement and dismissed EA's

2  bankruptcy case. A copy of the Bankruptcy Court's "Order Granting Motion Approving Settlement and

3  Dismissing Case and Related Relief" (the "Dismissal Order") entered on March 15, 2018 is attached as

4  Exhibit 6.

5    16.    Under the terms of the Settlement, EA was required to pay JFL the sum of FOUR

6  MILLION EIGHT HUNDRED AND FIFTY THOUSAND DOLLARS ($4,850,000.00) pursuant to the

7  following schedule:

8        a.  Within sixty (60) calendar days after entry of the Dismissal Order, EA will wire JFL the

9            sum of TWO MILLION DOLLARS ($2,000,000.00), in immediately available funds,

10           pursuant to written wire instructions to be provided by JFL.

11       b.  Within one hundred and twenty (120) calendar days after entry of the Dismissal Order,

12           EA will wire JFL the sum of TWO MILLION EIGHT HUNDRED AND FIFTY

13           THOUSAND DOLLARS ($2,850,000.00), in immediately available funds, pursuant to

14           written wire instructions to be provided by JFL.

15  [Settlement, § 3.2, subsections 3.2.1 and 3.2.2.]  These payments are referred to collectively as the

16  "Settlement Payments."  [*Id.*]

17    17.    Under the terms of the Settlement, Avenatti was required to personally guarantee, in his

18  individual capacity, the Settlement Payments of $4,850,000.00 and enter into a separate Guaranty

19  Agreement with JFL to that effect (the "Guaranty" or "Guaranty Agreement").  [Settlement, § 3.3.]

20  Accordingly, on or about December 12, 2017, Avenatti and JFL entered into the Guaranty Agreement

21  attached hereto as Exhibit 1.

22    18.    The first Settlement Payment of $2,000,000.00 was due on or before May 14, 2018,

23  which was sixty (60) calendar days after the Bankruptcy Court's entry of the Dismissal Order.

24    19.    On May 7, 2018, JFL sent EA and Avenatti its written wire instructions.

25    20.    On May 14, 2018, in breach of the Settlement Agreement, EA failed to wire the

26  $2,000,000.00 to JFL and still has not honored its payment obligations as of the filing of this Verified

27  Complaint.

28

21.     Pursuant to the Guaranty Agreement, Avenatti "unconditionally and irrevocably" guaranteed that "if EA shall fail to pay one or both of the Settlement Payments when they are due under Section 3.2 of the Agreement, [Avenatti] shall promptly pay such unpaid portion of the Settlement Payments, without demand or notice." [Guaranty, § 1.] Avenatti further agreed that his liability under the Guaranty Agreement "shall be the immediate, direct and primary obligation of [Avenatti] and shall not be contingent upon JFL's exercise or enforcement of any remedy it may have against EA or any other person or entity." [*Id.*, § 2(i).]

22.     Under the Guaranty Agreement, Avenatti further agreed to submit to the jurisdiction of the courts of the State of California "for the purpose of any action or proceeding arising out of or relating to this Guaranty" and that "all claims in respect of any such action or proceeding may be heard and determined in such courts . . . ." [Guaranty, § 15.] Avenatti also agreed to irrevocably waive any objection to the venue or jurisdiction of any court in the State of California. [*Id.*]

23.     Although not required, on May 15, 2018, JFL sent a notice of default to Avenatti and requested the immediate payment of $2,000,000.00 pursuant to the terms of the Guaranty Agreement. A copy of the May 15, 2018 notice letter is attached as Exhibit 7.

24.     As of the date of the filing of this Verified Complaint, Avenatti has failed to pay the first Settlement Payment of $2,000,000.00 in breach of the terms of the Guaranty Agreement.

**THE PARTIES**

25.     Plaintiff Jason Frank Law, PLC ("Plaintiff" or "JFL") is a California corporation based in Los Angeles, California.

26.     Defendant Michael J. Avenatti ("Defendant" or "Avenatti") is an individual currently residing in Los Angeles, California.

**JURISDICTION AND VENUE**

27.     This Court has jurisdiction over this unlimited civil case because Plaintiff and Defendant are citizens and residents of the State of California.

28.     Venue is appropriate in the County of Los Angeles because Plaintiff and Defendant are residents of Los Angeles.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FIRST CAUSE OF ACTION FOR**

**BREACH OF CONTRACT**

29.     Plaintiff incorporates by reference and realleges paragraphs 1 through 28 as if fully set forth herein.

30.     On or about December 12, 2017, Avenatti and JFL entered into a written Guaranty Agreement.  A true and correct copy of the Guaranty Agreement is attached as Exhibit 1.

31.     On or about December 12, 2017, EA, Avenatti and Avenatti & Associates APC, on the one hand, and JFL and Jason Frank, on the other hand, entered into a Settlement Agreement, along with other parties (the "Settlement" or "Settlement Agreement").  A true and correct copy of the Settlement Agreement is attached as Exhibit 5.

32.     The terms of the Settlement were approved by the Bankruptcy Court and the Dismissal Order was entered on March 15, 2018.  A true and correct copy of the March 15, 2018 Dismissal Order is attached as Exhibit 6.

33.     Pursuant to Section 3.2 of the Settlement, EA was required to wire the first Settlement Payment of $2,000,000.00 to JFL on or before May 14, 2018.  EA failed to make this payment.

34.     Under the terms of the Guaranty, Avenatti "unconditionally and irrevocably" guaranteed that "if EA shall fail to pay one or both of the Settlement Payments when they are due under Section 3.2 of the Agreement, [Avenatti] shall promptly pay such unpaid portion of the Settlement Payments, without demand or notice." [Guaranty, § 1.]  Avenatti further agreed that his liability under the Guaranty Agreement "shall be the immediate, direct and primary obligation of [Avenatti] and shall not be contingent upon JFL's exercise or enforcement of any remedy it may have against EA or any other person or entity."  [*Id.*, § 2(i).]

35.     All conditions for Avenatti's payment obligations under the Guaranty have now occurred because EA failed to pay the first Settlement Payment of $2,000,000.00 on or before May 14, 2018.

36.     JFL has fully performed all conditions, covenants and acts required under the Settlement and Guaranty as a precondition for Avenatti's payment obligations under the Guaranty, unless such acts are excused or otherwise not yet due.

1    37.    Avenatti has failed to wire or otherwise pay JFL the first Settlement Payment of
2    $2,000,000.00 as required under the Guaranty Agreement. Avenatti has no valid excuse for failing to
3    perform this obligation.

4    38.    As a result of Avenatti's breach of the Guaranty, JFL has been damaged in the amount
5    of not less than $2,000,000.00.

6    39.    In the event EA and Avenatti fail to make the second Settlement Payment of
7    $2,850,000.00, JFL will amend this Verified Complaint to seek such damages from Avenatti under the
8    Guaranty.

9    40.    The Settlement Payments and the amounts owed under the Guaranty are not secured by
10   real property.

11                                  **PRAYER FOR RELIEF**

12        Plaintiff respectfully prays for the following relief:

13        1.  Damages in the amount of $2,000,000.00;

14        2.  Pre-judgment and post-judgment interest;

15        3.  Attorneys' fees, costs and expenses pursuant to Section 10 of the Guaranty;

16        4.  A Right to Attach Order and a Writ of Attachment; and

17        5.  Such other and further relief as the Court deems just and proper.

18
     Dated: May 16, 2018                          BROWNE GEORGE ROSS LLP
19                                                Eric M. George
                                                  Benjamin D. Scheibe
20

21

22                                                By:_____
                                                         Eric M. George
23                                                Attorneys for Plaintiff Jason Frank Law, PLC

24

25

26

27

28

                                               - 7 -
                                        VERIFIED COMPLAINT

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **VERIFICATION**

I, Jason M. Frank, in my individual capacity and as the owner of Jason Frank Law, PLC, verify and declare under the laws of the State of California, and under penalty of perjury, that the foregoing is true and accurate. Executed this 16th day of May, 2018 at Irvine, California.

Jason M. Frank

Exhibit 1

GUARANTY

THIS GUARANTY ("Guaranty"), dated as of the 12th day of December, 2017, is made by the undersigned Michael J. Avenatti ("Guarantor"), an individual resident in California, in favor of Jason Frank Law, PLC, a California professional law corporation ("JFL").

JFL and Eagan Avenatti LLP ("EA") (among others) are parties to a certain Settlement Agreement and Releases, dated as of the 12th day of December 2017 (as may be amended, restated, modified, renewed or extended from time to time, the "Agreement"). To induce JFL to enter into the Agreement and comply with its terms, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, Guarantor has agreed to guaranty EA's obligation to timely pay $4,850,000.00 to JFL under Section 3.2 of the Agreement (the "Settlement Payments"). Guarantor acknowledges that he will derive substantial direct and indirect benefits from JFL's execution and compliance with the Agreement and from the compromises contained in the Agreement.

To induce JFL to enter into and agree to the payment and other terms set forth in the Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Guarantor hereby agrees as follows:

1.    *Guaranty.* (a) Guarantor hereby unconditionally and irrevocably guarantees to JFL, its successors, assigns, endorsees and transferees, the full and prompt payment when due of the Settlement Payments provided for in Section 3.2 of the Agreement in the total amount of $4,850,000.00. Guarantor further agrees that if EA shall fail to pay one or both of the Settlement Payments when they are due under Section 3.2 of the Agreement, Guarantor shall promptly pay such unpaid portion of the Settlement Payments, without demand or notice.

(b)  Guarantor represents and warrants to JFL as follows:

(i)     Guarantor is a natural person residing in California.

(ii)    Guarantor has the capacity to execute, deliver, and perform under this Guaranty and the Agreement.

(iii)    This Guaranty is the legally valid and binding obligation of Guarantor, enforceable against Guarantor in accordance with its terms except as such enforcement may be delayed or restricted after the commencement by or against EA of any action, case or proceeding involving insolvency, bankruptcy, reorganization, receivership, arrangement, adjustment, composition, assignment for the benefit of creditors, liquidation, winding up or dissolution under any applicable laws with respect thereto (an "Insolvency Proceeding") or laws and principles of equity affecting the rights and remedies of creditors generally.

(iv)    The execution and delivery of this Guaranty and the Agreement, and the performance of the requirements evidenced by this Guaranty and the Agreement, will not violate any law applicable to Guarantor or constitute a default or breach of any contract to which Guarantor is a party or by which its properties are bound.

(v)     Guarantor is not insolvent and is not the subject of any Insolvency Proceedings.

2.     *Liability of Guarantor.*  The liability of Guarantor under this Guaranty shall be irrevocable, absolute, independent and unconditional, and shall not be affected by any circumstance which might constitute a discharge of a surety or guarantor other than the indefeasible payment and performance in full of its commitments hereunder.  In furtherance of the foregoing and without limiting the generality thereof, Guarantor agrees as follows: (i) Guarantor's liability hereunder shall be the immediate, direct, and primary obligation of Guarantor and shall not be contingent upon JFL's exercise or enforcement of any remedy it may have against EA or any other person or entity ("Person"); (ii) this Guaranty is a guaranty of payment when due and not of collectability; (iii) JFL may enforce this Guaranty upon the occurrence of a default notwithstanding any dispute between JFL and EA with respect to the existence of such default, without limiting any defenses that Guarantor otherwise has;  (iv) payment of a portion, but not all, of the Settlement Payments shall in no way limit, affect, modify or abridge Guarantor's liability for any portion of the Settlement Payments remaining unsatisfied; and (v) Guarantor's liability with respect to the Settlement Payments shall remain in full force and effect without regard to, and shall not be impaired or affected by, nor shall Guarantor be exonerated or discharged by, (A) any Insolvency Proceeding with respect to EA, Guarantor, any other guarantor or any other Person; (B) any limitation, discharge, or cessation of the liability of EA, any other guarantor or any other Person for the payment of the Settlement Payments due to any statute, regulation or rule of law, or any invalidity or unenforceability in whole or in part; (C) any merger, acquisition, consolidation or change in structure of EA, Guarantor or any other Person, or any sale, lease, transfer or other disposition of any or all of the assets or shares of EA, Guarantor, any other guarantor or other Person; (D) any assignment or other transfer, in whole or in part, of JFL's interests in and rights under this Guaranty, including, without limitation, JFL's right to receive payment of the Settlement Payments; (E) any claim, defense, counterclaim or setoff, other than that of prior performance, that EA, Guarantor, any other guarantor or other Person may have or assert, including, without limitation, any defense of incapacity or lack of corporate or other authority to execute or deliver this Guaranty, the Agreement or any other document related thereto; (F) any direction of application of payment to EA, Guarantor, any other guarantor or other Person; (G) any modification, agreement or stipulation between EA and JFL or any other parties to the Agreement, or their respective successors, assigns, transferees, endorsees, heirs, executors, personal representatives and legatees, with respect to the Agreement or the requirements therein or herein; and (H) JFL's vote, claim, distribution, election, acceptance, action or inaction in any Insolvency Proceeding. Guarantor's liability hereunder is absolute and unconditional irrespective of the value, genuineness, validity or enforceability of the Agreement or any other related agreement.

3.     *Consents.*  Guarantor hereby consents and agrees that, without notice to or further assent from Guarantor:  (i) JFL may request and accept other guaranties of payment of the Settlement Payments and may, from time to time, in whole or in part, surrender, release, subordinate, modify, waive, rescind, compromise or extend any such guaranty and may permit or consent to any such action or the result of any such action and JFL shall not be liable to Guarantor for any failure to collect or enforce against any other party liable for the Settlement Payments; and (ii) JFL may exercise, or waive or otherwise refrain from exercising, any other right, remedy, power or privilege granted by the Agreement or any document related thereto, or otherwise available to JFL, with respect to the timely and complete payment of the Settlement Payments, even if the exercise of such right, remedy, power or privilege affects or eliminates any

right of subrogation or any other right of Guarantor against EA; all as JFL may deem advisable, and all without impairing, abridging, releasing or affecting this Guaranty.

4.    *Waivers.* (a) Guarantor waives and agrees not to assert:  (i) any right to require JFL to proceed against EA, any other guarantor or any other Person; (ii) the defense of a statute of limitations in any action hereunder or for the collection or performance of the payment of the Settlement Payments; (iii) any defense arising by reason of any lack of corporate or other authority or any other defense of EA, Guarantor or any other Person; (iv) any defense based upon JFL's errors or omissions in the administration of its obligations under the Agreement and/or this Guaranty; (v) any rights to set-offs and counterclaims; (vi) without limiting the generality of the foregoing, to the fullest extent permitted by law, any other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties, or which may conflict with the terms of this Guaranty; (vi) any and all rights and defenses arising out of an election of remedies by the creditor, even though that election of remedies, such as a nonjudicial foreclosure with respect to security for payment of the Settlement Payments, has destroyed the Guarantor's rights of subrogation and reimbursement against the principal by the operation of Section 580(d) of the California Code of Civil Procedure or otherwise; and (vii) without limiting the generality of the foregoing, to the fullest extent permitted by law, any other defenses or benefits that may be derived from or afforded by applicable law limiting the liability of or exonerating guarantors or sureties, or which may conflict with the terms of this Guaranty, including, without limitation, any and all benefits that otherwise might be available to Guarantor under California Civil Code §§1432, 2809, 2810, 2815, 2819, 2839, 2845, 2848, 2849, 2850, 2899 and 3433 and California Code of Civil Procedure §§580a, 580b, 580d and 726.  (b) Guarantor waives any and all notice of the acceptance of this Guaranty, and any and all notice of the creation, renewal, modification, extension or accrual of the payment of the Settlement Payments, or the reliance by JFL upon this Guaranty, or the exercise of any right, power or privilege hereunder.  The obligations created under this Guaranty (the "Obligations") shall conclusively be deemed to have been created, contracted, incurred and permitted to exist in reliance upon this Guaranty.  Guarantor waives promptness, diligence, presentment, protest, demand for payment, notice of default, dishonor or nonpayment and all other notices whatsoever to or upon EA, Guarantor or any other Person with respect to the Obligations created hereunder.  (c) The Obligations of Guarantor hereunder are independent of and separate from the requirements and obligations of EA under the Agreement and any other guarantor and upon the occurrence and during the continuance of any default, a separate action or actions may be brought against Guarantor, whether or not EA or any such other guarantor is joined therein or a separate action or actions are brought against EA or any such other guarantor.  (d) Guarantor shall not have any right to require JFL to obtain or disclose any information with respect to (i) the financial condition or character of EA or the ability of EA to pay and perform under the Agreement; (ii) the Obligations under this Guaranty; (iii) any collateral or other security for any or all of the Settlement Payments; (iv) the existence or nonexistence of any other guarantees for any or all of the Settlement Payments; (v) any action or inaction on the part of JFL or any other Person; or (vi) any other matter, fact or occurrence whatsoever.

5.    *Subrogation.*  Until the Obligations shall be satisfied in full, Guarantor shall not have, and shall not directly or indirectly exercise, (i) any rights that it may acquire by way of subrogation under this Guaranty, by any payment hereunder or otherwise, (ii) any rights of

contribution, indemnification, reimbursement or similar suretyship claims arising out of this Guaranty, or (iii) any other right which it might otherwise have or acquire (in any way whatsoever) which could entitle it at any time to share or participate in any right, remedy or security of JFL as against EA or other guarantors, whether in connection with this Guaranty or otherwise.

6.      *Continuing Guaranty.*   Guarantor agrees that this Guaranty is a continuing guaranty relating to the Settlement Payments, and Guarantor expressly acknowledges that this Guaranty shall remain in full force and effect notwithstanding that there may be periods in which no Settlement Payments are owed.   This Guaranty shall continue to be effective or shall be reinstated and revived, as the case may be, if, for any reason, any payment of the Settlement Payments by or on behalf of EA shall be rescinded, avoided, or must otherwise be restored by JFL, whether as a result of any Insolvency Proceeding or otherwise.   To the extent any Settlement Payment is rescinded, recovered, avoided or restored, the Obligations shall be revived in full force and effect without reduction or discharge for such payment.

7.      *Payments.*   Guarantor hereby agrees, in furtherance of the foregoing provisions of this Guaranty and not in limitation of any other right which JFL or any other Person may have against Guarantor by virtue hereof, upon the failure of EA to pay the Settlement Payments when and as the same shall become due, Guarantor shall forthwith pay, or cause to be paid, in cash, to JFL an amount equal to the amount of the Settlement Payments then due (including interest which, but for the filing of a petition in any Insolvency Proceeding with respect to EA, would have accrued on such Settlement Payments, whether or not a claim is allowed against EA for such interest in any such Insolvency Proceeding). Guarantor shall make each payment hereunder, without deduction (whether for taxes or otherwise), set-off or counterclaim, on the day when due in immediately available funds, and in U.S. dollars.

8.      *Notices.*   All notices and other communications provided for hereunder shall, unless otherwise stated herein, be in writing (including by email) and shall be mailed, sent or delivered (i) if to JFL, at Frank Sims & Stolper LLP, 19800 McArthur Blvd., Suite 855, Irvine, California 92612,, (ii) if to Guarantor, at or to its address or, or email address, set forth below its name on the signature page below, or at or to such other address or email address, as such party shall have designated in a written notice to the other party.   All such notices and communications shall be effective upon delivery, if sent by email, and effective upon receipt, if sent by another method.

9.      *No Waiver.*   No failure on the part of JFL to exercise, and no delay in exercising, any right, remedy, power or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, remedy, power or privilege preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.   The rights and remedies under this Guaranty are cumulative and not exclusive of any rights, remedies, powers and privileges that may otherwise be available to JFL.

10.     *Costs and Expenses.*   The Parties agree that should any relief be brought by any Party to enforce any provision or right under this Guaranty, the prevailing party shall be entitled to recover, in addition to any other relief, reasonable attorneys' fees and costs incurred therein.

11.     *Binding Effect; Entire Agreement; Amendments*.  This Guaranty shall be binding upon Guarantor and his successors, assigns, personal representatives, executors, heirs and legatees, and inure to the benefit of and be enforceable by JFL and its successors, endorsees, transferees and assigns; provided that Guarantor shall not have the right to assign or transfer its rights or Obligations hereunder, in whole or part, without the prior written consent of JFL.  This Guaranty constitutes the entire agreement of Guarantor with respect to the matters set forth herein and supersedes any prior agreements, commitments, discussions and understandings, oral or written, with respect thereto, except as set forth in the Agreement.  Other than as stated in Paragraph 17 hereof, there are no conditions to the full effectiveness of this Guaranty.  This Guaranty may not be amended except by a writing signed by Guarantor and JFL.  No waiver of any rights of JFL or Guarantor under any provision of this Guaranty or consent to any departure by Guarantor therefrom shall be effective unless in writing and signed by JFL and Guarantor. Any such amendment, waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.

12.     *No Discharge in the Event of Guarantor or EA Bankruptcy*.  It is the intention of JFL and Guarantor that Guarantor's payment obligations under this Guaranty shall be non-dischargeable, under 11 U.S.C. Section 523(b), in the event Guarantor becomes a debtor in a bankruptcy case while the Settlement Payments remain outstanding and thereafter to the extent any party in (1) Guarantor's bankruptcy case, or (2) a subsequent bankruptcy case or similar proceeding in which EA is the debtor or has a similar role seeks to recover all or any portion of the Settlement Payments.

13.     *Knowing and Explicit Waivers*.  Guarantor and JFL acknowledge that they have either obtained the advice of legal counsel or have had the opportunity to obtain such advice in connection with the terms and provisions of this Guaranty.  Guarantor acknowledges and agrees that each of the waivers and consents set forth herein are made with full knowledge of their significance and consequences.  Additionally, Guarantor acknowledges and agrees that by executing this Guaranty, it is waiving certain rights, benefits, protections and defenses to which it may otherwise be entitled under applicable law, including, without limitation, under the provisions of the California Civil Code and California Code of Civil Procedure referred to in Section 4, and that all such waivers herein are explicit, knowing waivers.  Guarantor further acknowledges and agrees that JFL is relying on such waivers in connection with execution of the Agreement and this Guaranty, and that such waivers are a material part of the consideration which JFL is receiving.

14.     *Severability*.  Whenever possible, each provision of the Guaranty shall be interpreted in such manner as to be effective and valid under all applicable laws and regulations. If, however, any provision of this Guaranty shall be prohibited by or invalid under any such law or regulation, it shall be deemed modified to conform to the minimum requirements of such law or regulation, or, if for any reason it is not deemed so modified, it shall be ineffective and invalid only to the extent of such prohibition or invalidity without affecting the remaining provisions of this Guaranty.

15.     *Law; Submission to Jurisdiction*. This Guaranty shall be governed by and construed in accordance with California law. Guarantor hereby (i) submits to the non-exclusive jurisdiction of the courts of the State of California and the federal courts of the United States

sitting in the State of California for the purpose of any action or proceeding arising out of or relating to this Guaranty, (ii) agrees that all claims in respect of any such action or proceeding may be heard and determined in such courts, (iii) irrevocably waives (to the extent permitted by applicable law) any objection which it now or hereafter may have to the laying of venue of any such action or proceeding brought in any of the foregoing courts, and any objection on the ground that any such action or proceeding in any such court has been brought in an inconvenient forum, and (iv) agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner permitted by law.

16. *JURY TRIAL WAIVER.* TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, JFL AND GUARANTOR HEREBY WAIVE THEIR RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS GUARANTY OR ANY DEALINGS BETWEEN THE PARTIES RELATING TO THIS GUARANTY. JFL AND THE GUARANTOR ACKNOWLEDGE THAT THIS WAIVER IS A MATERIAL INDUCEMENT TO ENTER INTO THIS GUARANTY, THAT EACH HAS ALREADY RELIED ON THE WAIVER IN ENTERING INTO THIS GUARANTY AND THAT EACH WILL CONTINUE TO RELY ON THE WAIVER IN ITS RELATED FUTURE DEALINGS. JFL AND THE GUARANTOR WARRANT AND REPRESENT THAT EACH KNOWINGLY AND VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS TO THE EXTENT PERMITTED UNDER APPLICABLE LAW FOLLOWING CONSULTATION WITH LEGAL COUNSEL.

17. *Contingencies to Effectiveness of Guaranty.* This Guaranty and its terms and Obligations shall not become effective until each of the conditions set forth in paragraph 1.1 of the Agreement has occurred.

18. *Married Persons.* Any married person who signs this Guaranty as the Guarantor hereby expressly agrees that recourse may be had against his or her separate and community property for all his or her obligations under this Guaranty.

IN WITNESS WHEREOF, Guarantor has executed and delivered this Guaranty, as of the date first above written.

MICHAEL J. AVENATTI, Guarantor

Address: 520 Newport Center Drive, Suite 1400
*Newport Beach, CA 92660*

Email: mavenatti@eaganavenatti.com

Exhibit 2

**JAMS ARBITRATION**
**Reference No. 1220053114**

Jason Frank Law, PLC,
　　　Claimant and Cross-Respondent,

　　　　　　　v.

Eagan Avenatti, LLP,
　　　Respondent and Cross-Claimant.

---

### FINAL ORDER RE: CLAIMANT MOTIONS FOR SANCTIONS

　　　This Order enforces and finalizes the Panel's January 30, 2017 Order Re: Claimant Motions for Sanctions ("Jan. 30th Order").

　　　Claimant Jason Frank Law, PLC ("JFL") has filed two Motions to sanction Respondent Eagan Avenatti LLP ("EA"). The first seeks discovery sanctions for EA's repeated failure to comply with Panel Orders to respond to certain JFL discovery. The second seeks to preclude EA from offering evidence of its affirmative counterclaims because it has failed to deposit its share of the fees and expenses for the arbitration. EA opposed each Motion. It argued against the discovery sanctions on the ground that it has produced substantial responses. It opposed the preclusion of its affirmative evidence on the ground that such relief is premature.

　　　The full Panel reviewed each Motion, participated in the telephonic hearing of the Motions, conferred before and after the hearing of the Motions and approved the Jan. 30th Order. In summary, the Jan. 30th Order stated:
-   "The Panel will enter an Order pursuant to JAMS Rule 31(b) precluding EA from offering evidence of any affirmative claim unless it pays its share of all outstanding fees by February 3, 2017. If EA does not pay in full its share of all outstanding fees by February 3rd, it shall be precluded from offering evidence of any affirmative claim at the Hearing, whether as pled in its counterclaims or in the guise of a defense."
-   "EA is ordered to produce all previously ordered discovery responses by February 3, 2017. If EA does not do so, the Panel ... will impose issue sanctions for each category of identified non-compliance, reserving the most severe issue sanction for EA's failure to abide Panel Orders regarding its tax returns."

　　　On February 6, 2017, EA served on JFL its purported production to comply with the Jan. 30th Order. As requested by the Panel, JFL submitted on February 7, 2017 a Letter Brief Re: Notice of Non-Compliance ("Letter Brief").

　　　The full Panel has reviewed JFL's Letter Brief and conferred regarding the finalization of

the Jan. 30th Order. This Final Order is approved in full by each member of the Panel.

## JAMS RULE 31(B) SANCTION

JAMS Comprehensive Arbitration Rules and Procedures ("JAMS Rules"), Rule 31(b) provides that "JAMS requires that the Parties deposit the fees and expenses for the Arbitration from time to time during the course of the proceedings and prior to the Hearing. The Arbitrator (or Panel) may preclude a Party that has failed to deposit its *pro rata . . .* share of the fees and expenses from offering evidence or any affirmative claim at the (plenary) Hearing." Scheduling Order ("Sch O") No. 1, §11(b) states that "(t)he parties will be requested to deposit fees sufficient to compensate the arbitrator for the scheduled hearing in advance of the commencement of the hearing." Sch O No. 1, §10(a) set the plenary Hearing to commence March 13, 2017 and stated that "The cancellation period for the Hearing is 60 days or more prior to the Hearing. Once the cancellation period lapses, Arbitration hearing fees are not refundable."

Fees for the plenary Hearing were due January 12, 2017. JFL paid its share. EA did not. In order to keep the Hearing on calendar, JFL advanced EA's fees in the amount of $113,204.75. JFL also advanced EA's share of initial fees so that a Preliminary Arbitration Management Conference could be held.

EA did not pay its share – or any amount – of JAMS fees by February 3, 2017, or by the issuance of this Order. Therefore, the Panel will enforce the Jan 30th Order by precluding EA from offering evidence of any affirmative claim at the Hearing, whether as pled in its counterclaims or in the guise of a defense.

## DISCOVERY SANCTIONS

JFL seeks sanctions against EA for multiple failures to comply with prior Panel Orders. On October 27, 2016, the Panel ordered EA to produce responses to JFL's Requests for Documents. EA partially responded to two of 17 requests. It has failed to produce tax returns; monthly bank statements; revenue accounting records; wires, checks or invoices for expenses over $25,000; communications between Michael Avenatti and JFL, Michael Eagan and JFL, Judy Regnier and JFL and EA and any third party regarding the EA-JFL Agreement ("Agreement"); communications between EA and Eagan regarding its revenue, expenses or profits; Jason Frank's old cellphone; EA's communications with Frank after his resignation; and documents EA contends support its defenses and counterclaims.

## Tax Returns

On October 27, 2016, the Panel ordered EA by November 10, 2016 to produce copies of its federal tax returns for 2013, 2014 and 2015 and its Schedule K-1s for those years. EA did not produce produce the returns claiming that neither it nor its accountant had copies of the returns. On November 30, 2016, the Panel expressed that EA's response "stretches the bounds of credibility." It ordered EA by December 1, 2016 to request from the Internal Revenue Service a "Record of Account Transcripts" and warned that if EA failed to comply it would consider "all permissible sanctions." EA EA evaded the clear mandate of the Order by having its attorney sign and file a Request for Transcript

of Tax Return, not the Record of Account Transcripts.  Not only was this a different form than the one one the Panel ordered EA to file, it was not signed by an authorized agent of EA.  Compounding the violation of the Panel Order, EA provided no authorization to release the Transcript to its counsel.  Of Of course, the IRS quickly responded with a Third Party Rejection Notice that it could not release the returns to a third party.  EA took no further steps, even belatedly, to comply with the Panel's Orders, including the obvious step of directing its counsel to resubmit the Record of Account Transcripts with a signed authorization by EA, until February 3, 2017.  In other words, EA sat on its hands in a transparent effort to delay the inevitable as long as possible.

According to JFL's Letter Brief, on February 3, 2017, EA purportedly mailed to the IRS a request for its tax returns, which it signed.  However, EA provided no proof of service for the mailing. Also according to JFL, EA faxed the request to the IRS on February 6, 2017.

In its November 30th Order, the Panel ordered EA to make this request by December 1st. Clearly, EA has not complied.  There can be no other conclusion than that EA violated the Order and, that, at a minimum, it intentionally and knowingly violated the obvious spirit of the Order.[1]

JFL requests imposition of the following issue sanctions for EA's consistent failure to comply with its contractual, discovery and Panel-ordered obligations to produce its tax returns:

- The Panel issue a Partial Final Award that JFL's 2013, 2014 and 2015 Profit Share Bonuses be based on EA's revenue as set forth in EA's responses to Interrogatories Nos. 1, 3 and 5, minus expenses produced before January 6, 2017.  JFL may seek more damages at the plenary Hearing if it obtains evidence of further EA revenue.
- Find that EA breached §5 of the Agreement by failing to provide the tax returns to JFL.
- Permit JFL to amend its Prayer to add a claim for punitive damages and find that EA acted with malice, oppression and fraud.

While the Panel believes JFL's request for these sanctions is reasonable, it prefers to impose issue and evidentiary sanctions rather than to issue a Partial Final Award at this time. Therefore, the Panel directs JFL to prepare Proposed Findings of Fact ("Proposed Findings") based on its proposed formula for calculating JFL's 2013, 2014 and 2015 Profit Share Bonuses and that EA breached §5 of the Agreement by failing to provide the tax returns to JFL.  The Panel will review the Proposed Findings and, if acceptable, will adopt them prior to the commencement of the plenary Hearing.  Except for permitting JFL to seek additional damages regarding its entitlement to Profit Share Bonuses if it obtains new evidence of further EA revenue, the Panel will not allow or consider any other evidence at the plenary Hearing on the amount of 2013, 2014 and 2015 Profit Share Bonuses to which JFL is entitled and on whether EA breached §5 of the Agreement.  Finally, the Panel will permit JFL to amend its Prayer to add a claim for punitive damages and find that EA acted with malice, oppression and fraud in connection with its failure to produce its tax returns.

---

[1] During oral argument at the January 26, 2017 hearing of JFL's Motion for Sanctions, EA's counsel expressed confusion about what the Panel ordered EA to do in its October 27th and November 30th Orders.  The Panel reiterated and ordered what had always been clear:  produce the tax returns.

Bank Statements

According to JFL's Letter Brief, on February 6th, EA produced bank statements for the period January 2013 – May 2016, but not for the remainder of 2016. Furthermore, despite no "Redaction" marking, the produced bank statements contained extensive blank spaces, which JFL contends purposefully hid revenue as well as opening and closing balances. Based on unredacted information in the statements, JFL calculated that EA redacted 73 deposits or credits in 2013 alone.

The Panel ordered on January 18, 2017 that EA produce "complete" bank statements for 2013-2016. It has not complied.

JFL requests these issue sanctions against EA for failing to produce complete bank statements:

- Issue a Partial Final Award making the same findings regarding calculation of JFL's Profit Share Bonus for 2013, 2014 and 2015 as it requests for EA's failure to produce its tax returns.
- EA cannot contest JFL's allegation that EA used amounts it owed JFL to pay for resources employed on JFL's cases.
- The Panel permit JFL to amend its prayer for relief to add a claim for punitive damages and find that EA acted with malice, fraud and oppression by hiding its revenue numbers.
- In calculating JFL's 2016 Profit Share Bonus, for each month EA has not produced revenue numbers, that the Bonus calculation use EA's average monthly revenue for the period January 2013-May 2016.

The Panel reiterates its above Order that JFL prepare Proposed Findings regarding not only the calculation of JFL's Profit Share Bonus for 2013, 2014 and 2015, but also to calculate the Bonus for the period June 2016 – December 2016 and to preclude EA from contesting JFL's allegation that EA used amounts it owed JFL to pay for resources employed on JFL's cases. In addition, the Panel will permit to JFL to amend its Prayer for relief to seek punitive damages and further find that that EA acted with malice, fraud and oppression by hiding its revenue numbers.

Emails and Other Information

JFL's Letter Brief states that EA did not produce any remaining documents or information ordered by the Panel on January 30th:

- Emails regarding performance of Agreement, including to and from Avenatti and Eagan
- Emails to and from Eagan regarding EA's revenue, profits and expenses
- EA emails with JFL after his resignation
- Documents and emails regarding the drafting and negotiation of the Agreement
- Jason Frank's old cellphone
- Back up documentation for EA expenses in excess of $25,000 including amounts Avenatti claims were paid to him as origination fees rather than profit distributions

JFL requests an evidentiary sanction that EA be precluded from offering into evidence any document in its possession, custody or control not produced prior to January 6, 2017, including JFL documents, unless JFL introduces the document first. The Panel imposes this evidentiary sanction.

## Wires re *Loftin* Fees

On October 27, 2016, the Panel specifically ordered EA to produce bank statements and wires by November 10th regarding the date when *Loftin* Legal Fees transferred from its client trust account to its operating account. EA has not produced these documents. EA orally committed to fully comply with this Order by February 3rd.

According to JFL, EA did not produce the bank statements and wires. Accordingly, JFL asks that the Panel impose an issue sanction finding that the legal fees were collected in 2014, not 2013. The Panel imposes this issue sanction.

## Interrogatories

On December 20, 2016, the Panel ordered EA to produce further responses to JFL's Interrogatories by January 6, 2017. EA failed to meet that deadline, but did provide some further responses on January 10, 2017.

According to JFL's Letter Brief, EA provided no further response to Interrogatory No. 9 regarding the calculation of "net attorneys' fees" in the *Eden* class action and related lawsuits. JFL requests an issue sanction that in calculating the *Eden* Bonus, "net attorneys' fees" shall be the total amount awarded by the trial court in the class action plus revenue collected in individual *Eden* related cases minus costs identified in EA's application for attorneys' fees and costs in the class action. The Panel will impose this issue sanction.

Also, JFL's Letter Brief states that EA provided no further responses to the following interrogatories:
- No. 7. Identify full amount of 2016 revenue
- Nos. 10 & 11. Total "JFL Origination Fees" in 2016
- No. 13. Information regarding "Origination Fees" collected by Avenatti
- No. 14. Identify case names for "Referral Fees" or "Fees Paid to Outside Counsel"

The Panel directs JFL to prepare Proposed Findings corresponding to EA's failure to further respond to these interrogatories.

## Defenses and Counterclaims

According to JFL's Letter Brief, EA produced no documents or information regarding its defenses or counterclaims. The Panel is ordering that EA may not present any evidence on its counterclaims, so there is no need to address its non-production regarding those counterclaims. Separately, JFL requests that EA be precluded from asserting any defenses for which it has refused to produce supporting evidence. The Panel will impose this issue sanction.

CONCLUSION

Except for its request for issuance of a Partial Final Award, which is premature, JFL's requested sanctions are reasonable and appropriately responsive to the magnitude of EA's non-compliance with Panel Orders. JFL is directed to submit to the Panel specific Proposed Findings which the Panel will conclusively adopt at the plenary Hearing.

Dated:      February 10, 2017

Judge Perry Friedman (Ret.)
Chair, Arbitration Panel

Exhibit 3

JAMS ARBITRATION
Reference No. 1220053114

Jason Frank Law, PLC,
      Claimant and Cross-Respondent,

      v.

Eagan Avenatti, LLP,
      Respondent and Cross-Claimant.

---

### ORDER RE:   JASON FRANK MOTION TO COMPEL DEPOSITIONS

On February 14, 2017, Claimant and Cross-Respondent Jason Frank Law, PLC's ("JFL") requested an order and issuance of subpoenas that Michael Eagan, Michael Avenatti and Judy Regnier appear for deposition.    JAMS immediately made efforts to schedule a telephonic hearing regarding the Motion.    On February 15, 2017, Respondent and Cross-Claimant Eagan Avenatti, LLP ("EA") stated that it anticipated filing responsive papers by February 20, 2017 and requested a hearing.    EA filed its Opposition to the Motion on February 21, 2017 at 4:37pm.    The Panel has read and considered JFL's Motion and EA's Opposition.

Eagan is one of two equity partners of Respondent and Cross-Claimant Eagan Avenatti, LLP ("EA"), Avenatti is EA managing partner and Regnier is EA office manager.    EA opposes the Request on the grounds that the parties had been in discussions regarding proposed dates for the depositions and the request seeks improper non-party discovery.

On December 20, 2017, the Panel issued an Order that, among other things, ordered the parties to meet and confer to determine the sequence and scheduling of these depositions along with EA depositions of Jason Frank, Scott Sims and Andrew Stolper.    The Panel expressly ordered that "If the parties are unable to agree on sequencing, the depositions shall be taken in alternating order, beginning with EA taking the first deposition, JFL taking the second, and so on to the sixth deposition."

The Panel has reviewed the meet and confer correspondence between counsel for the parties.    It reveals the same pattern of delay, obfuscation and unresponsiveness by EA that has characterized its conduct throughout this arbitration.    As the Panel ordered on December 20th, JFL is entitled to take the depositions of these three EA-affiliated individuals.    JFL requests that Regnier appear on February 23, 2017, Eagan appear on February 24, 2017 and Avenatti appear on March 1, 2017.    The Panel orders that Avenatti, Eagan and Regnier each appear for deposition no later than March 3, 2017.    If any of these individuals fails to appear for deposition by that date, JFL may file a Request for Sanctions on March 6, 2017.    If JFL files such a Request, EA shall file a Response by March 7, 2017.    In deciding whether to impose sanctions, the Panel will evaluate whether the parties acted in good faith to schedule the depositions by March 3rd.    JAMS shall reserve March 8, 2017 at 5:30pm for a telephonic hearing of the Request.

JFL also asserts that EA's depositions of Sims and Stolper are now moot because on February 10, 2017 the Panel ordered that EA is precluded from offering evidence of any affirmative claim at the plenary hearing, whether as pled in its counterclaims or in the guise of a defense.   EA contends that Sims and Stolper's testimony is still relevant to its defense of JFL's claims.   EA is entitled to depose Sims and Stolper only on subjects other than EA's affirmative claims, whether pled in its counterclaims or in the guise of a defense.   However, due to EA's failure to meet and confer in good faith, the Panel no longer insists on the alternating order of depositions.   Rather, the Panel orders JFL to make Sims and Stolper available for deposition at a time mutually convenient to them and the parties.

Finally, JFL requests that if Avenatti, Eagan or Regnier fail to appear for deposition as ordered, that the Panel impose $10,000 sanctions personally on the non-appearing individual, not to be paid by EA, and further prohibit EA from offering any evidence at the plenary hearing and deem all JFL claims to be established.   As stated above, the Panel will not impose sanctions at this time, but will consider a Request for Sanctions if any of these individuals does not appear for deposition by March 3rd.

**The full Panel joins in granting JFL's Motion as set forth above.**

At 8:28am on February 22, 2017, JAMS gave written notice of setting a telephonic hearing of this Motion at 5:00pm on February 22nd.   The Panel issued a Tentative Ruling granting JFL's Motion at 9:13am.   At 12:47pm, counsel for EA objected to "the unilateral setting of the hearing for 5:00 today.   Counsel for Respondent is unavailable at this time."   The undersigned Chair called the telephonic hearing to order at 5:10pm, asked JAMS operator Brandy Brily to remain on the line and requested appearances.   Eric George, Esq. and Benjamin Scheibe, Esq., appeared for Claimant, who also appeared.   Counsel for EA did not appear.   The Chair then announced that before the hearing, he had conferred with Panelist Judge Judith Ryan (Ret.) and together they agreed that the Chair would not conduct the hearing in the absence of EA's counsel.   Instead, the Panel would issue an Order on the Motion.   This is that Order.

Dated:        February 22, 2017

_____
Judge Terry Friedman (Ret.)
Chair, Arbitration Panel

Exhibit 4

UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

CASE NO.6:17-bk-01329-KSJ

IN RE:

EAGAN AVENATTI, LLP,

Debtor.

MARCH 8, 2017

TRANSCRIPT OF PROCEEDINGS

BEFORE THE HONORABLE KAREN S. JENNEMANN

HELD AT 400 WEST WASHINGTON STREET
ORLANDO, FLORIDA

A P P E A R A N C E S:

ELIZABETH A. GREEN, ESQUIRE
TIFFANY PAYNE, ESQUIRE
Baker & Hostetler
    Appearing on behalf of Debtor

ISAAC M. MARCUSHAMER, ESQUIRE
Berger Singerman, LLP
    Appearing on behalf of Jason Frank Law, PLC

BENJAMIN D. SCHEIBE, ESQUIRE (Telephonic Appearance)
Browne George Ross, LLP
    Appearing on behalf of Eric M. George

ALSO PRESENT:
Jason M. Frank (Telephonic Appearance)
of Jason Frank Law, PLC

Proceedings recorded by electronic sound recording
Transcript provided by ACCREDITED COURT REPORTERS
(407) 443-9289
acreporters@embarqmail.com

2

I N D E X

PROCEEDINGS BEFORE JUDGE JENNEMANN:                    3

Motion to Lift Stay


CERTIFICATE OF REPORTER:                              28

3

1              ORLANDO, FLORIDA, MARCH 8, 2017, 2:29 P.M.

2                       P R O C E E D I N G S

3              THE CLERK: The Court calls Case Number 17-1329,

4       Eagan Avenatti, LLC.

5              Interested parties please come forward and

6       enter your appearances.

7              THE COURT: And let me take appearances in the

8       courtroom first.

9              MS. GREEN: Good morning, Your Honor.  Elizabeth

10      Green for Eagan Avenatti.

11             MR. MARCUSHAMER: Good afternoon, Your Honor.

12      Isaac Marcushamer from Berger, Singerman on behalf of the

13      movant this afternoon, the Jason Frank Law Firm.

14             THE COURT: Very good. And then who do we have

15      on the telephone?

16             MR. SCHEIBE: Your Honor, this is Benjamin

17      Scheibe appearing for Eric George. We are not counsel in

18      the bankruptcy but we are counsel for the moving party,

19      Mr. Frank, in the California arbitration that's

20      referenced in the papers.  We're here just to let the

21      Court know, if it has any questions, what's going on in

22      that arbitration.

23             THE COURT: Very good.  Other telephonic

24      appearances.

25             MR. MARCUSHAMER: I think, Your Honor, one --

4

1             MR. FRANK: Good morning, Your Honor.  Jason

2    Frank on behalf of Jason Frank Law Firm.

3             THE COURT: Right.

4             MR. MARCUSHAMER: And I believe one of my law

5    partners may be listening in on this only but shouldn't

6    have to say anything.

7             THE COURT: Very good.  Any other party?

8             MS. GREEN: Your Honor, Tiffany Payne with our

9    firm is also present.

10             THE COURT: Very good.  And you represent the

11   debtor.  So we don't have the petitioning creditor?

12             MR. MARCUSHAMER: Not -- not as far as I'm

13   aware, Your Honor.

14             THE COURT: Okay.  Okay.  And if you don't mind,

15   I'm going to listen to the debtor's position first.

16   Thank you.

17             MR. MARCUSHAMER: Yes, ma'am.

18             THE COURT: Ms. Green or Ms. Payne, either one,

19   can you tell me what's going on with this involuntary 11?

20             MS. GREEN: Yes, Your Honor, I can try.

21             We were retained officially this morning.  I

22   did have a conversation with Mr. Avenatti on Monday and

23   one again on -- a couple yesterday, but we were

24   officially retained today, and Eagan Avenatti is a trial

25   practice firm located in Newport Beach, California.  Mr.

1    Eagan is rated AV pre-eminent in Martindale Hubbell.

2    They're a real law firm that does a lot of contingency

3    fee litigation all over the country and they have

4    apparently creditors in various places.

5            THE COURT: What kind, tort or is it product

6    liability or --

7            MS. GREEN: Tort.

8            THE COURT: Tort.

9            MS. GREEN: And some product liability I believe

10   actually.

11           THE COURT: Okay.  Okay.  Go ahead.

12           MS. GREEN: This case began as an involuntary

13   case under 303 of the bankruptcy code, as you know, on

14   this past Wednesday, and immediately upon filing the

15   bankruptcy case, as you also know, the automatic stay

16   comes into effect.

17           The purpose of the automatic stay is to

18   preserve the status quo while we figure out what's going

19   on, and quite frankly, that's really what needs to happen

20   here is we need to figure out what exactly is going on in

21   terms of the involuntary case.

22           What's being asked here is that you lift the

23   automatic stay for the determination of a potential 14

24   million dollar claim by this creditor.  There are, and I

25   can confirm, millions of dollars of other creditors, over

6

1    20 million dollars and other creditors.  The punitive

2    debtor hasn't yet decided what they're going to do with

3    the case because it just happened.

4           THE COURT: Um-hum.

5           MS. GREEN: And in addition to asking this Court

6    to lift the stay to determine this 14 million dollar

7    claim, one of the real problems here is that that in the

8    arbitration proceeding not only are they doing that but

9    they're asking for a declaration from the panel that the

10    claimant is entitled to 100 percent of any fees of Eagan

11    Avenatti and that they're seeking in matters originated

12    by the claimant on the grounds that statutory recovery

13    would constitute unjust enrichment and would be the

14    result of an unjust conversion.

15           As you know, those fees would be property of

16    the bankruptcy estate of Eagan Avenatti.  Some of the --

17    one single case is approximately 20 to 30 million

18    dollars.  We're talking about really significant dollars

19    here.

20           In addition, the debtor if they were to go

21    forward with this arbitration would end up spending

22    hundreds of thousands of dollars over this seven day

23    period, and so it's our position that not only would this

24    create a huge problem during the gap period and that

25    there's a lot of money that's going out the door by the

1    debtor but that there would be a determination by this

2    arbitrator of significant claims.

3           Rightly the movant cites the EME case which

4    says that if there is an arbitration clause in an

5    agreement in a non-core matter that the bankruptcy court,

6    unless it's contrary to the provisions of the bankruptcy

7    court or the intent of the code, should go forward with

8    the arbitration proceedings, although not really at this

9    stage of the case.  EME happened much later on in the

10   stage of the case.

11          But, I would argue that, first of all, I don't

12   know that this is non-core.  It seems to me that if this

13   is a relation of debtor and creditor and a relation of

14   the actual assets of the estate, that one, this

15   bankruptcy court has the exclusive jurisdiction of

16   determining what is and is not property of the estate.

17   The movant is seeking to make that determination in this

18   arbitration, and I don't believe that it would even the

19   playing field for the other creditors in the case if the

20   Court lifts the stay at this point in time.

21          It also really does conflict with the

22   provisions of the code because it is this Court's job to

23   determine what those assets of the estate are, and we are

24   not -- we're not there yet.  We just got here.

25          THE COURT: Who is the petitioning creditor?

Case 8:17-bk-11961-CB   Doc 157-1   Filed 07/12/17   Entered 07/12/17 20:23:27   Desc
Case 1:18-mj-03161-KMW   Document 66-2   Filed 05/29/18   Page 35 of 82
Exhibit 1   Page 9 of 29

8

1          MS. GREEN: The petitioning creditor was an
2     investigator who did investigation on one of the law
3     firm's cases. So it's not a, as I understand it, the
4     petitioning creditor -- I know the petitioning creditor
5     isn't related to the law firm. It is an independent
6     third person.

7          The movant argues that it's going to suffer
8     irreparable harm, and it's interesting because the only
9     irreparable harm that the movant argued that it's going
10    to suffer is the loss of the money that it paid to do
11    this JAMS arbitration. Their pleadings are very clear
12    that that's the irreparable harm, and they point to the
13    scheduling order which is interesting because they give
14    you one sentence of the scheduling order where it says
15    that if -- if the arbitration doesn't go forward this
16    money is forfeited. However, if you read the second
17    sentence in 11(b) of the scheduling order, it says that
18    JAMS shall refund the fees for any hearing day which is
19    rebooked to the extent earned on that day.

20         So there is a rebooking possibility; and second
21    of all, the movant hasn't done anything to see if this
22    could be rebooked. In fact, we have an email that we
23    could provide to Your Honor where they basically ask JAMS
24    to keep it on the calendar. They didn't ask them if they
25    could move it, they didn't ask them if it could be

Case 1:18-mj-03161-KMW   Document 66-2   Filed 05/29/18   Page 36 of 82
Case 8:17-bk-11961-CB   Doc 157-1   Filed 07/12/17   Entered 07/12/17 20:23:27   Desc
Exhibit 1   Page 10 of 29

9

1    rescheduled, they didn't ask them about the money.  They

2    just said, keep this on the calendar because we have a

3    motion before the bankruptcy court and we want it to go

4    forward.

5          So it's clear that they have not done anything

6    to determine whether or not that money can -- can be used

7    again, and it clearly says on Page 5 in Section 11(b)

8    that any fees can be used.

9          Second of all, the Eleventh Circuit has made it

10    clear repeatedly that money injury in and of itself is

11    not irreparable harm if they can be compensated with

12    other relief, granted in other circumstances, but in

13    United States versus Jefferson City the court held that

14    if there is time and energy or money loss that's not

15    irreparable harm and that's pretty much the standard

16    whenever you're looking at irreparable harm.  You're not

17    looking at a money damage, you're looking at something

18    else that cannot be repaired.

19          Here the damage to the estate with the cost of

20    gap funds, the money that would be expended by the debtor

21    to the tune of hundreds of thousands of dollars, the fact

22    that there are other creditors that are potential

23    creditors in this punitive debtor case, and the fact that

24    the arbitrator would be determining what are essentially

25    core matters, I believe the Court should deny this

10

1    motion.

2              THE COURT: Thank you. And on behalf of the

3    movant.

4              MS. GREEN: And, Your Honor, I do have that

5    email and we also have the JAMS document that I described

6    if you choose to --

7              THE COURT: Very good. This is a --

8              MS. GREEN: I know it's not an evidentiary

9    hearing --

10             THE COURT: -- this is a preliminary, I'm not

11   taking evidence today so --

12             MS. GREEN: Correct.

13             THE COURT: Go ahead.

14             MR. MARCUSHAMER: Thank you, Your Honor. Again,

15   Isaac Marcushamer on behalf of the movant.

16             Your Honor, I'm going to start a little bit

17   differently --

18             THE COURT: Um-hum.

19             MR. MARCUSHAMER: -- than I'd originally

20   planned.

21             THE COURT: Um-hum.

22             MR. MARCUSHAMER: I didn't know Ms. Green was

23   going to be here for today's hearing.

24             THE COURT: Um-hum. Um-hum.

25             MR. MARCUSHAMER: There had been no notice of

11

1     appearance, and Ms. Green is an incredibly capable lawyer

2     with a great law firm and a lot of respect and we've done

3     a lot of work with them.

4                THE COURT: Um-hum.

5                MR. MARCUSHAMER: And her presentation was one

6     of a debtor's lawyer who had come in and sought

7     protection from a bankruptcy court.

8                THE COURT: Um-hum.

9                MR. MARCUSHAMER: That didn't happen here.  What

10    happened here is a sole creditor across the country from

11    where this law firm operates filed an involuntary

12    petition, and until we filed a motion and until this

13    Court set it for hearing, nobody at the debtor -- at the

14    alleged debtor's office, which is a law firm, came before

15    this Court and say, hey, wait a minute, this is wrong,

16    this shouldn't happen.  No, instead they waited -- they

17    used that automatic stay which most courts, I think

18    except Judge Cristol, have found applies under the

19    statute --

20                THE COURT: Um-hum.

21                MR. MARCUSHAMER: -- they use the automatic stay

22    to prevent the depositions that had been ordered to go

23    forward -- to go forward and now they're seeking to delay

24    exactly what the arbitrators found, that same pattern to

25    delay and obfuscate.  That's what's in their order that's

12

1      attached to our papers, they're seeking to do the exact

2      same thing here without ever declaring themselves to be

3      bankrupt.

4             The danger here, Your Honor, is what may happen

5      is they're going to come here today and say, it's just a

6      quarter million dollars.  You know what, Your Honor, and

7      it's just some time, and Mr. Frank has been waiting a

8      long time and gone to great efforts to get there, and

9      they're going to come here and say, no, put it off, and

10     it's going to delay it even further and then turn around

11     and say, you know what, we can test the involuntary,

12     we're not actually bankrupt.

13            That's not what this is about.  That's not what

14     that sign outside of your chambers -- outside of your

15     courtroom says about an honest debtor getting a fresh

16     start.  That's not what this is about.  That's not what

17     this case is about.  That's not what our motion is about.

18            There is irreparable harm to Mr. Frank.  He had

19     to pay not only his fees but their share of the fees

20     because they refused to do that to get a date scheduled,

21     in a clear pattern.  We did everything we could to serve

22     them directly, to make sure that service was good, and to

23     ensure that they at least knew what we were doing; and

24     it's been my experience and I think it's been your

25     experience, Your Honor, that when there's an opportunity

13

1      for an advanced piece of litigation to go and liquidate a

2      claim, bankruptcy courts routinely allow those creditors

3      and the debtor wherever may be to go and finish that

4      litigation through to judgment.

5              We have not asked to collect. Ms. Green

6      mentioned all sorts of grave (sic) of horribles that we

7      may end up with a declaratory judgment we are seeking,

8      and you may put whatever you wish in the order that gives

9      you comfort for this gap period to ensure that my client,

10     I'm representing, will not seek to collect one penny as

11     long as this case is pending. We will come back before

12     the Court, but we should not lose months of work simply

13     because a $28,700 creditor across the country in what

14     potentially is, we've been now told has -- I guess a firm

15     that has tens of millions, maybe 20 million dollars worth

16     of claims, and I'm going to believe that they're probably

17     more than 12 creditors, right, which would mean that

18     there would have to be two more that join would have that

19     opportunity to state what's going on there.

20             The automatic stay is not a weapon.  There is

21     nothing to seek here and figure out what should happen

22     except what had to do with this bankruptcy case, and the

23     debtor, the alleged debtor has had more than seven days

24     to figure that out and now this morning they decided and

25     it's a lawyer, it's a law firm.

1          I promise you this, if I told Paul Singerman

2     that an involuntary bankruptcy had been filed against our

3     firm, that day he's in court.  I'm fairly confident that

4     where Your Honor worked before the managing partners

5     would be in court that day.  They wouldn't wait a week.

6     They wouldn't send emails, which we can provide to Your

7     Honor, multiple times saying we're going to -- don't, you

8     know, you can't go forward because there's the automatic

9     stay.  That's not what this is about.

10          Judge Cristol, in his Acelor opinion, which is

11     found at 169 BR 764, he determined that the automatic

12     stay doesn't apply in the gap period.  Very interesting

13     piece.  I didn't cite it to the Court because I think

14     that he may be --

15          THE COURT: And I've ruled otherwise, so we

16     don't need to go there.

17          MR. MARCUSHAMER: Right, right.  So --

18          THE COURT: With due respect to Judge Cristol

19     but --

20          MR. MARCUSHAMER: -- but he does make an

21     interesting point, there's a really interesting quote

22     that he does make, and I do want to read it for the

23     Court.

24          He says, it cannot be presumed that the intent

25     of Congress was to provide that all acts of creditors are

Case 1:18-mj-03161-KMW   Document 66-2   Filed 05/29/18   Page 42 of 82
Case 8:17-bk-11961-CB   Doc 157-1   Filed 07/12/17   Entered 07/12/17 20:23:27   Desc
Exhibit 1   Page 16 of 29

15

1    totally stayed upon the filing of an involuntary petition

2    whilst the debtor is free to wander the financial meadows

3    without any controls or inhibitions as to its acts or

4    omissions.

5          The point here, Your Honor, is, yes, the

6    automatic stay does apply, that's why we filed our

7    motion, but they -- the debtor, the alleged debtor should

8    not be free to wander about and pick and choose what

9    cases are going to go forward and which ones are going to

10   be stayed while it hasn't even applied to this Court to

11   say, yes, I'm an honest debtor, yes, I'm coming forward.

12   That's not how this is supposed to work.

13         I'm happy to walk Your Honor through the

14   details of our motion.

15         THE COURT: But the stay would apply to

16   everything, so I --

17         MR. MARCUSHAMER: This --

18         THE COURT: -- don't understand that particular

19   argument.

20         MR. MARCUSHAMER: So to the extent that they

21   -- that the debtor is involved in offensive litigation

22   trying to collect money against former clients, right,

23   the stay wouldn't apply because the debtor itself, the

24   alleged debtor is not staying.  It's our understanding

25   that there are at least one or two cases where the debtor

1    is seeking to assert liens against former clients. Those
2    claims are (sic) applied. That money could come in and
3    then go back out. Now in this gap period we wouldn't
4    know. We wouldn't know, because the debtor's entitled
5    to --

6            THE COURT: Well, you wouldn't know if there
7    wasn't a stay in place either, so you wouldn't know that
8    either way. So I don't -- okay, but go ahead.

9            MR. MARCUSHAMER: My point, Your Honor, is
10   simply that they're getting the benefit of the stay,
11   they're using the stay, and they're preventing us from
12   going ahead and liquidating our claim just to the point
13   of liquidation, something that I think is frankly
14   routine.

15           There is no harm to the petitioning creditor,
16   if he has a claim, and there's been no documentation as
17   to what his claim is other than what's on the petition.
18   To the extent he has a claim and there's a bankruptcy
19   case that goes forward, then his claim will be dealt
20   with.

21           At some point my client's claim is also going
22   to have to be dealt with, and what makes the most sense
23   is, everybody's geared up for this arbitration, they've
24   known about it since August -- August 2016 -- as recently
25   as two weeks ago they were before the panel. Panel

Case 1:18-mj-03161-KMW  Document 66-2  Filed 05/29/18  Page 44 of 82
Case 8:17-bk-11961-CB  Doc 157-1  Filed 07/12/17  Entered 07/12/17 20:23:27  Desc
Exhibit 1  Page 18 of 29

17

1.      issuing orders, this arbitration is going forward, here's

2      what's going to happen, and now they want to reset the

3      whole clock. There is no benefit to not finding out how

4      much if anything my client is owed. My client may be

5      owed nothing if he loses. We submit that we don't think

6      that's likely but that's possible. Let's find out,

7      because that's going to materially affect whatever may or

8      may not happen in this court.

9              So, Your Honor, finally there was a

10      representation, and I trust Ms. Green and her colleagues

11      that the petitioning creditor is wholly independent from

12      the debtor, we are not wholly convinced that that's the

13      case --

14              THE COURT: Um-hum.

15              MR. MARCUSHAMER: -- that's something that I

16      think needs to be flushed out and so we would propose the

17      following. Allow our arbitration to proceed next week.

18      The dates are reserved, the panel is reserved, the fees

19      have been paid. Don't force my client to have to come

20      with another deposit later on or go back to begging JAMS

21      to see if they'll give him some credit. Let's get that

22      done, let's find out how much if anything my client's

23      owed. At the same time we can find out and allow the

24      process to play out here, and the debtor should have to

25      make a determination as to whether or not it's going to

18

1    be a debtor. And if it is, then let's let everybody know

2    how that process is going to play out, because in my

3    experience the gap period can sometimes last into weeks

4    and months and even in one case of mine years.  So to say

5    here that we're going to wait until the gap period is

6    over, that's not fair to Mr. Frank.

7                I'm happy to answer any questions Your Honor

8    may have.

9                THE COURT: I understand your argument.  Thank

10   you.  And, Ms. Green, your response.

11               MS. GREEN: Yes, Your Honor.

12               Your Honor, a couple of things.  One is, as

13   soon as the involuntary -- as soon as my client found out

14   about the involuntary petition, and I know this is a non-

15   evidentiary hearing and I'm not testifying, but they

16   found out about it because they were called, solicited by

17   a law firm to represent them.  As soon as they found out

18   about it, they did call to retain counsel.  Obviously,

19   there are conflict checks.  They have to figure out who

20   the lawyers are and how that all works, and that's

21   exactly what happened.

22               So to make the argument that they sat on their

23   hands and did nothing in this very short period of time I

24   think is unfair.  In fact, it was the law firm's counsel

25   that said that there was a stay in place because some --

1    one of the lawyers that they talked to informed them that

2    there was such a thing as an automatic stay that comes

3    into effect when there's an involuntary petition.

4              THE COURT: Um-hum.

5              MS. GREEN: Second, clearly the only agreement

6    that they attached to their pleadings say that this can

7    be rescheduled and that they will get credit. It doesn't

8    say they have to beg.

9              It says in 11(b) that to the extent that it is

10   rescheduled or rebooked for a day that they will get

11   credit for those days. So I think that that's an unfair

12   argument quite frankly.

13             And, finally, I would like Your Honor to look

14   at what they're exactly asking for, because they filed a

15   judicial arbitration and mediation services statement of

16   what their claims are, and their claims relate to all

17   kinds of receivables of this punitive debtor and those

18   are clearly property of the estate.

19             So they're not merely seeking to liquidate

20   their claim. These claims relate to one, two, three,

21   four, five, six, seven pending litigations. There's

22   various lien claims going back and forth. You can't just

23   say, hey, this is just about liquidating this claim.

24   And, frankly, this is about the other creditors, they're

25   not here.

20

1          If this case goes forward, we now have a 14

2     million dollar claim, we have a decision by an arbitrator

3     potentially that says that there are various claims on

4     various receivables of this law firm. I don't think that

5     it's appropriate at this point in time to lift the

6     automatic stay, and quite frankly, if this were a

7     voluntary case, I highly doubt that the Court would lift

8     the automatic stay anyway.

9          So I think that everybody needs time to figure

10    out where we are, and I don't believe that they've met

11    the standard to show that there's irreparable harm, and

12    clearly I think that the balance of the equities go to

13    the other creditors and this potential case.

14              THE COURT: Thank you.

15              MR. MARCUSHAMER: May I reply, Your Honor?

16              THE COURT: Yes.  Yes, please.

17              MR. MARCUSHAMER: Your Honor, section 11(b) says

18    clearly, if the hearing is cancelled or continued for any

19    reason, the deposit for the cancelled date shall be

20    deemed a cancellation fee and shall be immediately

21    payable to JAMS.

22          It says in the second sentence, as counsel

23    continues to point out, JAMS shall refund any fees for

24    any hearing date which is rebooked to the extent fees

25    earned on that day.

21

1           That can be read to be the unused fees.  Our

2    concern, and just be clear, the use of irreparable harm,

3    right, section 362(d) talks about cause. We have shown

4    cause.  We're going to lose a deposit.  That's --

5           THE COURT: What is -- I don't see in your

6    motion what the deposit was.

7           MR. MARCUSHAMER: The deposit was $226,000 in

8    JAMS.

9           THE COURT: Okay.

10          MR. MARCUSHAMER: That's what we had to pay --

11          THE COURT: That amount.

12          MR. MARCUSHAMER: -- a hundred -- a hundred and

13   thirteen thousand dollars was --

14          THE COURT: Each?

15          MR. MARCUSHAMER: -- our share and the alleged

16   debtor refused to pay its share.  So my client paid that

17   share as well in order to have the dates be locked in and

18   for the arbitration to go forward.  So we have covered

19   just over $226,000 in total so to allow this to go

20   forward.  Counsel --

21          THE COURT: Okay.  This is what I'm going to --

22   thank you.  This is what I'm going to do.  We all know if

23   this was a voluntary case, you're right, I would out of

24   the hand deny this motion this early in the case.  This

25   is not however a voluntary case, this is an involuntary

22

1    case filed by what appears to be at best the sort of

2    screwy small creditor who I don't think in anybody's

3    opinion could independently institute an involuntary

4    case.

5            If this is a law firm with a claim is

6    established, clearly you're going to have at least three

7    creditors and clearly one creditor with a $28,000 claim

8    is not going to be enough, so there -- and the fact that

9    this involuntary was filed in Florida when every other

10   indication is that this action should be in California

11   really doesn't appear to me to be a legitimate case.

12           So we have an involuntary case that has a

13   stench of impropriety.  Nothing to do with the debtor

14   necessarily.  I don't have any information as to the

15   relationship between the private investigator, the

16   petitioning creditor, and the debtor.  But, I can't make

17   Mr. Frank lose this date and $226,000 if there's really

18   nothing that the debtor gets other than the potentiality

19   of the stay for a case that's never going to go anywhere.

20           So, although the summons which -- and I agree

21   with Ms. Green -- the summons was not issued by this

22   Court until March -- the case was filed on March the 1st.

23   Let me tell you exactly what time.

24           MR. MARCUSHAMER: 1:32 p.m., Your Honor.

25           THE COURT: So later in the day on March the

23

1      1st.   The summons went out from the Court timely on March

2      the 2nd but it went out by mail and to electronic service

3      providers but I doubt that it went anywhere quickly

4      because it is an involuntary case.  We don't have a

5      matrix or anybody to serve.  So I don't disagree that

6      this firm, debtor got very limited notice of the

7      bankruptcy, but I'm not convinced they're entitled to the

8      stay.

9               I don't have any real confidence that they're

10     going to stay in this bankruptcy or any other bankruptcy,

11     and that whether the private investigator has some

12     relationship with the firm that would have induced a

13     collusive filing or if they just got plain lucky that

14     somebody filed on the eve of the arbitration, I just

15     don't know, but because of that issue the firm will have

16     until this Friday to decide whether they want to stay in

17     bankruptcy or not.

18              If they decide they're going to stay in

19     bankruptcy, with all due respect to the movant, I'm not

20     going to make them go forward at this juncture in this

21     case if there really is going to be a bankruptcy.  I

22     don't think there will be a bankruptcy.

23              If the debtor decides not to file bankruptcy,

24     they can get the full 21 days if they want to play with

25     that, play the normal summons rule, but the stay will

24

1      lift on Friday unless there's a consent to the

2      bankruptcy, and that will allow the arbitration to go

3      forward. It gives you -- it's not perfect but it's fair

4      in my opinion because the panel is established, the dates

5      are established, it's a four day arbitration, and if the

6      debtor isn't going to be a debtor you shouldn't get to

7      cancel the arbitration.

8              If the debtor is going to be a debtor, quite

9      honestly I'm going to cancel it if there's that much --

10     if we don't have a creditor matrix and I don't know what

11     the status of the case is, and so I think it would be

12     premature.

13             I've never had anything like this happen

14     before. So I'm doing the best I can with what I have,

15     but what I have is a sort of stinky involuntary and a

16     legitimate request by a creditor with somebody who may or

17     may not be a debtor.

18             MR. MARCUSHAMER: Your Honor --

19             THE COURT: Because if you choose not to be a

20     debtor, I think you could flick it away like a fly spec

21     and get it gone. And, yes, sir.

22             MR. MARCUSHAMER: I was just going to ask, to

23     the extent the stay is lifted on Friday, would Your Honor

24     be inclined to waive the 14 day period under 4001(d) --

25             THE COURT: Oh, absolutely. The arbitration

1      will go forward --

2                  MR. MARCUSHAMER: Thank you.

3                  THE COURT: -- if -- if I lift the stay and the

4      14 day period under -- under 4001(d) will be waived.

5      Questions?

6                  MS. GREEN: No, Your Honor, I understand.

7                  THE COURT: Okay.

8                  MR. MARCUSHAMER: Your Honor --

9                  MS. GREEN: And I've never had anything happen

10     like this before either. So I think we're all in the

11     same boat.

12                 MR. MARCUSHAMER: I guess I'm unique, this is my

13     second one like this so...

14                 THE COURT: Well, that's --

15                 MR. MARCUSHAMER: It happens.

16                 THE COURT: -- we don't need to make it a

17     practice in the Middle District of Florida, that's all

18     I'm saying. But, I will -- if the debtor consents to the

19     bankruptcy, I'm going to just defer ruling on the motion

20     until we can have a proper hearing but it will

21     effectively cancel the arbitration date.

22                 If the debtor does not consent to the

23     bankruptcy, then just submit the order and I'll sign it

24     Friday afternoon.

25                 MR. MARCUSHAMER: Okay. So you want my office to

26

1    submit the order --

2              THE COURT: Yes.

3              MR. MARCUSHAMER: -- this Friday afternoon?

4              THE COURT: I'm not going to be doing your

5    order.

6              MR. MARCUSHAMER: I --

7              THE COURT: And I probably will sign it Monday

8    quite honestly, so we'll have to wait until after the --

9    the 13th -- oh, the 13th is Monday.

10             MR. MARCUSHAMER: May we have a deadline a

11   little --

12             THE COURT: Oh, yes, absolutely.

13             MR. MARCUSHAMER: You know how Friday

14   works --

15             THE COURT: Yes, it's two -- it's roughly two --

16   well, it's not roughly, it's 2:57 p.m. on Wednesday, we

17   need to know by noon on Friday.

18             MR. MARCUSHAMER: Thank you, Your Honor.

19             THE COURT: I looked at the order and I

20   understand your argument, too, on rebooking but it says

21   that in the paragraph of the scheduling order also that

22   there is a 60 day cancellation period and the refund fee

23   would not be given.  So I think they've got a legitimate

24   concern.  So the choice is on the debtor.  If you want to

25   be a debtor, tell me by noon on Friday.  If not, I will

27

1    sign the order Friday afternoon.

2              MR. MARCUSHAMER: Thank you, Your Honor.

3              MS. GREEN: Yes, Your Honor.   Thank you.

4              THE COURT: Thanks.   And I'm going to keep my

5    notes.   The Court is in recess.   Thank you.

6              (Thereupon, the taking of the proceedings is

7    concluded.)

8

9

28

C E R T I F I C A T E

I certify that the foregoing is a correct transcript

from the electronic sound recording of the proceedings in

the above-styled matter.

*Lois H. Simonds*                     March 9, 2017

Lois H. Simonds
Notary Public-State of Florida
Commission Expires: 12/18/18
Commission #FF175996

FEDERALLY CERTIFIED TRANSCRIPT AUTHENTICATED BY:

/s/Antonio F. Hamilton
Accredited Court Reporters

Exhibit 5

## SETTLEMENT AGREEMENT AND RELEASES

This Settlement Agreement and Releases ("Agreement") is entered into this 12th day of December 2017 by and between Jason Frank Law, PLC, a professional law corporation organized in California ("JFL"), Jason Frank ("FRANK"), an individual, Scott Sims ("SIMS"), an individual, Andrew Stolper ("STOLPER"), an individual, and Frank Sims & Stolper LLP, a limited liability partnership organized in California ("FSS") (collectively, the "JFL Parties"), on the one hand, and Eagan Avenatti LLP ("EA"), a limited liability partnership organized in California, Avenatti & Associates, APC ("A&A"), a professional corporation organized in California, Michael Avenatti ("AVENATTI"), an individual, and Michael Eagan, an individual ("EAGAN") (collectively, the "EA Parties"), on the other hand. The JFL Parties and EA Parties are collectively referred to as the "Parties."

WHEREAS, JFL and FRANK entered into an Independent Contractor Agreement with EA effective November 1, 2013 (the "JFL Agreement") and prior to that time FRANK had been an employee of EA;

WHEREAS, SIMS entered into an Employment Agreement with EA dated March 1, 2014 (the "SIMS Employment Agreement");

WHEREAS, on or about February 28, 2016, JFL filed a Demand for Arbitration with JAMS against EA asserting claims for damages and other remedies for breach of contract, which demand was later amended to include claims for fraud, unjust enrichment, declaratory relief and punitive damages (the "JFL Arbitration");

WHEREAS, on or about May 20, 2016, JFL, FRANK, SIMS and STOLPER ceased practicing law at EA and formed a new law firm, FSS;

WHEREAS, the clients in the matters listed on Exhibit "A" (attached hereto) (collectively, the "Matters") terminated EA as their counsel in the Matters and retained FSS as their counsel in certain of the Matters;

WHEREAS, EA asserted attorneys' liens in the Matters and/or claimed it had the right to recover its reasonable attorneys' fees and costs for the work performed at EA on the Matters;

WHEREAS, on or about July 22, 2016, EA filed a Demand for Arbitration with JAMS against EA's former client, Kimberly Birbrower, seeking to recover fees and costs in the Birbrower v. Quorn Foods, Inc. matter, which is one of the Matters (the "EA/Birbrower Arbitration");

WHEREAS, on or about August 9, 2016, SIMS filed a Demand for Arbitration with JAMS against EA seeking certain sums owed under the SIMS Employment Agreement, including claims for breach of contract, fraud, accounting and constructive trust (the "SIMS Arbitration");

WHEREAS, on or about September 23, 2016, EA filed counterclaims against SIMS in the SIMS Arbitration asserting claims for breach of contract, fraud, violation of the California Uniform Trade Secret Act, breach of fiduciary duty, breach of duty of loyalty, conversion, accounting, and constructive trust;

WHEREAS, on or about September 12, 2016, EA filed counterclaims against JFL in the JFL Arbitration asserting claims for breach of contract, fraud, breach of fiduciary duty, breach of duty of loyalty, conversion, accounting, constructive trust and tortious interference;

WHEREAS, on or about December 15, 2016, EA filed a complaint in California Superior Court, County of Orange, Case No. 30-2016-00892564-CU-BC-CJC against its former client, William Scott Callaway, seeking to recover fees and costs in the Callaway v. Mercedes Benz USA, Inc. et al. matter, which is one of the Matters (the "EA/Callaway Lawsuit");

WHEREAS, on or about December 21, 2016, EA filed a complaint in California Superior Court, County of Orange, Case No. 30-2016-00893847-CU-MC-CJC against Paul Root and Madison Street Partners, Inc. asserting claims for aiding and abetting breach of duty of loyalty and aiding and abetting fraud (the "EA/Root Lawsuit");

WHEREAS, on or about February 8, 2017, EA's former clients, Authentic Entertainment Properties, LLC and Authentic Entertainment Properties Development, LLC (collectively "AEP") filed a Demand for Arbitration with JAMS against EA seeking declaratory relief and damages relating to EA's former representation of AEP in the AEP v. Royal Center Associates, LLC et al. matter, which is one of the Matters (the "AEP/EA Arbitration");

WHEREAS, on or about February 28, 2017, EA filed a motion to adjudicate its attorney lien against AEP in the District Court for Clark County Nevada, in the AEP v. Royal Center Associates, LLC et al. matter, which such motion was denied and is currently being appealed by EA;

WHEREAS, on or about March 1, 2017, an Involuntary Bankruptcy Petition against EA, seeking that EA be a debtor in a Chapter 11 case was filed in the Middle District of Florida, Case No. 6:17-bk-01329-KSJ (the "Bankruptcy Case");

WHEREAS, on or about March 10, 2017, EA consented to entry of Order for Relief in the Bankruptcy Case;

WHEREAS, on or about May 16, 2017, the Bankruptcy Case was transferred to the Central District of California, Santa Ana Division, before the Honorable Catherine E. Bauer (the "Bankruptcy Court"), and assigned a new case number 8:17-bk-1191-CB;

WHEREAS, on or about June 19, 2017, JFL filed a Proof of Claim in the Bankruptcy Case in the amount of not less than $18,615,886, which included (a) $12,396,633 in unpaid compensation under the JFL Agreement; (b) $1,868,221 in prejudgment, prepetition interest; (c) $500,000 in pre-petition attorneys' fees and costs; and (d) fraud damages and punitive damages in an unliquidated amount but likely in excess of $4,000,000;

WHEREAS, on or about June 19, 2017, FRANK, SIMS, STOLPER and FSS also filed Proofs of Claim in the Bankruptcy Case;

WHEREAS, on or about July 12, 2017, JFL filed a motion for relief from stay to proceed with the JFL Arbitration [Bankruptcy Case Docket Nos. 155, *et al.*] ("JFL RFS Motion"), the Debtor and certain other parties filed oppositions to the JFL RFS Motion, JFL filed a reply to those oppositions, a hearing on the JFL RFS Motion commenced on August 9, 2017 and was continued by direction of the Bankruptcy Court until September 20, 2017 and repeated times thereafter through and including December 13, 2017;

WHEREAS, AVENATTI is the managing member and majority equity holder of EA and solely owns and controls A&A;

WHEREAS, JFL, FRANK and SIMS have asserted that AVENATTI is personally liable to them for all or substantially all claims they have against EA and that A&A may be liable to them, all of which Avenatti and A&A dispute;

WHEREAS, it is in the personal, professional and business interests of AVENATTI and the professional and business interests of EA and A&A that the disputes among the JFL Parties and EA Parties be resolved promptly and each has concluded that he/it will received meaningful value if this Agreement is executed, approved and fully satisfied; and

WHEREAS, the Parties desire to resolve any and all disputes between them on the terms set forth herein (the "Settlement");

NOW THEREFORE, for and in consideration of the mutual covenants contained herein and for other good and valuable consideration, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

## 1.    Dismissal of Bankruptcy Case.

1.1.    Subject to Paragraph 1.5 below, the effectiveness of the terms and obligations of this Agreement are contingent upon (a) EA filing a motion ("Settlement and Dismissal Motion") with the Bankruptcy Court seeking entry of one or more orders (the "Orders") approving the Settlement and authorizing and directing the Debtor to fully comply with all terms of this Agreement pursuant to Fed. R. Bankr. Pro. 9019 ("Settlement Order"), and dismissing the Bankruptcy Case, pursuant to Bankruptcy Code Section 1112(b) ("Dismissal Order"), on terms acceptable to JFL and EA, on or before January 3, 2018,with a hearing on the Settlement and Dismissal Motion to be held on January 24, 2018; (b) entry of the Orders on or before January 31, 2018; (c) the Bankruptcy Case being dismissed within sixteen (16) calendar days after entry of the Dismissal Order; (d) execution of the Guaranty Agreement (as defined below), on or before December 12, 2017; and (e) if a stay of the Settlement Order or Dismissal Order has been entered pursuant to Rule 8007 of the Federal Rules of Bankruptcy Procedure ("Rule 8007"), a

Termination Notice, as defined in Paragraph 1.5 below, having not been provided by JFL or EA. The proposed Order(s) are attached as Exhibit B.

1.2.    The JFL Parties will not oppose any of the relief sought in the proposed Orders, nor will they encourage others to do so, all subject to the timely satisfaction of the deadlines set forth herein (collectively "Deadlines").

1.3.    In the event the Orders are not entered by the Deadlines for their entry, or the Guaranty Agreement is not executed by the pertinent Deadline for its execution, the Parties shall be returned to the *status quo ante* prior to their execution of this Agreement, and the Agreement shall be deemed null and void, and neither this Agreement, its execution nor any statements contained therein may be used in any subsequent proceedings in any court or arbitration.

1.4.    The hearing on the JFL RFS Motion shall be continued until January 24, 2018.

1.5.    If a stay of the Settlement Order or Dismissal Order is entered pursuant to Rule 8007 (a "Stay Order") or if the terms of this Agreement are materially modified by the Court, then JFL or EA may elect to withdraw from and terminate this Agreement, in which case this Agreement and all Orders entered thereon will be rescinded and all Parties will be restored to the *status quo ante* prior to the execution of this Agreement, and the Agreement shall be deemed null and void, and neither this Agreement, its execution nor any statements contained therein may be used in any subsequent proceedings in any court or arbitration. If JFL or EA elects to exercise this right to terminate this Agreement, it shall provide notice of this election to the other parties to this Agreement, in writing, within five (5) business days after the Stay Order is entered (the "Termination Notice"). Upon such election, the Parties will cooperate in taking any action necessary to request that the appropriate court vacate the Settlement Order, the Dismissal Order and Stay Order, and will not object to or oppose such actions.

1.6.    If a Stay Order is issued and neither JFL or EA elect to terminate the Agreement in accordance with Paragraph 1.5, then the time for performing all obligations under this Agreement will commence upon the later of: (a) sixteen (16) calendar days after the Stay Order is no longer in effect provided that the Settlement Order and Dismissal Order have been affirmed; or (b) the time when the obligation would have otherwise been required to be performed under the terms of this Agreement.

2.    **Resolution of EA's Asserted Liens and Right to Attorneys' Fees and Costs in the Matters.**

2.1.    Within sixteen (16) calendar days of entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, EA will withdraw all purported liens asserted in the Matters and will forever waive and forego, with prejudice and finality, any present or future claims for attorneys' fees, costs, expenses, damages, or any other compensation or remedies arising out of or relating to the Matters.

2.2.    Upon the sixteenth (16th) day following the entry of the Settlement Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, the EA Parties will be deemed to have released and forever waived and foregone, with prejudice and finality, any present or future claims for damages, legal fees and costs, or other remedies against (a) the JFL Parties, (b) the current, prior or future parties in the Matters; (c) the current, prior or future co-counsel of EA or FSS in the Matters, or (d) any other party or their counsel for claims arising out of or relating to the Matters, as more fully set forth in Section 5 of this Agreement.

2.3.    In exchange for the consideration provided under the terms of this Agreement, JFL has agreed to reduce its claim in the Bankruptcy Case, as set forth in paragraph 3.1, below, and SIMS, FRANK, STOLPER and FSS have agreed to waive, forego and withdraw each of their claims in the Bankruptcy Case, subject to and except for the terms of the Releases provided in Paragraph 5 below and compliance with the terms and conditions of this Agreement.

2.4.    In addition, the JFL Parties have agreed that EA will receive 50% of any and all legal fees which would otherwise be paid to FSS or FRANK in the future in connection with FSS's contingency agreement with AEP in the AEP v. Royal Center Associates, LLC et al. matter.  This arrangement will be documented in a separate written agreement between EA, AEP and FSS (the "AEP Fee Sharing Agreement"), the execution of which shall be required for this Agreement to take effect.  A copy of the AEP Fee Sharing Agreement is attached as Exhibit C.

3.    **Settlement Payments to JFL.**

3.1.    Upon entry of the Settlement Order, JFL will have an allowed claim against EA in the amount of TEN MILLION DOLLARS ($10,000,000.00), which claim ("JFL Allowed Claim") of JFL and liability of EA will survive dismissal of the Bankruptcy Case, and will not be subject to any further defenses, offsets, counterclaims, oppositions, answers, objections, contests, disputes or other challenges by any EA Party or any other party, provided, however, if (a) the Dismissal Order is not entered, (b) a Stay Order is entered and a Termination Notice is timely sent, or (c) the Settlement Order is overturned, vacated or remanded on appeal, then the JFL Allowed Claim will be null and void and the proof of claim it filed in the Bankruptcy Case and all the claims, rights, and damages asserted therein and in the JFL Arbitration will remain pending.  Nothing in this Paragraph 3.1 is intended to limit the rights of any Parties to enforce the terms of this Agreement.[1]

---

[1] For the avoidance of any doubt, the Parties arrived at the JFL Allowed Claim amount of TEN MILLION DOLLARS ($10,000,000.00) after deducting the credit for fees on the Matters as described in Paragraph 2.3 above and additionally JFL, thereafter, further agreed to reduce its claim to TEN MILLION DOLLARS ($10,000,000.00) as part of this Settlement.  In other words, the Allowed Claim of TEN MILLION DOLLARS ($10,000,000.00) will not be further reduced by any credit for fees, costs, expenses, damages or any other compensation allegedly owed on the Matters.

3.2.    EA will pay JFL the sum of FOUR MILLION EIGHT HUNDRED AND FIFTY THOUSAND DOLLARS (\$4,850,000.00) pursuant to the following schedule:

      3.2.1.  Within sixty (60) calendar days after the entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007 and remains in effect, EA will wire JFL the sum of TWO MILLION DOLLARS (\$2,000,000.00), in immediately available funds, pursuant to written wire instructions to be provided by JFL.

      3.2.2.  Within one-hundred and twenty (120) calendar days after the entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007 and remains in effect, EA will wire JFL the sum of TWO MILLION EIGHT HUNDRED AND FIFTY THOUSAND DOLLARS (\$2,850,000.00), in immediately available funds, pursuant to written wire instructions to be provided by JFL.

      3.2.3.  The payments to be made in accordance with Paragraphs 3.2.1 and 3.2.2 are collectively referred to as the "Settlement Payments."

3.3.    In consideration of the terms of this Agreement, including, without limitation, the Releases set forth herein and the nature and pendency of the disputes between JFL and the EA Parties, AVENATTI agrees to personally guarantee, in his individual capacity, the FOUR MILLION EIGHT HUNDRED FIFTY THOUSAND DOLLARS (\$4,850,000.00) of Settlement Payments. The complete terms of this guaranty shall be set forth in a separate agreement ("Guaranty Agreement") between JFL and AVENATTI. A copy of the Guaranty Agreement is attached as Exhibit D.

3.4.    As will be set forth in the Guaranty Agreement, it is the intention of JFL and AVENATTI that AVENATTI's payment obligations under the Guaranty Agreement shall be non-dischargeable, under 11 U.S.C. Section 523(b) in the event AVENATTI becomes a debtor in a bankruptcy case while the Settlement Payments remain outstanding and thereafter to the extent any party in (1) AVENATTI's bankruptcy case or (2) a subsequent bankruptcy case or similar proceeding in which EA is the debtor or has a similar role seeks to recover all or any portion of the Settlement Payments.

3.5.    If the Settlement Payments are paid by EA to JFL within the timeframes and in the manner required by this Agreement, then effective 367 calendar days after the final Settlement Payment is received by JFL, JFL will waive and forego its right to collect any part of the remaining FIVE MILLION ONE HUNDRED AND FIFTY THOUSAND DOLLARS (\$5,150,000.00) of its allowed claim.

3.6.    Remedy Upon Payment Default.    If the Settlement Payments are not made within three (3) business days of the applicable Settlement Payment date due, then all of the EA Parties agree that they will not oppose the entry by the Bankruptcy Court of a final, non-

appealable judgment against EA in favor of JFL in the amount of TEN MILLION DOLLARS minus any amounts previously paid to JFL pursuant to this Agreement (the "Final Judgment"), and will not oppose the reopening of the Bankruptcy Case for the limited and sole purpose only of entering this Final Judgment. JFL and the EA Parties expressly consent to the exclusive jurisdiction of the Bankruptcy Court to enter this Final Judgment against EA. By seeking or obtaining any of the relief described in this paragraph, JFL will not in any way waive or otherwise prejudice or impact its right to enforce the personal guarantee and Guaranty Agreement set forth in Paragraphs 3.3 and 3.4 of the Agreement.

4.   **Dismissal of Lawsuits and Arbitrations.**

4.1.   Within sixteen (16) calendar days of entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, the commencing party in each of the following actions shall dismiss the actions and all claims therein with prejudice: (a) the JFL Arbitration and EA's counterclaims therein; and (b) the SIMS Arbitration and EA's counterclaims therein. With respect to the other litigation, EA will not pursue the EA/Birbrower Arbitration, the EA/Callaway Lawsuit, the EA/Root Lawsuit or any claims against AEP. AEP has dismissed, without prejudice, the AEP/EA Arbitration.

5.   **Releases**.

5.1.   **Release of EA Parties by JFL Parties**.. Effective upon the latest of (a) entry of Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, and in consideration of the terms of this Agreement and other good and valuable consideration, JFL, FRANK, SIMS, STOLPER and FSS on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, owners, employees, heirs, parents, children, spouses, and related organizations hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the EA Parties, and each of them, and every one of their respective partners, officers, directors, owners, agents, employees, companies, parents, subsidiaries, divisions, affiliates, attorneys, trustees, legatee, personal representative, administrators, insurers, fiduciaries, executors, representatives, predecessors, successors, assigns, related parties, heirs, parents, children and spouses from and for any and all claims, causes of action, liabilities, damages, legal or administrative relief, of any basis or source, whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future, including, but not limited to, any and all claims raised in the JFL Arbitration, the Sims Arbitration or the Bankruptcy Case and/or any and all claims arising out of or relating to the JFL Agreement, the Sims Agreement and JFL's, Frank's, Sims' or Stolper's employment at or other rendition of services at EA. However, and notwithstanding any other terms in this Agreement, this release does not include or in any way release or waive claims held by any of the JFL Parties for indemnification, contribution and insurance coverage for any claims brought against them related to their employment at, or rendition of services at,

EA, including without limitation indemnification for tax liability that they may have now or in the future against EA. Further, notwithstanding the foregoing or any other terms of this Agreement, the releases set forth in this paragraph shall not operate to release the EA Parties from any of their payment and other covenants, obligations and duties under this Agreement or the Guaranty Agreement, nor will they in any way waive, limit or foreclose any of the JFL Parties from seeking and obtaining any appropriate remedies for any violation of the terms of this Agreement or the Guaranty Agreement.

5.2.    **Release of JFL Parties by the EA Parties.** Effective upon the latest of (a) entry of the Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, and in consideration of the terms of this Agreement and other good and valuable consideration, EA, EAGAN, A&A and AVENATTI on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, heirs, parents, children, spouses, creditors, owners, executors, trustees and related parties hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the JFL Parties, and each of them, and every one of their respective partners, officers, directors, owners, agents, employees, companies, subsidiaries, divisions, affiliates, attorneys, trustees, legatee or personal representative, administrators, insurers, fiduciaries, executors, representatives, predecessors, successors, assigns, related organizations, heirs, parents, children and spouses from and for any and all claims, causes of action, liabilities, damages, legal or administrative relief, of any basis or source, whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future. This release includes, but is not limited to any and all claims or counterclaims raised in the JFL Arbitration, the SIMS Arbitration or the Bankruptcy Case and/or any and all claims arising out of or relating to the JFL Agreement, the SIMS Agreement or the Parties employment at EA or other rendition of services at EA, or any and all claims for tortious interference, unfair competition, misappropriation, trade secret, conversion, fraud, breach of fiduciary duty, breach of duty or other such claims against the JFL Parties. Notwithstanding the foregoing, theses releases shall not operate to release the JFL Parties from any of their covenants, obligations and duties under this Agreement or the Guaranty Agreement, nor will they in any way waive, limit or foreclose any of the EA Parties from seeking and obtaining any appropriate remedies or relief for any violation of the terms of this Agreement or the Guaranty Agreement.

5.3.    **Release of Counsel in the Matters by the EA Parties.** Effective upon the latest of (a) entry of Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, and in consideration of the terms of this Agreement and other good and valuable consideration, each of EA, EAGAN, A&A and AVENATTI on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, heirs, parents, children, spouses, creditors and related organizations hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the current, past or future co-counsel, in-house counsel, local counsel or subsequent

counsel for current, past or future clients of FSS in the Matters for any claims for attorneys' fees, costs, expenses, damages, or any other compensation or remedies arising out of or related to the matters listed on Exhibit "A," whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future.   The persons and entities covered by this release include, but are not limited to: (a) Franklin D. Azar & Associates, P.C., Franklin D. Azar, Esq. Keith R. Scranton, Esq. and Jonathan Parrott, Esq.; (b) Law Offices of Steven R. Young and Steven R. Young, Esq.; (c) Girardi Keese, LLP and James O'Callahan, Esq.; (d) McNicholas & McNicholas, LLP, Patrick McNicholas, Esq., Matthew McNicholas, Esq., Philip Shakhnis Esq., and Michael J. Kent, Esq.; (e) Yuhl Carr LLP, Eric Yuhl, Esq. and Colin Yuhl Esq.; (f) Snell & Wilmer LLP and Steve T. Graham; (g) Lewis Roca Rothgerber Christie LLP and Dan R. Waite, Esq.; (h) Bridgford Gleason & Artinian, Richard K. Bridgford, Esq. and Michael H. Artinian, Esq.; (i) Orrick, Herrington & Sutcliffe LLP and Jörg Ritter, Esq.; (j) Osborn Machler and Simeon J. Osborn, Esq.; (k) Smyth & Mason PLLC and Jeffrey Smyth Esq. and (l) FSS, FRANK, SIMS and STOLPER as well as their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees and related organizations.

5.4.   **Release of the Clients in the Matters by the EA Parties.**   Effective upon the latest of (a) entry of Settlement Order, (b) entry of the Dismissal Order, and (c) dismissal of the Bankruptcy Case, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, each of EA, EAGAN, A&A and AVENATTI on their own behalf and on behalf of each and all of their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, heirs, parents, children, spouses, creditors and related organizations hereby irrevocably and unconditionally release, and fully and forever discharge, absolve, and covenant not to sue the clients and class members in the Matters for any claims for attorneys' fees, costs, expenses, damages, or any other compensation or remedies arising out of or related to the Matters whether known or unknown, that were, have been or could have been asserted now, in the past, or in the future. The persons and entities covered by this release include, but are not limited to: (a) Kimberly Birbrower; (b) William (Scott) and Elizabeth Callaway; (c) Authentic Entertainment Properties, LLP, Authentic Entertainment Properties Development, LLP, RCC Company, LLC, Robert Coffman, Robert O'Neil and Steve Graham; (d) Hannes Kuhn; (e) Gary and Louise Weaver; (f) Jeffrey Wall; (g) the Estate of Jonathan A. Spound, Corey Spound, Michael Spound, and Amy Spound; (h) Skylar Ward; (i) Jamie Deehan; (j) Rasheed, Robinson and Jiminez; (k) Shayna Broadstone and Kristine Billon; (l) Benjamin Lagunas, Dianna Mendoza and Susan Jung; and (m) Al Chaffee, Yuping Chen, Jeanne Demund, Laird Devick, Todd Hager, Ash Hanlon, Peter Heathcote, Nathaniel Heathcote, Mike Scheffler, Matthew Wahlman and Michael Wilson, as well as their respective legal predecessors, successors, assignees, attorneys, agents, partners, employees, related organizations, heirs, parents, siblings and children.

6.   **Waiver of Civil Code § 1542**.   Each of the Parties has read and understood the following language contained in Section 1542 of the California Civil Code:

> A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS
> WHICH THE CREDITOR DOES NOT KNOW OR SUSPECT

> TO EXIST IN HIS OR HER FAVOR AT THE TIME OF
> EXECUTING THE RELEASE, WHICH IF KNOWN BY HIM
> OF HER MUST HAVE MATERIALLY AFFECTED HIS OR
> HER SETTLEMENT WITH THE DEBTOR.

To the extent that Section 1542 is applicable, each of the Parties hereto expressly waives all rights, if any, that they may have under this statute.

7.   **No Admission of Liability**.   This Agreement is made in settlement of claims and allegations which are denied, disputed, and contested.   Neither this Agreement nor anything contained in this Agreement shall be construed as an admission of any fact, issue, liability, or responsibility by any Party hereto to any other Party hereto, all of which are expressly denied.

8.   **Assignment**.   Each of the Parties represents and warrants that he, she, or it has not assigned or transferred to any person not a Party to this Agreement any part or portion of any matter released under this Agreement, and each Party agrees to defend, indemnify, and hold harmless the other Parties against any claim (including the payment of attorneys' fees and costs actually incurred whether or not litigation or other proceedings are commenced) based on or in connection with, or arising out of any such assignment or transfer made, purported, or claimed.   Each of the Parties represents and warrants that he, she, or it will not assign or transfer to any person not a Party to this Agreement any part or portion of any obligations or liabilities created under this Agreement, except that JFL may assign its rights to receive the Settlement Payments to any party, in its sole discretion, and no Party may assign any of its other rights or obligations.   Each Party agrees to defend, indemnify, and hold harmless the other Parties against any claim (including the payment of attorneys' fees and costs actually incurred whether or not litigation or other proceedings are commenced) based on or in connection with, or arising out of any such assignment or transfer made, purported, or claimed in violation of this paragraph.

9.   **Indemnification of Claims Brought by Green Street Advisors, LLC.**   The EA Parties, and each of them, hereby agree they will fully indemnify the JFL Parties and the Estate of Jonathan A. Spound and its Administrators, Corey and Michael Spound, for any and all claims brought by Green Street Advisors, LLC ("Green Street") against them individually or collectively for amounts owed under the Service Engagement Agreement entered into between EA and Green Street in the matter Spound v. SSV Properties *et al.*, dated March 31, 2016, and modified by an Addendum with the same date (the "Green Street Engagement"), including but not limited to providing a defense and paying for all reasonable attorneys' fees, costs and expenses incurred defending against such claims.

10.   **Mutual Non-Defamation**.   Each of the Parties agree that they will not make any defamatory statements about each other to any third party, whether orally or in writing.

11.   **Changes to FSS Website.**  At the request of EA, FSS has made changes to its website with respect to matters that were previously resolved at EA, and those changes will remain in effect as long as such matters are included on the website.

12.   **EA Cooperation on Fee Applications.**  EA will cooperate with FSS to promptly compile and provide FSS with all time sheets, emails and other records documenting the time spent at EA on the disputed Matters so that FSS may submit such time in support of any necessary fee applications or other motion practice.

13.   **EA Agreement to Automatically Forward Emails.**  EA shall arrange to have all emails sent to the EA email addresses for FRANK, SIMS, STOLPER or Maritza Nowowiejski automatically forwarded to FRANK, SIMS, STOLPER and Maritza Nowowiejski at FSS for a period expiring no earlier than December 31, 2018, and thereafter disable the email addresses.

14.   **EA Agreement to Delete FRANK's Personal Folder.**  EA agrees that FRANK will be provided with access to his personal folder on EA's computer system, and upon request, will permanently delete any such items from EA's system.

15.   **Destruction of Documents and Use in Future Legal Proceedings.**  Within sixteen (16) calendar days of entry of the Dismissal Order, and provided no stay of the Settlement Order or Dismissal Order having been issued pursuant to Rule 8007, the Parties and each of their respective attorneys, consultants, experts, agents, and representatives and any other person or entity under the direction or control of any of them, and any other person or entity that they caused information to be disseminated to will destroy the original and all copies of the following materials and documents, whether in hard copy or electronic form:

- All discovery, documents, materials, and electronic files received from any Party that were marked confidential.

The Parties shall also jointly request JAMS and its arbitrators to destroy its entire file relating to the JFL arbitration, with the exception of billing information, within 10 days or other reasonable time period proposed by JAMS and agreed to by the Parties, and carry out all reasonable steps to ensure compliance.

Further, to the extent consistent with their professional, ethical and legal obligations, the Parties further agree they will not use the following documents in any subsequent legal proceeding, litigation or arbitration, unless the litigation is between the Parties:

- All discovery responses provided by any Party during the JFL Arbitration;
- All orders entered by any arbitrator during the JFL Arbitration relating to discovery or sanctions;
- All pleadings relating to any motion for sanctions and/or terminating sanctions submitted in connection with the JFL arbitration, including but not limited to all exhibits filed in connection with any such pleading.

16. **Payment, Dismissal and Release Obligations Are Not Excused by Alleged Breaches of this Agreement.** The payment, dismissal and release obligations set forth in this Agreement and the Guaranty Agreement will not be delayed or excused by any alleged breach or violation of Section 7 through 27 of this Agreement. However, any such breaches may be remedied pursuant to the dispute resolution procedures set forth in Paragraph 21 of this Agreement.

17. **Representations and Warranties.** The Parties hereto represent and warrant that each has read and understood and has received independent legal advice with respect to the advisability of making this Agreement, and/or has had the opportunity to obtain such legal advice and has knowingly entered into this Agreement without taking advantage of the opportunity to obtain such advice. Each Party has made such investigation of the facts pertaining to this Agreement and of all other matters pertaining hereto as they deem necessary. The Parties hereto represent and warrant that each signatory hereto has the full right and authority to enter into this Agreement and bind the Party on whose behalf he, she, or it has executed this Agreement.

18. **Further Assurances.** Each Party hereto agrees to cooperate fully and to execute any and all supplementary documents and to take all additional actions that may be necessary or appropriate to give full force and effect to the basic terms and intent of this Agreement and which are not inconsistent with its terms and intent.

19. **Headings.** The various headings in this Agreement are inserted for convenience only, and shall not be deemed a part of or in any manner affect this Agreement or any provision hereof.

20. **Governing Law**. This Agreement shall be governed and construed in accordance with the substantive laws of the State of California and the United States Bankruptcy Code. Respective counsel for each Party hereto has participated in the drafting of, read, and approved the language of this Agreement. The language of this Agreement shall be construed as a whole according to its fair meaning, and not strictly for or against any of the Parties hereto.

21. **Dispute Resolution Procedure.** Any disputes regarding this Agreement, with the exception of the procedures set forth in Paragraph 3.6 above pertaining to failures to make the Settlement Payments in accordance with the terms of this Agreement, shall be first submitted to the Honorable Louis Meisinger to resolve in mediation, and the cost of the mediation shall be equally borne by the JFL Parties, on the one hand, and the EA Parties, on the other hand. If the Parties are unable to resolve the dispute, then 10 days after the mediation, they will submit the claim to binding arbitration before Benchmark Resolution Group, Inc. (the organization recently formed by Judge Meisinger) in Los Angeles, California to be resolved employing their rules and procedures for arbitration.

22. **Waiver/Severability.** The Parties agree that no waiver by any Party of any particular provision or right under this Agreement shall be deemed to be a waiver of any other

provision or right herein.  The Parties further agree that each provision or term of this Agreement is intended to be severable from the others so that if any particular provision or term hereof is or determined to be illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the legality or validity of the remaining provisions and terms hereof.

23.   **Attorneys' Fees**.  The Parties agree that should any relief be brought by any Party to enforce any provision or right under this Agreement, the prevailing party shall be entitled to recover, in addition to any other relief, reasonable attorneys' fees and costs incurred therein.

24.   **Entire Agreement.**  This Agreement constitutes the sole and entire agreement and understanding between the Parties concerning the subject matter hereof and supersedes all prior agreements and understandings between the Parties on those subjects hereto with the exception of (a) the AEP Fee Sharing Agreement and the Guaranty Agreement and (b) the Separation Agreement entered into between EA and STOLPER dated May 23, 2016 (the "STOLPER Separation Agreement").  If there is an inconsistency between this Agreement and the STOLPER Separation Agreement, this Agreement will control. Each of the Parties hereto acknowledge to each of the other Parties that no other Party or any agent or attorney of any Party has made any promise, representation or warranty whatsoever, express or implied, written or oral, not contained herein concerning the subject matter hereof to induce him, her, or it to execute this Agreement, and each of the Parties hereto acknowledges that he, she, or it has not executed this Agreement in reliance on any promise, representation or warranty not expressly contained herein.  No person has any authority to make any representation or promise on behalf of any Party that is not set forth herein.  This Agreement may be modified only with a written instrument duly executed by each of the Parties hereto.

25.   **Binding Agreement.**  This Agreement shall bind and shall inure to the benefit of successors and assigns of each Party.  With respect to the individual Parties, this Agreement shall also bind and inure to the benefit of his or her heirs, assigns, executors, legatees, administrators and personal representatives.  With respect to the entity Parties, this Agreement shall also bind and inure to the benefit of any parent, affiliate, predecessor-in-interest, successor-in-interest, transferee, endorsee, or assign.

26.   **Notice Provision**.  Any and all notices required by this Agreement shall be mailed and emailed in writing to the following:

26.1.   **To the JFL Parties**. To Jason Frank, Scott Sims, & Andrew Stolper, Frank Sims & Stolper LLP, 19800 McArthur Blvd., Suite 855, Irvine, California 92612, jfrank@lawfss.com; ssims@lawfss.com; astolper@lawfss.com

26.2.   **To the EA Parties**.  To Michael Avenatti & Michael Eagan, Eagan Avenatti, LLP, 520 Newport Center Drive, Ste. 1400, Newport Beach, CA 92660, mavenatti@eaganavenatti.com.

27. **Execution/Counterparts.** This Agreement may be executed in counterparts, and a facsimile or PDF signature shall have the same force and effect as an original signature penned in ink. When each of the Parties hereto has signed and delivered at least one such counterpart to all other Parties or their counsel, each counterpart shall be deemed an original, and when taken together with other signed counterparts, shall constitute one fully executed agreement which shall be binding upon and effective as to all Parties.

IN WITNESS WHEREOF, the Parties hereto have caused this Agreement to be executed as of the day and year indicated below.

December 2, 2017

EAGAN AVENATTI LLP

Michael J. Avenatti
Its Managing Partner

December 12, 2017

AVENATTI & ASSOCIATES, APC

Michael J. Avenatti
Its President

December 12, 2017

MICHAEL J. AVENATTI

Michael J. Avenatti
In his individual capacity

December 2, 2017

MICHAEL Q. EAGAN

Michael Q. Eagan
In his individual capacity

December 2017

JASON FRANK LAW, PLC

Jason M. Frank
Its President

137774123 8

14

December 12, 2017                FRANK SIMS & STOLPER, LLP

                                 _____
                                 Jason M. Frank
                                 Partner

December 12, 2017                JASON M. FRANK

                                 _____
                                 Jason M. Frank
                                 In his individual capacity

December 12, 2017                SCOTT H. SIMS

                                 _____
                                 Scott H. Sims
                                 In his individual capacity

December 12, 2017                ANDREW D. STOLPER

                                 _____
                                 Andrew D. Stolper
                                 In his individual capacity

APPROVED AS TO FORM:

December ___, 2017               PACHULSKI STANG ZIEHL & JONES LLP

                                 _____
                                 Richard M. Pachulski
                                 Counsel to Eagan Avenatti LLP

December 22, 2017

PERKINS COIE LLP

_____
Sara L. Chenetz
Counsel to the JFL Parties

December __, 2017

SULMEYER KUPETZ LLP

_____
Marc Haroupian
Counsel to Michael Avenatti and Avenatti &
Associates APC

137774123.8                                    16

December ___, 2017          PERKINS COIE LLP

_____

Sara L. Chenetz
Counsel to the JFL Parties

December ___, 2017          SULMEYER KUPETZ LLP

_____

Marc Haroupian
Counsel to Michael Avenatti and Avenatti &
Associates APC

# Exhibit A to Settlement Agreement

| Case Name |
|---|
| 1. Birbrower v. Quorn Foods, Inc. |
| • Nationwide class action for false advertising |
| 2. Callaway v. Mercedes Benz USA, Inc. |
| • California class action concerning defective seat heaters |
| 3. Authentic Entertainment Properties v. Royal Center et al. |
| • Breach of Joint Venture Agreement |
| 4. Weaver v. Southern California Edison, et al. |
| • Personal injury action |
| • Plaintiff is Jason Frank's cousin |
| 5. Shine v. Williams Sonoma, Inc. |
| • California employment class action challenging on-call shift policy |
| 6. Ward v. Tilly's |
| • California employment class action challenging on-call shift policy |
| 7. Deehan v. Gap, Inc. |
| • California employment class action challenging on-call shift policy |
| 8. Rasheed v. Gap, Inc. |
| • California employment class action challenging on-call shift policy |
| 9. Broadstone v. Pacific Sunwear |
| • California employment class action challenging on-call shift policy |
| 10. Broadstone/Billon v. Bath & Body |
| • California employment class action challenging on-call shift policy |
| 11. Robinson v. BCBG |
| • California employment class action challenging on-call shift policy |
| 12. Lagunas v. Ambercrombie |
| • California employment class action challenging on-call shift policy |
| 13. Jiminez (Dylan) |
| • Unaware of any case by this name |

14. RFF v. Spound

- Hourly breach of contract case representing Defendant
- Incorrectly listed on EA's schedule as a plaintiff case

15. Hannes Kuhn

16. Chaffe v. Keller Rohrback

- Attorney malpractice action

17. Eldard (Wall) v. Hewlett Packard

- California employment class action for waiting time penalties

Exhibit 6

1  Richard M. Pachulski, SBN 90073
   Ira D. Kharasch, SBN 109084
2  Robert M. Saunders, SBN 226172
   Pachulski Stang Ziehl & Jones LLP
3  10100 Santa Monica Blvd., 13th Floor
   Los Angeles, CA 90067
4  Tel: 310-277-6910
   Fax: 310-201-0760
5  rpachulski@pszjlaw.com
   ikharasch@pszjlaw.com
6  rsaunders@pszjlaw.com

```
FILED & ENTERED

        MAR 15 2018

   CLERK U.S. BANKRUPTCY COURT
   Central District of California
   BY mccall    DEPUTY CLERK
```

7  Attorneys for Debtor and Debtor in Possession

8              UNITED STATES BANKRUPTCY COURT

9      CENTRAL DISTRICT OF CALIFORNIA – SANTA ANA DIVISION

10

11 In re:                              Case No. 8:17-bk-11961-CB

12 EAGAN AVENATTI, LLP,                 Chapter 11

13                                      ORDER GRANTING MOTION
                                        APPROVING SETTLEMENT AND
                        Debtor.         DISMISSING CASE AND RELATED
14                                      RELIEF

15                                      Hearing:
                                        Date:     February 28, 2018
16                                      Time:     10:00 a.m.
                                        Courtroom: 5D
17                                      Address:   411 West Fourth Street
                                                   Santa Ana, CA 92701-4393
18

19     A hearing was held on February 28, 2018, at 10:00 a.m., before the Honorable Catherine E.

20 Bauer, United States Bankruptcy Judge for the Central District of California, in Courtroom 5D

21 located at 411 West Fourth St., Santa Ana, CA, on Debtor's Motion Approving Settlement and

22 Dismissing Case filed January 30, 2018 as Docket #343 ("Motion"). Capitalized terms which are

23 not defined in this Order shall have the same meanings as provided to such terms in the Motion.

24 Appearances were made as noted on the record.

25     A declaration from SulmeyerKupetz, APC ("Sulmeyer Declaration") was filed March 15,

26 2018 as Docket #408, stating that it has received into its trust account the Initial Payment (as defined

27 in IRS Payment Stipulation at Docket #341), and the allowed amounts of the fees and expenses of

28 Pachulski Stang Ziehl & Jones LLP and Dinsmore & Shohl, LLP. A declaration from Dinsmore &

1

1    Shohl, LLP (together with the Sulmeyer Declaration, "Declarations") was filed March 15, 2018 as

2    Docket #409, stating that it has received the Debtor's California confessions of judgment for certain

3    identified claims ("Identified Claims").

4        The Court having read and considered the Motion and pleadings filed in support of the

5    Motion, heard the statements of counsel at the Hearing, considered and overruled the opposition of

6    unsecured creditor Stoll Nussbaum & Polakov, read and considered the Declarations, and with good

7    cause shown:

8        **IT IS ORDERED:**

9        1.    Except as otherwise set forth in this order, the Motion is granted, the JFL Settlement

10   is approved, the Debtor is authorized and directed to take all steps necessary to implement and

11   effectuate the Settlement Agreement, and the Case is dismissed.

12       2.    SulmeyerKupetz, APC is authorized and directed to pay from its client trust account

13   the Initial Payment to the United States on or before the tenth calendar day following the entry of

14   this order pursuant to the terms set forth in the IRS Payment Stipulation at Docket #341, regardless

15   of whether there is a stay pending appeal.

16       3.    SulmeyerKupetz, APC is authorized and directed to pay from its client trust account

17   the allowed fees and costs of Pachulski Stang Ziehl & Jones and Dinsmore & Shohl, LLP, on the

18   tenth calendar day after this order is entered, except if there is a stay pending appeal.

19       4.    Dinsmore & Shohl, LLP is authorized to release each confession of judgment at the

20   request from a holder of an Identified Claim per the below.

21       5.    Claim 8-1, filed in this case by Jason Frank Law PLC, is allowed in the amount of

22   $10,000,000.00 ("Compromised Claim Amount"), and additionally to the extent such claim asserts a

23   claim for indemnification, contribution, and insurance coverage brought against JFL related to the

24   performance of services at Eagan Avenatti, LLP.

25       6.    If Jason Frank Law, PLC timely and fully receives the Settlement Payments set forth

26   in paragraph 3.2 of the Settlement Agreement, the Compromised Claim Amount will be deemed

27   satisfied in full on the date set forth in paragraph 3.5 of the Settlement Agreement.

28       //

1    7.    Claims 6-1, 7-1 and 9-1 are each allowed only to the extent such claims assert a claim

2    for indemnification, contribution and insurance coverage for any claims brought against Jason M.

3    Frank, Scott Sims or Andrew Stolper related to the performance of services at Eagan Avenatti, LLP.

4    8.    Holders of Identified Claims shall be paid the liquidated, non-contingent prepetition

5    amount set forth in their proofs of claim, or as set forth in the Debtor's Schedules if no proof of

6    claim was filed prior to the filing of the Motion. Such amounts shall be paid in nine equal monthly

7    installments, without interest, beginning 91 days after the date of entry of this order. If the Debtor

8    fails to timely remit any installment, then the Debtor shall have ten days after written notice is

9    mailed by the holder to the Debtor to cure such payment default. If the payment default is not timely

10    cured, then the holder, without further notice to the Debtor, may accelerate the balance due and

11    submit to the Superior Court of the State of California the confession of judgment provided by the

12    Debtor to Dinsmore & Shohl, LLP prior to the entry of this order. Any postpetition portion of an

13    Identified Claim shall be paid in the Debtor's ordinary course of business. Disputed claims, which

14    are general unsecured claims that are not Identified Claims or ride-through claims (as identified in

15    the Motion), shall be entitled to pursue all remedies available under applicable non-bankruptcy law

16    on entry of this order.

17    9.    Any and all claims of ZB, N.A. d/b/a California Bank & Trust that remain

18    outstanding as of the dismissal of the Case shall ride-through the dismissal of the Case unimpaired,

19    with all legal, equitable and contractual rights, including any related security interests, unaltered, and

20    shall be enforceable against the Debtor on and after the dismissal of the Case. The Debtor reserves

21    all legal, equitable and contractual defenses, including offset and recoupment rights to such claims.

22    //

23    //

24    //

25

26

27

28

3

1       10.    The Court retains post-dismissal jurisdiction pursuant to LBR 1017-2(f) and as set

2 forth in the Motion.

3                                             ###

24 Date: March 15, 2018

Catherine Bauer
United States Bankruptcy Judge

4

Exhibit 7





+1 (949) 201-2400

+1 (949) 201-2405

www.lawfss.com

Newport Gateway
19800 MacArthur Boulevard
Suite 855
Irvine, CA 92612

May 15, 2018

**VIA U.S. Mail & Electronic Mail**

Michael Avenatti
520 Newport Center Drive, Ste. 1400
Newport Beach, CA 92660
mavenatti@eaganavenatti.com

Dear Mr. Avenatti,

As you are aware, your firm, Eagan Avenatti, LLP, which also does business under the name Avenatti & Associates, APC ("EA"), failed to make its first settlement payment of $2,000,000.00 to Jason Frank Law, PLC ("JFL"). This payment was due on or before May 14, 2018 in accordance with Section 3.2.1 of the Settlement Agreement.

Pursuant to the Settlement Agreement and Guarantee Agreement, you agreed to personally guarantee the prompt payment of EA's settlement payments in your individual capacity. Specifically, pursuant to Paragraph 1 of your Guaranty Agreement, you agreed to personally, unconditionally and irrevocably guarantee that "if EA shall fail to pay one or both of the Settlement Payments when they are due under Section of 3.2 of the Agreement, [you as the] Guarantor shall promptly pay such unpaid portion of the Settlement Payments, without demand or notice."

Accordingly, we are writing to request that you immediately pay JFL the sum of $2,000,000.00 by the close of business today. You were previously provided with the wire instructions via electronic mail on May 7, 2018. If JFL does not immediately receive these funds today, it intends to exercise its remedy rights under the Settlement Agreement and Guarantee Agreement.

Sincerely,

Jason M. Frank, Esq.

CC:     Eric George, Esq.
        Sara Chenetz, Esq.
        Mark Horoupian, Esq.
        Richard Pachulski, Esq.
        Ira Kharasch, Esq.