I5u2cohC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
     In the Matter of Search Warrants
3    Executed on April 9, 2018
     ------------------------------x
4    MICHAEL D. COHEN,

5                 Plaintiff,

6         v.                              18 MJ 3161

7    UNITED STATES OF AMERICA,
                                          Conference
8
                 Defendant.
9
     ------------------------------x
10                                        New York, N.Y.
                                          May 30, 2018
11                                        10:30 a.m.

12   Before:

13                   HON. KIMBA M. WOOD,

14                                        District Judge

15
                           APPEARANCES
16
     MCDERMOTT WILL & EMERY LLP
17        Attorneys for Plaintiff
     BY:  TODD HARRISON
18        STEPHEN M. RYAN
          JOSEPH B. EVANS
19

20   ROBERT S. KHUZAMI
          Acting United States Attorney for
21        the Southern District of New York
     THOMAS A. McKAY
22   RACHEL A. MAIMIN
     NICOLAS ROOS
23   ANDREA GRISWOLD
          Assistant United States Attorneys
24

25
```

I5u2cohC

1   Also Present:

2

    SPEARS & IMES LLP
3        Attorneys for Intervenor
         Donald J. Trump, President
4   BY:  JOANNA C. HENDON

5

    LAW OFFICES OF ALAN S. FUTERFAS
6        Attorneys for Intervenor
         The Trump Organization
7   BY:  ALAN S. FUTERFAS
         ELLEN RESNICK

8

9   MICHAEL AVENATTI
         Attorney for Interested Party
10       Stephanie Clifford a/k/a "Stormy Daniels"

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

I5u2cohC

```
 1              (Case called)

 2              THE DEPUTY CLERK:  Counsel, please state their

 3    appearances.

 4              MS. MAIMIN:  Good morning, your Honor.  Rachel Maimin,

 5    Thomas McKay, Andrea Griswold, and Nicholas Roos for the

 6    government.

 7              THE COURT:  Good morning.

 8              MR. HARRISON:  Good morning, your Honor.  Todd

 9    Harrison, Steve Ryan, and Joseph Evans for Michael Cohen.

10              THE COURT:  Good morning.  And good morning,

11    Mr. Cohen.

12              MS. HENDON:  Good morning, your Honor.  For the

13    president intervenor, Joanna Hendon, Chris Dysard, and Reed

14    Keefe.

15              MR. FUTERFAS:  Good morning, your Honor.  For Trump

16    Organization, Alan Futerfas and Ellen Resnick.

17              THE COURT:  Good morning.

18              MR. AVENATTI:  Good morning, your Honor.  Michael

19    Avenatti on behalf of proposed intervenor, Ms. Daniels.

20              THE COURT:  Good morning.

21              I will begin by seeking the government's update on its

22    production of material.

23              MS. MAIMIN:  Yes, your Honor.

24              As reflected in the report of the special master dated

25    yesterday, we completed our rolling production of material to
```

1    Mr. Cohen and the special master on May 22 with the exception

2    of three items, namely, two BlackBerries that Quantico is still

3    working on getting into and the contents of a shredding machine

4    which we expect to produce within two to three weeks.

5             THE COURT:  Very good.

6             Do you have any idea of the possible volume of

7    materials that represents?

8             MS. MAIMIN:  The BlackBerries we can't be certain

9    because we are not in them, so we can't tell the volume of

10   electronic material.  I don't believe the contents of the

11   shredding machine are voluminous at all.

12            THE COURT:  Okay.  Thank you.

13            Mr. Cohen's production of portions of material to the

14   intervenors, who would like to address that?

15            MR. HARRISON:  I will address that, your Honor.

16            THE COURT:  Mr. Harrison.

17            MR. HARRISON:  Thank you, Judge.

18            So as the court is aware, the court originally set

19   this date as a control date for ten business days after we had

20   received everything.  We have been receiving rolling

21   productions from the government.  As you heard, our last

22   receipt of materials was on May 22.  There are still some

23   outstanding items, but we have been tackling things as soon as

24   they come in.  We have got people working diligently on them,

25   your Honor.

I5u2cohC

```
1              Just to run quickly through the process of what we
2    have done, the first thing we did was make sure all the parties
3    were on the same page as to control numbers, and that required
4    us to take the data from the government, run it through our
5    systems, assign control numbers to everything, and then give a
6    copy of that back to the government so they had control numbers
7    and a copy to the special master, as well.  So that was
8    something that took some time and effort on our part.
9              Subsequent to that or at the same time, we received
10   over 3.7 million files from the government, your Honor.  We
11   have gone through about 1.3 million of those, so about a third
12   of them.  So we are really tackling this diligently, and we are
13   making pretty good progress on that.
14             Some of that initial time was spent on processing and
15   uploading all that data, the large amounts of data, and then we
16   tackled it and started reviewing it.
17             We have made six sets of privilege designations to the
18   special master so far, and at the same time we have been
19   searching for and producing -- making productions to lawyers
20   for the president and lawyers for The Trump Organization.  So
21   that's also a process that we have to go through that we have
22   people working on.  We have made nine productions so far to the
23   lawyers for the president and The Trump Organization.  So
24   that's just taken a lot of time and effort, Judge.  We have got
25   people working all night, weekends, etc., etc.  So we are
```

I5u2cohC

1    making pretty good progress.

2              THE COURT:  Can you give me a feeling for the volume

3    of documents for each production you mentioned now.

4              MR. HARRISON:  For each production that we have

5    received from the government, your Honor?

6              THE COURT:  That you received and reviewed.

7              MR. HARRISON:  Well, we have received about 3.7

8    million files from the government, your Honor, and we have gone

9    through about 1.3 million of them, so we are about a third of

10   the way through the materials that we have received from the

11   government.

12             THE COURT:  All right.  Is there any distinction

13   between how difficult it is to review one production as opposed

14   to another?

15             MR. HARRISON:  Yes.  Certainly, Judge.  The hard copy

16   productions are relatively easy to review.  The mobile data,

17   which there has been a lot of, we have received information

18   from 13 separate mobile devices.  That takes a long time to

19   upload.  It takes a long time for us to review because of the

20   format of the UFED reports that we received from the government

21   in relation to mobile devices.  So that's been the majority of

22   the information so far, and that is the most difficult to

23   process and to review, but we have gotten through a lot of

24   those devices already.

25             There are also, we received 19 digital media devices,

I5u2cohC

1    like hard drives, thumb drives, and things like that.  That is

2    easier to upload and easier to review than mobile devices, but

3    still, you know, a somewhat laborious process, your Honor.

4            THE COURT:  By approximately what point in time do you

5    expect to have reviewed the remainder of the files the

6    government has already sent you?

7            MR. HARRISON:  Based on the volume that we have gotten

8    so far, Judge, and the fact that we have gotten through about a

9    third of it, I estimate -- and it's a little bit hard to

10   estimate, but we estimate that we will be done fully with the

11   review approximately mid July.  So we were going to suggest to

12   the court if you wanted to put control date on for 30 days from

13   now, that might be a good idea.

14           THE COURT:  Let me hear from the government as to the

15   reasonableness of this proposed deadline.

16           MS. MAIMIN:  We don't believe that this is a

17   reasonable deadline.  As the defense counsel just stated, the

18   material is already loaded.  Our production was complete as of

19   May 22.  The UFED reports are actually produced in that format

20   because they are easy to review and are in a format that

21   facilitates a quicker review.  One of our concerns, as the

22   court is aware from the beginning, is delay, and that is an

23   unreasonable delay.

24           THE COURT:  What, in your view, would be reasonable,

25   given your familiarity with the material?

I5u2cohC

1          MS. MAIMIN:  Mid June, your Honor.

2          THE COURT:  All right.  Now, as counsel has pointed

3    out, the reason for this conference initially was to see

4    whether the special master review is proceeding almost as

5    quickly as a taint team review would or whether it is taking

6    much longer.  It sounds as if it is taking much longer and as

7    if we may have to revert to the taint team unless Mr. Cohen's

8    lawyers can put enough in the way of resources into this to be

9    finished with the current production by mid June.

10          MR. HARRISON:  Well, Judge, we will do whatever we

11   have to do, but I will say that that's an unreasonable deadline

12   the government has set.  And if the government was reviewing

13   this stuff, they wouldn't have been through it in this amount

14   of time either.  And the government has not proffered any

15   reason why they think that our date is unreasonable.  They just

16   think it is unreasonable because they want the stuff faster,

17   and I understand that, but we are moving heaven and earth.  We

18   have people working all night.  We have people sleeping on

19   couches in our offices.  We have people who worked all through

20   the Memorial Day weekend.  I had an associate yesterday who

21   felt a tremor in his hand from lack of sleep.  I had to send

22   him home late last night.  He came back at 7:30 this morning.

23   We are working around the clock.

24          The government knows that this stuff takes time to

25   review.  They know what they have given us.  They know the

I5u2cohC

| | |
|---|---|
| 1 | types of media and things that they have given us.  They know |
| 2 | that this takes time to review.  Whatever date we say, Judge, |
| 3 | they were going to say they want it sooner than that, say our |
| 4 | date was unreasonable.  So I don't think they have really |
| 5 | proffered any reasons as to why our suggested date is |
| 6 | unreasonable, and I can assure the court that we are working |
| 7 | around the clock.  We are working as fast as we can.  This |
| 8 | stuff takes a while to get through. |
| 9 | THE COURT:  How many lawyers are working on this |
| 10 | full-time? |
| 11 | MR. HARRISON:  15, your Honor. |
| 12 | THE COURT:  Full-time? |
| 13 | MR. HARRISON:  15 plus two, yes, data folk, two data |
| 14 | specialists. |
| 15 | THE COURT:  And they are all working full-time on |
| 16 | this? |
| 17 | MR. HARRISON:  Yes, Judge. |
| 18 | THE COURT:  Ms. Maimin. |
| 19 | MS. MAIMIN:  Your Honor, as I mentioned before, so |
| 20 | much of the time -- and I think defense counsel said this, |
| 21 | too -- that caused delay initially was the loading of the |
| 22 | documents.  That is complete.  We can see that the special |
| 23 | master is reviewing material quite expeditiously as it is |
| 24 | received, and we believe that Mr. Cohen and the intervenor |
| 25 | should be held to the same standard. |

I5u2cohC

1          THE COURT:  I think that's correct.  The special

2    master is reviewing everything quite quickly, and I think that

3    counsel could do that if they put enough of the right type of

4    resources into it.  So by mid June you need to have finished

5    the balance of the production that you have to date.

6          MR. HARRISON:  I understand, your Honor.  I will just

7    point out that we have a lot of other tasks that the special

8    master doesn't have.  The special master is doing a great job,

9    working very diligently, but we also have to do searches for

10   the lawyers for the president and searches for lawyers for The

11   Trump Organization, make productions to them.  As I mentioned,

12   we had to spend a certain amount of time making sure that

13   everybody was on the same page with control numbers, so we had

14   to run all the data, give it control numbers, and give a copy

15   back to the government, give a copy of that to the special

16   master, so everyone is on the same page.  So we have been sort

17   of the central repository for everything, which we are not

18   complaining about, but there are a lot of extra tasks that we

19   have and that the government doesn't have and that the special

20   master doesn't have.  So there is a lot of other stuff that we

21   have to do.

22          THE COURT:  Much of it you have already done.

23          MR. HARRISON:  A lot of that has already been done,

24   Judge, but the review itself just takes time.  It takes time.

25          THE COURT:  Okay.  Mid June is the date.

I5u2cohC

1          Now, did the government say that you have handed over

2     everything other than two types of material?

3          MS. MAIMIN:  Yes, your Honor, two BlackBerries and the

4     contents of the shredder.

5          THE COURT:  Okay.  If you had Mr. Cohen's assistance,

6     could you get right into the BlackBerry?

7          MS. MAIMIN:  I'm not certain, your Honor.  We are

8     working through that.  But it is my understanding that these --

9     that Mr. Cohen may not have the necessary information to get

10    into the BlackBerries at this time.

11         MR. HARRISON:  Judge, those are really old items.

12    There may not even be any information or any relevant

13    information on them, and we don't have any information to

14    assist the government in that.

15         THE COURT:  All right.  Is there any way of dating

16    them, where they were kept, in his office or home or hotel,

17    Mr. Harrison?

18         MR. HARRISON:  I'm sorry.  I couldn't hear you, your

19    Honor.

20         THE COURT:  Is there any way of dating, D-A-T-I-N-G,

21    the material in the BlackBerries?  You say it is very old.  Can

22    you give me any more than that?

23         MR. HARRISON:  Let me make an effort, Judge.  Hang on

24    one second.

25              (Mr. Harrison and Mr. Cohen confer)

I5u2cohC

1          MR. HARRISON:  Judge, I have had this discussion

2     before, but I just wanted to double check.  So our best

3     estimate is that those devices are at least eight years old,

4     and we believe that one of them, maybe both of them, belong to

5     Mr. Cohen's wife.  And we are talking about the two BlackBerry

6     devices, as I understand.

7          THE COURT:  Has the government attempted to have

8     Mr. Cohen's wife assist in opening them?

9          MS. MAIMIN:  No, your Honor.  We were not aware that

10    Ms. Cohen may have owned the BlackBerries.  But we are happy to

11    work with defense counsel to see if that would facilitate

12    production.

13         THE COURT:  It would have been helpful if Mr. Cohen's

14    lawyers had given the government this information some time

15    ago.

16         MR. HARRISON:  Sorry.  Just so it is clear, we don't

17    have any information to give them.  We had this discussion with

18    the government very early on.  We gave them all of the

19    information related to those issues that we could.  We don't

20    have any more information to give them.  We haven't been

21    holding anything back from them.

22         THE COURT:  Ms. Maimin said that she just learned that

23    the BlackBerries may belong to Mr. Cohen's wife.

24         Am I right?

25         MS. MAIMIN:  Yes.  I don't believe we were previously

I5u2cohC

1    aware of that.

2            MR. HARRISON:  I do believe we had discussion about

3    that early on, Judge.  We might not have been sure.  In fact, I

4    don't know that we are 100 percent sure right now, as I

5    indicated, that those are Mr. Cohen's wife's.  That's our

6    belief.  That's our best guess.  They are so old that we don't

7    know for sure.

8            THE COURT:  All right.  Would any of the intervenors

9    wish to be heard on document production?

10           MS. HENDON:  Your Honor, I would just say that, from

11   the perspective of the president, the rate at which we see the

12   government providing material to Mr. Cohen and Mr. Cohen

13   providing it to us, we are very satisfied and pleased with that

14   and the rate at which we are receiving material and able to

15   make our privilege designations, and we remain very grateful to

16   the court for implementing this process.

17           THE COURT:  Thank you.

18           MR. FUTERFAS:  Your Honor, I would just echo those

19   remarks.  When you receive the materials and start going

20   through it, you see how intensely you do have to look at it to

21   make real privilege reviews.  We are making those privilege

22   notations in a very, very limited, narrow, careful scope, which

23   I think the special master appreciates.  But when you get into

24   that process, you see how much work that Mr. Cohen's lawyers

25   are doing, and we appreciate and know how hard they are working

I5u2cohC

1   to accomplish this process, and we also are appreciative to the

2   special master for her role.  She has been very helpful in

3   moving this forward.  So I would add that.

4           THE COURT:  Very good.  Okay.

5           Mr. Avenatti has asked that I address your pending *pro*

6   *hac vice* motion.  Mr. Cohen's lawyers ask that it be held in

7   abeyance to the extent that the motion to intervene is also in

8   abeyance.

9           Let me first ask the government, do you still have a

10  position on this or do you take no position on either motion?

11          MS. MAIMIN:  We take no position on the *pro hac vice*

12  motion; and, as stated in our letter to the court, we are not

13  taking a position at this time on the motion to intervene.

14          THE COURT:  All right.

15          Mr. Avenatti, I will be glad to hear you.  I have your

16  motion and your affidavits.

17          MR. AVENATTI:  May I approach the podium, your Honor?

18          THE COURT:  Yes.

19          MR. AVENATTI:  Your Honor, thank you.

20          I am not going to repeat what has been stated in the

21  papers as well as the supplemental affidavits that have been

22  filed with the court.

23          Let me first address the motion to intervene.  We have

24  no issue and we agree with the government that that should be

25  held in abeyance.  We are continuing to have communications

I5u2cohC

1    with the government as to whether it will ultimately be

2    necessary for us to intervene.

3           Part of the issue, your Honor, or one of the issues

4    that bears on that is an item that we requested be taken up in

5    the agenda relating to these audio recordings that we have

6    become aware of that may reflect attorney-client privileged

7    communications between my client and her former counsel,

8    Mr. Davidson.

9           THE COURT:  What is your information on that?  You

10   have alluded to it in general, but --

11          MR. AVENATTI:  Your Honor, I received a call last week

12   from a member of the press who asked me to comment on an audio

13   recording that the member of the press had evidently heard.  It

14   was an audio recording between Mr. Cohen and Mr. Davidson, my

15   client's former counsel.  During that discussion, Mr. Davidson

16   disclosed attorney-client privileged communications that he had

17   with my client.

18          Needless to say, this was a very disturbing call for

19   me to receive, asking for comment on (a) an audio recording

20   that appears to have been made by Mr. Cohen without permission

21   by Mr. Davidson from all indications, and (b) why would

22   Mr. Davidson be communicating with Mr. Cohen about

23   attorney-client privileged communications that he was having

24   with Ms. Clifford?  And why would that then be recorded?  And

25   why would a member of the press be provided access to that

I5u2cohC

recording?

Now, there are only two places, by my estimation, your
Honor, that that could have been or two sources for that
information:

One, it would have to be the F.B.I. or the U.S.
Attorney's office.  They would have access to it if it was
obtained in the raid.  I don't believe for one moment, your
Honor, that either of those two organizations or entities
provided that information to this reporter.  I would be
shocked, based on my workings with the U.S. Attorney's office
over the last few weeks and how cooperative those
communications have been, if anyone from their office would
have leaked that to the press.  I would be absolutely shocked.

So, therefore, that had to have come, from our
estimation, your Honor, from Mr. Cohen or someone associated
with Mr. Cohen who provided that to the press recently in an
effort to paint a false narrative about my client or
Mr. Davidson or for some other reason.

But, your Honor, it makes no sense to me as to why a
recording would have (a) been made, (b) why Mr. Davidson would
have disclosed attorney-client privileged communications
without the consent or knowledge of my client -- and I can
assure you, your Honor, that my client at no point in time
waived the privilege or informed Mr. Davidson that such
information could be provided to Mr. Cohen -- and, lastly, your

I5u2cohC

1    Honor, it is very disturbing to me that I don't have access to

2    the recording.  I don't know -- my understanding is, from what

3    I was told, there are other recordings between Mr. Cohen and

4    Mr. Davidson relating to my client and attorney-client

5    privileged information.

6            Obviously we want to take steps, your Honor, to

7    protect this information.  We don't want it provided to the

8    press.  We need to be able to make a determination ultimately

9    as to whether to waive privilege relating to communications

10   between my client and Mr. Davidson.  But as you might imagine,

11   your Honor, all of this was very surprising and disturbing to

12   me, as Ms. Clifford's current counsel.

13           THE COURT:  You are essentially participating in this

14   proceeding.  It seems to me you have no standing to make these

15   points unless you want to intervene.

16           MR. AVENATTI:  And, your Honor, I understand that.  I

17   am only providing that by way of background to tell you that we

18   are happy to delay our motion to intervene, in accordance with

19   the request by the government, as we work through these issues.

20   But sooner rather than later, that's going to have to be teed

21   up, especially if we continue to learn of potential

22   attorney-client privileged information that was provided by

23   Mr. Davidson to Mr. Cohen.  That's my only point, your Honor.

24           THE COURT:  All right.

25           MR. AVENATTI:  Your Honor, as it relates to the *pro*

I5u2cohC

*hac vice* application, your Honor, it is highly unusual for such

an application to be denied.  I'm sure your Honor is well aware

of that.  It is highly unusual for there to be opposition to

that application.  I have had the benefit of reading the

opposition to the application.  A lot of it relates to matters

that are completely irrelevant to these proceedings, have

nothing to do with these proceedings.

        The argument relating to the release of the

information concerning Mr. Cohen, there has been no linkage

between that information and this proceeding, your Honor.

There is no allegation that that information has anything to do

with this proceeding whatsoever.  This proceeding, currently

it's not a criminal case.  It is not a civil case *per se*.  It

is an "*in re*" proceeding relating to the seizure of documents.

        Furthermore, your Honor, any claim that somehow

extrajudicial statements have had any bearing on this matter or

have any potential bearing on this matter, your Honor, I do not

believe those arguments are well taken for the following

reason:  There is no jury in this proceeding.  There is no

trial in this proceeding.  This proceeding is a proceeding,

like I just stated, about documents and how documents are going

to be handled and how particular privilege issues are going to

be addressed by way of a special master, etc.  Your Honor

ultimately makes the determination, together with

recommendations from Judge Jones, relating to how those

I5u2cohC

1    documents are to be addressed and how those documents are to be

2    handled.  Nothing that may be said in the press could

3    potentially have any bearing on any of those decisions.  Your

4    Honor has been on the bench for a very, very long time.  This

5    is not the first high-profile case your Honor has handled by

6    any stretch of the imagination.  Your Honor is used to handling

7    high-profile matters.  Your Honor is used to have extensive

8    media coverage relating to those matters.  So nothing that

9    could be said in connection with any statements outside of this

10   courtroom could have any bearing on your Honor's ultimate

11   determination.

12        Now, as it relates to my fitness, I have never been

13   disciplined by any bar organization in the United States, no

14   state bar disciplinary record whatsoever.  I have been an

15   exemplary member of the bar for 18 years.  I have practiced

16   around this country in various state and federal courts.  I

17   have tried cases in no fewer than nine different states.  I

18   have an exceptional track record.

19        And if your Honor would like to hear me address any

20   particular statements or allegations from Mr. Cohen's counsel

21   as to why my *pro hac* should not be granted, I would be more

22   than prepared to address those, your Honor.

23        THE COURT:  Granting your motion *pro hac* doesn't, as

24   you know, give you a roving ability to bring up anything you

25   wish in connection with this matter.  You would be in here to

1    protect your client's rights.  To the extent that the special

2    master might become involved in reviewing purportedly

3    privileged materials and making a determination in consultation

4    with you, the parties have been sharing the cost of the special

5    master 50/50.  In reviewing the material from the JAMS

6    arbitration, that left some question in my mind about whether

7    you would in fact share something that you say you will share.

8            MR. AVENATTI:  Well, your Honor, let me put the

9    court's concern at ease.  There is no question whatsoever, your

10   Honor, that if the special master spends any time working on

11   anything relating to Ms. Clifford, we are more than happy to

12   pay the special master's fees and costs associated with that.

13   If need be, we are happy to put a retainer up of whatever the

14   special master deems appropriate.

15           I noted in the statement filed by the special master,

16   Judge Jones, she is billing at $700 an hour, which I found to

17   be incredibly reasonable, your Honor.  Based on her experience,

18   not only on the bench but as an attorney, I thought that was

19   exceptionally low, quite honestly, at least based on my

20   experience with New York and Los Angeles rates.

21           So, again, your Honor, let me put the court at ease.

22   We will be happy to advance whatever retainer the court deems

23   appropriate, depending on how much time is estimated as it

24   relates to reviewing those documents.  Again, it is tough for

25   us to say, because we don't know how many audio recordings

I5u2cohC

1    there are.  We don't know how much information was provided.

2    We are basically flying blind, your Honor.

3              THE COURT:  Thank you.

4              Would you like to respond, Mr. Ryan?

5              MR. RYAN:  Thank you, Judge.

6              Judge, this proceeding is about keeping confidential

7    privileged information of the President of the United States,

8    of Mr. Cohen, of the lawyers who have given advice to

9    Mr. Cohen, and it is being turned on its head by Mr. Avenatti.

10             When he was here on April 26, he got up and spoke

11   three different times.  Not once did Mr. Cohen's lawyers rise

12   to address his *pro hac vice* motion or the motion to intervene,

13   not a word.

14             The reason I rise today is because I have never seen

15   an attorney conduct himself in the manner that Mr. Avenatti

16   has.  Earlier this month, he deliberately took information that

17   he knew was nonpublic, confidential information that was about

18   my client's bank records, that were likely -- almost an

19   ineluctable conclusion that came from a SAR report.  Those SAR

20   reports cannot be made public by the law enforcement officials

21   or by the banks who handle them.  He published that information

22   gratuitously.  He intended to prejudice and cause harm to my

23   client, and he did.  He succeeded in that.  The court would

24   have to take judicial notice of the volume of media attention

25   that was then devoted to it.  But what Mr. Avenatti did in

1    releasing those records was entirely reckless and improper.

2            The second thing that Mr. Avenatti did in that same

3    release is he improperly released the bank records of a

4    gentleman living in Tel Aviv and he improperly released a

5    Canadian aid worker, a distinguished civil servant of the

6    Canadian government, and his Toronto bank account.  It was a

7    drive-by shooting of anyone named Michael Cohen that he could

8    come up with the information.

9            And in the two things that he did, we came back the

10   next day intending to raise it to the court because we had

11   never seen anything like this.  I have practiced law for 37

12   years, and I have never risen to oppose the *pro hac vice* motion

13   of an attorney to practice law.  And Lord knows there are

14   people who I would rather not have been against in that time.

15   This is not -- the event that he is sidestepping is his

16   intentional, malicious, and prejudicial release of that

17   information.

18           Now, what have we learned since that came out?  Within

19   the day that I was actually filing the motion, the second day,

20   I had spoken to the Canadian aid worker, and we were able to

21   obtain the clarity that his records had been done.  We were

22   able, actually through the press, to obtain the Israeli

23   newspaper article.  We never spoke directly to that gentleman.

24   I spoke directly to the man in Tanzania, is outraged that his

25   records have been released.

I5u2cohC

On the same day, the Treasury inspector general indicated there would be an inquiry by the inspector general's office as to the likely release of the SARs reports.  So that investigation is still going on.

Subsequent to that, your Honor -- and we put this in the record to you -- there was an extraordinary *New Yorker* article that quoted apparently, according to this press report, the individual who had released it, who showed in his comments that he knew that he had violated the law in releasing it.  And of course no one in the press printed those bank records of my client until Mr. Avenatti released it.  And I'm going to put on -- upon information and belief, my phone rang off the hook the day before during the day that that release was done.  He released that document under embargo to at least three different entities.

So if we want to talk about leaks to the media, that document was made available to a television network and print journalists to prepare their stories for his release that night.  It was a premeditated drive-by shooting of my client's rights.  That's why we are here today raising this issue.

Now, what have we learned subsequently?  Within the past week, not something we did, not something we had anything to do with, a United States bankruptcy court has issued a judgment against the named partner's law firm, Avenatti & Eagan, for $10 million.  But in the course of that, your Honor,

I5u2cohC

1    I want to read a couple of quotes from other judges about the

2    conduct of that case.  I'm going to refer for a moment to the

3    Florida bankruptcy judge, and the court can find the document I

4    am reading from, it is exhibit -- it is document 66-2.  I'm on

5    lines 12 and 13.  And the bankruptcy judge in Florida addressed

6    the fact that a filing was made in that bankruptcy court that

7    says, "We have an involuntary case that has a stench of

8    impropriety."  Okay?  This is one of your brethren, a judge of

9    the United States, who had to make that ruling.

10             And who did that filing benefit?  Well, it benefited

11   Mr. Avenatti.  He was scheduled to have his deposition taken

12   and to provide evidence, and he didn't have to do that because

13   of the stay.

14             So when we look from place to place, what's the

15   importance of that?  The importance of it is that Mr. Avenatti

16   cannot keep his agreements.  He didn't pay the money that he

17   agreed to pay to settle this matter.

18             We know that he is involved in ways that call

19   attention to himself, his 170 appearances on television -- 74

20   on CNN, according to a recent report.  This is about the

21   aggrandizement of a single attorney and his client that, while

22   they may have a motion in this case that should be heard with

23   respect and that we didn't rise to oppose when it first came

24   here, but I'm rising now because I can't believe that we are

25   going to allow this court in the Southern District of New York

I5u2cohC

```
 1   to be treated this way.  It is not appropriate, your Honor.

 2          It shakes me to my boots that, at this point in my

 3   career, I have to rise to oppose this sort of conduct, which is

 4   laid out.  We have not come in here and provided hearsay about

 5   a reporter who called him.  If we had released those audiotapes

 6   to a reporter, it would have been the biggest story in America.

 7   It has not occurred.  The audiotapes that we have, if any, that

 8   pertain to him, under lock and key, they are controlled by my

 9   law firm, TO, and POTUS, to the extent that there may be a

10   claim of privilege related to them.  I am unaware of any

11   release of an audio file of this kind.

12          Now, let me address this further.  I think what he has

13   done today is rise to try and equate our behavior, but we are

14   not squabbling children.  And I know sometimes when lawyers get

15   up and they fight like this in front of a court, we look that

16   way, but it's not true.  Because this goes to the very heart of

17   what his intention is in this representation.  His release of

18   the bank secrecy issues, candidly, he shouldn't be asking us to

19   answer questions, he should be asked to answer those questions

20   himself.

21          I apologize for the vehemence that I have approached

22   this this morning, your Honor.  I think this is wrong, and I

23   had to rise.  I really didn't want to do this.  But it is an

24   issue now put before the court, and I think the appropriate

25   way -- there is a very strange thing going on in terms of any
```

I5u2cohC

1    discussions between the government and him, strange bedfellows,

2    perhaps, but we haven't intervened in that.  They said the

3    motion is not here.  I would urge you to tell -- hold his

4    application in abeyance because who knows what's going to trick

5    out next week.  Who knows what we are going to read, given the

6    role of the inspector general, given the issues in the

7    bankruptcy case.  There is really no reason to rule today on

8    this.  I would respectfully request the court take the matter

9    under advisement.  If we are going to go forward with the

10   motion, then the court will have heard us and you could rule at

11   that time.

12            I thank you for hearing me.

13            THE COURT:  Thank you.

14            Mr. Avenatti, do you wish to respond?

15            MR. AVENATTI:  Yes, your Honor.

16            That was quite the tale --

17            THE COURT:  Let's not comment on it.

18            MR. AVENATTI:  Your Honor, what Mr. Ryan just stated

19   to the court, 95 percent of it is without any evidentiary basis

20   whatsoever.  There is no evidence that we engaged in any

21   improper conduct relating to the release of any documents

22   relating to Mr. Cohen.  There is no evidence of that.  And the

23   reason why that is true, your Honor, is because we did not.  We

24   did not do anything improper relating to the release of

25   information concerning Mr. Cohen; and, in any event, that has

I5u2cohC

1    nothing to do with this proceeding or with the standards under

2    which we can be admitted -- I can be admitted *pro hac vice*.

3    There is no evidence that we did anything improper, your Honor.

4    There is no evidence that the inspector general is

5    investigating me or our release of the information.  There is

6    no evidence of that whatsoever.  We haven't been contacted by

7    the inspector general.  We haven't been contacted by anyone

8    associated with the government.  We haven't been contacted by

9    the F.B.I.  We haven't been contacted by the Treasury

10   Department.  We have been contacted by no one -- no one, your

11   Honor -- relating to anything that we have released.

12        THE COURT:  I've a different view from you, from the

13   one you have expressed earlier as to what it is that would

14   subject you to the standards for professional responsibility in

15   this court.

16        In my view, this matter, which is a potential

17   precursor to a criminal trial if charges are filed against

18   Mr. Cohen, I believe that once you are participating in this

19   proceeding, you are subject to New York Code of Responsibility

20   3.6 and the local rule for the Southern District of New York

21   23.1.  That means that you would have to stop doing some things

22   you have been doing.  If you participate here, you would not be

23   able to declare your opinion as to Mr. Cohen's guilt, which you

24   did; you would not be able to give publicity to documents that

25   are not public.  It would change your conduct.  That is my only

I5u2cohC

1   possible role in doing what Mr. Cohen's lawyers want, which is,

2   to essentially stop in its tracks your publicity tour on TV and

3   elsewhere.  And I say "publicity tour" not in a derogatory

4   sense.  You are entitled to publicity so long as -- that is, I

5   can't stop you, unless you are participating in this matter

6   before me.

7              So I either want you to participate or not be in the

8   matter at all.  I don't want you to have some existence in a

9   limbo, where you are free to denigrate Mr. Cohen and I believe

10  potentially deprive him of a fair trial by tainting a jury

11  pool.  I know a jury, if there is one, is way down the road,

12  and memories certainly may fade, but this conduct is inimicable

13  to giving Mr. Cohen eventually a fair trial.

14             So unless you want to move to intervene, in which case

15  you will be subject to all of these rules as well as this

16  court's grievance committee, then I will hold in abeyance your

17  motion *pro hac vice*, and you will not be permitted to use this

18  court as a platform for anything because you won't be a

19  participant in it.

20             MR. AVENATTI:  And, your Honor, I don't believe that I

21  have done that, quite honestly, your Honor.  And we are the

22  ones that -- I am the one that asked that the agenda item be

23  placed on the agenda for consideration by your Honor, because

24  we don't want to be in limbo *per se*, your Honor.

25             Now, Mr. Cohen's counsel, they are the ones that

I5u2cohC

1    oppose the court taking up my *pro hac vice* application today as

2    set forth on the agenda, to be clear.  So I ask that the court

3    pass judgment on the *pro hac vice* application today.

4            THE COURT:  I don't think that makes you a

5    participant.  You would have to --

6            MR. AVENATTI:  I agree.

7            THE COURT:  You would have to move to intervene, and

8    you have no particular portfolio to intervene here unless it is

9    Ms. Clifford's rights that you are protecting.

10           MR. AVENATTI:  Your Honor, I understand that.  If the

11   court -- if it is the court's inclination to hold the *pro hac*

12   pending the motion to intervene decision or hearing, so be it.

13   That is more than acceptable to us.  We are continuing to work

14   with the government.

15           Your Honor, I will note that now my concerns have been

16   confirmed.  Mr. Ryan states there are recordings relating to my

17   client.  They are under lock and key.  He stated that on the

18   record.  So that's now been confirmed.  So that raises

19   considerable concerns.  I will digest those concerns.  We will

20   move appropriately.  But if there are recordings of my client's

21   former counsel disclosing attorney-client privileged

22   information, that is of significant concern to me and my

23   client.  And we will address that with the government, and we

24   will attempt to arrive at a resolution, your Honor.

25           THE COURT:  Very good.  Thank you.

I5u2cohC

1          Is there anything that we should take up in addition?

2          MS. MAIMIN:  Your Honor, we would just respectfully

3    request that the court set a specific date in mid June for the

4    completion of Mr. Cohen's review.

5          MR. RYAN:  Your Honor, could I be heard for one

6    minute?

7          THE COURT:  Yes.

8          MR. RYAN:  I want the court to understand something

9    about the materials that we are dealing with.  For example, if

10   there is an hour-long conversation that's one of the 3.7

11   million files, one of our attorneys has to listen to that hour

12   in order to do that or the TO or presidential lawyers have to.

13   I don't think I can maintain quality control of a larger staff

14   of attorneys working on this matter than we currently have.  We

15   are burning money at a rate, candidly, that I don't know that I

16   can even increase.

17         THE COURT:  I'm prepared to turn this over to a taint

18   team which I view as fair.

19         MR. RYAN:  But, your Honor, the 1.3 million records

20   that we are through is a demonstration of how hard we have

21   worked.  We are working flat out.  And, candidly, it was only

22   on the 22nd that we obtained some of the latest devices that we

23   have gotten and put them up.  We are doing, candidly, a great

24   job on this, and I don't think we could do more.  I don't think

25   it would be either fair or appropriate.  The court faced this

I5u2cohC

```
 1   decision of what would be fair and appropriate.  The special

 2   master process is working perfectly.  But an unrealistic

 3   deadline of mid June, I don't know that we can make that.  And

 4   I just want the court to understand, I just don't know that we

 5   can do that.

 6             I would ask the court's indulgence to not accept that

 7   date.  Bring us back that date, and let us give you a report.

 8   Let the special master report to you on that date of where we

 9   are.  I hear you that you want this done.  And, you know, we

10   have tried to get a process that worked for that, and I just

11   ask the court to consider that in her ruling.

12             THE COURT:  What I am considering in addition is the

13   fact that the special master is able to keep up with the

14   production with herself, I believe a partner, and perhaps a few

15   others.  They don't have an army.  They don't have people

16   sleeping on couches.  They are able to speed up in a way that

17   you are apparently not able to do.

18             MR. RYAN:  I think I need to address that.  The

19   special master can correct this or my colleagues can correct it

20   in the government or the intervening parties.

21             The special master initially was reviewing documents

22   the same way we were, reviewing all of them.  At this point I

23   think the special master, while spot-checking things, is

24   actually reviewing the privilege claims that we are making and

25   then some extra things.  Her staff is not doing what we are
```

I5u2cohC

```
1    doing and going through every document that we need to.  And we

2    are not going through every document.  We are only going

3    through the documents that actually the logic of the search

4    terms tells us to look at.  We are actually not looking at the

5    ones that don't trigger that actually may contain privileged

6    information, too.

7         We have already made compromises to meet the court's

8    deadline is I guess the point I am trying to make.  We are only

9    reviewing documents that get a hit on the search terms for

10   privilege.  And so I think the special master really

11   understands what we are doing, and I would just say that the

12   June 15 date, I just don't know what I'm going to do to get

13   that done.  I need more time than that and, I think, I just ask

14   you to consider that in your ruling.

15        MR. FUTERFAS:  Your Honor, may I be heard on that?

16        THE COURT:  Yes.

17        MR. FUTERFAS:  We are very appreciative -- and I think

18   Ms. Hendon would concur with this.  We are aware of the work

19   they are doing, and we are appreciative of the care they are

20   giving.  They are doing the first run of all of this material,

21   and we are relying on their firm, as is president's counsel

22   relying on them to carefully go through it and cull out and do

23   the search terms and cull it out.  So what we get is a very,

24   very small subset.  But I am trusting, as I believe Ms. Hendon

25   is, that lawyers are carefully going through that and are doing
```

I5u2cohC

1   the right job and getting it to us.  So we very much value this

2   process.  And I would say this, that, you know, I think we can

3   all try and their firm can try for a date in mid June.  We

4   could come back, and maybe their firm only needs another week

5   or another ten days to get it done, or whatever it might be.

6            But I can assure your Honor that, based on the

7   conversation we have had with the special master, everyone has

8   been working very well together.  They are working very

9   diligently.  The process is working.  We are getting the

10   documents that we should be getting.  So is the president's

11   counsel.  And we are well on the way to getting this done.  So

12   whether it is done on June 15 or it is done on June 20 or

13   whatever it might be, this is a process that's working, and

14   people are working very hard and we are trusted and invested in

15   that process.

16            MS. HENDON:  Your Honor --

17            MR. HARRISON:  Judge --

18            THE COURT:  I understand.

19            MS. HENDON:  I'm sorry, Mr. Harrison.

20            If I could just make two points.

21            The first is that, without discussing here what I

22   understand the special master and her small team to be doing, I

23   do believe it is the case that it is something quite different

24   than the McDermott team, and that if you switched tasks between

25   the Bracewell firm and the McDermott team, the McDermott team

I5u2cohC

1    would be able to get everything done by June 15 and the

2    Bracewell team would be saying, We need more time.  It might

3    make sense -- it's entirely up to your Honor, if your Honor is

4    inclined -- to discuss this point, if your Honor does believe

5    that too much time is being taken -- which is not our

6    observation at all -- with the special master, because I don't

7    feel it is my place to put on the record exactly what I

8    understand that team to be doing and why it is that that team

9    can move at a certain speed.  That said, I know your Honor is

10    keen to keep us all on a fast track, and I don't mean to

11    quarrel with that in any way.

12         The second point I wanted to make was simply, on

13    behalf of the president, we endorse fully every argument that

14    Mr. Ryan and his team have made in writing concerning the *pro*

15    *hac* application of Mr. Avenatti.  We are glad that your Honor

16    will hold it in abeyance, because it sounds as if your Honor

17    has already done so, but the materials attached to Mr. Ryan's

18    letter of yesterday warrant very careful scrutiny, in my view.

19         And I will just say that when I came into the

20    courthouse this morning, there was a podium in front of the

21    courthouse with eight microphones set up on that podium, and I

22    walked by and nobody looked at me.  Nobody wanted to take my

23    picture.  And I don't know, but I don't think that podium is

24    there for Michael Cohen or Steve Ryan or for me.

25         Thank you, your Honor.

I5u2cohC

1          THE COURT:  Thank you.

2          MR. HARRISON:  Judge, just to put the point on --

3          THE COURT:  You were next, Mr. Harrison.

4          MR. HARRISON:  Just to put the point on one quick

5    thing Mr. Ryan said, just so it is clear, I'm picking random

6    numbers, if we get a batch of 10,000 documents and we review

7    the 10,000 documents, we may only designate -- I am just making

8    up numbers here -- 500 of them privileged.  So we send those

9    privilege designations to the special master is how it is

10   working, and I think the special master is only reviewing those

11   documents we have designated as privileged.  So I think our

12   subset of review is much larger than the special master.

13         THE COURT:  I understand.  Thank you.

14         Mr. Avenatti.

15         MR. AVENATTI:  Your Honor, briefly, I want to just

16   respond.

17         THE COURT:  Yes.

18         MR. AVENATTI:  Thank you.

19         Your Honor, Mr. Trump had adequate notice of my *pro*

20   *hac vice* application.  They could have filed whatever they

21   wanted to file, his counsel could have, in opposition to that.

22         So let me address what was just stated to your Honor.

23         Counsel referenced the court to the attachments that

24   were filed yesterday.  Those generally relate to a bankruptcy

25   proceeding concerning a firm that is not at issue in this case,

I5u2cohC

 1   that has never represented Ms. Daniels, never will represent

 2   Ms. Daniels, and is not a firm that I presently work on behalf

 3   of in connection with this matter, to be clear.

 4            THE COURT:  How much of this is a distinction without

 5   a difference?  You are the named partner in each firm.  You

 6   operate out of the same office.  What's the distinction?

 7            MR. AVENATTI:  Well, your Honor, I think it's a

 8   critical distinction, because that firm has never represented

 9   my client.

10            But I would like to address what counsel stated.

11   Counsel is directing the court to a bankruptcy judgment as

12   reason why my *pro hac vice* should not be permitted, counsel who

13   represents Mr. Trump, who has had his own fair share of

14   bankruptcies over the years, and those haven't disqualified him

15   in various contexts, so the irony of that, your Honor, is

16   rather palpable.  Furthermore, counsel is referring to tweet

17   messages, I guess, that I sent.  Well, we know that her client,

18   her very own client, Mr. Trump, has tweeted about this matter

19   in great detail and has tweeted about Mr. Cohen in great detail

20   during these proceedings, so the irony, your Honor, of that is

21   palpable.

22            Now, let me also address the microphones that are set

23   up in front of the courthouse.  If anyone in this courtroom

24   believes that if my *pro hac* is denied those microphones are

25   going to go away or the press that is seated here is no longer

I5u2cohC

```
1    going to attend, they are fooling themselves.  Whether I'm in

2    this case or not, this case is going to have a considerable

3    amount of press attention, a considerable amount of public

4    interest, and for good reason, because of the issues in the

5    case and their seriousness as it relates to the President of

6    the United States, your Honor.

7            Thank you.

8            THE COURT:  All right.

9            Ms. Hendon.

10           MS. HENDON:  Thank you, your Honor.

11           I just would like to respond to the statement that I

12   believe Mr. Avenatti said "that firm" -- referring to Eagan

13   Avenatti or Avenatti Eagan -- "has never represented my

14   client."  I don't know how many times he said that.  I notice

15   that he put that in an affidavit that he filed with the court

16   last night.  That affidavit only has three paragraphs, and it

17   was information in that affidavit that Mr. Avenatti chose to

18   volunteer.  No one asked him to put that affidavit in.  And

19   paragraph 3(a) states that "The firm of Eagan Avenatti LLP is

20   not the law firm of Ms. Daniels."

21           With the court's permission, I would like to hand up

22   what I have marked as Exhibit 1.  We will give copies to

23   Mr. Avenatti and Mr. Futerfas, plaintiff, and the government.

24           MR. AVENATTI:  Your Honor, I have no idea what this

25   is.
```

I5u2cohC

| | |
|---|---|
| 1 | THE COURT: You don't need to speak yet. I don't |
| 2 | either. |
| 3 | MS. HENDON: As your Honor may be aware, Mr. Avenatti, |
| 4 | on behalf of Ms. Daniels, has two actions pending in federal |
| 5 | court -- one in California, which is stayed, and one in this |
| 6 | district before Judge Furman. As recently as last week, |
| 7 | lawyers from the Avenatti Eagan firm were in communication with |
| 8 | the president's counsel concerning the matter pending in this |
| 9 | district. You will see that on I think the first e-mail. |
| 10 | The second e-mail likewise shows Avenatti Eagan -- |
| 11 | pardon me, Eagan Avenatti, attorneys or an attorney acting for |
| 12 | Ms. Clifford in an action against the president. |
| 13 | And the third e-mail from March 2018, just two months |
| 14 | ago, is another Eagan Avenatti e-mail sent to counsel for the |
| 15 | president -- this one in the California action -- on behalf of |
| 16 | Ms. Clifford, and on that e-mail you see that Mr. Avenatti |
| 17 | himself bears an Eagan Avenatti e-mail address. |
| 18 | Now, I had these materials when I first took the |
| 19 | podium this morning to say I had two comments -- one, I endorse |
| 20 | Mr. Ryan and, two, you know, I think the McDermott firm has |
| 21 | been working as hard as anyone can to get us the document -- |
| 22 | but I chose not to bring this up. But I think the court should |
| 23 | note that Mr. Avenatti did not need to respond to that point. |
| 24 | He did not need to put in this affidavit last night. He chose |
| 25 | voluntarily to do it, and he was not straightforward with the |

1    court.  He was not open with the court.

2            If you read paragraph 3(a) carefully, "The firm of

3    Eagan Avenatti LLP is not the law firm for Ms. Daniels."  I

4    don't know what that means, but it appears carefully

5    constructed to create an impression with the court in a matter,

6    frankly, of zero moment in these proceedings.

7            When I was a prosecutor and we would sum up in front

8    of the jury, we would say to the jury:  You know, when I

9    elicited that untruthful or misleading statement about that

10   little, tiny point from the defendant on cross, you were

11   probably bored and you were probably wondering, ladies and

12   gentlemen, why did I spend all that time on that little, tiny

13   thing about which the defendant was not candid with you?  And

14   the reason I spent time on that -- and, your Honor, the reason

15   I stood up again today -- is because when someone, especially a

16   lawyer, is prepared to be not straight forward and cute and, I

17   would say, misleading with the court on the tiniest of matters,

18   it raises a serious question about how that person, how that

19   lawyer will conduct himself on the more serious matters.

20           That's all, your Honor.  Thank you.

21           THE COURT:  Thank you.

22           MS. HENDON:  I would ask that the court receive what I

23   have marked as Exhibit 1, those three e-mails, as part of

24   today's record.

25           THE COURT:  All right.  It is currently marked

I5u2cohC

1    Intervenor Exhibit 3.  We will give it that designation.

2             MS. HENDON:  That's fine, your Honor.

3             THE COURT:  It is received.

4             Is there anything further?

5             MS. MAIMIN:  Yes, your Honor.  We would just hope the

6    court could set a date in mid June for the production of

7    documents.

8             THE COURT:  Good point.

9             Mr. Cohen's review of the materials currently in their

10   possession, in the possession of counsel for Mr. Cohen, must be

11   completed by June 15, 2018.  If it is not, the balance of the

12   materials will go to the taint team which will review them.  It

13   is important for the court to balance the slow, deliberate

14   needs of those who are asserting attorney-client privilege with

15   the need for an investigation to go forward.

16            I would like to note to Mr. Avenatti that, until you

17   are admitted here, I don't expect you to stand and be heard

18   here.  I have no control over what you do outside.  I just

19   wanted to be sure that was understood.

20            MR. AVENATTI:  Understood, your Honor.  Thank you.

21            THE COURT:  All right.  Thank you very much.

22            We will have the next conference as soon as the

23   special master decides it is a good time.

24                              oOo

25