14G3COH1

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x
     In the Matter of Search Warrants
 3   Executed on April 9, 2018
     ------------------------------x
 4   MICHAEL D. COHEN,

 5                    Plaintiff,

 6            v.                              18 Mag. 3161

 7   UNITED STATES OF AMERICA,

 8
                      Defendant.
 9
     ------------------------------x
10                                    New York, N.Y.
                                      April 16, 2018
11                                    2:15 p.m.

12   Before:

13                     HON. KIMBA M. WOOD,

14                                    District Judge

15                          APPEARANCES

16
     MCDERMOTT WILL & EMERY LLP
17        Attorneys for Plaintiff
     BY:  TODD HARRISON
18        JOSEPH B. EVANS
          STEPHEN RYAN
19
     ROBERT S. KHUZAMI
20        Acting United States Attorney for
          the Southern District of New York
21   THOMAS A. McKAY
     RACHEL A. MAIMIN
22   NICOLAS ROOS
          Assistant United States Attorneys
23

24

25
```

14G3COH1

Also Present:


SPEARS & IMES LLP
      Attorneys for Intervenor
      Donald J. Trump, President
BY:  JOANNA C. HENDON
         REED M. KEEFE
         CHRISTOPHER W. DYSARD

ALAN FUTERFAS
      Attorney for Intended Intervenor
      Trump Organization

DAVIS WRIGHT TREMAINE LLP
      Attorneys for ABC, Inc., New York Times Co., Associated
Press, CNN, Newsday
BY:  ROBERT BALIN


MICHAEL AVANATTI
      Attorney for Interested Party
      Stephanie Clifford a/k/a "Stormy Daniels"

14G3COH1

1          THE COURT:  Good afternoon, please have a seat.

2          THE DEPUTY CLERK:  The Court calls Michael D. Cohen v.

3    the United States of America.  Counsel, state your appearances.

4          MR. McKAY:  Tom McKay, Rachel Maimin and Nicholas Roos

5    for the government.

6          MR. HARRISON:  Good afternoon, your Honor.  Todd

7    Harrison and Joe Evans who you've seen in the courtroom before

8    on behalf of Mr. Cohen.  I also have and would like to

9    introduce my client Steve Ryan who is two down from me who

10   filed a pro hac vice --

11         THE COURT:  Your partner?

12         MR. HARRISON:  Yes, your Honor.

13         MR. RYAN:  It is an honor to appear before you, your

14   Honor.

15         THE COURT:  That's very kind.  I will grant it.

16         MR. HARRISON:  Thank you, Judge.  He may address the

17   Court today, so thank you.

18         THE COURT:  That's fine.  It also occurs to me that

19   the lawyers for President Trump and the Trump Organization

20   should probably be at counsel table as well.

21         MS. HENDON:  Should we note our appearances first,

22   your Honor?

23         THE COURT:  Yes.  I've signed an order that you are an

24   intervenor.

25         MS. HENDON:  Yes, Joanna Hendon, Spears & Imes, LLP.

14G3COH1

1    With me Christopher Dysard and Reed Keefe on behalf of the

2    president.

3             MR. FUTERFAS:  Alan Futerfas, good afternoon.  We

4    filed a letter this morning on behalf of the Trump

5    Organization, so I wanted to let your Honor know we're here and

6    just at least pursuant to that letter request the opportunity

7    to intervene.

8             THE COURT:  All right.  Some time after this

9    proceeding could you file a motion to intervene.

10            MR. FUTERFAS:  Yes.

11            MS. HENDON:  We're very comfortable where we are, if

12   your Honor wouldn't mind us remaining at our seats.

13            THE COURT:  I don't mind.

14            Now I'd like to turn to Mr. Harrison and ask can you

15   answer the questions I posed at our last hearing.

16            MR. HARRISON:  Yes, Judge.  We did file a letter this

17   morning at 10 o'clock pursuant to your Honor's direction.

18   That's a reflection of a lot of work we did this weekend to try

19   to narrow things down as much as possible and to answer the

20   Court's questions.  I think it answers the Court's questions

21   pretty much all way.

22            I believe that it actually sort of supports our

23   application for us doing the review or having a special master,

24   because I think it has narrowed things down a little bit and I

25   think hopefully will help to alleviate the Court's concerns

14G3COH1

1   about any potential delay in relation to a special master.

2            THE COURT:  Do you know the volume, roughly the volume

3   of privileged documents that were seized?

4            MR. HARRISON:  No, Judge, I don't.  We laid out as

5   much as we know in our letter.  We indicated the privilege

6   relationships that Mr. Cohen had as both a client and as an

7   attorney.  We don't recognize all of the items that the

8   government seized.  We don't know -- they list a hard drive, a

9   disc, things like that, Judge, and we don't know exactly how

10  many documents are on there or even exactly what is on those

11  particular, these media.

12           THE COURT:  May I interrupt you just to ask Mr. McKay

13  if the government has a feeling for how many documents in all

14  were seized.

15           MR. McKAY:  How many documents in all were seized.  In

16  terms of physical documents?

17           THE COURT:  I'll begin there.

18           MR. McKAY:  No.  In fact, because of the pendency of

19  this motion, the investigative team has tried to be very

20  careful about any communications with the filter team to get

21  into particulars.

22           Very broadly speaking, I understand that a few or

23  maybe as much as 10 boxes of physical documents were seized.

24  But in terms of the real volume, it is going to be the hard

25  drives, the electronic devices, that's where you're going to

14G3COH1

1   see the real volume.

2            THE COURT:  All right.  Is it feasible for you to give

3   duplicate sets of all you have to Mr. Cohen?

4            MR. McKAY:  It's feasible, but there are many reasons

5   why we oppose that request, and I'm happy to set forth those

6   reasons now if your Honor is prepared to hear them.

7            THE COURT:  Yes.

8            MR. McKAY:  So, despite Mr. Cohen's counsel's sworn

9   assertions last week that there were thousands if not millions

10  of privileged documents, his letter this morning admits he has

11  only three legal clients.  And I think this is fatal to their

12  motion.

13           THE COURT:  Now, what time period are you talking

14  about?

15           MR. McKAY:  I'm talking about 2017-2018.  I'm going to

16  go back through the other time periods in a minute because I

17  think this is very important --

18           THE COURT:  Okay.

19           MR. McKAY:  -- to discuss.

20           But, just to explain why I think the number and volume

21  of materials is really critical is in their brief they say,

22  well, Friday's hearing got away from the legally operative

23  facts.  But the number of clients and the volume of materials

24  seized are very important.  Because Mr. Cohen has premised his

25  motion on the assertion that he is an attorney and has lots of

14G3COH1

1      privileged materials, and so, for that reason, this case is

2      like the Lynne Stewart case.  But now that assertion has proven

3      to be a little bit misleading.  I think it undermines his

4      argument and it makes this case a lot more like any white

5      collar case in which the subject of a search has sought legal

6      advice.  Mr. Cohen sets forth he's got more attorneys of his

7      own than he has clients.

8              So with respect to the facts that Mr. Cohen has now

9      provided, I'd like to walk through them because he claims that

10     he had numerous clients when he was practicing between 1991 and

11     2006 with I believe it was three different firms.  But for each

12     of those firms, Mr. Cohen's letter states that counsel does not

13     know whether any privileged materials were seized.

14             Now, that should be surprising to the Court because,

15     A, defense counsel has had access to their client all weekend,

16     who should be able to know what is in his files and on his

17     computer, and B, they actually have the electronic devices.

18     Most of the devices, with a few exceptions, were imaged on site

19     during the search.  So they can open up the computer and see

20     what, if any, privileged files were in there.  But, apparently,

21     they have not done so despite the Court's direction that they

22     provide more information by this morning.

23             THE COURT:  Could you just pause.  I'm not sure I

24     understood.  Is it your assertion that all privileged

25     communications are in the devices they have?

14G3COH1

1          MR. McKAY:  No, it's not my assertion.  It may be

2     there were some physical documents that were seized that

3     include privileged communication.  We don't know because we

4     haven't reviewed them yet.  But they do have access to their

5     client who should be aware of what physical documents were

6     located in his premises.

7          I'd also point out that with respect to everything

8     that occurred pre-2006, all of the different practice that

9     Mr. Cohen may have had 20, 30 years ago, all of the rider terms

10    in the search warrants are either explicitly limited by date

11    range to much more recent years, or, they specifically refer to

12    conduct that is considerably more recent than 2006.

13          THE COURT:  Remind me what the period is.

14          MR. McKAY:  It depends on which specific subject in

15    the rider term we're talking about.  And since those are still

16    under seal, I don't want to get into the details.  But for

17    certain subjects we asked for documents from January 1st, 2013,

18    going forward.  Other subjects aren't specifically date bound,

19    but the events that they relate to are all sort of post 2011 I

20    believe.

21          And so, to the extent that Mr. Cohen had documents on

22    his hard drives or in his physical files that go back beyond

23    2006 when he was actually practicing representing clients,

24    they're likely to be not responsive to the warrant.  I'm not

25    committing that they are, but they're likely not to be.

1          So if that was the concern and Mr. Cohen were actually

2     able to assert that he had legal practice, that some of the

3     privileged materials related to his legal practice, 2006 were

4     included, it may be that we could do some carve out for that

5     period of time, because it could be treated differently, given

6     the low likelihood that such documents are actually likely to

7     be responsive.

8          So then you go from 2007 to January 2017.  Mr. Cohen's

9     letter states that he was working as a counsel at the Trump

10    Organization.  But that letter does not state one way or the

11    other whether he has retained any materials from his employment

12    at the Trump Organization since he left there over a year ago.

13    The Trump Organization has put in its own letter, but nowhere

14    does it state a belief or an assertion of fact that Mr. Cohen

15    in fact took privileged materials with him over a year and a

16    half ago and still has them in his possession.  And most

17    corporations don't permit employees to keep their privileged

18    client files with them after they leave.

19         So Cohen's failure to assert that there actually is

20    privileged material from the Trump Organization on his devices

21    or in his premises is pretty telling, because for those prior

22    three firms that we just talked about, the letter affirmatively

23    states that they don't know the answer.  But the silence as to

24    the Trump Organization is telling.

25         So that leaves us with January 2017 to the present

14G3COH1

1   when Mr. Cohen has stated that he had only three legal clients.

2   He hasn't even provided evidence of these relationships as the

3   Court directed on Friday.  But, more importantly he's provided

4   no detail about the volume of communications with these

5   clients.  So it's still not clear whether his counsel had a

6   valid basis for the assertions they made in their briefing last

7   week.

8        All of that supports the argument that we've made from

9   the outset, which is that Mr. Cohen might have a legal degree,

10  but this investigation and the search is largely focused on his

11  private business dealings and personal financial dealings.  And

12  that is very significant for the analysis the Court has to

13  conduct, because this takes this far from the realm of the

14  Lynne Stewart case.  Which, again, involved a practicing

15  criminal defense attorney, the seizure of large amounts of

16  privileged material, the seizure of materials from other

17  attorneys that were not under investigation, files that were

18  related to criminal defendants.  And not just that, criminal

19  defendants being prosecuted by this office, which was extremely

20  consequential because it meant that the filter protocol that we

21  proposed was actually impracticable because the walled AUSAs --

22        THE COURT:  Proposed in that case.

23        MR. McKAY:  Correct.  Because the filter protocol, the

24  walled AUSAs might stumble upon the files of their own criminal

25  defendants.

14G3COH1

1          Lynne Stewart is very, very different from this case.

2     That's why we've been focusing on the number of clients and the

3     volume of privileged communications, because we think this is

4     just the run-of-the-mill case, the kind of case where every day

5     we have filter teams doing privilege reviews.

6          Now, a lot of their brief talks about their inability

7     to disclose the identity of this third client.  I can dispute

8     whether they're correct that it's privileged.  I don't think

9     they're accurately describing the special circumstances

10    exception.  I think the ethical obligations they describe yield

11    to a court order, and their discussion of the ethical

12    obligations all presupposes that the client's name will be

13    publicly disclosed, when I think the Court's directive on

14    Friday was to do it under seal, and the government had no

15    objection to being done under seal.

16         But the critical point as to the failure to disclose

17    the third client is that Mr. Cohen's refusal to provide that

18    client's name or a full client list or details about the

19    representation suggests -- it's powerful evidence of how this

20    review is likely to play out if Mr. Cohen's proposal is

21    granted.  If he can't disclose the client name, even to the

22    Court under seal, or to the filter team under seal, how can the

23    proposed review process that he'd like possibly work?

24         In his proposal, he wants to make the initial

25    privilege call.  So presumably he's going to have to produce a

14G3COH1

1    privilege log so we have some indication of what things he's

2    claiming privilege over.  But without the name of the client,

3    or any information about the representation, how can the

4    government ever hope to push back against the inevitably

5    overbroad claim of privilege?  It is impossible.

6         The same is true with the special master.  I think the

7    letter suggests that Mr. Cohen would be willing to disclose

8    this third client's name to the special master but still not to

9    the government.  So you have the same problem.  Without the

10   name of the client, we can't contest the determination, and

11   that's actually really significant because we may know facts

12   about an individual who may be the client in question that the

13   special master doesn't know, and they are relevant to analysis

14   of the privilege inquiry or crime fraud inquiry.

15        I can just give one example, which is that Mr. Cohen's

16   letter states that he has some clients for whom he provides

17   strategic advice or business consulting.  Now, he hasn't put

18   those in the realm of legal clients for now, but let's say he

19   lists on his privilege log an e-mail with a representative of

20   an anonymized major corporation.  It may be we have subpoenaed

21   that corporation, that we have his consulting agreement with

22   Mr. Cohen.  It may be that we've interviewed the executives of

23   that corporation, and the executives have told us that there

24   was no attorney-client relationship.  But if they won't give us

25   the name, they just anonymize the client, then we can't make

14G3COH1

1    that same challenge to the special master.  So we're going to

2    be stuck with this overbroad claim of privilege and no way to

3    litigate it.

4            This is really what Judge Jones was describing in the

5    Grant case when she denied the request for a special master.

6            So, I think the continued resistance to provide the

7    Court with facts and names is just a preview of what's going to

8    happen if the Court grants Mr. Cohen's requested proposal.  I

9    think it indicates that he's going to continue to hide behind

10   overbroad claims of privilege, which is going to drag out the

11   investigation with litigation and delay.  All of which is very

12   much to the benefit of the party who is under criminal

13   investigation.

14           Briefly, since the letter that was filed this morning

15   went sort of well beyond the disclosure of the client list and

16   added a few other arguments, I'd like to respond to those if

17   the Court would allow.

18           THE COURT:  Sure.

19           MR. McKAY:  One is Mr. Cohen makes a halfhearted

20   Fourth Amendment claim.  He says we did an end run around the

21   Fourth Amendment.  But of course we got a search warrant, so

22   that of course is a frivolous claim.

23           He admits that to obtain the search warrant we had to

24   show probable cause that his premises and devices contained

25   evidence of a crime.  He said the search warrant was designed

1    to allow the government to obtain that material and that

2    material only, but now the government is in possession of all

3    of Mr. Cohen's data, a classic example of overreach.  That's

4    page 7.

5        But that argument completely misunderstands how

6    searches of electronic evidence work under Rule 41 and the

7    applicable warrants.  The Second Circuit described this in the

8    Ganias case, that because of the volume of evidence in

9    electronic material, and the logistical issues, it is perfectly

10   appropriate to do on-site imaging of electronic devices for

11   later review for responsiveness to the warrant.  That's

12   expressly provided for in Rule 41, it was expressly provided

13   for in the warrants in this case.  There was nothing improper

14   about the way the search warrants were executed in this case.

15       Lastly, if I may, there is one argument which seems to

16   permeate Mr. Cohen and President Trump's submissions.  And I

17   think it is best stated at page 8 of Mr. Cohen's letter when he

18   writes "The appointment of a special master will protect the

19   integrity of the government's investigation from the toxic

20   partisan politics of the day and attacks on the impartiality of

21   the Justice Department and the U.S. Attorney's Office."

22       Now, there are three parties to this litigation as of

23   right now.  Only two of them have made public comments about

24   the searches.  Last Monday both Mr. Cohen and President Trump

25   made inflammatory public statements about this case.  Our

14G3COH1

office has done no such thing.  So it is improper for the

parties to a litigation to attempt to drum up media attention

about the case, and then turn around and cite that media

attention to the Court as the basis for their requested relief.

The Court shouldn't allow that.

So they may question the impartiality of the career

prosecutors who would be doing the filter team review, but

Judge Jones felt very differently in <u>Grant</u>.  She wrote in her

decision to approve a filter team as opposed to a special

master that it was based on the expectation and presumption

that the government's privilege team and the trial prosecutors

will conduct themselves with integrity.  She said the

government is entitled to that presumption.  I think this Court

should reach the same result.

Mr. Cohen and President Trump both make this argument,

but it is important to remember why we're here, which is that a

federal magistrate judge found probable cause that there was

evidence of crimes in Mr. Cohen's premises and on his devices.

The judge was made well aware that this search, like many

searches in white collar cases, would result in a seizure of

some potentially privileged information.  That's why the

warrants expressly provide for the review of seized materials

conducted in a manner that respects the privilege such as the

filter team here.

So, when President Trump and Mr. Cohen -- well, the

14G3COH1

only thing that makes this case unusual in any respect is that

one of Mr. Cohen's clients is the president.  But neither

Mr. Cohen nor the president in the letter that he filed last

night, which we responded to in writing and I won't repeat

those arguments now, neither one of them has a persuasive

reason why this case should be any different.  Why the

president should be entitled to a privilege review procedure

that's different than the ones that are ordinarily and commonly

conducted in this district.

         And both Mr. Cohen and the president have explicitly

invoked in their briefs the appearance of fairness in the

administration of justice.  But I actually think that cuts

against their argument.  It would not protect the public's

confidence in the administration of justice to give Mr. Cohen

and the president special treatment.  This Court should promote

the appearance of fairness by treating this case like any

ordinary case in this district and approving the government's

proposed use of a filter team.

         THE COURT:  All right.  Let me ask you a question.

Going back to the Stewart case, Mr. McKay, the government

eventually was allowed to argue to the Court questions of

privilege, so the government had to have seen the privileged

documents.  Mr. Khuzami was on that case.

         Are you aware of what happened there?

         MR. McKAY:  Your Honor, I'm not specifically aware,

14G3COH1

```
 1    but I think the answer is not that the filter team was
 2    permitted to review -- I will confirm this if I'm wrong.  But I
 3    think the filter team was not permitted to review the actual
 4    documents, but rather a privilege log was created by defense
 5    counsel.  And based on the privilege log, which has information
 6    like the name of the communicants and the timing and some
 7    general explanation, the government was then able to contest
 8    the application based on context.  And I think that is what
 9    Judge Jones describes in the Grant case as being inadequate.
10    That without actually looking at the privileged documents, the
11    government doesn't have the requisite context to challenge the
12    privilege determination.
13           So I think it is the case that in Stewart all that was
14    done is a privilege log.  If I'm wrong about that, I will
15    correct myself as soon as I can.
16           THE COURT:  Okay.  Good.  All right.
17           With respect to the client's name being withheld, that
18    is not in accord with the law in this circuit.  If you have a
19    reason for that client's name to be treated under seal, you'll
20    tell me.  Yes.
21           MR. RYAN:  Your Honor, Steve Ryan.
22           With respect to that client, the client is a publicly
23    prominent individual.  The representation was legal in
24    analysis.  With regard to naming that person now, the concern
25    was that even if we put it in a sealed proceeding right now,
```

14G3COH1

1    that it might be released.  If we could count on that not being

2    released to the public, at this point no one would want to be

3    associated with the fact that they were a client in this way

4    because of the notoriety around this search warrant.

5         We are protecting the identity of that person, but not

6    from the Court and not from an in camera review by the Court.

7    And I can give you that name right now in a sealed envelope and

8    provide it to the Court.

9         The client was contacted over the weekend and asked

10   that we not disclose their name.  And further, that we take an

11   appeal if the Court was going to make that name public.

12        THE COURT:  What is the legal ground for withholding

13   the client's name?

14        MR. RYAN:  The legal ground, your Honor, is, first of

15   all, Mr. Cohen's duty to the client under the Bar codes that

16   we've presented the Court with.

17        THE COURT:  Well, remember that what we deal with here

18   is federal law and Second Circuit law.  This is not a diversity

19   case.

20        MR. RYAN:  No, no, understood.  I'm talking about the

21   Bar rules that govern Mr. Cohen's conduct in terms of releasing

22   it.

23        THE COURT:  Well, if I order that it be released, he

24   has no problem with respect to his own ethics.

25        MR. RYAN:  This is an issue, your Honor, where I would

1    ask the Court, if the Court's going to deny our motion for a

2    special master, then there is no reason to disclose the name

3    because it won't matter, and the government will go about its

4    business and the taint team will see all of these things

5    anyway.

6          If we give it to you, and I have some assurance that

7    we're not violating that client's right not to be disclosed

8    publicly today, then I can do this.  I can write it down and

9    put it in an envelope right now.

10          But this client is not associated with any of the

11   paragraphs of the specification to my knowledge.  In other

12   words, we pared everything down over the weekend.  We looked,

13   and if it was a business client, we've dropped all of that.  We

14   really did our level best to do that.  I've got this one last

15   matter and the name, and I'm simply trying to protect the

16   privacy of that individual, your Honor.

17          THE COURT:  All right.  If you hand the name up, I'll

18   maintain it under seal.  But it seems to me that the

19   government, perhaps just Mr. McKay should know who it is so

20   that he can identify whether that person had any responsive

21   documents.

22          MR. BALIN:  Your Honor, I apologize for interrupting.

23   I'm a lawyer representing the press, ABC, the New York Times,

24   Associated Press, CNN, and Newsday.

25          THE COURT:  I think you'd better come to the podium.

14G3COH1

1          MR. BALIN:  I think I better, too, your Honor.

2          I've sat and listened until we got to the point where

3     I realized there is a public access issue here, your Honor.  I

4     think that you got to start with two things -- I'm Robert

5     Balin, Davis, Wright, Tremaine.  Thank you very much.

6          One, your Honor, the Second Circuit in the very cases

7     that are before you has said that they've never actually held

8     that the attorney-client privilege is a higher value under the

9     First Amendment that may rebut the presumption of access.

10    That's number one.

11         Secondly, there is no credible claim that this

12    client's mere identity is attorney-client privileged

13    information.  Counsel for the government alluded to it.  Your

14    Honor, the law on this is pretty clear, too, and it is the

15    case, actually, the very case cited by Mr. Cohen's counsel.

16    It's the <u>Vingelli</u> case.  In the <u>Vingelli</u> case, the Court made

17    it very clear the general rule absent special circumstances is

18    there is no attorney-client privilege in the name of a client

19    except for two circumstances:  When naming that client would

20    somehow identify the communications with counsel, or, if the

21    communication is known but the source isn't, by naming that

22    client, again, same thing, it would be invading the

23    attorney-client communication.

24         Mr. Cohen's letter, which I read very closely this

25    morning, doesn't make that argument at all.  Mr. Cohen's letter

1    makes the argument that it would be embarrassing to be

2    associated with what he terms a raid on a house, at a home.

3    That argument was also expressly rejected in <u>Vingelli</u>.  And

4    your Honor, I must point you to the relevant paragraph because

5    I think it says it better than me.

6              THE COURT:  If you give me the beginning word, I'll

7    have the paragraph in front of me.

8              MR. BALIN:  "Disclosing," your Honor.  "Disclosing."

9              THE COURT:  I've got it.  I've got it.

10             MR. BALIN:  "Disclosing the client's name would not

11   necessarily reveal his or her purpose in consulting Attorney

12   Vingelli.  The client may harbor concern that he or she will be

13   tarnished by guilt by association.  Fear of such a tinge does

14   not suffice to show that revealing the client's identity would

15   be tantamount to exposing the purposes for which the client

16   sought legal services."

17             And lastly, your Honor, the rule governing the

18   unprivileged nature of client identification implicitly accepts

19   the fact that a client might retain or consult an attorney for

20   numerous reasons.

21             Your Honor, I hardly need to remind the Court of the

22   intense public interest in the issues that are currently before

23   this court.  I look around and I see that every other seat is

24   occupied by a member of the press.  Ultimately, however your

25   Honor rules, right, the public is going to want to know the

14G3COH1

```
 1   basis for your Honor's ruling.  That is the very nature of the
 2   First Amendment access right, so that we, the people, and the
 3   press, can monitor our institutions and have a rational basis
 4   for agreeing or disagreeing.
 5          And I hesitate to add, your Honor, that I suspect no
 6   matter how you rule, those in the public will agree or
 7   disagree.  That is what we do in society.
 8          Finally, your Honor, I would make one last point.  It
 9   was Justice Burger who I think put it well.  "People in our
10   open society do not demand infallibility from their
11   institutions.  But it is difficult for them to accept what they
12   are prohibited from observing." That was in Richmond
13   Newspapers v. Virginia many years ago.
14          Your Honor, I see no basis for denying public access.
15   If your Honor is going to order disclosure of this name, I see
16   no basis for denying public access to that name.
17          THE COURT:  Well, you're quite right that Vingelli
18   supports your position and it's good law in this district and
19   circuit, even though it's rather old.
20          I think you're right that Mr. Harrison has not met the
21   standard for an exception to the notion that client identity,
22   and even fee arrangements, must be revealed.
23          Mr. Harrison, tell me how you meet the Vingelli
24   standard for not disclosing the name of that client.
25          MR. RYAN:  Your Honor, let me summarize my position on
```

14G3COH1

this.

THE COURT:  Yes, Mr. Ryan.

MR. RYAN:  First of all, had a subpoena been issued, this person's name would never have been turned over.  It would have been non-responsive to any of the activity.

THE COURT:  This is not a subpoena.

MR. RYAN:  Second, we have a duty under Rule 1.6(15) to protect the identity of this.  The client has asked their identity be protected.

THE COURT:  That is not enough under <u>Vingelli</u>, and I point out to you that if a Court requires disclosure of the name, your client is off the hook.

MR. RYAN:  Finally, I think in the future this will affect people's willingness to consult an attorney if this is the end result, the end result of having done so where they're not associated with the event, but they've chosen an attorney who has been treated in this way.  And this could happen.  I don't think it's a proper message.

With regard to those cases, your Honor, I don't have another case to cite for you.  I have the name, I'll hand it up to the Court.  But this is what -- this is what we were trying to avoid.  Because if the Court's not going to grant our application, this is unnecessary to publicize this person's name.

THE COURT:  Let's take one thing at a time.  Under

14G3COH1

Vingelli, you have not made out that your client meets the
exception at all.  And hence, I rule it must be disclosed
publicly now.

          MR. McKAY:  Your Honor, if I may.  I just briefly want
to respond to this whole line of inquiry because I think it is
important to emphasize that although I think the Court and
counsel for the New York Times are right about the issue of
disclosure of this nature, that's not why we're focused on it.
I want to make sure the government's point is clear on this.
That is, what Mr. Ryan just said was if this was a subpoena,
this name would be not responsive to it.

          It is not a subpoena, it is a search warrant.  But
still I believe he said earlier that this name would not be
covered by any of the descriptions in the rider for the search
warrant, i.e., materials relating to this individual aren't
responsive to the search warrant.  Now, without the name, we
don't know that.  Right.

          So this is a perfect illustration of what is going to
happen if Mr. Cohen's proposal carries the day.  Is that
they're going to hide behind attorney-client privilege to try
to not disclose facts like this one which the Court has made
very clear they have an obligation to disclose.  And then use
that to try to hide behind, or prevent us from reviewing
documents that may well be non-privileged and responsive to the
warrant.

1              I just pulled out the Stewart case and confirmed what

2    I had said earlier, because I wasn't positive, I want to make

3    clear.  At page 9 of the Stewart case, the Court makes clear

4    that although the government will not have the opportunity to

5    review any of the documents for which a privilege has been

6    asserted before raising objections to the special master's

7    determinations, it then goes on to say the special master may

8    make some calls in their favor nevertheless.

9              So I think what I said earlier was correct, that there

10   was a privilege log prepared in Stewart, and the government

11   wasn't able to actually see the underlying documents that they

12   sought to challenge.

13             So what Mr. Ryan just said, that documents relating to

14   this client will be non-responsive to the search warrant

15   illustrates our point exactly.  If they are going to continue

16   to hide behind overbroad and incorrect claims of privilege, the

17   process isn't going to work.

18             THE COURT:  Give me again your point on Stewart?  It

19   was page 7?

20             MR. McKAY:  Page 9, your Honor.  Throughout the

21   opinion there is discussion of how the defendant will prepare a

22   privilege log.  But there at the bottom of page 9 it describes

23   how the government won't actually see the documents.

24             And I would point out again that that's the concern

25   that Judge Jones raised in Grant, and that's at page 2 of

14G3COH1

1    <u>Grant</u>.  She explained that without the benefit of such review,

2    i.e., review of content of the documents, the privilege team

3    would be likely unable to argue, for example, that no

4    attorney-client attached.

5            THE COURT:  You're touching on a point that concerns

6    me with respect to privilege logs because they often don't

7    convey enough so that the other side can actually know what's

8    in there, and they take a very long time to prepare.  They took

9    a very long time in <u>Stewart</u>.  So I'm not sure that a privilege

10   log does the trick.

11           MR. McKAY:  Your Honor, that's exactly the concern

12   that we're expressing, both Mr. Cohen's proposal and the

13   special master.  I don't see how either of those two proposals

14   can work without someone preparing a privilege log.  Whether it

15   is Mr. Cohen in the first instance, or the special master.

16   Because either way, if they're going to determine that certain

17   documents aren't privileged, they need to find a way to

18   communicate that to the government.  And if they're not going

19   to show the privileged documents or the potentially privileged

20   documents to the government, the next best thing is a privilege

21   log.  It is an incredibly time-consuming process, it is not

22   particularly effective, as Judge Jones has described in this

23   context.  And so that's why we think our proposal is the most

24   efficient and in many ways the most protective of the

25   privilege.

14G3COH1

1            THE COURT:  Mr. Harrison.

2            MR. HARRISON:  Can I respond to Mr. McKay, your Honor?

3            THE COURT:  Certainly.

4            MR. HARRISON:  Thank you, Judge.  Thank you.  Good to

5   see you this afternoon.  Thank you very much for giving us the

6   time over the weekend to really do properly the work that we

7   needed to do.

8            And with all due respect to Mr. McKay, who is an

9   excellent advocate, a lot of things he says just don't match up

10   with the facts as we know them in this case.  It seems like

11   something that he prepared to say before we submitted our

12   10 a.m. letter.  Because he says that we're trying to hide

13   behind an overbroad exertion of the privilege.

14            We spent a lot of time this weekend narrowing things

15   down.  And we got it down to one person who has requested of

16   our client that his identity remain -- not go out into the

17   public domain.  It is an understandable reaction on his part.

18   It doesn't make a whole lot of difference to us in this case.

19   We were willing to disclose it to the Court and to the

20   government, which is what Mr. Ryan was saying he was willing to

21   do.  We got an instruction that we're trying to comply with

22   from one of Mr. Cohen's clients.

23            So, to narrow it down to one individual out of all the

24   individuals that Mr. Cohen has represented in the past, as we

25   put in our 10 a.m. letter this morning, was a pretty good

14G3COH1

1    effort and I think demonstrates pretty clearly we're not trying

2    to hide behind an overbroad assertion of the privilege.

3    Another point that Mr. McKay --

4              THE COURT:  I just don't understand the argument that

5    just because this undisclosed client consulted Mr. Cohen, that

6    that is somehow embarrassing or an invasion of privacy.  That's

7    not enough under case law, and I don't understand it factually.

8    I understand that he doesn't want his name out there.  But,

9    that's not enough under the law.

10             MR. HARRISON:  I understand, your Honor.  We

11   understand Mr. Cohen, and frankly, derivatively, our ethical

12   obligations to be as we laid them out of our letter of 10 a.m.

13   But if the Court disagrees and rules against us, we'll do

14   whatever the Court directs us to do.

15             THE COURT:  I'm directing you to disclose the name

16   now.

17             MR. RYAN:  Do you want me to stand and say it or

18   should I give you the piece of paper that you told me to write.

19             THE COURT:  Whatever you are most comfortable with.

20             MR. RYAN:  The client's name that is involved is Sean

21   Hannity.

22             THE COURT:  Thank you.

23             MR. HARRISON:  Judge, to continue just responding to

24   what Mr. McKay said about the various factors.  Going back

25   through Mr. McKay's comments first and then I'll turn to my

14G3COH1

1  sort of more prepared remarks.  The next thing --

2          THE COURT:  May I, before we get to that, I would like

3  to have someone on each team be thinking if I were to appoint a

4  special master to deal with some set of the documents, can you

5  give me four names, can each side give me four names.  I

6  haven't decided this yet, but I'd like to at least be ready for

7  it.  Go ahead.

8          MR. HARRISON:  Thank you, your Honor.  So just going

9  back through Mr. McKay's remarks.  The next thing he discussed

10  didn't make a whole lot of sense in light of our 10 a.m. letter

11  either.  He talked about the fact that we had said in our

12  letter that Mr. Cohen previously had strategic and business

13  related clients.  And he did.  He had a number of them.  And as

14  we pointed out in our letter, we went back and reviewed that

15  stuff, reviewed his relationship with those clients, and as we

16  said in our letter, I think it is an arguable proposition for

17  us and Mr. Cohen as to whether they are legal clients or not.

18  These are often very hard questions to determine.  It is a

19  mixed issue of facts and how the relationship played out.

20          At the end of the day, we took a very conservative

21  position and we told the Court and the government that we were

22  not going to claim that they were legal clients, and we were

23  not going to claim that those were privileged relationships

24  that would be covered by the privilege.

25          So I don't really understand Mr. McKay's point in

14G3COH1

1    relation to those clients that we were making an overbroad

2    claim of privilege.  We did exactly the opposite per the

3    Court's instruction on Friday.  So, that didn't make a whole

4    lot of sense.

5            Mr. McKay also said a couple of times referred to the

6    focus on the volume of materials here.  But he doesn't know

7    what the volume of materials are.  It seems pretty clear to us,

8    just based on the little we know and looking at the list of

9    things that were seized, and I won't get into the detail, but a

10   lot of electronic media that there is most likely a lot, a

11   decent amount, at the very least, of documents, e-mails and

12   other documents on there.  So, there probably is a decent

13   amount of volume.

14           But Mr. McKay makes a good point about the fact that

15   there aren't -- makes a good point about the fact that we can

16   conceivably limit this search in time and subject.  And I think

17   a special master could do that and you could certainly do that.

18   That's something we could work with the Court and the

19   government on.

20           My guess is, I don't know, Judge, because I don't know

21   the volume of the materials, I don't know exactly what's on

22   there.  But my guess is that this could be done in a relatively

23   short, in relatively short order and wouldn't be some lengthy

24   review like in the Lynne Stewart case.

25           THE COURT:  What would make this case easier than the

14G3COH1

Lynne Stewart case?  That case had three boxes of documents.

MR. HARRISON:  Well, Judge, just based on what
Mr. McKay said, it sounds like we can probably work out a limit
on time.  For instance, if he's saying that things before the
time period that Mr. Cohen was at the Trump Organization
starting in either late 2006 or early 2007, I keep getting that
mixed up.  But from before that time period is not relevant,
then probably will cut off a certain number of documents.

THE COURT:  I wonder if you could confer with your
client to give us his best estimate of the total number of
documents.

MR. HARRISON:  Judge, I can tell you we don't know.
We really don't know.  And I think that if anybody can sort of
relate to that, if all of my documents and electronic media
were seized, I wouldn't know how much stuff was on there.  I
wouldn't necessarily know what was on there.  Especially if it
went back a number of years.  If you seized all the documents
in my office and my house, I would have not a very good idea
how many documents had been seized, especially when we're
talking about a lot of electronic media.

Mr. McKay also said that a couple times in the
beginning of his remarks that we had sort of been misleading
and misled the Court when we said there were thousands of
documents.  There is no doubt that there's thousands of
documents.  I am even more sure of that assertion today than I

14G3COH1

1    was on Friday.  Thousands of documents that have been seized.

2    The next question is how many privileged documents or

3    privileged relationships are within that seizure.  And we laid

4    that out a little bit in our 10 a.m. letter for the Court, and

5    I think it is worth going over a little bit.  Because it is

6    more complicated than the government makes out.

7              Even if we just start in 2007, Judge, when Mr. Cohen

8    started at the Trump Organization, and we ignore his many years

9    of law firms dealing with clients before that, we still have a

10   number of privilege relationships there.  During his time at

11   the Trump Organization, Mr. Cohen's a lawyer for the Trump

12   Organization, we assume that there are a number of Trump

13   Organization related documents in what was seized.  Mr. Cohen

14   was also the personal attorney for Mr. Trump during that period

15   that he was at the Trump Organization.  We assume that there

16   are privileged documents related to that legal relationship.

17   During that period, Mr. Cohen was also a lawyer at the Trump

18   Organization, as we laid out, who was managing the

19   organization's relationships with outside attorneys who were

20   handling any number of matters around the world.  Litigation,

21   real estate issues, corporate issues.  And the nature of all

22   those relationships is really something that Mr. Cohen is, and

23   we as his attorneys are going to have much more familiarity

24   with in the first instance than the government will.

25             I can tell you, I don't believe, Judge, that in that

14G3COH1

1    section where we laid out outside attorneys with whom Mr. Cohen

2    had a legal relationship, either as a client or as a lawyer

3    overseeing their work for his client, my guess is there are

4    more attorney relationships like that.

5        While he was a lawyer at the Trump Organization, he

6    had, he managed a number of different outside firms.  I don't

7    think, going back 10 or 10 years or over 10 years he can

8    remember all the lawyers that he dealt with on different legal

9    outside legal matters.

10        So, I think there are going to be some other issues

11    that crop up like this that we and Mr. Cohen will recognize

12    immediately if we are doing the review that are privileged.

13    When you're putting on a privilege log communications between

14    Mr. Cohen and an outside law firm that's not going -- that's

15    not going to be much of an issue I don't think, Judge, but

16    we're going to be best placed to do that review, either with

17    the privilege holders, the Trump Organization, or in some

18    instances with Mr. Trump as Joanna, Ms. Hendon will get to in a

19    minute.

20        So there are a number of relationships there that are

21    very tricky, and it won't be obvious on a review, but we'll

22    know what they are.  And I don't think that they're going to be

23    an issue at all.

24        Judge, let me just go back again.  This, as the Court

25    knows, Mr. McKay said a couple time this is just a normal case

14G3COH1

1    like any other white collar case.  That's just not correct.

2    We're talking about an unprecedented raid on the office and the

3    home of the sitting President of the United States' personal

4    attorney, during the course of which the government seized all

5    the records, paper, electronic, whatever else, was in

6    Mr. Cohen's home and his temporary residence and his office,

7    without regard to whether those materials fit within the four

8    corners of the warrant.

9         Now that's not unusual, Judge, and I'm not accusing

10   the government of doing anything improper necessarily there.  I

11   don't know exactly how it was done and what happened.  We may

12   get to those issues at some other time.  I'm not accusing them

13   of doing anything wrong.  I'm just saying when you execute a

14   search warrant like that, just by its very nature, and

15   Mr. McKay touched on this as well, you sweep up a ton of

16   documents that are not related to the warrant, that are not

17   related to the probable cause determination that an independent

18   magistrate judge has signed off on.

19        And in the normal case, maybe some other procedure

20   would be okay.  Not in this one, Judge.  The stakes are too

21   high.  Everyone is watching this case.  There are partisan

22   attacks going back and forth from this side to that side.

23   50 percent of America thinks that this general investigation is

24   unfair.  50 percent think it is a great idea.  I don't take

25   sides on the issue, Judge.  All I say is, the American public

14G3COH1

 1   is watching this, and I don't think a lot of people feel

 2   comfortable or think in their gut that it's right that the

 3   government can execute a search warrant in this case, on the

 4   sitting President of the United States, an investigation into

 5   what appears to be in his personal life, sweep up a whole bunch

 6   of documents and look at all of them without regard to what

 7   they are and without regard to whether they're pursuant to the

 8   warrant.

 9              (Continued on next page)

I4GMCOH2

1          MR. HARRISON:  I think that this case is incredibly

2     different.

3          THE COURT:  I think you are overstating your problem

4     because Mr. McKay has narrowed his approach and what he intends

5     to look at.

6          MR. HARRISON:  That's not clear to me, Judge, and I'm

7     sure we can work something out with the government and with a

8     special master and with the Court's involvement, if necessary.

9     We do need to hammer out guidelines.  Whatever course the Court

10    picks, we certainly need to hammer out guidelines.

11          I'm not aware from any of the remarks that Mr. McKay

12    made that any of his guidelines or suggested guidelines are

13    going to solve that problem.  My understanding is the

14    government is going to look at everything.  Whether it's with a

15    taint team or some other way, they are going to look at every

16    scrap of paper that they got through the execution of this

17    warrant, and we don't think that's fair in the first instance,

18    which is why we have made the request to the Court in this

19    extraordinary case to let us do, as in the *Lynne Stewart* case,

20    not just the initial review for privilege along with the

21    privilege holders, who will have the best idea of what that

22    true legal relationship was, but also for responsiveness.  We

23    think that's only fair.  I think that's something that would

24    make sense to the average American.  That should be done.

25          And I think America, frankly, is looking to the Court

I4GMCOH2

as the third coequal branch of government in this fight that's

going on in the executive and legislative branch to give people

a sense that things are fair, to give people a sense that this

is being done impartially, to give people a sense that there is

the appearance of fairness, Judge, in addition to fairness.

And I'll say again, your Honor, I'm not accusing the

government of doing anything wrong legally here.  I'm not.

There is nothing legally wrong in the way that they executed

the search warrant.  All I'm saying is, it's the nature of

search warrants versus the service of a subpoena to sweep up a

whole bunch of stuff that is not being seized pursuant to or

within the scope of an independent review by a federal judge.

That's an important distinction here and it's what makes this

case, in addition to the fact that it's an unprecedented raid

and seizure of the sitting president's personal attorney.

Those two factors together make it combustible, Judge.

That's why the press is all here.  That's why everybody is

looking at this case.  That's why there are commentators

arguing with each other on all the different news networks

about what we are talking about here today.  It's important in

this particular case.  It's different, Judge.  It's important

here to get it right and tell people we are doing this fairly,

not that the government is doing anything wrong.

I say that again because it's an important point to

make.  But why not have a special master, at the very least,

I4GMCOH2

1    your Honor?  Why not send a message to people, we are going to

2    make sure we get this right.  We are going to make sure it's

3    fair.  We are going to make sure everybody think it's

4    impartial.

5            Frankly, I wish the government had joined me in our

6    application for a special master.  We could have gotten through

7    this much faster.  We reached out to them last week, before we

8    filed our papers, to see whether if they would be willing to do

9    that, and they weren't.  I think it makes sense for everybody

10   concerned.  That's our application, Judge.

11           THE COURT:  Thank you.

12           Mr. McKay.

13           MR. McKAY:  Your Honor.  Where to begin.  This isn't a

14   battle between the different branches of government.  Career

15   prosecutors in the Department of Justice went to a federal

16   magistrate judge and got a search warrant based upon a showing

17   of probable cause that there would be evidence of crime in

18   Michael Cohen's premises.  Just because he has a powerful

19   client doesn't mean he's entitled to different treatment.

20   Everyone is watching this case, that may be true.  That's all

21   the more reason why the Court should follow the normal

22   procedure for cases like this in this district.

23           Mr. Harrison said he doesn't take sides in the

24   partisan political attack.  No one from this side of the table

25   has tried to drum up media attention about this case, but

I4GMCOH2

Mr. Harrison's law partner did on the day the searches were

executed.  You heard again and again and again during

Mr. Harrison's comments that they assumed there are documents

from the Trump Organization.  They assume there may be some

documents related to other clients.

On Friday you gave defense counsel a job.  Over the

government's objection you gave them an adjournment until

Monday to sit with their client, review the materials, which I

emphasize again, they have the electronic devices.  They have

the materials.  They have the opportunity to look and see

what's on there.  They didn't do it.  They took the whole

weekend.  They didn't do it.  They gave you more vague

assertions about how we don't know if there are documents

relating to these old clients.  They said nothing about whether

there are Trump Organization documents still in Mr. Cohen's

possession.  I think he just said he assumes that there may be.

That's not a basis on which for the Court to conclude that the

premise of their motion is correct.

The premise of their motion is that this is an

unprecedented raid on the law office of an attorney.  Because

we have established -- when they filed their motion they said

it wasn't thousands of documents; it was thousands, if not

millions, of privileged documents.  Now we learned that over

the last year and a half it's of three clients.

We are not getting down into the details of the

I4GMCOH2

1    clients' names or the amount of clients because we thought it

2    was something interesting to find out.  It is because it was

3    the fundamental premise of their motion.  They tried to put

4    this in the *Lynne Stewart* box.  And when we pressed them on

5    those factual assertions, when the Court asked for evidence to

6    substantiate their claims, they came up empty.  They came up

7    empty.  So their motion should be denied because the factual

8    premise for it is faulty.

9        They talk about making limits in time and subject

10   matter, but this is not realistically going to work.  We are

11   happy to take reasonable proposals from defense counsel.  For

12   instance, Mr. Trump's letter asked that the government provide

13   Mr. Cohen and his counsel with a copy of the seized materials,

14   all of the seized materials and to identify to the President

15   all seized materials that relate to him in any way.  Mr. Trump,

16   President Trump, one of the most talked about people on the

17   planet, Mr. Cohen worked for him for many years.  Mr. Cohen's

18   signature line in his e-mail box used to say special counsel of

19   the Trump Organization.  Now it says personal attorney to the

20   President.  An enormous volume of Mr. Cohen's documents, the

21   vast majority are likely to, quote, relate to President Trump

22   in any way.

23       That's not what attorney-client privilege is, however.

24   Attorney-client privilege is much, much narrower than that.  By

25   their requests now, by the things they are asking for now, in

I4GMCOH2

1    the interest of trying to sound reasonable, trying to sound

2    limited, they are just setting the stage for what's going to

3    happen when the Court, if the Court orders a special master,

4    orders their proposal, which is that they are going to take

5    that inch and they are going to take it a mile.  They are going

6    to use that wedge that the Court has given them to chip away,

7    chip away, make broader and broader claims of privilege and

8    slow down this ongoing criminal investigation because it is in

9    Mr. Cohen's interest to do so.

10          I cited the example of the business relationship at

11   the outset.  Not because I prepared my remarks before the

12   letter was filed, I prepared them after the letter was filed,

13   but it's because they made an overbroad assertion on Thursday

14   about the number of clients that Mr. Cohen had.  And when the

15   Court held their feet to the fire they came back and they said,

16   well, we have narrowed this.  We are not asserting these

17   business interests that he has.  And that's because when the

18   rubber meets the road, when it comes time to actually proving

19   evidence of these attorney-client relationships, they can't do

20   that except with respect to three clients.

21          So this is a preview of the type of litigation you are

22   going to have if we find ourselves in one of their proposed

23   procedures.  They are going to start by bidding high in terms

24   of the amount of privileged material, just as they did in these

25   proceedings, and only once the special master or the

I4GMCOH2

1    government, if we are able to, although we are not able to see

2    the documents under those procedures, calls them on it and a

3    Court calls them on it are they actually going to come back to

4    a more reasonable interpretation of attorney-client privilege.

5    And even today the Court had directly ordered them to disclose

6    a name that under case law is obviously not privileged.  You

7    had to directly order them in open court.  You had to drag it

8    out of them.  That's what we are going to be dealing with if

9    the Court orders a special master.  It's going to go on for

10   months, maybe years, just like the *Lynne Stewart* case.

11           MR. HARRISON:  Judge, very briefly to respond to that.

12   Mr. McKay keeps talking about how bad we are going to be in the

13   future.  We are pretty good people, Judge, and I think that the

14   10 a.m. letter --

15           THE COURT:  It's not that you are not good people.

16           MR. HARRISON:  I'm joking, Judge.

17           THE COURT:  It's that you have miscited the law at

18   times.

19           Go ahead.

20           MR. HARRISON:  Well, I don't know that we have

21   miscited the law, Judge.  But I will say that we have not

22   slowed down anything.

23           Let me just explain last week and what happened.

24   Mr. Cohen's law office and home and everything else was raided

25   on Monday.  I came onto the case on Monday night or Tuesday.

I4GMCOH2

So when we appeared in front of the Court and filed our papers
and appeared in front of the Court on Friday, I had been on the
case for two and a half, three days maybe.  We hadn't had time
to sit down with our client and go over all this information
about what had happened.  And so when we had our discussions in
court on Friday, I explained it.  I don't know that I got into
enough detail.  I probably should have gotten into more detail
about how recently I had gotten into the case.  I had been in
it for three days.  I needed time to sit down and figure things
out.

          THE COURT:  I am going to interrupt you for a moment.
Your letter says on page 2 that Steven Ryan of your firm has
been working on the special counsel's investigation, the
related House of Representatives and Senate inquiries
regarding, among other things, campaign finance matters.  I
recognize that Mr. Harrison personally just came to this, but
Mr. Ryan has been in it for a while, right.

          MR. RYAN:  Can I just mention, your Honor, if you
think of swim lanes in a pool, my swim lane was Russia and the
related issues to Russia.

          THE COURT:  It says in the letter, as well as campaign
financing --

          MR. RYAN:  That's only happened within the last few
weeks and it's in relationship to federal campaign law issues,
which is this narrow.

I4GMCOH2

1          With all due respect, all of us started on Monday with

2     a completely different matter.  I want to say, there are five

3     paragraphs in that attachment A that deal directly with seeking

4     the papers of the President of the United States in possession

5     of my client.  It is not what the government has represented is

6     about my client's personal life.  There are five paragraphs

7     there.  This case is that.  And we spent the weekend, frankly,

8     narrowing the issues, taking issues off the table.

9          Here is what I can tell you.  I know that materials

10    for TO, for the Trump Organization, are in the materials that

11    have been seized, so there are some materials for the Trump

12    Organization.  But the key here is a priority.  The Court can

13    order a prioritization of where a special master is needed and

14    it's needed with respect to the papers that may contain

15    privileged information about the President of the United

16    States.

17         That's the core of why Mr. Cohen on Thursday filed

18    this motion and why we believe it's still an important motion

19    and, candidly, I'm glad we withdrew claims of broader amounts

20    of privilege because we can't sustain them from the paper we

21    have now.  And we have done the right thing there and we ask

22    that the Court look with favor on the proposal that we have

23    made with regard to the special master.

24         THE COURT:  I'm intrigued by your suggestion of

25    prioritization.  Do you have a proposal for what would be

I4GMCOH2

1      prioritized?

2              MR. RYAN:  Yes.  I believe that, obviously, the issues

3      that are of the greatest importance relate to the President of

4      the United States and that the special master's role would be

5      initially directed at that.  And then what we could do is work

6      with the U.S. Attorney's Office on the prioritization of other

7      issues.  Trump Org would have to be prioritized.  I think the

8      Trump Org legal issues that he has been involved in are

9      probably frankly very easily to deal with, notwithstanding the

10     larger volume of documents.  I think that's an example of the

11     thinking that we would like to work with.

12             Candidly, this man's life has been turned upside down

13     in the past week.  We were working on the Russia case for a

14     year and, candidly, I believe the Russia case with regard to my

15     client is a complete dry hole and now we have a completely

16     different matter, so I will apologize if there are any mistakes

17     that have been made there.

18             This Court has something that's never occurred in the

19     history of the United States, which is, the papers related to

20     the President of the United States have been taken from his

21     personal attorney in a search warrant and all of them are going

22     to be reviewed by the government, that is, the FBI and

23     Assistant U.S. Attorneys, whether they are on a taint team or

24     on the actual trial team.  And candidly --

25             THE COURT:  They certainly will not be given to the

I4GMCOH2

1    trial team.

2           MR. RYAN:  Understood.  But there will always be an

3    Assistant U.S. Attorney there.  There will always be an 1811

4    doing it for the government and, candidly, that is not

5    necessary.  The materials are now within the government's

6    possession.  They can't be harmed.  This case has come out of

7    the blue and it can just take a few weeks to straighten this

8    out.  It won't take that long.

9           THE COURT:  What would be straightened out in a few

10   weeks?

11          MR. RYAN:  We will know which materials related to the

12   President of the United States or other people who have been

13   swept into this don't have to be going forward because the

14   special master can make a determination that the United States

15   Attorney's Office can then challenge with regard to those

16   privileged documents.

17          THE COURT:  How soon can you produce what you believe

18   are privileged documents relating to the President?  You

19   mentioned a few weeks.  What can you do?

20          MR. RYAN:  Your Honor, we are a large law firm.  We

21   have resources.  We know how to do this.  I've practiced law

22   for 37 years.  I've tried organized crime cases here in New

23   York in the Southern District.  I've argued in the Court of

24   Appeals here.  I give the Court my answer that we will do it as

25   absolutely fast as we can with no purpose of delay in handling

I4GMCOH2

1    this issue.

2            THE COURT:  That's exactly what was said in *Lynne*

3    *Stewart*, which gives one pause.

4            MR. RYAN:  On the other hand, we are all officers of

5    the court.  Candidly, I don't know the volume, which is why I

6    can't make a promise.  But I'm the one who put the

7    prioritization issue on the table for you.  I'm trying to solve

8    the problem, not perpetuate it.

9            THE COURT:  Mr. McKay.

10            MR. McKAY:  Your Honor, in prioritizing the

11    President's communications, Mr. Ryan hasn't cited any legal

12    authority why those should be prioritized over other privileged

13    relationships Mr. Cohen may have.  The other individual he put

14    in his letter, the individual whose name he raised today, their

15    privilege is no different from the President of the United

16    States' privilege.

17            I understand the sensitivity of reviewing those

18    documents, but without a legal basis why he should be treated

19    differently, I don't know that their proposal makes any sense.

20    But, more importantly, the pledge that you just got was

21    something like, as fast as we can with no purpose of delay.

22    That will not hold up.  If there were going to be a

23    prioritization and there were going to be some pledge, I think

24    it should be in the form of a court order saying that the

25    privilege log needs to be created and submitted to the special

I4GMCOH2

1   master, if that's the way the Court goes, by date certain.

2            THE COURT:  I know that other courts have done that

3   and they have given law firms two to three weeks to come up

4   with a privilege log.  It's hard for me to pick a reasonable

5   amount of time until I know the volume.

6            MR. McKAY:  I think what would happen is, if we are

7   going down this hypothetical, before anything could be provided

8   to the special master and/or Mr. Cohen's counsel and/or the

9   President's counsel, we would need to do a few things that we

10  haven't done yet because of the pendency of this litigation.

11  For physical documents we would have to scan them and upload

12  onto an electronic system.  With respect to hard drives that

13  have already been imaged we need to put them onto the

14  electronic database.

15           I believe there are a few electronic devices, I think

16  just cell phones, that haven't yet been fully imaged.  Those

17  would need to be imaged and put up onto the system.  There

18  would be a little bit of logistical leg work on our hand before

19  it could get started.  The next thing that would happen would

20  be that however we are going to define the relevant priority,

21  we would need to come up with how you define that universe.

22           As I said before, the way the President has proposed

23  to define documents that he has an interest in is any document

24  that relates in any way to him.

25           THE COURT:  I know that and that's problematic.

I4GMCOH2

1           MR. McKAY:  Clearly going to be overbroad.  We would
2     need to find a narrower definition or set of search terms that
3     would govern how you narrow the field.
4           THE COURT:  I'll be looking to Ms. Hendon to address
5     this after Mr. McKay.
6           MS. HENDON:  Any time, your Honor.
7           MR. McKAY:  After you do that, we would have -- here
8     is another thing.  If you are going to do it that way, there is
9     a separate question.  Does the filter team do the uploading and
10    sorting on the electronic database?  Not reviewing documents,
11    but making these sort of mechanical sorting into the priority
12    review set.  Or does a special master do that.  I think that
13    would pragmatically have to be done by the filter time because
14    all of these electronic databases that we have already in place
15    up and running, using in this case, using in other cases that
16    work along with the FBI cart teams, electronic seizure system,
17    that would all be greatly delayed if you put that task on a
18    special master --
19          THE COURT:  I agree.  I would be glad to hear
20    Mr. Harrison and Ms. Hendon on this, but I do think the
21    government would need to be the entity that puts everything up
22    on the system.  Not that they are reading documents, but just
23    puts them on the system that they can be numbered, identified,
24    and given to Mr. Cohen's counsel, Ms. Hendon.
25          MR. McKAY:  Your Honor, I think that's the logistics

I4GMCOH2

1    that would have to happen.  Once that happens, we will have a

2    sense of the volume and then I think the Court could set a

3    realistic deadline for the completion of a privilege log by the

4    special master and/or defense counsel, however the mechanics

5    are going to work out.  But I emphasize again, those are the

6    logistics that would be required to follow that proposal.  We

7    don't think that proposal is necessary or appropriate in this

8    case.

9              THE COURT:  Which proposal?

10              MR. McKAY:  The proposal to narrow the field to the

11    set of President Trump documents and have a special master do

12    the privilege calls on those.  In the *Lynne Stewart* case, as

13    you said, it was just a few boxes of documents and it took a

14    special master more than a year to produce a privilege log.

15              What we have already seen from the overbroad privilege

16    claims that started on Thursday and the gentle walking back of

17    those facts, Mr. Harrison said he had only been on the case for

18    two and a half days.  Then don't file a sworn affirmation

19    asserting facts that you don't have knowledge of.

20              The fact that they have already made these overbroad

21    claims is proof positive that if we follow this approach we are

22    going to have more of the same down the road, and whatever

23    deadline the Court sets is going to get pushed back by more and

24    more litigation of these claims.

25              And so no one has yet given a basis why President

I4GMCOH2

1   Trump's assertion of attorney-client privilege is any different

2   from any other citizen of the United States.  It's more

3   interesting to the media, but his attorney-client privilege is

4   the same as any other individual.  Without that legal basis, we

5   don't see a reason for the Court to carve out an exception that

6   applies only to the President and give him a procedure that is

7   different from the procedure that happens in many, many cases

8   in this district.

9           THE COURT:  How long do you think it would take for

10   the government to put everything up on the system?

11           MR. McKAY:  Your Honor, I think we absolutely could

12   get -- if you did it on a rolling basis, we could get a large

13   volume of documents up in a fairly short order, a week or two

14   at most.  There may be certain devices, for example, for which

15   we don't have the pass code that have to be sent down to

16   Quantico to decrypt.  Those things may take longer.  But the

17   majority of evidence I think we could probably have up and

18   ready in a week or two.

19           THE COURT:  Ms. Hendon, do you wish to be heard?

20           MS. HENDON:  Yes, your Honor.  Thank you.

21           Good afternoon, your Honor.  I would just like to make

22   clear at the outset that on behalf of the President we are

23   seeking a temporary restraining order and a preliminary

24   injunction prohibiting the government from beginning any review

25   of the materials seized from Mr. Cohen until such time as (1)

I4GMCOH2

1    copies of the seized materials have been provided to Mr. Cohen

2    (2) Mr. Cohen has provided to his client through the

3    President's counsel, me, the subset of materials that relate to

4    the President and (3) the President has had the opportunity to

5    review the subset of materials for any materials that we

6    believe are covered by the attorney-client privilege or work

7    product protection.

8              THE COURT:  How much time a week could your client

9    devote to this job?

10             MS. HENDON:  Your Honor, what I expect is that as in

11   every discovery matter that I've ever been involved in,

12   criminal or civil, the district court sets a schedule for each

13   phase of the discovery matter at issue.  The parties are heard

14   on whether they think the schedule is fair and reasonable or

15   not.  The Court rules and the parties obey the Court's ruling

16   and the parties, the clients themselves, do what is required by

17   their counsel, who has appeared before your Honor, to abide by

18   the Court's schedule.

19             THE COURT:  Right.  I just want to try to figure out

20   what's a reasonable schedule.

21             MS. HENDON:  Your Honor, we can't possibly know that

22   today.  I want to make the point that the reason we can't know

23   that is because the government elected unilaterally, as is

24   their right, to seek and obtain a search warrant and sweep up

25   probably vast amounts of documents and data from the offices of

I4GMCOH2

1   a lawyer.

2              So in order for me to be in a position to prepare a

3   privilege log, two things have to happen.  The seized data,

4   some of which, somewhere throughout, contains records and

5   evidence of the representations that Mr. Cohen has engaged in

6   on behalf of my client.  I don't know where it is.  I don't

7   know how much it is.  And my client doesn't know those things

8   either, because clients don't know what's inside their lawyer's

9   files.  Clients don't know what work product and communications

10  are being engaged in and created every day that the lawyer is

11  working for the client.  Mr. Cohen needs to get that -- I'm

12  afraid, because it is occurring -- all of the materials seized

13  so that Mr. Cohen can make an assessment as to "what in here

14  relates to the work I did for the President."

15             Now, that doesn't mean every piece of paper with the

16  word Trump on it, for obvious reasons, but some amount of that

17  material was generated, whether e-mails from Mr. Cohen to

18  others or work product generated by Mr. Cohen, or I don't know

19  what.  I don't know what's in Mr. Cohen's law files.  But some

20  amount of that material was generated in the course of

21  representing my client.  Mr. Cohen needs to identify that

22  material and get it to me so that I can then review it and make

23  claims of privilege advised by my client.

24             Now, it may be that we overdesignate privilege.  That

25  sometimes happens in discovery matters.  Not through any

I4GMCOH2

intention of overdesignating privilege, but we may think

something is privileged, this happens all the time, and put it

on a log.  And one day a Court decides you know what, I have

heard your proffered privilege, Mr. President.  I'm not

persuaded.  This document is not privileged.

       There is some risk that the holder of the privilege is

going to put things on his or her privilege log that the Court

might one day say are not privileged.  This happens all the

time.  But this is what has to take place here.  We will create

a privilege log.  If your Honor orders that the privilege log

contains specifics or particular information so that some of

the frailties of privilege logs that your Honor alluded to

earlier are absent from this case, we will follow your Honor's

order, and then we provide the privilege log as we would in any

litigation, civil or criminal, to the government, and the

government will look at the privilege log and maybe they will

call me and say, you know what, items 1 through 15 are so

vague, we don't understand what they mean.  And I may say,

well, that's all you are getting because I think I complied

with Judge Wood's order, and they may come to your Honor and

say, it's too vague, and you may come back to me and say, put

more information.  This is what happens.

       The government then comes to your Honor and says,

items 1 through 15, we have reason to believe these are not

privileged.  Your Honor directs me to provide the documents to

I4GMCOH2

you, to your Honor in camera.  You hear argument from me on
behalf of my client as to whether I can establish privilege,
your Honor makes a decision, and I'm bound by your Honor's
decision.

          Now, it will take a long time here, but it's going to
take a long time because of the mechanism the government chose
to use in order to obtain information from Mr. Cohen.  When you
proceed by search warrant, you necessarily obtain vast amounts
of data.  It's different than proceeding by search warrant.
That's fine, but the fact that this is going to take time is
not to be held against the privilege holder.  It's just a fact.

          The privilege, your Honor, has been recognized for
more than 400 years.  It's the oldest of the privileges known
to the common law and the most revered.  Nothing less than the
fair and just operation of our legal system, which is a beacon
to the world and to history, depends on this privilege and
without it, no client could speak freely with counsel and no
attorney could competently serve their client.  So, yes,
privilege logs are a real pain for everybody.  They always have
been, they always will be.  No one likes preparing them, no one
likes making challenges to them.  Judges don't like having to
adjudicate disputes over them, but we do this day in and day
out in federal courts across the country because it is the only
way to vindicate the rights of the privilege holder.

          Once we have from Mr. Cohen the set of materials --

I4GMCOH2

again, it's not every piece of paper with the word Trump on it,
but it's the e-mails he wrote and received.  They might not
have been with Mr. Trump.  They might have been with -- I am
not going to go into the scenarios that could play out in any
lawyers' practice.  Those are in our brief.

        But what we obtain from Mr. Cohen, the communications,
records, Post-it notes, whatever he finds in the materials
given back to him by the government, that evidence would
reflect work he did on behalf of the President.  We will review
that material and prepare a log and get it to the government on
the schedule that your Honor orders.  It's just that simple.

        I agree with Mr. McKay, we are not here asking for
anything special or different in this case.  I'm asking for the
President to have the opportunity to protect this sacred
privilege that is given to litigants in contract disputes,
slip-and-fall cases, dog bite cases, any case that I think any
of us could name before any court.

        As the holder of the attorney-client privilege over
materials seized by the government from his lawyer, the
President has the right, he is entitled to perform the initial
review of those materials so that he may designate as
privileged any he believes covered by an applicable privilege.
No other procedure will ensure, as this Court must, that the
President's privilege is scrupulously protected, and for the
Court to do otherwise would be breaking new ground.

I4GMCOH2

```
1          No court in this circuit has taken that extraordinary
2   step under these circumstances, namely, denying the privilege
3   holder's application to be the initial privilege reviewer of
4   documents created in the course of his legal representation
5   seized from his lawyer by the government pursuant to search
6   warrants.
7          MR. McKAY:  Your Honor --
8          MS. HENDON:  May I continue, please.  I sat for a long
9   time.
10         THE COURT:  He thought you were finished.
11         MS. HENDON:  There has been a lot of discussion and
12  commentary about the President seeking to convert a search
13  warrant into a grand jury subpoena.  I don't understand that
14  argument.  Executing a search warrant and serving a grand jury
15  subpoena are simply two ways to gather evidence from a law
16  office, if that's what you want.  The choice by the government
17  unilaterally to use one rather than the other does nothing to
18  disrupt the fact that it is the client of the lawyer that owns
19  the privilege, and he is, therefore, best place to ensure it is
20  preserved.  The government has achieved its purpose in
21  executing the search warrants here.  They have everything that
22  they chose to take.  The focus now should be on ensuring that
23  the privilege is not invaded, which requires allowing the
24  privilege holder to review the new privilege claims in the
25  first instance.
```

I4GMCOH2

1          The government has not articulated a single reason why

2     they should be able to usurp the privilege holders' rights in

3     this regard.  Let's stop and think about this for a moment.

4     For anyone in the courtroom who has ever hired a lawyer, if

5     criminal prosecutors raided that law office and seized

6     materials relating to your case, how would you react if you

7     were told, you don't get to see those materials, you don't get

8     to make the privilege call.  Don't worry, the government is

9     going to do it for you.  I think what you would say is, well, I

10     am going to federal court because I don't think a federal court

11     in this country is going to permit that government overreach.

12          Not only has the government failed to articulate a

13     single reason why they should be permitted to usurp the

14     privilege holder's role in this process, the reasons that they

15     have given for it betray that they are not equipped for the

16     job.

17          Your Honor does not need to hear from me.  If your

18     Honor wishes to interrupt me with a question, please do.  I

19     have a few more minutes of remarks.

20          THE COURT:  Go ahead.  I want to point out that the

21     attorney-client privilege is based in policy, not the

22     Constitution.  And as Judge Koeltl said in the *Stewart* case, it

23     cannot stand in the face of countervailing law or strong public

24     policy and should be strictly confined within the narrowest

25     possible limits underlying its purpose.

I4GMCOH2

1          MS. HENDON:  I would never disagree with anything

2     Judge Koeltl says, your Honor, but I think that analysis and

3     that point, respectfully, is not germane today.  That analysis

4     is germane when you get my privilege log and I argue to you

5     that something is privileged and you have a view that it's not.

6     You may have reasons and rationales for it is not being

7     privileged in the face of my claim.

8          But I don't think the fact that the privilege is

9     rooted in policy and not the Constitution, and we have not made

10    any constitutional arguments for that reason, I don't think the

11    fact that the privilege is rooted in policy vitiates the

12    argument that it is the privilege holder who owns the privilege

13    and is best situated in the first instance to make those

14    privileged designations.  They can be rejected.  They can be

15    overruled by your Honor.

16         Now, the government, as I said, has given every reason

17    to believe that they are not equipped for this job; that is,

18    substituting for the privilege holder in making initial

19    designations designed to vindicate the privilege.  They have

20    taken the position repeatedly that Mr. Cohen is not a real

21    lawyer, that doesn't provide real legal services.  He is more

22    of a businessman.  They have made representations about how

23    little they expect there to be in terms of privileged material.

24    That may be right, that may be wrong.

25         But any third party holding those views is not

I4GMCOH2

adequately positioned to make privilege calls with respect to
the President's documents.  These are maybe genuinely held
beliefs and they may be rooted in the investigation.  But
someone who holds these views and expresses them publicly
cannot be counted upon by the privilege holder, the public or
the Court, to adequately vindicate the policy interests in the
attorney-client privilege on behalf of the President.

          In addition, until today there has been a tremendous
focus on speed and the need to just get going.  We have to look
at these things.  We have every right to these things.  And,
again, if I were the prosecutor, that might a paramount concern
to me.  But that concern, too, is not consistent with the
careful and deliberate and meticulous attention to whether a
document might be privileged or not.

          I just want to comment on a few or respond to a few of
the points raised in the government's letter of this morning.

          The government argues that we have misunderstood their
review protocol.  We don't at all.  Our point is that the
government should not be reviewing and it has no right to see
privileged materials seized from the law office of Mr. Trump's
lawyer, period.  They have no right to do that and they have
not asserted any authority for their right to do that.  It's
convenient for them to do it because they are holding all the
documents, but that's not a right.  Only the President holds
this privilege.

I4GMCOH2

1          The government relatedly has suggested that we provide

2     them with search terms and filter terms to assist them as they

3     perform their privilege review of Mr. Trump's materials.  But

4     this is such an inferior alternative to what anybody would

5     expect, namely, that the privilege holder would review his

6     materials and identify what he believes is privileged subject

7     to challenge later before the judge.

8          We don't understand why we are hearing from the

9     government, and this afternoon more generally, why there is all

10     this effort, and it feels like contortions, to try to put the

11     government in the shoes of the privilege holder so that they

12     can do what they believe is a fair and controlled review for

13     privilege.

14          The proper way is to proceed is to allow the privilege

15     holder to do that.  It is not a neutral application of

16     privilege law that is called for here.  It is the privilege

17     holder's incentive incentivized, something the government

18     criticized.  It is an incentivized review that needs to be done

19     to assure potentially privileged documents are identified.  And

20     if the President or his counsel have overclaimed, that is

21     subject to challenge.

22          On this topic I just want to raise for the Court sort

23     of the alternative.  The government says, well, the President

24     is incented to overclaim privilege.  As I said, if that

25     happens, there can be challenges and the Court will adjudicate

I4GMCOH2

1    them.

2              THE COURT:  It would appear that he already has

3    asserted an overbroad privilege if, as Mr. McKay said and I

4    think I recall, that every document between Mr. Trump and

5    counsel is privileged.

6              MS. HENDON:  I have not asserted that on behalf of my

7    client.  That's not our position.  I'm unaware of any assertion

8    of privilege by our client in this proceeding.

9              One minute, your Honor.

10             MR. McKAY:  Your Honor, that was the Trump

11   Organization.

12             THE COURT:  Thank you.

13             MS. HENDON:  We made no such claim.  We don't know

14   what's privileged.  The government may be right, we may get

15   these materials, look at them and find 15 documents.  I just

16   don't know.  But no one has made any representations to the

17   Court on this point at all because they are not in a position

18   to do so.

19             While it's always true that the privilege holder who

20   has the incentive to make privilege calls, because it is his

21   privilege, he wants his information kept confidential, if he

22   misdesignates something as privileged or can't sustain that

23   claim, the remedy is the Court rejects the claim and the

24   document is deemed nonprivileged and provided to the

25   government, or whoever the adversary is in the proceeding.

I4GMCOH2

1          By contrast, if the government, by running a host of

2     imaginative filters and search terms because they have no

3     knowledge, no firsthand knowledge of the underlying

4     representation of how Mr. Cohen and --

5          THE COURT:  They have said they are willing to work

6     with you on that.

7          MS. HENDON:  No amount of filters, your Honor, and

8     search terms is going to adequately protect against the

9     possibility that documents are missed.

10          THE COURT:  It's a way to take a first cut so things

11     can get moving.

12          MS. HENDON:  What is left out of the first cut is any

13     number of documents that may be privileged but are never cut by

14     the search terms or the protocols, and they just go to the

15     investigative team.

16          THE COURT:  No, no.  That's not what is proposed.

17     They don't go to the investigative team at that point.

18          MS. HENDON:  I'm talking about materials that are not

19     picked up by the government's filters.

20          THE COURT:  Whatever is picked up by the government's

21     filters, and they think is privileged, that would not go

22     anywhere.  They would meet with you.

23          MS. HENDON:  I understand that, your Honor.  I'll just

24     say one point on that and revert to our sort of threshold

25     argument.  If they find something they think is privileged,

I4GMCOH2

1    they are going to meet and confer with us.  My point is, the

2    way law offices work, if you don't know how a lawyer

3    communicates or what he was supposed to be doing for a client

4    or what he was permitted to share with third parties --

5               THE COURT:  That's what you can tell the government

6    when you meet with them.

7               MS. HENDON:  But there is no filter or search term.

8    If I don't know what the documents say, I can't design filters

9    or search terms --

10              THE COURT:  You are right.  It won't pick up

11   everything, but it would be a first cut to get things moving.

12              MS. HENDON:  If the fact is that the search terms and

13   protocols cannot pick up anything, that leaves a risk that

14   never picked up as part of the cut and the taint review is

15   privileged material.

16              THE COURT:  I think the notion is that you would have

17   a chance to review other documents for privilege, but we would

18   get moving on whether the search terms turn up clearly

19   privileged documents.

20              MS. HENDON:  I have not heard the government say that.

21              THE COURT:  I may have it wrong.

22              MS. HENDON:  Your Honor, all I wanted to do there was

23   just weigh the competing risks between an overincentivized

24   reviewer and a reviewer who doesn't have sufficient facts about

25   the underlying investigations, the underlying representations,

I4GMCOH2

was not a party to the underlying representations and has
interests, you know, that are far from aligned with a privilege
holder to go the review.  You have to weigh those risks and I
think the answer is very clear that the privilege holder should
not be required to take those risks.

        The threshold point in our application, your Honor, is
that the government should not seek privileged documents of the
President.  The President should make his privilege
determinations in the manner that I described and create a
privilege log, as is done every day throughout federal courts
in the country, the government makes its objections, and the
Court rules.

        There is no reason and no authority in a case like
this where the law offices of the privilege holder have been
searched with the Court requiring otherwise of the privilege
holder.  We have objected to a special master because we don't
think a special master has the right to see privileged
documents of the privilege holder.  *Lynne Stewart* requested
that and that was the relief granted.

        We are not requesting that.  We do not want that.  We
do not think a special master will adequately protect the
privilege or the President.  We think that the privilege holder
has to do it.

        THE COURT:  The privilege holder can identify
documents that you are going to contend are privileged, but you

I4GMCOH2

1    don't make the decision as to whether they are privileged.

2              MS. HENDON:  No.  I didn't mean to suggest that, your

3    Honor.  I want to be very clear.  The privilege holder

4    identifies documents over which he claims privilege, and we

5    give the privilege log to the government, they make challenges

6    to your Honor, and your Honor rules.  You will ask me to make a

7    proffer, you will ask for facts, and you will say, I just find

8    that these are not really privileged documents and the

9    documents go back to the government and to the investigative

10   team.  We think that process, where you have one law firm, one

11   client reviewing for privilege, as we do at my firm month in

12   and month out, making a log and getting it to the government is

13   going to be much faster than bringing in another law firm, a

14   special master, and building in layers of process there.

15             It will be faster, it will be more efficient for the

16   Court and the government to work with us on these matters.  But

17   that's a secondary concern for our client.  The primary concern

18   is, he is objecting to anyone other than himself making the

19   initial determination of privilege, the initial claim of

20   privilege.

21             The last thing I wanted to say, your Honor, before you

22   put any questions to me or Mr. McKay speaks is that I do think

23   that a decision for the government in this case sets the wrong

24   precedent.  The search of law offices in this country is an

25   extraordinary event.  The U.S. Attorney's Office manual which

I4GMCOH2

1   applies to all federal prosecutors recognizes this.  The search

2   of law offices in this country should remain an extraordinary

3   event, and a ruling for the government on the facts of this

4   case puts that at risk.

5        When you execute a search warrant at a lawyer's

6   office, you don't just get the documents, were your Honor to

7   rule this way.  It would mean the government doesn't just get

8   the documents.  They get the first crack at reviewing

9   privileged material that at the time that you applied for the

10  search warrant you had every expectation of finding when you

11  executed the search.  That is not something I think that anyone

12  in this room wants to see encouraged.

13       THE COURT:  Thank you, Ms. Hendon.

14       MS. HENDON:  Thank you, Judge.

15       MR. McKAY:  May I, your Honor.

16       THE COURT:  Yes.

17       MR. McKAY:  I think it might be helpful if I start by

18  just clarifying what we are proposing as the filter team

19  protocol, as there appear to be some misapprehension there.

20       First of all, we are not usurping the privilege

21  holder's rights.  With respect to communications between

22  President Trump and Mr. Cohen, if there are any such

23  communications that the filter team takes the view this is not

24  privileged, they will not be turned over to the investigative

25  team until we have either, A, gone to defense counsel or

I4GMCOH2

1    Mr. Trump's counsel or Mr. Cohen's counsel and confirm that

2    they agree with the filter team's determination, or, in

3    extraordinary circumstances in which something about the reason

4    why we think it's not privileged would disclose a nonpublic

5    aspect of our investigation, in that circumstance we might go

6    ex parte to the Court for that determination.  I expect that to

7    be an exceedingly rare, possibly even a null set, but I don't

8    want to say it could never happen.  But in almost any case the

9    filter team would be conferring with counsel for the privilege

10   holder and/or Mr. Cohen about the determination of the

11   privilege.

12        Ms. Hendon expressed some concern that things were

13   going to slip through the cracks if we don't have the right

14   search terms or filter terms.  As the Court pointed out, we

15   would intend to consult with counsel for President Trump about

16   search terms.  If there are things that they can tell us that

17   make the review better, we are happy to do it, but under no

18   circumstances is the suggestion that everything that doesn't

19   hit a search term just, boom, goes over the wall to the

20   investigative team, such that if stuff doesn't hit a search

21   term because of a pronoun, or whatever the hypothetical she had

22   in her brief was, that it automatically goes over to the

23   investigation team.

24        The filter team is still going to review, and in fact

25   review twice, these documents and make privilege calls based

I4GMCOH2

not just on the existence of search terms, but on a review of
the actual document.  This concern about things slipping
through the cracks is not realistic.

I think it's important to emphasize the incentives
again because the privilege holder in any case is going to have
an incentive to be overbroad under the assertion of privilege.
Where Mr. Cohen is now, clearly, obviously, under a criminal
investigation, he is going to have even more incentive to try
to slow down our investigation by dragging things out with
claims of privilege.

By contrast, the filter team at the U.S. Attorney's
Office has every incentive to be conservative in its view of
what is not privileged, which is to say, if the filter team
determines something to be not privileged and passes it over
the wall to the investigative team, the investigative team
reads that document.

We have potential problems down the road, potential
future litigation about suppression or about taint for the
members of the investigative team.  Those are things that we
take very seriously, and you can look at self-interest.  It's
not just because we are trying to honor the privilege, though,
of course, we are, and, of course, we have an ethical
obligation to do so.

It is in the U.S. Attorney's Office's self-interests
to be very concerned about those privilege determinations, and

I4GMCOH2

1    that has a very important practical effect about the amount of

2    litigation that follows and the amount of disputes over

3    privilege that follows because let's say we identify 100

4    communications between President Trump and Mr. Cohen.  It may

5    well be that the filter team for the U.S. Attorney's Office

6    says, you know what, 90 of these are clearly privileged, so

7    let's keep them on the privileged side of the wall and no one

8    ever has to argue about that.

9           We don't have to confer with defense counsel for the

10   President about those, and eight of these have no relevance to

11   our investigation.  Although they might not be privileged,

12   what's the point in arguing with counsel about whether they are

13   privileged so we can pass them over the wall, because they are

14   not relevant, they are not responsive.  Those go into the

15   privileged side of the wall and never get passed over.

16          It narrows the field to only those documents where

17   there is some claim or good-faith claim by the filter team that

18   there is in fact a basis to think this isn't privileged, and

19   these documents are responsive and have relevant importance to

20   the investigative team's case such that it is worth taking the

21   time and the resources and the Court's resources to figure out

22   whether or not this is in fact privileged.

23          If you put the shoe on the other foot and Trump's

24   counsel is reviewing the privileged documents in the first

25   instance, he has got to account for every single potentially

I4GMCOH2

1      privileged document.  Out of that same set of a hundred, he has

2      got to give us a privilege log of 100 documents.

3              I think that sort of segues into the other point that

4      I want to make.  You started by asking counsel how much time

5      will President Trump be able to devote to this endeavor.  She

6      didn't answer the question, but I think the question is

7      obvious.  He's a busy man.  And defense counsel, I suspect, is

8      not likely going to agree to privilege determinations or

9      nonprivilege determinations without consulting her client.  I

10     assume that would be the case.

11             It's going to be very difficult for her to get the

12     President of the United States' time to consult about a

13     privilege log with 100 items on it.  If there are two items in

14     question that the U.S. Attorney's Office has identified, that's

15     going to be much easier to do.  So you couldn't get a

16     commitment on the amount of time it would take other than

17     Ms. Hendon said -- I think she literally said it's going to be

18     a long time, and that is the truth.

19             If it goes that way, if there is a special master or

20     Mr. Cohen or President Trump's counsel is allowed to make the

21     first cut, I think it's going to be an extremely inefficient

22     process, and whatever dates the Court sets are inevitably going

23     to result in requests for more time, more adjournment.

24             I think just, lastly, I want to come back to what

25     Judge Jones said because Ms. Hendon kept talking about how

I4GMCOH2

1    privilege logs are done all the time.  They are done all the

2    time in response to sentences where we already don't have the

3    documents, where we are trying to get the documents.  For

4    reasons that we have set out in great detail in our brief, we

5    determined it was necessary to go by search warrants in this

6    case.  There are very good reasons to do that.  Judge Jones

7    explained that it's not that we are usurping the privilege

8    holders' right.

9              The filter team protocol that was approved in that

10   case that's proposed in this case, it honors the privilege.  It

11   adequately protects the privilege.  But it does so by balancing

12   the privilege against the important public interest in

13   effective law enforcement.  Judge Jones describes that in the

14   *Grant* case, and that's really important here because the filter

15   team protocol, we believe, is more efficient than the

16   alternative.  We think it honors the privilege, but you also

17   have to consider the law enforcement interest here, an ongoing

18   criminal investigation that is going to get derailed by

19   protracted practice litigation.  For that reason, we do think

20   you should rule consistent with common practice in this

21   district.

22             (Continued on next page)

23

24

25

I4G3COH3

1          THE COURT:  Does anyone else want to be heard?

2          MS. HENDON:  May I just reply briefly?

3          THE COURT:  Yes.

4          MS. HENDON:  Thank you, your Honor.  I just, with

5     respect to things falling through the cracks, I want to be very

6     clear about this and I also want to talk about the Judge Jones

7     case briefly.

8          Lets start with the Judge Jones case, I think it's

9     <u>Grant</u>.  In that case, and it is like a two-and-a-half, maybe

10    three-page opinion.  The government searched a nightclub and

11    they searched I think either a personal device or an e-mail

12    account of a gentleman who owned the nightclub, and that

13    gentleman was under indictment or he was a subject of the

14    investigation.

15          And so, we're talking about radically different

16    factual circumstances.  This is where the man worked, so it is

17    a search of his workplace, and it is a search of either his

18    e-mail account or his personal devices.

19          Now, what flows from that in terms of our discussion

20    today.  If I represented Mr. Grant, and the government said

21    let's do a taint review, I could actually sit down with

22    Mr. Grant and say, well, they've got stuff from your business

23    and they've got stuff from your e-mail.  Talk to me about is

24    there an in-house lawyer at your business?  Do you use outside

25    lawyers?  Have you been involved in litigation?  And as for

I4G3COH3

your own personal e-mail or your telephone, who are your

lawyers.

You can sit down when you're not talking about a law

office.  You're talking about a raid of a different place.  A

bank, a pharmaceutical company, a nightclub, you can actually

say to your client, well, looks like the government wants to do

a taint review.  Can we come up with some search terms and

protocols.  And because it is your residence, and your e-mail,

and your personal device, you might say as the client, you

know, it's probably going to be cheaper, and I think the risk

of something getting through is de minimus, given I know what

the legal activities the business has been active in and I know

about my own legal activities.  Then let's turn over a bunch of

protocols and search terms because, hey, I run a nightclub.  I

don't run a law firm.

And in that situation, in almost every situation I can

think of, other than a law office, you can do that.  If you're

representing, you know, Merrill Lynch and you get a subpoena,

you say, all right, let's get the names of all the in-house

lawyers and all the external counsel, and it is Merrill Lynch,

it is a huge organization.  So if we run these terms ourselves,

and make our privilege pull based on the names of lawyers or

the names of disputes we've been involved in, that's a good

pull.  We might miss something, but that's our call.  That's

what we want to do.  We'll do it that way.

1           And this scenario is true of every single case cited

2       by the government.  It is not a law office scenario.  It is

3       somebody who is under investigation.  It is their business, it

4       is their home, it's their personal effects.  And it is not so

5       hard for that individual to make a judgment that here's what we

6       need to know in order for the government to preserve my

7       privilege.  I could see consenting on Mr. Grant's behalf to do

8       that.  Cost is a concern in these cases, too.

9           But, when you seize records from a law office, and I'm

10      representing the President now, he didn't make the things

11      inside that office.  He's not Michael Cohen's law partner.  He

12      doesn't know how they keep their files.  Do they make memos.

13      He also doesn't know who does Michael e-mail all day long when

14      he's doing my work.  And who of the people that he's e-mailing

15      who might look to a taint team review like a third party, who

16      of those people are actually other lawyers working for me.  So

17      it's still privileged even though there's a third party on it.

18          I haven't once mentioned communications between

19      Mr. Trump and Mr. Cohen because I think the government's

20      briefing says there are none to their knowledge.

21          THE COURT:  Well, only with respect to reviewing

22      e-mails.

23          MS. HENDON:  But, correct.  So maybe they've written

24      some -- they've written letters to each other or passed memos

25      back and forth.

I4G3COH3

1          THE COURT:  Or talked.

2          MS. HENDON:  But we're talking about seizing

3    materials.  So there could be a tape recording, your Honor,

4    that's right.  There has been some press accounts of that.

5          But, within a law office, there is so much more

6    potentially privileged material held for a client than just

7    e-mails back and forth or tape recorded telephone calls back

8    and forth with the client.

9          The other thing that the Court should consider here is

10   that there's been a series of representations made by the

11   government, I defer to them on this point, that Mr. Cohen is a

12   very active businessman and he spends a lot of his time, maybe

13   most of his time on business affairs rather than legal, doing

14   legal work.

15         Now, I and my colleagues, we're criminal defense

16   lawyers and litigators, and we are thinking about the

17   attorney-client privilege just all day long when we're working

18   and preserving privilege.

19         One of the things I worry about, and I cast no

20   aspersions with respect to Mr. Cohen who I've never spoken to

21   before saying hello before today.

22         What if he's gotten on his e-mail and relayed things

23   in e-mail, "the President wants this," "the President's top

24   concern is that," that he had no authority to relay.  Now, my

25   client hasn't waived privilege over the communications that are

I4G3COH3

1   embedded in that e-mail.  My client picked up the phone and

2   said, "Michael, I'd like you to do this for me, it's very

3   important, it has to happen by the end of the day."  If

4   Mr. Cohen wrote an e-mail or had some other communication with

5   someone, not my client, in which something my client had

6   relayed to him in confidence gets embedded, you know, my client

7   would want to assert privilege over that.

8            The problem here is everything is capable of slipping

9   through the cracks.  Because unlike <u>Grant</u> and unlike every case

10  in the government's papers, where you're talking about

11  someone's residence or their business or their own e-mail

12  account or their own phone, the privilege holder in this

13  instance just doesn't know what's there.  And he doesn't know

14  how his communications with his lawyer have been handled by

15  that lawyer.

16           And so, if you think about the taint team trying to

17  attack this, the taint team or a special master is even further

18  removed from what actually happened between the attorney and

19  the client.  They're even less likely to be able to pick up on

20  what is actually privileged material going out the door in an

21  unauthorized fashion.

22           So, you know, it cannot be that the privilege holder

23  has to identify every conceivable harm and wrong that can flow

24  from a taint process.  But I hope the Court is satisfied by the

25  ones I've proffered when it is a law office, the privilege

I4G3COH3

1  holder doesn't work there, doesn't know what's in there, hasn't

2  seen the stuff that was seized.  There is a tremendous risk

3  that privileged material will not be recognized as such.  It

4  may not be recognized, it may not be recognized as such by me

5  as the president's counsel.  But at least in that case I can

6  tell my client, you know, that's on me.  We got the documents,

7  the Court ruled for us, and I missed something.  But that's on

8  us.  That's an issue between him and me.  That's not we let the

9  government make these calls for you, and the government is so

10  good at so many things, but they are not best situated or even

11  adequately situated to the task I'm talking about.

12        THE COURT:  But your premise is wrong.  They will talk

13  to you and learn from you.

14        MS. HENDON:  But your Honor, I'm telling you I don't

15  know what's in the documents because I haven't seen them, and I

16  don't know how the -- my client doesn't know what was generated

17  inside that firm.  There is nothing for me to share with --

18        THE COURT:  May I ask you to use the microphone for

19  the overflow courtroom.

20        MS. HENDON:  I'm so sorry.

21        There's nothing for me to engage with Mr. McKay on,

22  because as I'm standing here before your Honor, I'm presenting

23  hypotheticals that I hope will persuade you and maybe even the

24  government of the risks here.  I'm not describing things I am

25  aware of.  I have no knowledge and no way of acquiring

I4G3COH3

1    knowledge of what it is I should then go discuss and engage

2    with Mr. McKay on.  I have nothing to tell him.  Because I

3    don't know how Mr. Cohen ran his office, kept his files,

4    recorded things my client said to him.

5          THE COURT:  You're getting into areas that we really

6    don't need to deal with now.  What we need to deal with now is

7    what are the next steps.  How do we get this under way.

8          MS. HENDON:  Well, your Honor, I do appreciate that

9    and I thought I was.  What I'm addressing is the inadequacy of

10    what the government would like the next step to be.

11          THE COURT:  I've heard you.

12          MS. HENDON:  Okay.  May I have one moment, your Honor?

13          THE COURT:  Yes.

14          (Pause)

15          MS. HENDON:  I have nothing further.  Thank you, your

16    Honor.

17          THE COURT:  Thank you.  Mr. McKay.

18          MR. McKAY:  I'll be brief, your Honor.  The concerns

19    that Ms. Hendon just raised are in large part why we focused in

20    our papers, and I think this focus has been borne out, about

21    the limited nature of Mr. Cohen's law practice.

22          If you look at the Grant case, yes, it is not the

23    search of an attorney's office.  That's why it is important to

24    know that the volume of privileged materials involving

25    Mr. Cohen in actual legal practice is smaller.

I4G3COH3

1          Ms. Hendon repeatedly said that she just doesn't know,
2     she doesn't know what's there.  She doesn't know how many
3     documents there are.  I think that's actually fatal to her
4     argument that this is any different than Grant.  As we've said,
5     from the e-mails, from the United States Attorney's Office's
6     search warrants, we know of no communications between President
7     Trump and Mr. Cohen.  It may be that this is an exceedingly
8     small set.  So it may be that this is just like Grant.
9          So Ms. Hendon can't really, having not talked to her
10     client, or talked to Mr. Cohen and gotten any actual facts
11     about this, really make the assertion that this is different
12     than Grant because she just doesn't know.  She said herself
13     about five times.
14          The concern that President Trump can't figure out what
15     is in Mr. Cohen's files doesn't seem like a big problem here
16     where Mr. Cohen is sitting at the table, is clearly zealously
17     asserting his client's interest.  And I think Ms. Hendon's
18     proposal was that she be consulting with Mr. Cohen's counsel
19     about these privilege determinations.  So the question that
20     President Trump can't navigate Mr. Cohen's files rings hollow.
21          The bottom line point she's making, I understand it to
22     be, that the privilege holder is the only one who can truly
23     honor the privilege.  And if that is true, then that is true in
24     every single case where attorney-client privileged materials
25     are seized.  It is not just attorneys law offices.  It is cases

I4G3COH3

like Grant where someone has consulted with a lawyer.  It is

any defendant or suspect or subject of investigation who has

consulted with a lawyer in the past.

    But that's not how practice works in this district.

It is not any single time there is attorney-client privileged

communications seized during a search warrant, all the

materials get passed back to the privilege holder to make the

initial review.  That's because having the privilege holder

make the initial review is not the only way to honor the

privilege.  As courts have repeatedly held, the filter team

protocol adequately represents the privilege and balances it

against the important government interests at stake as well.

    MR. HARRISON:  Very --

    MS. HENDON:  May I just --

    THE COURT:  Yes.

    MS. HENDON:  Thank you.  It's not the case that I or

the President couldn't confer with Mr. Cohen and gain insight

into how he ran his office and what might be privileged.

That's exactly what I'm proposing the Court permit us to do.

We certainly cannot do that without the documents.

    THE COURT:  Well, Mr. McKay, could you remind us all

what is still in Mr. Cohen's office.

    MR. McKAY:  Yes.  That the electronic devices or most

of the electronic devices.  I think the cell phones we have

physical custody of.  Most of the electronic devices -- and I

I4G3COH3

hear the back table saying that's not true.

I'll be clear.  As I said earlier, because of the pendency of this litigation, I haven't had a full conversation with the taint agents who did the search and seizure.  I haven't actually looked at the search warrant returns because we're being very cautious about not letting anyone on the investigative team get into that information.

But to be clear, my understanding is that most of the electronic devices were imaged on site so that Mr. Cohen and President Trump could in fact look at what they have.  And to the extent that they don't still have it now, the filter protocol contemplates that if we are designating things between them as not privileged, we're going to provide them with the copies.  So at the time that they need to make the determination to weigh in on the question of privilege, they're going to have copies, even if they don't already have it now.

MS. HENDON:  The only point I want to make, and then I'll be seated, your Honor, is that the prosecutor keeps referring to every other case, every other case.  What happens and what has been done in every other case.  And this is just isn't those cases.

We stated very clearly in our papers that there is no case that presents the facts of this one.  This is an extraordinary case.  This is a case of first impression for this Court.

I4G3COH3

1          The fact that there have been taint teams agreed to or

2     put in place in other matters simply means that taint teams are

3     sometimes used.  That is not authority for the Court deciding

4     the particular question here, which is whether a taint team can

5     vindicate the privilege -- pardon me, which is whether, where a

6     privilege holder asserts the right to perform the first review

7     of materials seized by the government from his lawyer's

8     offices, the Court may direct instead that government agents do

9     so.  Thank you.

10          THE COURT:  Thank you.

11          MR. HARRISON:  Very, very briefly, your Honor.  Three

12     things.  One is Mr. McKay said a couple times we have access to

13     all the electronic media, we don't.  We simply don't.  I don't

14     know if your Honor --

15          THE COURT:  What do you have access to?

16          MR. HARRISON:  Not much, Judge.  Mr. McKay said -- I

17     encourage the Court to look at the search warrant returns and

18     see there is a number of cell phones, a large amount of cell

19     phones as Mr. McKay said.  There is also a bunch of drives,

20     electronic drives that were taken that we don't have.

21          Two, Mr. McKay said several times that we were going

22     to be inefficient if the Court allows us to do it.  The one

23     example of something that's happened so far in this case is I

24     think we're pretty efficient.  We filed our papers on Thursday

25     evening, we showed up in front of the Court on Friday at 10:30.

I4G3COH3

1   The Court ordered us to do something, we did it over the

2   weekend and we've resolved those issues by Monday.

3          If the Court allow us and the privilege holders to

4   have the materials, to have copies of the materials and do the

5   first cut, we'll do a similarly efficient job.

6          THE COURT:  There is no question but you're going to

7   get a set of the materials.  But you're not going to take away

8   what the government has.  Go ahead.

9          MR. HARRISON:  We have never suggested that we should

10  take it.  They should obviously keep, however you want to

11  describe, the master copies.  But I think the privilege holder

12  should get to do the first cut.  It is not quite clear,

13  Mr. Cohen is the privilege holder also for some of these

14  documents and communications we believe.  I think we've made

15  clear.  He was the client for certain attorneys and we put that

16  in our papers.

17         Lastly, Judge, I'll just say there has been good

18  arguments made here today.  The balance of the equities we

19  think should be with the American citizen whose stuff was

20  taken.  That's been swept up in a search warrant.

21         The privilege holders know and the lawyer in this

22  instance know the documents best.  Know the relationships best.

23  Know which relationships are privileged and which are not.

24  We're really best placed to look at these materials.  There is

25  no exigency problem.  As the Court pointed out, the

I4G3COH3

1    government's already got the documents.  They're not going to

2    go anywhere, and I think that's the best way to approach this,

3    your Honor.

4              THE COURT:  Thank you.  Would anyone else like to be

5    heard on this?

6              MR. McKAY:  Just one last point, your Honor.  The

7    American citizen whose materials were taken was someone who a

8    magistrate judge found probable cause that he had evidence of

9    crimes in his possession.

10             The efficiency example that they moved quickly over

11   the weekend, I would debate that they answered your questions

12   fully by this morning.  But in any event, their incentive this

13   weekend is they want a TRO to stop the government review.  The

14   second the review is stopped and a special master or whatever

15   other remedy the Court orders takes place, their incentive

16   flips.  Their incentive is to delay an ongoing criminal

17   investigation.

18             THE COURT:  All right.  Would anyone else like to be

19   heard?

20             MR. FUTERFAS:  Good afternoon.  Very briefly.  I'm not

21   going to weigh in on the able arguments of my fellow counsel

22   here, whether your Honor approves of a special master or

23   approves the proposal suggested by Ms. Hendon.

24             On the Trump Organization's side, all we request is

25   that we at some point be afforded a copy of the Trump

I4G3COH3

Organization related materials, whether we get it from the

government, whether we get copies made from Mr. Cohen's firm or

Mr. Ryan's firm receives.  And the reason we want them,

obviously, is because we can go through, and quite frankly, we

can help the government make privilege determinations.  And we

can weigh in, whether it is the special master or whoever is

going to take the charge based on the procedure and the

protocol that your Honor finally puts in place.

The reason I say that is Mr. Cohen worked within the

Trump Organization for 10 years.  He touched all kinds of

matters.  There were negotiations, litigation matters, IP,

intellectual property matters, a whole range of things for the

course of 10 years.  Mr. Ryan has asserted to your Honor that

there are Trump Organization materials that were seized or

found in his possession at the time.  Okay.  And all we want to

be able to do is weigh in with whoever is going to be making

those privilege determinations pursuant to your Honor's

direction, whatever process or procedure your Honor puts in

place.  Because those can be complicated.

Just giving you a quick hypothetical.  If Mr. Cohen,

for example, is sending an e-mail to an individual, the

government may not realize or the special master may not

realize or whoever is doing this initial cut, so to speak, may

not realize who that individual is.  Is that individual

co-counsel in another case, are they a lawyer in a different

I4G3COH3

1    firm that has a common interest privilege.  Are they a limited

2    partner in a deal that's potentially covered by the

3    attorney-client privilege.  I mean, there are so many different

4    permutations that could occur, and without having some basis of

5    knowledge to assist whoever is making that determination, we

6    want an opportunity to weigh in and say here's the body of

7    material that related to our company that was found at

8    Mr. Cohen's office, we go through it, we look at it, we make

9    our own determination, and then whoever we have to interface

10   with, whether it is a special master, whether it is your Honor,

11   whether it's a taint team, whatever it is that your Honor

12   eventually determines is the process, we just want the

13   opportunity to do that.

14          And I think it is also for that reason that we do, and

15   I stated in my letter of this morning, we do obviously support

16   the idea, either of the ideas suggest by Ms. Hendon or the

17   proposal made by Mr. Ryan and his firm, that they get the

18   materials and they do a cut of the Trump Org materials, send it

19   to us, we could then weigh in, and we think actually that would

20   greatly expedite the process.

21          If the government has to look at a piece of paper and

22   try to figure out who is the individual on the other side of

23   that e-mail, are they a lawyer, are they a doctor, are they a

24   friend, who are they, where do they fit in, that's a very

25   time-consuming job that the government will have.  We could

I4G3COH3

1    actually kind of help that process forward, whoever we're

2    dealing with.

3             And that's all I would add, your Honor.  Thank you.

4             THE COURT:  Thank you.  Does anyone else wish to be

5    heard?  All right.

6             I have faith in the Southern District U.S. Attorney's

7    Office that their integrity is unimpeachable.  I think even

8    Ms. Hendon, who worked there at one time, agrees.  So I think

9    that a taint team is a viable option.

10            In terms of perception of fairness, not fairness

11   itself, but perception of fairness, a special master might have

12   a role here.  Maybe not the complete role, but some role.

13            My interest is in getting this moving efficiently and

14   speedily.  So what I'd like to do is first have us reconvene

15   when the government has finished its designation of everything

16   and can hand over to opposing counsel copies of it.  I don't

17   know, Mr. McKay, if making copies and handing it over is a

18   time-consuming process.  So, I'll leave it to you to tell me

19   when we should next convene.

20            MR. McKAY:  Your Honor, it may be that, as I

21   mentioned, I haven't talked in detail to the filter team or

22   filter agents about the specifics in terms of number of devices

23   and volume.  So it might be that I should go back, have that

24   conversation, and then write in to the Court with a more

25   precise estimate of how quickly we would have copies of

I4G3COH3

everything.

I would, as I mentioned earlier, I suspect it is going to be the case that we would be able to do this most efficiently on a rolling basis. Probably be able to give the large majority fairly soon, and there may be a few devices that are more difficult to extract that would take longer. We wouldn't want to hold the process up for those devices. So it may that be we say we're going to have a large majority in a week and then the rest hopefully two, three weeks, whatever the case may be. But we can provide the Court with a more specific estimate.

THE COURT: Thank you. And my view is that we would meet at that point, we would know the volume of the documents, opposing counsel will have seen the documents and other items, and we can make a much more intelligent choice of whether the government taint team should handle this or whether a special master should handle part of it.

And I would want opposing counsel to move very fast in terms of, if you're getting things on a rolling basis, I would want you to keep up with the government just as I would want the special master to keep up with everyone, if there is a special master.

What I envision is sort of a test. As soon as you've seen the documents, I'll want to hear your proposals for how we can move fast.

I4G3COH3

1          MS. HENDON:  May I ask a question, your Honor?

2          THE COURT:  Yes.

3          MS. HENDON:  Is your Honor ruling against Mr. Trump's

4     application for a TRO?

5          THE COURT:  I was about to --

6          MS. HENDON:  And preliminary injunction?

7          THE COURT:  I was about to get to that.

8          I'm denying the motion for a TRO because it's

9     currently moot.  The government is not accessing anything,

10    other than to copy it and number it for you.

11         With respect to a preliminary injunction, that I think

12    is premature at this point.  We have to wait and see what the

13    volume is and how you can argue.

14         MS. HENDON:  Okay.  So your Honor, just so I'm very

15    clear on what I'm going to be doing in the next 24 hours.  Your

16    Honor has denied the TRO, but you have not denied the

17    preliminary injunction.

18         THE COURT:  Right.

19         MS. HENDON:  And may I request two things.  That your

20    Honor please either confirm with the government that they will

21    continue to not -- to agree voluntarily not to review the

22    material, other than pulling it together for the parties, and

23    two, that the material be provided in a reasonably accessible

24    and readable manner.  Because I and my partners have received,

25    you know, productions of forensically imaged material that it

I4G3COH3

1    then takes us three weeks and the hiring of technical experts

2    to sort of open up and extract data.  This is a very big

3    problem.

4            THE COURT:  I hear you.  And I think Mr. McKay will

5    need to go back and talk to his people with respect to what

6    he'll be able to give you.

7            But on the first point, Mr. McKay, how do you respond?

8            MR. McKAY:  Yes, your Honor.  So, we are not going to

9    start reviewing the documents substantively during the pendency

10   of these proceedings while we await your determination.  So as

11   you said, the TRO is moot from that respect.

12           THE COURT:  Yes.

13           MR. McKAY:  Though I just want to clarify our ability

14   to do a few things so there is no suggestion that we've

15   breached that agreement.

16           The first is, of course, for the purpose of actually

17   getting all these documents in the database and in a place

18   where we can give them to counsel, we're permitted -- the

19   filter team is permitted to scan the physical documents into

20   our database and take the electronic documents and put them all

21   into the database.  This doesn't contemplate substantive

22   review, just the mechanical process of getting this in a format

23   where everyone can easily read it.

24           THE COURT:  Okay.  I think that's reasonable and meets

25   Ms. Hendon's concern, I hope.

I4G3COH3

1      MS. HENDON:  It does, your Honor.  I just add one

2 thing because I don't know this for a fact, but it may be

3 likewise difficult and costly for the government to take the

4 various media they've seized and put it into reasonably

5 accessible format for us.

6      I would just suggest as an option for the government's

7 consideration, if they have the data, if they decide to sort of

8 have the data up on a site for their own review, there are ways

9 to make others have access, with walls all in place, to that

10 same website or database.  This is entirely up to the

11 government, but it would alleviate their need to be pulling

12 apart forensic images for us.  If they have it uploaded in a

13 nice way where you can search and read documents and they're

14 willing to give us access, that's fine with me.

15      MR. McKAY:  Your Honor, we'll speak to counsel about

16 the most efficient way, system-wise, to give these documents to

17 them.

18      But one related point regarding the scope of our

19 ability to manipulate these documents at this point is that I

20 take the Court's direction to be we should be providing a copy

21 of all of the documents seized from Mr. Cohen to Mr. Cohen.

22      THE COURT:  Yes.

23      MR. McKAY:  With respect to President Trump, I think

24 we would object, and I suspect other clients of Mr. Cohen might

25 object to us producing documents that are either personal

I4G3COH3

1    documents of Mr. Cohen, or documents relating to other clients

2    to President Trump.  It is often the case where we produce a

3    subset of seized documents to the individual that is affected

4    by that subset of documents.  And I think that might be

5    particularly useful here, not just because of privacy interests

6    involved for third parties, but also because I took from the

7    back and forth earlier that one possible route the Court was

8    considering was employing a special master for the specific

9    purpose of reviewing documents, communications that might

10   potentially be attorney-client privilege as to President Trump.

11        So, I think if that's an option the Court is

12   considering, having the special master focus on that universe

13   of documents as opposed to all of the documents seized during

14   the searches, it would be important for us in the process of

15   production to try to determine what the field of documents that

16   could be turned over to President Trump is.  So that not only,

17   like I said, we're protecting the privacy interests, but also

18   Ms. Hendon can make a more accurate assessment of what the

19   privilege log turnaround time for her would be.

20        There has been a lot of discussion here, it may be

21   that's actually a very small number.  And so if it's really

22   truly very small, it is going to fundamentally alter the debate

23   from a circumstance where we've given everything to President

24   Trump, and now we're not sure what the volume that applies to

25   him is.

I4G3COH3

1          THE COURT:  What is the best way to sort that out.

2     Would it be for Mr. Cohen to decide what to share with others?

3          MS. HENDON:  That is what we urge the Court to permit.

4     I do not want the government doing anything to segregate

5     documents of Mr. Trump while we're in this initial very modest

6     phase of working with the Court on how we get to the end of

7     phase.  If you understand my point.

8          I think all we're doing now is get a full set of the

9     materials in a readable, searchable form to Mr. Cohen.  The

10    government has agreed not to search or review any of the

11    materials.  I will work with counsel for Mr. Cohen to ensure

12    that I receive documents pertinent to Mr. Trump's applications.

13    I do not want the government taking any steps to make cuts like

14    that, please.

15         THE COURT:  Do you wish to be heard?

16         MR. HARRISON:  Yes, your Honor.  I just join

17    Ms. Hendon in that application.  It sort of makes sense, we can

18    get stuff back and we know working with the privilege holders

19    how best and quick to get it back to them.

20         THE COURT:  All right.

21         MR. McKAY:  Your Honor, our concern with that is that

22    if we come back in two weeks, whatever the case may be, and

23    we -- I guess I'm confused about what Mr. Cohen's proposal is

24    in terms of what will happen.  He is, once he gets the copy,

25    going to make his estimate of how many of those could properly

I4G3COH3

1    be provided to President Trump?

2              THE COURT:  I believe that's the proposal.

3              MR. HARRISON:  In close consultation with Ms. Hendon

4    for Mr. Trump, yes.

5              MR. RYAN:  And T.O.  We'll do it with all of the

6    organizations, your Honor.  We will make that determination and

7    we agree that the government won't be searching for that.  And

8    if they give us the material 10 days from now, as soon as we

9    can begin the review, after that, we'll begin to turn it over

10   on a rolling basis to the other organizations, and we can

11   prioritize as well.

12             THE COURT:  Roughly how many hours a week are you

13   prepared to spend, the law firm?

14             MR. RYAN:  I think it really depends -- I am assuming

15   it is going to take 10 days, based on the representation the

16   United States Attorney's Office made before they flow us the

17   first set of materials.  If it's shorter, we'll begin work

18   shorter.  I think what happens is, when we see what we've got,

19   and the volume, first of all, that will be very helpful to

20   understanding how difficult the task is or how much labor would

21   be necessary.

22             But, candidly, the technology has changed so much that

23   there are many things we can do.  We have a discovery center.

24   We are 1,000 lawyers.  We have a discovery center that are

25   skilled in these kind of activities.  And a boutique law firm

I4G3COH3

1    would not have that technology array.  They have the better

2    brains perhaps, but not the technology array that we have.

3         So we'll work this as hard as we have to, to satisfy

4    the Court that we are giving it all of the energy that the

5    Court would direct us to do.

6         So, I would say that if you schedule your hearing to

7    talk more about this, that you do that giving us at least 10

8    business days post the time, so we can come in and give you an

9    interim report on that.  We'll in that 10 business days only

10   begin to flow it to T.O., to Trump Organization or the

11   President, President's counsel, you know, maybe the eighth day

12   before we can turn stuff over to them that they can start

13   looking at.  And I think we could, you know, if the Court wants

14   to do this in a graduated fashion, I think we can meet the

15   Court's needs and convince the Court that we're working

16   expeditiously on this.

17        THE COURT:  I'm wondering whether you should meet

18   again to consider search terms.  Meet and confer to try to get

19   a set of search terms that can speed all of this up.

20        MR. McKAY:  Your Honor, I think it would make sense to

21   do this in parallel.  Which is to say, we can speak, we will

22   expeditiously create copies of all the material and get it over

23   to Mr. Cohen's counsel.  Once they have it, they should be

24   given a very prompt turnaround.  They have 1,000 lawyers, they

25   have lots of resources to make their estimate of what the

I4G3COH3

universe of documents is that should be provided President

Trump for his review, what the universe is to the Trump

Organization, to any other clients they wish to identify.

But in parallel, I think, in fairness, we should be

able to have the filter team run a purely mechanical search

term evaluation so that we're not left trusting, with respect,

trusting their estimates of the volume of materials.  Which is

to say our filter team would run simple mechanical keyword

searches to see, for instance, how many to from e-mails involve

a particular client.  Or how many times a particular search

term or series of search terms hit on a particular client.

Then, when we come back to court shortly thereafter,

we've got an estimate from Mr. Cohen's counsel, an estimate

from the government, of what the volume of each subset of

documents is.  We may not agree, I'm sure we won't because our

search terms may differ slightly, and we can discuss what

appropriate terms would be.  But I think it make sense to have

two estimates and I think what I'm proposing is mechanical.  It

is not our review team going through documents and making

substantive determinations of privilege.  It is trying to get a

sense of how many e-mails with President Trump, how many

documents that will hit on search terms that are indicative of

privilege.

When we're back in court, we can make a more educated

determination of should a special master be appointed at all or

I4G3COH3

1    should it be appointed for some subset of the documents.

2              THE COURT:  Thank you.

3              MR. HARRISON:  Just --

4              THE COURT:  Have your teams had a chance to consider

5    names of special masters?  I know that Mr. Harrison said last

6    time he already had someone in mind.

7              MR. RYAN:  Could we do that tomorrow?  Submit the four

8    names to you?  I think we need overnight to do that.

9              THE COURT:  All right.

10             MS. HENDON:  Your Honor -- I'm sorry, Mr. McKay.  I

11   don't on behalf of the President consent to the government

12   running mechanical searches.  It seems the argument is that

13   they want to do that so they can trust the credibility of

14   representations that are being made by, I don't know, the law

15   firm --

16             THE COURT:  No, I don't think so.  They're doing it to

17   estimate the amount of time needed.

18             MS. HENDON:  But, well, I heard something different,

19   your Honor.  I'm not saying it is an improper concern for the

20   government to have necessarily if they want to say that.  But I

21   don't consent to mechanical searches designed to pull up volume

22   numbers of documents that might relate to Mr. Trump or not.

23             THE COURT:  If no one is reading them, I don't think

24   that your objection is well taken, so I overrule.

25             MS. HENDON:  Can we get an agreement on just

I4G3COH3

1   confirmation -- I'm not sure what a mechanical search is, your

2   Honor.  I do searches so that I can pull up subsets of

3   documents for purposes in my work.

4           THE COURT:  So I'll ask Mr. McKay to describe it.

5           MR. McKAY:  So, in the database we have, we can

6   search, for example, if it is just e-mails, we can search any

7   e-mail to and from JudgeWood@UScourts.com.  And that will say,

8   oh, there were 332 e-mails exchanged with Judge Wood.

9           With documents, it is a little more complicated.  But

10  you can use -- because you don't have a to from header that so

11  easily sorts.  You can still use search terms that whenever a

12  document hits on that search terms, you can create statistics

13  for how many responsive hits you get.  You plug in the search

14  terms and up comes the responsive list, and then the program

15  records that number.

16          THE COURT:  All right.  And with respect to search

17  terms, it seems to me that it might be helpful for the

18  government to tell opposing counsel what you propose and see if

19  they, within 24 hours, want to propose something else.

20          MR. McKAY:  Right.  And that would be, again, search

21  terms specific to individuals or entities with whom there is

22  some reason to think there may be an attorney-client

23  relationship.  So right now I think we've got four.

24          MS. HENDON:  Your Honor, that's over our objection.

25  And I'm sorry, your Honor.  I just lost my train of thought.

I4G3COH3

1            THE COURT:  Take your time.

2            MS. HENDON:  Yes.

3            THE COURT:  Take your time.  You can stand up again.

4            MS. HENDON:  I will, thank you.

5            I'm sorry, your Honor.  I remember what it was.  I

6     don't think those numbers that are generated, volume of

7     documents for a particular privilege holder should leave the

8     taint team.  I think that should be shared with --

9            THE COURT:  I'm sorry.  I'm not sure I understand what

10     you're saying.

11            MS. HENDON:  I don't think the investigative team

12     should be told -- I assume these searches are going to be run

13     by the taint team.

14            THE COURT:  Yes.

15            MS. HENDON:  I don't think the investigative team

16     should be told what the volume of documents is that are pulling

17     up a Trump --

18            THE COURT:  You don't intend to do that, do you?

19            MR. McKAY:  No, we do.

20            THE COURT:  To give it to the investigative team?

21            MR. McKAY:  Yes.

22            MS. HENDON:  He is the investigative team, your Honor.

23            MR. McKAY:  There is nothing privileged about a

24     statistical random -- computer-generated number of how many

25     e-mails there are in a database.  There is nothing privileged

I4G3COH3

1    about that.  It is the same concept as why an attorney-client

2    list is not privileged.

3          THE COURT:  That's not privileged.  I'm just wondering

4    how useful it is at that point.

5          MR. McKAY:  I think it is only useful to the extent

6    that what we're trying to decide is volume for purposes of

7    appointing a special master.  Obviously if there is 1,000 hits

8    to a particular search term, that doesn't mean there is 1,000

9    privileged documents.  It just means we're giving President

10   Trump 1,000 documents, and so now we know how long it is going

11   to take Ms. Hendon to do her privilege review.  If it is 20,000

12   documents, now we know we might have a different story.

13         THE COURT:  Right.

14         MS. HENDON:  I just note my objection to this, your

15   Honor.  Thank you.

16         THE COURT:  Okay.

17         MR. HARRISON:  Mine too, Judge.  I would say the proof

18   will be in the pudding.  It will all come out in some way at

19   the end.  I don't know it is necessary.

20         THE COURT:  I'll allow the government to do it over

21   objection.  All right.

22         So you'll have each have four names for me of a

23   possible special master, and I'm not deciding now that I'll

24   appoint one.  But I'd like to have in mind who might have

25   enough time if we need to appoint one.

I4G3COH3

1        MR. RYAN:  Yes, ma'am.

2        THE COURT:  One moment.

3        The parties have disputed whether the search, well, I

4   think the press disputes whether the search warrant should be

5   sealed.  I think I ruled on it last time.  But I would say that

6   I haven't seen anything to change my ruling that the warrant

7   and the portions of the application need to remain under seal

8   in the interest of allowing the prosecutors to do their work

9   expeditiously, and not to embarrass or taint individuals who

10  are innocent.

11       MR. BALIN:  Your Honor, may I just respond that I will

12  consult with my clients about whether they want to make a

13  written application or not?

14       THE COURT:  That's fine.  Thank you.  All right.  Is

15  there anything we should take up?

16       MR. McKAY:  Your Honor, can I just make sure I have

17  crystal clear the next step now, which is that we're going to,

18  first of all, the U.S. Attorney's Office will confer with the

19  filter team and the folks at the FBI who have the ability to

20  give us a better estimate of the volume.  And we're going to

21  write to the Court with our best estimate of how soon we can

22  have copies over to Mr. Cohen's counsel.  And we're happy to do

23  that by I think perhaps either end of the day tomorrow might be

24  a good deadline or perhaps even early Wednesday.

25       THE COURT:  All right.  Early Wednesday certainly

I4G3COH3

1   sounds soon enough.

2          MR. McKAY:  Okay.  And in the interim, we're happy to

3   put in that letter our proposed names for a special master and

4   we'll do that.

5          And the last thing was just I suppose we should meet

6   and confer with defense counsel about potential search terms.

7   And we can do that before we file our letter on Wednesday.  And

8   to the extent that any issues may arise out of that, we'll

9   notify the Court.

10         THE COURT:  All right.  And then when all counsel have

11  decided it will be fruitful to meet, you will let me know.

12         MR. McKAY:  Yes, your Honor.  And I guess we'll confer

13  with defense counsel about that as well, and hopefully we can

14  propose a date.

15         THE COURT:  Okay.  Is there anything else we should

16  take up?  All right.  Thank you very much.  We are adjourned.

17         (Adjourned)

18

19

20

21

22

23

24

25